## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TRAFINNA WILSON,

               Plaintiff,

        v.

CHRISTIANA CARE HEALTH
SERVICES, INC.,

               Defendant.

C.A. No. 06-CV-00705 (MPT)

---

### DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION
### FOR SUMMARY JUDGMENT

---

David H. Williams (DE 616)
James H. McMackin, III (DE 4284)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
P.O. Box 2306
Wilmington, DE  19899-2306
302.888.6900
dwilliams@morrisjames.com
jmcmackin@morrisjames.com

Michael J. Ossip (admitted pro hac vice)
Sean W. Sloan (admitted pro hac vice)
Yordanos Teferi (admitted pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
215.963.5761/5084
Fax:  215.963.5001

Attorneys for Defendant Christiana Care
Health Services, Inc.

Dated: January 11, 2008

# TABLE OF CONTENTS

**Page**

I.     NATURE AND STAGE OF THE PROCEEDINGS ............................................. 1

II.    SUMMARY OF ARGUMENT ......................................................................... 1

III.   INTRODUCTION .......................................................................................... 2

IV.    STATEMENT OF UNDISPUTED FACTS ....................................................... 2

    A.     Plaintiff's Employment With Christiana Care ............................................ 2

    B.     Plaintiff's Repeated Violations of Christiana Care Policy ......................... 4

        1.     Christiana Care's Policies ................................................................. 4

        2.     Plaintiff's Violations of Christiana Care's Policies ..................... 7

            a.     Initial Counseling About Internet Usage ........................... 7

            b.     Plaintiff's Lateness ............................................................. 8

            c.     Plaintiff's DML for Excessive Personal Telephone Calls ................................................................................... 10

            d.     Plaintiff's Termination From Employment ..................... 14

    C.     Plaintiff's Unsuccessful Appeal Through the Peer Review Process ....... 18

V.     ARGUMENT ................................................................................................. 19

    A.     Summary Judgment Standard .................................................................. 19

    B.     The Legal Framework .............................................................................. 20

    C.     Plaintiff's Gender Discrimination Claim Fails Because It Lacks Any Factual or Legal Basis ..................................................................... 23

    D.     The Court Should Grant Summary Judgment As To Plaintiff's Race Discrimination Claim, As Plaintiff Cannot Demonstrate That The Legitimate, Non-Discriminatory Reason For Her Termination-Her Admitted Policy Violations-Is Pretextual ......................................... 24

    E.     The Court Should Grant Summary Judgment On Plaintiff's Claim For Breach Of The Covenant Of Good Faith And Fair Dealing ............. 30

VI.    CONCLUSION .............................................................................................. 32

# TABLE OF AUTHORITIES

## CASES

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986)............................................................................20

Boykins v. Lucent Tech., Inc.,
78 F. Supp. 2d 402 (E.D. Pa. 2000)
aff'd, No. 00-1087, 2002 WL 402718 (3d Cir. February 4, 2002) ................................20

Bray v. L.D. Caulk Dentsply Int'l,
No. 98-441-SLR, 2000 WL 1800527 (D. Del. July 31, 2000) ......................................27

Brewer v. Quaker State Oil Refining Corp.,
72 F.3d 326 (3d Cir. 1995)............................................................................27

Bruton v. Diamond State Tel. Co.,
623 F. Supp. 939 (D. Del. 1985)............................................................................20

Celotex Corp. v. Catrett,
477 U.S. 317 (1986)............................................................................19, 20

Conneen v. MBNA Am. Bank, N.A.,
182 F. Supp. 2d 370 (D. Del. 2002)
aff'd, 334 F.3d 18 (3d Cir. 2003)............................................................................31

Cooper v. Binney & Smith, Inc.,
No. 96-6230, 1998 WL 103302 (E.D. Pa. Feb. 26, 1998) ............................................27

Davis v. Ashcroft,
Civ. No. 00-584, 2002 WL 1065686 (D.N.J. Mar. 8, 2002)............................................27

E.I. DuPont de Nemours & Co. v. Pressman,
679 A.2d 436 (Del. 1996) ............................................................................30, 31

Fuentes v. Perskie,
32 F.3d 759 (3d Cir. 1994)............................................................................22, 23, 30

Jalil v. Avdel Corp.,
873 F.2d 701 (3d Cir. 1989)
cert. denied, 493 U.S. 1023 (1990). ............................................................................22

Jones v. Sch. Dist. of Phila.,
198 F.3d 403 (3d Cir. 1999)............................................................................20

King v. Sch. Dist. of Phila.,
No. 00-CV-2503, 2001 WL 856948 (E.D. Pa. July 26, 2001)........................................27

McDonnell Douglas Corp. v. Green,
411 U.S. 792 (1973)..............................................................................................20, 21

McIntyre v. City of Wilmington,
No. C.A. 01-396 GMS, 2002 WL 1586280 (D. Del. July 9, 2002)
aff'd, No. 02-3204, 2003 WL 21570104 (3d Cir. June 27, 2003) ................................22

Naghiu v. Inter-Continental Hotels Group, Inc.,
165 F.R.D. 413 (D. Del. 1996) ....................................................................................19

Nichols v. Bennett Detective & Protective Agency, Inc.,
2006 U.S. Dist. LEXIS 35491 (D. Del. May 31, 2006)..................................................21

Pamintuan v. Nanticoke Mem'l Hosp.,
192 F.3d 378 (3d Cir. 1999)........................................................................................21

Pivirotto v. Innovative Sys., Inc.,
191 F.3d 344 (3d Cir. 1999).........................................................................................22

Reed v. Agilent Techs., Inc.,
174 F. Supp. 2d 176 (D. Del. 2001)........................................................................28, 30

Reeves v. Sanderson Plumbing Prods., Inc.,
120 S. Ct. 2097 (2000)...........................................................................................21, 22

Robertson v. Allied Signal, Inc.,
914 F.2d 360 (3d Cir. 1990).........................................................................................20

Schoch v. First Fid. Bancorporation,
912 F.2d 654 (3d Cir. 1990).........................................................................................20

Simpson v. Kay Jewelers,
142 F.3d 639 (3d Cir. 1998).........................................................................................27

St. Mary's Honor Ctr. v. Hicks,
509 U.S. 502 (1993).....................................................................................................22

Taylor v. Proctor & Gamble Dover Wipes,
184 F. Supp. 2d 402 (D. Del. 2002)
aff'd, No. 02-1701, 2002 WL 31716395 (3d Cir. Dec 4, 2002) ...................................21

Texas Dep't of Cmty. Affairs v. Burdine,
450 U.S. 248 (1981).....................................................................................................21

Waldron v. SL Indus., Inc.,
56 F.3d 491 (3d Cir. 1995)................................................................................21

## STATUTES

42 U.S.C. §1981 ("Section 1981")....................................................................1

19 Del. C. §710..........................................................................................1, 20

19 Del. C. §712(c)(1)....................................................................................23

## RULES

Federal Rule of Civil Procedure 56 ..................................................................19

## I.    NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Trafinna Wilson ("Plaintiff") commenced this action by filing a Complaint

against Defendant Christiana Care Health Services, Inc. ("Christiana Care" or "Defendant")

in the Superior Court of the State of Delaware, Kent County.  See Civil Action No. 06C-10-

038.  Christiana Care timely removed this action to this Court.  Plaintiff alleges claims

arising out of the termination of her employment with Christiana Care for: 1) race and gender

discrimination under the Delaware Discrimination in Employment Act, 19 Del. C. §710

("DDA") (Count I); 2) race discrimination under Section 1981 of the Civil Rights Act of

1866, 42 U.S.C. §1981 ("Section 1981") (Count II); and 3) breach of the implied covenant of

good faith and fair dealing (Count III).  Discovery closed on November 30, 2007, and

Defendant has now moved for summary judgment on all counts of the Complaint because

there are no genuine issues of material fact and Defendant is entitled to judgment as a matter

of law.

## II.    SUMMARY OF ARGUMENT

Plaintiff's gender discrimination claim fails as a matter of law because she never filed

a claim of gender discrimination with either the Equal Opportunity Employment Commission

("EEOC") or the Delaware Department of Labor ("DDOL").  In any event, Plaintiff

conceded at her deposition that there are no facts that support a claim for gender

discrimination.

Plaintiff's Section 1981 and DDA race discrimination claims fail, as Plaintiff cannot

demonstrate that Defendant's legitimate, non-discriminatory reason for her termination-her

admitted, continued violations of Christiana Care's policies– was a pretext for illegal

discrimination.  Finally, the Court should grant summary judgment on Plaintiff's claim for

1

breach of the covenant of good faith and fair dealing because she cannot demonstrate any fraud, deceit or misrepresentation in Defendant's decision to terminate her employment.

## III.    INTRODUCTION

Christiana Care terminated Plaintiff's employment because, by her own admission, she violated Christiana Care's policies on several occasions. Her termination in August 2005 followed a series of progressive disciplinary actions, including initial counseling, a written warning, a second written warning, and a Decision Making Leave (the penultimate step in the disciplinary process, akin to a suspension). Plaintiff's own testimony establishes that she was well aware of Christiana Care's policies against excessive telephone and internet usage and lateness, for which she was disciplined. Plaintiff admitted that she received numerous warnings during her employment for tardiness and idleness, that she had received a final warning for excessive personal telephone usage, and that she had disregarded her employer's final warning and continued to use company time and resources to conduct personal business. Defendant's decision to terminate Plaintiff's employment as a result of her continued policy violations was clearly a legitimate, non-discriminatory business decision. Plaintiff's claim that she was terminated because of her race is nothing other than an afterthought; in fact, when she appealed her termination through Christiana Care's Peer Review Process, and again at her deposition, Plaintiff claimed that she was terminated not because of her race, but because she had objected to an effort to transfer her to another position within her department.

## IV.    STATEMENT OF UNDISPUTED FACTS

### A.    Plaintiff's Employment With Christiana Care

Plaintiff, who is African-American, was employed by Christiana Care as a

Community Advocate on March 16, 1998. (A-2)[1]. Due to a lack of funding, Plaintiff's position was to be eliminated in 2001, and instead of being laid off, she was transferred to a secretarial position in Christiana Care's Psychiatry Department. (A-3-4). In either 2002 or 2003, Plaintiff sought another position because she was having performance issues and by her own admission: "I really wasn't a ... secretary." (A-7). Human Resources made Plaintiff aware of an open position in the billing department in which Plaintiff was interested. (A-8). Plaintiff was interviewed, in separate face-to-face interviews, and then selected for this position by Melinda Fitzgerald, Billing Supervisor, and April Habich,[2] Billing Department Manager, both of whom Plaintiff now accuses of discriminating against her. Plaintiff further testified that both Ms. Fitzgerald and Ms. Habich were "cordial and friendly" to her during her interviews. (A-10-12). Thus, by the time Plaintiff arrived in the billing department, she had been employed in several other positions. When those positions did not work out for a variety of reasons, Christiana Care had arranged for Plaintiff to transfer to other positions. Moreover, the two individuals who she now accuses of discriminating against her because of her race, Ms. Fitzgerald and Ms. Habich, were the two individuals who *selected* Plaintiff for her position. Such conduct hardly evidences racial discrimination.

In her new role as Billing Representative/Charge Entry, Plaintiff's responsibilities included data entry and posting bills. (A-11). Shortly after she began in the department, Plaintiff was given new responsibilities as a Billing Representative/Follow-up when a new computer system was installed. (A-29; A-110). Plaintiff's new position required her to

---

[1]   All references to the record are attached hereto as Appendix Exhibits and referred to herein as "A-."

[2]   Plaintiff was directly supervised by Ms. Fitzgerald until Plaintiff's termination in August 2005, and Ms. Habich was Ms. Fitzgerald's direct supervisor during this time. (A-9-10; A-107)

follow up on delinquent accounts by contacting, by telephone, insurance companies and patients in an attempt to get these accounts paid. (A-29-31, A-63-64). Plaintiff's performance was not always consistent, and was better when she was performing her initial data entry responsibilities, rather than her subsequent follow-up duties. (A-108-110).

**B.      Plaintiff's Repeated Violations of Christiana Care Policy**

     **1.      Christiana Care's Policies**

Christiana Care has a progressive discipline policy. (A-169-70). Under this policy, infractions are generally dealt with in accordance with their severity, with several disciplinary steps typically preceding termination, including First and Second Step Written Reminders and a Decision Making Leave, a form of suspension. Plaintiff was fully aware of this policy and of Christiana Care's progressive discipline process and understood the consequences of her continued violation of Christiana Care's policies. Thus, Plaintiff testified:

> Q:  Did you have a general understanding of what the term progressive discipline means while you worked at Christiana Care?
> A:  Yes.
> Q:  What is your understanding of that term "progressive discipline"?
> A:  That means they would-progressive discipline to me means that they would-you would get, like you were on Stage I, you would go to Stage II. It would progress if you continued to go ahead with the behavior.
> Q:  And while you worked at Christiana Care weren't you subjected to progressive discipline?
> A:  Yes.
> Q:  In fact, didn't you first receive a verbal warning, then a written warning, then a decision making leave, and then a termination?
> A:  For? For the internet? For the telephone? For what?
> Q:  For different infractions.
> A:  That's what it end[ed] up to be, yes.

(A-19-20).

During Plaintiff's employment, Christiana Care had an explicit policy regarding the use of telephones, personal cell phones and pagers while on duty.  That policy provided as follows:

> Because Christiana Care receives thousands of telephone calls daily through our telephone system, employees may not use departmental telephones for personal business.  While at work, you may only receive calls for hospital business or personal emergencies.  Pay telephones or personal cell phones may be used when it is necessary to make personal calls on non-working time.
>
> Use of personal cell phones and pagers while on duty is prohibited.  Employees who are required to use cell phones or beepers for Christiana Care business reasons are to respond to calls in an appropriate area with consideration given to confidentiality, safety, and maintaining a quiet environment for those whom we serve.  (A-183)

Plaintiff testified that she was well aware of this policy, which was published on the Christiana Care intranet, as well as Christiana Care policy regarding personal use of the internet while at work.  Thus, she testified as follows:

> Q:    I want to show you, it's an 18-page document.  It's been Bates stamped in the middle of the page DP --meaning we produced it -- 382 through 399, and I'm not going to ask you to read it.  I just generally want to know whether you are familiar with this document or a version of this document very similar to this?  It's called Employee Handbook, Health Services, Health Initiatives and Home Health and Community Services Employee Handbook.
>
> A:    (Pause.)
>
> Q:    Do you recall my question?
>
> A:    No.  I'm sorry.
>
> Q:    The question is whether this document is familiar to you as an employee handbook?
>
> A:    No.
>
> Q:    Do you recall seeing an employee handbook online while you worked for Christiana Care?
>
> A:    I did visit an employee handbook maybe a few times online.
>
> Q:    Let me ask you to look at 5 of 18, down at the bottom it's actually marked "electronic communication." Do you recall ever being aware of a policy that Christiana Care had on electronic communication, in particular the computer and other   electronic systems?
>
> A:    Yes.
>
> Q:    Did you have an understanding as to what Christiana Care policy was with regard to the use of those systems?

5

A:    Yes.

Q:    What was your understanding?

A:    My understanding was the use of the internet was Christiana Care's property and that it was not supposed to be used for personal use.

Q:    If you take a look at Page 7 of 18, there's a section that says, "Telephone messages, personal cell phones and pagers." There's three paragraphs there. Were you familiar with this specific policy during the time you worked for Christiana Care?

A:    Well, I was familiar with the policy and that we could -- I mean that -- I was familiar with Christiana Care's telephone policy.

Q:    And what was your understanding of the policy?

A:    It was property of Christiana Care, and that in case of an emergency, or something like that, you know, you could use the telephone or -- basically in case of emergencies, but it was the property of Christiana Care and it was supposed to be conducted for business.

Q:    Let me read into the record the first paragraph of this policy on Page 7. "Because Christiana Care receives thousands of telephone calls daily through our telephone system, employees may not use departmental telephones for personal business. While at work, you may only receive calls for hospital business or personal emergencies. Paid telephones or personal cell phones may be used when it is necessary to make personal calls on non-working time." Was this your understanding of Christiana Care policy regarding personal telephone calls?

A:    I have a problem with when it says, While working only may receive calls from the hospital for personal use -- I mean for business and personal emergencies. That is true, but -- that's what it says.

Q:    And while you worked there, was this your understanding of Christiana Care policy? Let me ask it this way. While you worked there, was your understanding consistent with this statement?

A:    It was, my understanding was consistent with the statement.

Q:    Did you comply with Christiana Care policy regarding personal telephone calls while you worked for the hospital?

A:    No.

Q:    Did you comply with Christiana Care policy regarding the use of the internet while you worked for Christiana Care?

A:    No.

Q:    And as a result, you were disciplined on occasion; is that right?

A:    Correct.

Q:    And ultimately terminated; correct?

A:    Correct.

(A-15-19).

Plaintiff also conceded that in February 2005, her immediate supervisor, Ms.

Fitzgerald, sent an email to her entire department, including Plaintiff, reminding them of Christiana Care's policy regarding personal phone calls and cell phones.  (A-195; A-45-48).

### 2.    Plaintiff's Violations of Christiana Care's Policies

### a.    Initial Counseling About Internet Usage

Shortly after Plaintiff began working in the billing department, Ms. Fitzgerald identified Plaintiff's use of the internet for personal reasons as a developing issue. Thus, on April 3, 2002, Ms. Fitzgerald sent Plaintiff an email which simply stated: "The internet report is showing your usage is very high…is there any reason?"  Plaintiff responded by saying: "Sorry.  I will discontinue my use."  (A-196).  Later in 2002, Ms. Habich brought this issue to Plaintiff's attention.  (A-197) (E-mail from Plaintiff to Ms. Habich acknowledging that "Ms. Habich . . . has a big concern with my Internet usage"), (A-28).  Nevertheless, despite these discussions and her commitment to discontinue her use of the internet for personal reasons, Plaintiff admits that she continued to use the internet for non-business purposes:

> Q:    And so you have seen reports that Christiana Care printed out that showed the number of hits and the number of user sessions at artisansbank.com?
> A:    Yes.
> Q:    At youravon.com?
> A:    Uh-huh.
> Q:    Is youravon.com an internet site that you went to for personal use?
> A:    Yes.
> Q:    And you did that at work?
> A:    I did.
> Q:    And it had nothing to do with your work as a biller for Christiana Care; right?
> A:    It didn't.
> Q:    You didn't just respond to a popup, you actively had to go to youravon.com?
> A:    You are right, that's correct.
> Q:    You did that even after your supervisor told you that you shouldn't do that; correct?
> A:    That's correct.

(A-26-27)

Q:    Did you continue to use the internet for personal use in 2002?
A:    As far as my banking was concerned and things like that, yes.
Q:    As far as your Avon also was concerned?
A:    Yes.
Q:    Did you continue to use the internet for personal use in 2003?
A:    If I had the Avon business, yes.
Q:    And for banking?
A:    Yes.
Q:    How about for shopping?
A:    I think I did.  I think I ordered a couple things from there.
Q:    At work?
A:    Yes.
Q:    While on work time?
A:    I did use it at work.
Q:    And did you also use the internet at work from time to time to go to
      websites that talked about your horoscope?
A:    I remember checking my horoscope, yes.
Q:    At work using the company computer?
A:    Yes.
Q.    On work time?
A.    Yes.

(A-32-33).

### b.    Plaintiff's Lateness

In addition to her continued violation of Christiana Care's internet usage policy,

Plaintiff had problems coming to work on time, which led to several disciplinary actions

against her.   In April 2003, Plaintiff was counseled by her supervisors about her lateness,

and in fact, at her request, her hours of work were changed from 7am to 3:30pm to 7:30am to

4pm to enable Plaintiff to get to work on time.  (A-198; A-36-40).  Unfortunately, this

counseling and change in her hours did not help.  Thus, pursuant to the discipline policy,

Plaintiff received a First Step Reminder for Overall Attendance on June 16, 2003.  (A-198;

A-34-36).  This first step in the disciplinary policy was administered to Plaintiff because she

had been late in excess of Christiana Care lateness standard.[3]  (A-198).  Although Plaintiff attempted to disagree with the discipline on the grounds that she had only been "one minute late," she admits that prior to being disciplined she received a memo from Ms. Habich that specifically stated that "if your [sic] one minute late your [sic] considered late." (A-34-36; A-198; A-199-200). The First Step Reminder placed Plaintiff on notice that "[a]ny future occurrences of absences or lateness, which place [her] out of CCHS standard, may result in future disciplinary action up to and including termination."  (A-198).

Unfortunately, this disciplinary action again was unsuccessful in getting Plaintiff to change her behavior.  In October of 2003, Plaintiff was late six times within a two-week period, again in violation of Christiana Care standard.  As a result, she was given a Second Step Reminder for Overall Attendance (A-201; A-39-40).[4]  Once again, Plaintiff had an excuse for her repeated violations of policy, claiming this time that she thought she had a seven minute grace period (A-201; A-43), which was not the case, and which was directly contrary to her supervisor's prior instructions that reporting to work even one minute late was considered by Christiana Care to be late.

Incredibly, Plaintiff admitted in her deposition that there were occasions when, to avoid being considered late, she "swiped" into work, in effect, reporting that she was ready for duty, but then went to park her car:

---

[3]  The standard for an employee working 10 hours a day within a rolling 12-month period is six absences and five latenesses.  Once one is disciplined for being out of the standard, the disciplinary action remains in effect for one year if no other discipline is administered in the interim.  (A-198).

[4]  As noted in the Second Step Reminder (A-201), that discipline remained active for two years.  Because Plaintiff was free from discipline for two years, she progressed to the next level of discipline – a DML – in 2005.

| | |
|---|---|
| Q: | Were there ever any times when you worked for Christiana Care, Ms. Wilson, where you would punch in and then go park your car? |
| A: | I had done that so that I could try to save time, yes. |
| Q: | So you would swipe in, meaning that you would register for work, run back to park your car, and then come in a few minutes later? |
| A: | After I parked my car. |
| Q: | Right. |
| A: | Yeah. |
| Q: | It was your understanding, was it not, that when you swiped in, you were supposed to be ready for work? |
| A: | That's true. |
| Q: | But there were times you admit you would swipe in, meaning tell people or suggest you were ready for work? |
| A: | No, I didn't tell anyone. |
| Q: | But when you swipe in, it suggests that you're ready for work? |
| A: | Ready for work. |
| Q: | And in fact you go on the clock; right? |
| A: | Yes. |
| Q: | So in order to avoid being late, you would swipe in, run back to park your car, and then come back in a few minutes later? |
| A: | I did that a couple times, yes. |
| Q: | And Melinda counseled you about that for a few times? |
| A: | Yes. |
| Q: | You understood that that was not acceptable, though? |
| A: | I stopped, yes. |
| Q: | But you understood that it wasn't acceptable? |
| A: | A lot of times when I got to work I would just go, swipe the clock, and go park my car and I would come back, yes. Sometimes even if I did it, I wasn't late. |
| Q: | Well, you weren't late because you swiped your card. |
| A: | Right. |
| Q: | But you swiped in – |
| A: | There's no excuse for it. I'm sorry, yes, yes. Yes, it happened. |

(A-41-43). Thus, not only was Plaintiff unquestionably late to work on numerous occasions for which she was properly disciplined, she also attempted to avoid being caught as late on other days by trying to manipulate the system.

### c.    Plaintiff's DML for Excessive Personal Telephone Calls

In March 2005, Plaintiff was given yet another discipline, this time for making excessive personal telephone calls during work hours. (A-58) Because she had already

received two written warnings for other disciplinary infractions, this disciplinary action was a Decision Making Leave ("DML")[5], representing the penultimate step, and the last step short of termination, in Christiana Care's progressive discipline process. (A-58-59; A-170; A-202). As outlined in the policy, the "purpose of a DML is to give the employee the opportunity to reflect on the problem(s) and to make a decision to stay and change the behavior or voluntarily resign." (A-170; A-71; A-164-65). Plaintiff fully understood the consequences of having a DML:

> Q:    What is a decision making leave at Christiana Care?
> A:    It's a decision that either -- well, the way they explained it to me was this was a decision making leave saying whether or not I wanted to continue my employment with Christiana Care or I wanted to terminate my employment and go somewhere else.

(A-71).

As noted above, Plaintiff's supervisor, Ms. Fitzgerald, had sent a memo to her entire department in February 2005 reminding the employees of Christiana Care's policies regarding personal use of the telephones. (A-45-48; A-195). Plaintiff admitted that she continued to ignore Christiana Care policy even after having reached the second step in the progressive discipline process:

> Q:    Before you saw this memo in February of 2005, had you seen the policy on telephone messages, cell phones and pagers?
> A:    Yes.
> Q:    Do you understand the policy as it was set forth in this memo, Exhibit 8?
> A:    Yes.
> Q:    Did you have any questions about it at the time?

---

[5]    This step, which may also be used for major rule violations or for unrelated performance problems and/or rule violations, consists of a one day paid leave and remains active for a period of three years. If an employee has no additional discipline for that three year period, the DML is deactivated. (A-170).

A:    No.

Q:    Did you comply with this policy?

A:    In 2005, in 2005?

Q:    2005.

A:    To the best of my ability.

Q:    Does that mean that you did or you didn't?

A:    That means that I complied to it to the best of my ability.  Yes, I did.

Q:    You made personal telephone calls at work, did you not?

A:    Yes, I did.

Q:    And did you understand that that was in violation of the policy?

A:    Well, I made personal telephone calls at work and I was supposed to have notified my supervisor when those telephone calls were going to be made.

Q:    And did you do that?

A:    I did on occasion.

Q:    Not always, though?

A:    Correct.

(A-46-48).

Because of complaints about Plaintiff's excessive personal telephone usage, Ms. Fitzgerald verbally addressed this issue with her on several occasions before proceeding to a formal disciplinary step.  (A-111; A-114-17).  When additional complaints about Plaintiff's telephone usage continued, Ms. Fitzgerald reviewed Plaintiff's phone and internet reports. (A-118-19).  She discovered that Plaintiff had made numerous personal phone calls totaling over six hours in a two-month period in January and February of 2005.  (A-54-55; A-57). Many of these calls were long distance calls made to one of Plaintiff's friends.  Additionally, on three days in late February, Plaintiff received personal phone calls during work hours totaling 107 minutes.  (A-61-62; A-203-211).  At her deposition, Plaintiff admitted making these calls, in violation of Christiana Care policy, despite having received a second step reminder:

Q:    So these calls, these 15 calls that were made between January 3rd and February 23rd, 2005, for a total of six hours and 12 minutes, these are all personal phone calls made while you were at work during working time?

A:      Correct.

Q:      Do you realize that that was a violation of Christiana Care policy?

A:      Yes, I do.

Q:      And you intentionally violated that policy by making those phone calls?

A:      Well -- yes.

(A-57).  She also admitted to having received several lengthy calls at work from a personal friend.  (A-61-62).

When she was first questioned about these calls by Ms. Fitzgerald, Plaintiff attempted to conceal the truth from her supervisor.  (A-61-62; A-120; A-203-211).  Eventually, however, Plaintiff admitted that these extensive calls were of a personal nature.  Plaintiff made these calls despite her understanding that her job required her to be on the phone contacting employers and insurance companies and that she was expected, while she was at work, to be conducting Christiana Care business and not using Christiana Care productive time for personal use.  (A-63-64).  She conceded that the personal calls made to and by her were "excessive."  (A-64).  Moreover, Plaintiff acknowledged that if she was on the telephone with her friend, she could not be doing her job making phone calls to patients and insurance companies.  (A-65-66).   Ultimately, at her deposition, Plaintiff conceded that she had no excuse for violating Christiana Care policy.  (A-67).

As a result, Plaintiff was issued a Decision Making Leave for her violation of Christiana Care's phone use policy.   (A-58 A-112-13; A-120; A-141-44; A-202).  As a condition of retaining her job, Plaintiff was required to submit a written statement acknowledging the seriousness of the situation, her understanding of the reasons this disciplinary action was taken against her, and her commitment to changing her behavior.  (A-70-73; A-202).  In her statement,  Plaintiff acknowledged:

I understand the issues the serious violation and the disciplinary action given. I take full responsibility and except [sic] the con-sequences set forth.

I am requesting to remain in my present position and a part of the Health Initiative Team. I will not make any personal calls unless I notify supervisor first. My supervisor will be notified when ever [sic] I am away from my desk and for an extended period of time.

(A-212).

Plaintiff testified that by writing the statement she understood the consequences of being on the last step of the progressive discipline process and therefore was committing to change her behavior:

Q:     And in writing this, were you indicating that you wanted to remain employed?
A:     Yes.
Q:     And were you taking personal responsibility for your violations of Christiana Care policy?
A:     Yes.
Q:     And did you believe that?
A:     I did.
Q:     Were you sincere?
A:     I was.

(A-71-72). Unfortunately, Plaintiff continued to violate Christiana Care policy which ultimately resulted in her termination.

### d.     Plaintiff's Termination From Employment

In August of 2005, Ms. Fitzgerald, in consultation with Ms. Habich, decided to transfer Plaintiff to another position within the department and to have her switch jobs with Terri Eastburn, another department employee. Ms. Fitzgerald proposed to do this for several reasons, primarily because she had received additional complaints from Plaintiff's co-workers about Plaintiff's excessive personal use of the telephone. Ms. Fitzgerald felt that by transferring Plaintiff to a position that required less time on the telephone, she could get Plaintiff to focus on her tasks at hand and spend less time on the phone. In addition, Ms.

Fitzgerald felt that this would be beneficial to the division for which she was responsible, as the director of her division was encouraging her to cross-train her employees so that employees were able to fill in for one another. Ms. Fitzgerald also thought that this job switch would be beneficial for Ms. Eastburn, who had been performing the same function for several years. (A-121-30; A-159).

When Ms. Fitzgerald presented this proposal to Plaintiff, she objected strenuously to it and promptly contacted Larry Bryson, Employee Relations Manager, to complain about it. (A-92; A-131; A-152-53). Mr. Bryson first met with Plaintiff, and then with Ms. Fitzgerald and Ms. Habich about this proposal. In the course of these meetings, Mr. Bryson learned that the primary reason behind the recommended move was Ms. Fitzgerald's concern about Plaintiff's continued violation of Christiana Care policy. (A-132-134; A-154-58; A-160-62;). Mr. Bryson, an African American, was not familiar with Plaintiff prior to being approached about this situation. He advised Ms. Fitzgerald and Ms. Habich that Plaintiff's ongoing performance problems and policy violations needed to be dealt with in accordance with Christiana Care's disciplinary policy instead of attempting to find another solution. (A-93; A-134-36; A160-62.). Mr. Bryson testified:

> Q:  Okay. Why were they going to hold off on cross-training?
> A:  They were going to hold off at my recommendation, because there was a performance issue. My recommendation was if there is a performance issue, if there is a behavioral issue, in terms of not dealing with policy and practice, let's deal with that issue.

(A-161).

At Mr. Bryson's suggestion, Ms. Fitzgerald reviewed Plaintiff's recent internet and phone usage reports as well as those of others in the group and discovered that Plaintiff had continued to violate Christiana Care policy by her personal telephone calls and personal use

of the internet. (A-136-37).

Ms. Fitzgerald consulted with Ms. Habich and then with Mr. Bryson regarding these reports. (A-137). Mr. Bryson directed Ms. Fitzgerald to obtain a statement from Plaintiff regarding her internet usage. (A-139).

In her statement, Plaintiff acknowledged that she was "aware of Christiana Care policy for Personal Calls and Non Business internet Use" and admitted that she "made non business calls." As she had done before, she pledged to "limit personal use of Christiana Care telephone." (A-139-40; A-244). In her deposition, Plaintiff conceded her ongoing violations of Christiana Care policy:

| | |
|---|---|
| Q: | Didn't you continue to make personal telephone calls in April and May and then throughout the summer of 2005? |
| A: | My telephone calls that I made, like I said before, I had notified Melinda on occasions that I needed to make personal telephone calls, and at other times I told -- at other times Melinda wasn't available. If a call came in and Melinda wasn't available and I took the call and I wasn't going to run around -- she smoked, so therefore I wasn't going to go outside and try to find her and let her know that I have a personal call. I just took the call. |
| Q: | And didn't you make personal calls? |
| A: | Yes, I did make a personal call. |
| Q: | A personal call? |
| A: | I made a couple, within -- it wasn't consecutive, but, yes, I did. |
| Q: | Approximately how many personal calls do you believe you made in July and August of 2005? |
| A: | I can't remember. |
| Q: | Was it only one or two? |
| A: | I'm not going-I cannot say. |
| Q: | Have you looked at the telephone logs that have been produced in connection with this lawsuit? |
| A: | Not recently. |
| Q: | At any time have you looked at those log? |
| A: | Yes, I did. |
| Q: | And based on that, have you made, have you made a determination as to how many personal calls or approximately how many personal calls you made? |

A:    I can't recall.
Q:    It was more than one or two, though, wasn't it?
A:    Yes.

(A-73-75).[6]

A review of the logs of Plaintiff's telephone usage and her deposition testimony

confirms her continued use of the telephone for personal use during the summer of 2005, (A-

80-83; A-203).  Moreover, despite previous warnings about her internet usage, by her own

admission, Plaintiff continued to use the internet for personal reasons in 2005.  (A-83-87).  In

her deposition, Plaintiff admitted her continued violations of Christiana Care policy:

Q.    Now, you had been aware of the hospital policy against personal phone calls
      and personal internet usage for several years at this point [summer 2005];
      correct?
A:    Yes.
Q:    You had been in meetings where this policy was discussed; correct?
A:    (Witness nods.)
Q:    You have to say yes or no.
A:    Yes.
Q:    You had, in fact, been counseled and warned against personal telephone calls
      and internet usage; correct?
A:    Yes.
Q:    You had been placed on a decision making leave, which is the final step in the
      disciplinary process, for excessive personal telephone calls; correct?
A:    Yes.
Q:    And yet you continued to make personal telephone calls; correct?
A:    Yes.
Q:    You continued to intentionally violate the policy; correct?
A.    To me it was inevitable.
Q.    It was what?
A.    To me it was unavoidable.
Q.    Your making personal telephone calls was unavoidable?
A.    Yes.
Q:    Why do you say that?
A:    It was unavoidable for me to make personal phone calls and for me to receive
      personal phone calls.  My job was to answer telephones.  If someone called
      me and I needed to get back with them -- at the same time that this occurred, I

---

[6]    In fact, cross-training with other divisions was listed on Plaintiff's annual performance
       evaluations in 2003, 2004 and 2005 as one of the "critical skills" needed to perform her
       job. (A-147-49; A-213-43).

was purchasing a house, and my lawyer called. I needed to call them back, I would call them back. If when the new insurance company needed to verify things, I needed to call them back. There were personal -- you know, there were things that I needed to use the telephone for.

Q:    Did you have a lunch break at this time?
A:    Yes, we had lunch breaks.
Q:    How long was your lunch break?
A:    A half an hour.
Q:    Could you make personal telephone calls during your lunch break?
A:    Yes, you could, I guess.
Q:    Did you get other breaks during the course of the day?
A:    I'm not going to -- no.
Q:    You had no other breaks that you were permitted to --
A:    I never took them.
Q:    Could you have taken a break?
A:    You know what? I need to say no.
Q:    If a personal friend of yours called while you were working, is there anything that prohibited you from telling them, I can't talk right now, I'll call you later?
A:    No.

(A-76-79).

Following a meeting among Ms. Fitzgerald, Ms. Habich and Mr. Bryson in which Plaintiff's disciplinary history and continued policy violations were discussed, these individuals decided that the appropriate course of action was to terminate Plaintiff's employment. (A-163; A-166-68; A-245). Mr. Bryson, who had 39 years of experience at Christiana Care, testified that, in his view, the termination decision, which he supported, was in conformity with Christiana Care policies and procedures. (A-167-68).

### C.    Plaintiff's Unsuccessful Appeal Through the Peer Review Process

Plaintiff challenged her termination by completing a Christiana Care Problem Solving Procedure Form on September 7, 2005, and requesting that a Peer Review Panel review her termination. (A-94; A-246-47). A Peer Review Panel made up of five neutral employees heard Plaintiff's appeal of her termination on September 22, 2005. (A-97; A-248). Pursuant to Christiana Care policy, Plaintiff was permitted to play an active role in the selection of the

Peer Review Panel members.  (A-95).

At the hearing, the Panel met with Plaintiff, allowed her to testify and present her case, posed questions to her, and reviewed her employment history.  (A-95-96; A-248).  The Peer Review Panel unanimously upheld Plaintiff's termination.  (A-97; A-248).   Thus, Plaintiff's termination was confirmed by a panel of neutral employees who had no prior knowledge of her circumstances.  This independent confirmation of Plaintiff's termination establishes, beyond any doubt, the non-discriminatory nature of her termination.

## V.    ARGUMENT

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 mandates the entry of judgment against a party who fails to offer admissible evidence sufficient to establish the existence of every element essential to that party's case and on which that party bears the burden of proof.  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 327 (1986) (summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'").  Although the defendant bears the initial responsibility of asserting the basis for its motion, the defendant is not required to negate the plaintiff's claim.  Rather, the defendant must only point out that there is an absence of evidence to support the plaintiff's case or, alternatively, offer affirmative evidence which demonstrates that the plaintiff cannot prove his case.  Naghiu v. Inter-Continental Hotels Grp., Inc., 165 F.R.D. 413, 418 (D. Del. 1996).

After the defendant demonstrates a lack of evidence to support the non-moving party's claims, the plaintiff must present competent evidence designating "specific facts

showing that there is a genuine issue for trial." <u>Celotex</u>, 477 U.S. at 324 (citation omitted).

Although the court is to view all evidence in a light favorable to the plaintiff, the mere

existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 247-48 (1986). Rather, a dispute must exist over a <u>material</u> fact. <u>Id.</u> To survive a

motion for summary judgment, therefore, the plaintiff must come forward with specific,

admissible and credible evidence supporting each element essential to her case; mere

conclusory allegations or denials are not enough. <u>Schoch v. First Fid. Bancorporation</u>, 912

F.2d 654, 657 (3d Cir. 1990). Mere speculation, conclusory allegations, and bare denials are

insufficient to raise a genuine issue of material fact. <u>See Robertson v. Allied Signal, Inc.</u>,

914 F.2d 360, 382 (3d Cir. 1990); <u>Bruton v. Diamond State Tel. Co.</u>, 623 F. Supp. 939, 943

(D. Del. 1985); <u>Boykins v. Lucent Tech., Inc.</u>, 78 F. Supp. 2d 402, 407 (E.D. Pa. 2000),

<u>aff'd</u>, No. 00-1087, 2002 WL 402718 (3d Cir. Feb. 4, 2002).

As demonstrated below, Plaintiff simply cannot carry her burden of demonstrating

that there are specific facts upon which the Court could find in her favor, and, therefore, the

Court should grant summary judgment to Defendant as to all of Plaintiff's claims.

**B.     The Legal Framework**

Claims under Section 1981 and the DDA, 19 Del. C. §710 <u>et seq.</u>, are both analyzed

under the familiar burden-shifting analysis established by the United States Supreme Court in

<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Jones v. Sch. Dist. of Philadelphia</u>,

198 F.3d 403, 409-410 (3d Cir. 1999) ("disparate treatment race discrimination claims under

Title VII [and] section 1981 ... require application of the familiar burden-shifting framework

the Supreme Court articulated in McDonnell Douglas Corp. v. Green"); <u>Pamintuan v.</u>

Nanticoke Mem'l Hosp., 192 F.3d 378, 385 (3d Cir. 1999) ("We analyze section 1981 claims

under the familiar McDonnell Douglas shifting burden framework used in Title VII

discrimination cases"); Nichols v. Bennett Detective & Protective Agency, Inc., 2006 U.S.

Dist. LEXIS 35491 (D. Del. May 31, 2006) (section 1981 and DDA claims analyzed under

the McDonnell Douglas framework).

     Under the McDonnell Douglas framework, Plaintiff has the initial burden of

establishing all of the elements of a *prima facie* case[7] of discrimination by a preponderance

of the evidence.  If the plaintiff succeeds in establishing a *prima facie* case, the burden then

shifts to the employer, who must merely produce a legitimate, non-discriminatory reason for

the employee's discharge.  Reeves v. Sanderson Plumbing Prods., Inc., 120 S. Ct. 2097, 2106

(2000); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).  The

defendant bears only a burden of production, not persuasion, regarding its reason.  Reeves,

120 S. Ct. at 2106.  Therefore, the defendant need not persuade the fact finder that the

proffered reason actually motivated the plaintiff's discharge.  Id.  Once the employer has

articulated a legitimate business reason for the decision, any presumption of discrimination

"drops out of the picture."  Reeves, 120 S. Ct. at 2106.

     The ultimate burden of persuading the trier of fact that the defendant intentionally

discriminated against her remains at all times with Plaintiff.  Id.  Once the defendant

---

[7]    To establish a *prima facie* case of discriminatory discharge under Section 1981, a
plaintiff must show: (1) that she is a member of a protected class; (2) she was qualified
for the position; (3) she was discharged; and (4) the discharge occurred "under
circumstances that give rise to an inference of unlawful discrimination."  McDonnell
Douglas Corp. v. Green, 411 U.S. 792 (1973); Waldron v. SL Indus., Inc., 56 F.3d 491,
494 (3d Cir. 1995); Taylor v. Proctor & Gamble Dover Wipes, 184 F. Supp. 2d 402, 408
(D. Del. 2002), aff'd, No. 02-1701, 2002 WL 31716395 (3d Cir. Dec 4, 2002).

produces a legitimate, non-discriminatory reason for an adverse action, the plaintiff must prove by a preponderance of the evidence that the alleged reasons proffered by the defendant were not its true or real reasons, but a pretext for intentional discrimination. Reeves, 120 S. Ct. at 2106; St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515-16 (1993); Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 n.4. (3d Cir. 1999); Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); McIntyre v. City of Wilmington, No. C.A. 01-396 GMS, 2002 WL 1586280 (D. Del. July 9, 2002), aff'd, No. 02-3204, 2003 WL 21570104 (3d Cir. June 27, 2003) (dismissing plaintiff's race discrimination claim where Plaintiff was unable to demonstrate that employer's legitimate, non-discriminatory reason for termination decision, specifically plaintiff's inappropriate conduct, was pretextual).

Because the plaintiff bears the ultimate burden of persuasion in a disparate treatment case, a defendant is entitled to summary judgment if it can demonstrate that the plaintiff could not carry the burden of proof at trial. A defendant may demonstrate this in two ways: (1) by showing that the plaintiff is unable to establish a *prima facie* case of discrimination; or (2) if the plaintiff has successfully established a *prima facie* case, by showing that the plaintiff could not produce sufficient evidence of pretext to rebut an assertion of non-discriminatory reasons for the employment decision. Fuentes, 32 F.3d at 763; Jalil v. Avdel Corp., 873 F.2d 701, 707 (3d Cir. 1989), cert. denied, 493 U.S. 1023 (1990).

To avoid summary judgment, a plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. The plaintiff must present sufficient evidence to "allow a fact finder

reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." Id. (emphasis in original) (internal citation omitted). To do so, the plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder *could* rationally find them unworthy of credence and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." Id. at 765 (emphasis in original)(internal quotations and citations omitted). It is not sufficient to show that the employer's decision was wrong, mistaken, imprudent or incompetently made. Id.

Solely for purposes of this Motion, Christiana Care assumes that Plaintiff has made out a *prima facie* case of racial discrimination, notwithstanding the absence of any evidence that gives rise to an inference of discrimination. Christiana Care is nevertheless entitled to summary judgment because Plaintiff is unable to demonstrate that its legitimate, non-discriminatory reasons for her termination are pretextual.

### C.    Plaintiff's Gender Discrimination Claim Fails Because It Lacks Any Factual or Legal Basis

In her Complaint, Plaintiff alleges that Christiana Care discriminated against her on the basis of her gender in violation of the DDA. (Count I). However, Plaintiff never filed an administrative charge with the EEOC or the Delaware Department of Labor claiming gender discrimination,[8] a prerequisite to the institution of a claim under the DDA. 19 Del. C. §712(c)(1) ("Any person claiming to be aggrieved by a violation of this chapter shall first file a charge of discrimination within 120 days of the alleged unlawful employment practice or

---

[8]    The Charge plaintiff filed (A-249-54) alleged only racial discrimination not gender discrimination.

its discovery, setting forth a concise statement of facts, in writing, verified and signed by the

charging party."). Thus, because Plaintiff did not exhaust her administrative remedies as to

any gender discrimination claim, such a claim is not properly before the Court. In any event,

the Court should grant summary judgment on Plaintiff's gender discrimination claim

because, by Plaintiff's own admission, there are no facts to support it.    When asked about

this claim at her deposition, Plaintiff testified:

> Q:    Are you alleging in this case, Ms. Wilson, that you have been
>        discriminated against because of your gender, because you're a
>        woman?
> A:    No.

(A-13).

> Q:    Do you believe that you have been treated somehow differently from
>        any male co-workers?
> A:    There was [sic] no male co-workers.

(A-14).   Thus, Plaintiff admits that she knows of no basis for a gender discrimination claim.

(Id.) Indeed, she testified that the department in which she worked was all-female and that

there are no possible male comparators.  (Id.)  At Plaintiff's deposition, even Plaintiff's

attorney seemed uncertain as to why the Complaint alleged gender discrimination claim.  (A-

13-14).   Therefore, her gender discrimination claim is patently without merit and must be

dismissed.

> **D.    The Court Should Grant Summary Judgment As To Plaintiff's Race
>        Discrimination Claim, As Plaintiff Cannot Demonstrate That The
>        Legitimate, Non-Discriminatory Reason For Her Termination-Her
>        Admitted Policy Violations-Is Pretextual.**

Plaintiff alleges that Defendants discriminated against her based on her race by

terminating her employment in violation of Section 1981 and the DDA. (Counts I, II).

Taking the allegations in the light most favorable to Plaintiff (as the Court must, on summary

judgment), they simply do not rise to the level of actionable race discrimination. Plaintiff was terminated because she violated Christiana Care's policies and she has admitted that she knowingly violated those policies. (A-22; A-25-28; A-32-33; A-34-37; A-39-41; A-44-45; A-47-48; A-57-61; A-67-69; A-70-74; A-76-80; A-98-100).

Indeed, Plaintiff has conceded the accuracy of the factual findings by the unemployment compensation referee who denied her claim for unemployment compensation benefits; her testimony in that regard is particularly instructive:

> Q:     I am not going to ask you to read everything here, but are you familiar generally with this referee's decision?
> A:     I read it, yes.
> Q:     I want you to look at the last page of this, Page 5. The paragraph that begins, "the claimant received." I want to read you some of this and then ask you whether you agree or disagree. "The claimant received numerous warnings during her employment at Christiana Care for both tardiness and idleness." Is that a true statement?
> A.     Yes, it was.
> Q:     "The claimant" -- and the claimant is you --"received a final warning for excessive personal telephone time." Is that a true statement?
> A:     Yes.
> Q:     "The claimant disregarded the employer's final warning and continued to use company time to conduct personal business."
> A:     Yes.
> Q:     Is that true?
> A:     Yes.
> Q:     "It is understood that other employees were discovered making personal phone calls as well, but these employees were not on final warning, as was the claimant."
> A:     That's true.
> Q.     "The bottom line is that the claimant was warned that personal telephone usage was not permitted, and the claimant ignored the warning and continued to use company time and resources to conduct her personal business." Is that a true statement?
> A:     Yes.
> Q:     "The claimant acknowledged that she had breaks throughout the day when she could have appropriately made her personal phone calls without violating company policy."
> Q:     Is that a true statement?
> A:     Yes.

> Q:   "The claimant acted in disregard of her employer's legitimate interests."  Do you agree with that?
> A:   I have some reservations about it.
> Q:   What kinds of reservations?
> A:   I didn't do anything maliciously, but if I needed to use the telephone or if I needed to use something, I did.  I mean everybody else did also, so.  I mean I know this is not a case of everyone else, but I don't feel that I did anything that no one else was doing.
> Q:   Was anybody else on a final warning, though, like you?
> A:   Like I said before, I am unaware of that don't know.  I mean that's not something that people run around and say, tell everybody.

(A-98-100; A-255-59).  Plaintiff's admission that she knowingly and repeatedly violated Christiana Care policy despite being on the final disciplinary step in Christiana Care's progressive discipline process demonstrates beyond any doubt the legitimacy of Christiana Care's decision to terminate her employment.

Although Plaintiff attempts to justify her violations of Christiana Care policy with the standard "everyone else did it," excuse, the fact is that she admitted that she was not aware of the extent to which any other employees in her department were also using the telephone and/or internet for personal usage.  (A-89-90).  Nor was she aware of whether any of those employees were ever counseled or disciplined about such use.   She was unable to provide any examples of others who committed similar policy violations and who were at a similar stage of progressive discipline.  (A-89-90; A-100-101).  In any event, Plaintiff's co-workers, to whom she compares herself, included both Caucasian and African American employees, and thus there can be no inference of racial discrimination from Christiana Care's treatment of her co-workers.  (A-145-46).  The bottom line is, as Plaintiff conceded, there were no other white employees who violated Christiana Care policy to the same extent as Plaintiff did, and who were at a similar stage of discipline.  (A-98-100).

Plaintiff's subjective belief that she was the victim of race discrimination cannot

avoid summary judgment in the absence of sufficient evidence substantiating such a belief. See King v. Sch. Dist. of Phila., No. 00-CV-2503, 2001 WL 856948, at *4 (E.D. Pa. July 26, 2001) (granting summary judgment to employer on race discrimination claim because plaintiff's "conclusory and unsupported beliefs" that she was treated differently based on her race were insufficient to create a genuine issue of material fact to support an inference of discrimination); Bray v. L.D. Caulk Dentsply Int'l, No. 98-441-SLR, 2000 WL 1800527, at *5 (D. Del. July 31, 2000) (granting summary judgment to employer on race discrimination claim and observing that "[s]peculation alone cannot establish a *prima facie* case of discrimination"); Cooper v. Binney & Smith, Inc., No. 96-6230, 1998 WL 103302, at *1 (E.D. Pa. Feb. 26, 1998) (granting summary judgment to employer on race discrimination claim, where "[t]he purported incidents of discriminatory conduct cited by plaintiff in his deposition testimony amount to nothing more than speculation based on subjective feelings"); Davis v. Ashcroft, Civ. No. 00-584, 2002 WL 1065686, at *16 (D.N.J. Mar. 8, 2002) ("Plaintiff's belief and his conclusory allegations that Defendant discriminated against him are insufficient to withstand Defendant's motion for summary judgment").

In reviewing an employer's legitimate business decision, it is not the role of the court to act as a "super personnel department." See Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 331 (3d Cir. 1995) ("[W]e do not sit as a super-personnel department that reexamines an entity's business decisions."). Neither the plaintiff nor the court is permitted to second-guess the wisdom of an employer's business decision, even if the decision was not the best decision or even a sound one-the issue is only whether the real reason for the decision was discrimination. See Simpson v. Kay Jewelers, 142 F.3d 639, 647 (3d Cir. 1998) (rejecting plaintiff's argument that employer should have used different criteria for its

decision; "'The question is not whether the employer made the best, or even a sound business decision; it is whether the real reason is [discrimination].'") (alteration in original); see also Reed v. Agilent Techs., Inc., 174 F. Supp. 2d 176, 187 (D. Del. 2001) ("A plaintiff may not avoid summary judgment merely by showing that the employment decision was wrong or even mistaken.... Such a standard is necessary to maintain the appropriate balance between the discrimination laws and the independence of private employers.")

Although Plaintiff now claims that racial discrimination motivated her termination, her contemporaneous complaints and her deposition testimony thoroughly refute her subjective assertion. When she went to speak with Mr. Bryson about the cross-training/job swap that Ms. Fitzgerald had proposed, she never told him that she thought that Ms. Fitzgerald had proposed this because of her race. (A-91). When she outlined the nature of her complaint in her Problem Solving Procedure Form in which she initiated the Peer Review process, she stated her belief as to the reason for her termination in no uncertain terms as follows: *"I was terminated because I was not willing to cooperate with managements [sic] decision to change my position, department , and cost center with another employee."* (A-246-47) (emphasis added). At no time during the Peer Review process did Ms. Wilson assert that she had been terminated because of her race, claiming instead that she had been terminated in retaliation for not cooperating with her supervisors' desire to assign her to another position. Similarly, at her deposition, when asked a direct question about why she thought she had been terminated, Ms. Wilson answered directly:

Q:   Why do you believe you were fired?
A:   I believe I was fired because I would not cooperate with Melinda and April's request to change my job from one-from occupational health to physician billing.

(A-88).

Plaintiff was terminated, after a series of disciplinary actions, when she continued to violate Christiana Care's established policies. She was well aware that her continued violation of those policies would result in her termination but was either unable or unwilling to change her behavior. The two individuals whom Plaintiff now accuses of discriminating against her were the two people who interviewed and hired her for her position in the first place. (A-9-10). Those individuals consulted with Larry Bryson, an African American, who advised them to check Plaintiff's telephone and internet usage records in August of 2005. Mr. Bryson agreed with the decision to terminate Plaintiff's employment, which he believed, based on 39 years of experience at Christiana Care (A-151), was in conformity with Christiana Care policy (A-167-68). Following her termination, Plaintiff was given the opportunity to present her case to a neutral Peer Review Panel, which upheld management's decision to terminate her employment. Even now, Plaintiff believes that the real reason she was terminated is not because of her race, but because she objected to her supervisors' proposal to change her position. Plaintiff even acknowledges that she bears responsibility for her termination, as a result of which, she has changed the way she behaves in her subsequent employment:

> Q:   Do you feel personally, Ms. Wilson, that you bear any personal responsibility for what happened to you at Christiana Care for losing your job?
> A:   I do. I do take -- I do think that there are some things that I could have changed that I would not do today in any job that I go into. I don't use their computer at all.
> Q.   Anything else that you would do differently today?
> A:   Like I said, with the internet, I don't get on the internet, I don't use their computer. I don't talk on their phone. I have a cell phone. I use my own cell phone. I don't do any of that.

(A-102-03).

Under these circumstances, there can be no doubt that Plaintiff does not have a triable claim of racial discrimination.  Plaintiff simply cannot demonstrate that the reasons articulated by Christiana Care for her termination were not the real reasons for its action or that any discriminatory animus motivated Ms. Fitzgerald, Ms. Habich and Mr. Bryson's decision to terminate her employment after progressive discipline failed to prevent Plaintiff from continuing to violate Christiana Care policy.   Plaintiff has failed to demonstrate that a reasonable factfinder could "infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." Fuentes, 32 F.3d at 764 (emphasis in original) (internal citation omitted).  Thus, Christiana Care is entitled to summary judgment with respect to Plaintiff's discriminatory discharge claim.

### E.    The Court Should Grant Summary Judgment On Plaintiff's Claim For Breach Of The Covenant Of Good Faith And Fair Dealing.

Plaintiff also alleges that Defendants violated the implied covenant of good faith and fair dealing in terminating her employment.  (Count III).  Although the employment at-will doctrine permits an employer to terminate an employee "without cause and regardless of motive," Delaware courts have held that the implied covenant of good faith and fair dealing creates a limited exception to the well-entrenched employment at-will doctrine.  E.I. DuPont de Nemours & Co. v. Pressman, 679 A.2d 436, 437 (Del. 1996).  However, "[th]e Delaware Supreme Court has *strictly limited* the application of the implied covenant of good faith and fair dealing in the employment context..." Reed v. Agilent Techs., Inc., 174 F. Supp. 2d 176, 190 (D. Del. 2001) (emphasis added).  Thus, [i]n Delaware, this covenant is breached when the employer misrepresents a material fact upon which the employee relies in deciding to accept a new position, when the employer falsifies or manipulates the records to create

false grounds for discharge, when the employer abuses its superior bargaining position to deprive the employee of compensation or where the termination would violate public policy." Conneen v. MBNA Am. Bank, N.A., 182 F. Supp. 2d 370, 381-82 (D. Del. 2002), aff'd., 334 F.3d 18 (3d Cir. 2003) (granting summary judgment for employer on claim for breach of the duty of good faith and fair dealing, where there was no evidence that employer had falsified or misrepresented information). Thus, to state a claim of breach of the implied covenant of good faith and fair dealing, an employer's actions must "constitute an aspect of fraud, deceit or misrepresentation." E.I. DuPont de Nemours & Co. v. Pressman, 679 A.2d at 437. See also Bailey v. City of Wilmington, 766 A.2d 477, 480 (Del. 2001) (granting summary judgment on claim for breach of duty of good faith and fair dealing where plaintiff did not allege that the grounds for his termination were fraudulent, but that the procedure followed in terminating him was improper).

While Plaintiff disagrees that Christiana Care had grounds to terminate her employment, there is no evidence whatsoever that it engaged in any conduct that would support a claim for breach of the duty of good faith and fair dealing. It did not misrepresent or falsify any information that was used to terminate her employment and no public policy is implicated by its action. An employer such as Christiana Care has every right to expect its employees to comply with its reasonable policies and Plaintiff's termination following several years of disciplinary actions and counseling, was clearly justified. Indeed, Plaintiff repeatedly admitted to her violations of Christiana Care policies. (A-22; A-25-28; A-32-33; A-34-37; A-39-41; A-44-45; A-47-48; A-57-61; A-67-69; A-70-74; A-76-80; A-98-100).

As there is nothing in the actions taken by Defendant that can remotely be construed as involving fraud, deceit or misrepresentation, or violative of public policy, the Court should

grant summary judgment on this claim.

## VI.    CONCLUSION

For the reasons set forth above, there are no genuine issues of material fact and

Defendant is entitled to judgment as a matter of law on all of Plaintiff's claims.

Respectfully submitted,

*David H. Williams*

David H. Williams (DE 616)
James H. McMackin, III (DE 4284)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
P.O. Box 2306
Wilmington, DE  19899-2306
302.888.6900
dwilliams@morrisjames.com
jmcmackin@morrisjames.com

Michael J. Ossip (admitted pro hac vice)
Sean W. Sloan (admitted pro hac vice)
Yordanos Teferi (admitted pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
215.963.5761/5084
Fax:  215.963.5001

Attorneys for Defendant Christiana Care Health
Services, Inc.

Dated: January 11, 2008