## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**TRAFINNA WILSON,**

**Plaintiff,**

**v.**

**CHRISTIANA CARE HEALTH
SERVICES, INC.,**

**Defendant.**

C.A. No. 06-CV-00705 (MPT)

## COMPENDIUM OF UNREPORTED CASES
## IN SUPPORT OF DEFENDANT'S BRIEF IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT

David H. Williams (DE 616)
James H. McMackin, III (DE 4284)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
P.O. Box 2306
Wilmington, DE  19899-2306
302.888.6900/5849
dwilliams@morrisjames.com
jmcmackin@morrisjames.com

Michael J. Ossip (admitted pro hac vice)
Sean W. Sloan (admitted pro hac vice)
Yordanos Teferi (admitted pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
215.963.5761
Fax:  215.963.5001
Attorneys for Defendant Christiana Care Health
Services, Inc.

Dated: January 11, 2008

## INDEX

1.   Bray v. L.D. Caulk Dentsply Int'l, No. 98-441-SLR, 2000 WL. 1800527 (D. Del. July 31, 2000)

2.   Cooper v. Binney & Smith, Inc., No. 96-6230, 1998 WL 103302 (E.D. Pa. Feb. 26, 1998)

3.   Davis v. Ashcroft, Civ. No. 00-584, 2002 WL 1065686 (D.N.J. Mar. 8, 2002)

4.   King v. Sch. Dist. of Phila., No. 00-CV-2503, 2001 WL 856948 (E.D. Pa. July 26, 2001)

5.   McIntyre v. City of Wilmington, No. C.A. 01-396 GMS, 2002 WL 1586280 (D. Del. July 9, 2002)

6.   Nichols v. Bennett Detective & Protective Agency, Inc., 2006 U.S. Dist. LEXIS 35491 (D. Del. May 31, 2006)

# EXHIBIT 1

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2000 WL 1800527 (D.Del.)
(Cite as: 2000 WL 1800527 (D.Del.))

**H**
Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Sonja L. BRAY, Plaintiff,
v.
L.D. CAULK DENTSPLY INTERNATIONAL,
Defendant.
No. C.A. 98-441-SLR.

July 31, 2000.
Sonja L. Bray, Plaintiff, pro se.

Scott A. Holt, of Young Conaway Stargatt &
Taylor, LLP, Wilmington, Delaware, for defendant.

ORDER
ROBINSON, J.

*1 At Wilmington this 14th day of November,
2000, it having come to the court's attention that the
Memorandum Opinion dated July 31, 2000 was
misprinted;

IT IS ORDERED that the attached Memorandum
Opinion shall serve as a corrected copy of said
Memorandum Opinion.

MEMORANDUM OPINION
I. INTRODUCTION

Plaintiff Sonja L. Bray filed this action on July 28,
1998 against defendant L.D. Caulk Dentsply Inter-
national ("Dentsply"), asserting a claim under the
Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et
seq., for race discrimination. [FN1] (D.I.2) Plaintiff
subsequently amended her complaint to add a claim
of retaliation against Dentsply. (D.I.29) At all times
relevant, plaintiff was a full-time production oper-
ator at Dentsply's facility in Milford, Delaware.
(D.I. 36, Exh. A at 24-25) Plaintiff had held this po-
sition since December 1995. (D.I. 36, Exh. A at
24-25; Exh. F) In her complaint, plaintiff alleges
that Dentsply management improperly punished her
for an infraction of company guidelines on the basis
of her race and retaliated against her after she filed

a charge of race discrimination. (D.I.2, 29) The
court has jurisdiction over this action pursuant to 28
U.S.C. § 1331.

> FN1. Plaintiff's original complaint also
> contained a claim for sex discrimination;
> this claim, however, was dismissed by or-
> der of the court on March 30, 1999.
> (D.I.16)

Currently before the court are plaintiff's motion for
partial summary judgment (D.I.34) and Dentsply's
motion for summary judgment (D.I.35). [FN2] For
the following reasons, plaintiff's motion shall be
denied and defendant's granted.

> FN2. Also pending before the court are
> plaintiff's motion to strike Dentsply's mo-
> tion for summary judgment (D.I.37) and
> Dentsply's motion to strike plaintiff's re-
> sponse to defendant's reply brief (D.I.39).
> The court shall deny both of these motions.

II. BACKGROUND

Plaintiff's allegations arise out of incident that took
place in early February 1998 and related events oc-
curring thereafter. On February 9, 1998, plaintiff
sold two boxes of Girl Scout cookies to a co-worker
("TC"), who paid by check. (D.I. 36, Exh. A at
51-52; D.I. 34, February 11, 1998 Memo to the
File) TC placed the cookies in her locker. (D.I. 36,
Exh. A at 51-52; D.I. 34, February 11, 1998 Memo
to the File) Later that same day, plaintiff informed
TC that she had lost the check and asked TC to
write her another one. (D.I. 36, Exh. A at 51-52;
D.I. 34, February 11, 1998 Memo to the File) TC
refused. (D.I. 36, Exh. A at 51-52; D.I. 34, Febru-
ary 11, 1998 Memo to the File) At the end of the
day, when TC went to her locker to get her coat, the
boxes of cookies were missing. (D.I. 36, Exh. A at
51-52; D.I. 34, February 11, 1998 Memo to the
File) TC confronted plaintiff, who admitted to tak-
ing the cookies. (D.I. 36, Exh. A at 51-52; D.I. 34,
February 11, 1998 Memo to the File) Words were
exchanged. (D.I. 36, Exh. A at 51-52; D.I. 34, Feb-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1800527 (D.Del.)
(Cite as: 2000 WL 1800527 (D.Del.))

ruary 11, 1998 Memo to the File)

Unbeknownst to both plaintiff and TC, a co-worker ("DJ") had overheard their exchanges. (D.I. 36, Exh. A at 51-52; D.I. 34, February 11, 1998 Memo to the File) Concerned that things were getting out of hand, DJ reported plaintiff's conduct to Randy Correia, plaintiff's Department Leader's supervisor, and Carol Craddock, a human resource representative. (D.I. 36, Exh. A at 28-29, 52; D.I. 34, February 11, 1998 Memo to the File)

**\*2** Craddock initiated an investigation into the incident. She interviewed several employees, including TC, DJ, and plaintiff. (D.I. 34, February 11, 1998 Memo to the File) According to Craddock's notes, during her interview with plaintiff on February 12, 1998, plaintiff admitted to taking the cookies but indicated "she had resolved everything with [TC]." (D.I. 34, February 11, 1998 Memo to the File) Plaintiff's conduct was determined to be in violation of Dentsply's Standards of Conduct and Work Rules, which prohibits theft or unauthorized removal of property while on company premises and subjects offenders "to appropriate corrective action." (D.I. 36, Exh. A at 27, Exh. B, ¶ 3, Exh. F) Accordingly, on February 13, 1998, plaintiff was placed on suspension for two (2) days without pay. (D.I.36, Exh. D)

On February 25, 1998, plaintiff filed a charge of discrimination with the Delaware Department of Labor ("DDOL"). (D.I.36, Exh. E) In her charge, plaintiff alleged that her suspension was motivated by racial animus. (D.I.36, Exh. E) Specifically, plaintiff alleged that "co-workers not of [her] race have committed infractions against this policy and have not had the same severity of punishment as [she] ha[d]." [FN3] (D.I.36, Exh. E)

> FN3. During her deposition, plaintiff admitted that, at the time she filed the charge, she was unaware of any co-workers "not of [her] race" who had violated this rule and received treatment favorable to hers. (D.I. 36, Exh. A at 98-101)

The DDOL ultimately concluded in a

memorandum dated May 28, 1998 that no reasonable cause existed to believe that Dentsply had discriminated against plaintiff on the basis of her race. (D.I.36, Exh. J)

In addition to filing a charge of discrimination, plaintiff sent a number of letters to Gary Weingarth, a manager at Dentsply's main office, in which she alleged unfair treatment. (D.I. 34, Letter to Weingarth) In one of these letters, plaintiff complained that she had reviewed her personnel file and found it contained an "inaccurate deposition." (D.I. 36, Exh. B ¶ 4 and Exh. C, ¶ 5) Craddock was notified of plaintiff's allegation and began an investigation into the matter. (D.I.36, Exh. B, ¶ 4)

As part of her investigation, Craddock reviewed plaintiff's personnel file. During that review, Craddock discovered a discrepancy between the information on plaintiff's February 1996 employment application and an employment background report performed by Equifax Employment Services (n/k/a Choice Point) ("Equifax"). (D.I.36, Exh. B, ¶ 4, Exh. F, Exh. G) Specifically, on her employment application, plaintiff had indicated she had never been convicted of a felony yet the Equifax report indicated a felony conviction in 1992. (D.I.36, Exh. B, ¶ 4, Exh. F, Exh. G) Craddock reported the discrepancy to Sally Paull, Director of Human Resources. (D.I.36, Exh. B, ¶ 4, Exh. C, ¶¶ 5-6)

On May 19, 1998, Paull called plaintiff into her office to discuss the discrepancy. (D.I. 36, Exh. A at 85-89; Exh. C, ¶ 7) When confronted with the Equifax report, plaintiff denied that she had ever been convicted of a felony although she admitted to various misdemeanor convictions. (D.I. 36, Exh. A at 85-89; Exh. C, ¶ 7) In order to verify plaintiff's assertion, Paull instructed plaintiff to get a copy of her criminal report from the Delaware Superior Court by Friday of that week. (D.I. 36, Exh. A at 66; Exh. C, ¶ 7) Because plaintiff failed to provide Paull with a copy of her criminal report, Paull contacted the Prothonotary to obtain the required information. (D.I.36, Exh. C, ¶ 7) The Prothonotary reported that plaintiff's 1992 conviction, in fact,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1800527 (D.Del.)
(Cite as: 2000 WL 1800527 (D.Del.))

was a misdemeanor. (D.I.36, Exh. C, ¶¶ 7-8) Having ascertained that the Equifax report was in error, Paull dropped the matter without disciplining plaintiff or giving her any type of warning. (D.I. 36, Exh. A at 86-87, Exh. C, ¶ 8)

*3 On June 1, 1998, plaintiff filed a second charge of discrimination against Dentsply. (D.I.36, Exh. H) In this charge, plaintiff alleged that Dentsply had retaliated against her for filing the first charge by questioning her about the aforementioned discrepancy. [FN4] (D.I.36, Exh. H)

> FN4. On December 31, 1998, the DDOL issued a memorandum wherein it concluded that no reasonable cause existed to believe that Dentsply had retaliated against plaintiff. (D.I.36, Exh. K)

On or about June 24, 1998, plaintiff informed Dentsply management that she would be resigning her employment at the end of July. (D.I. 36, Exh. A at 39; Exh. I) Plaintiff indicated to a variety of individuals varying reasons for her decision; these explanations included, *inter alia,* that she had a better job offer and her husband had found a better paying job. (D.I. 36, Exh. A at 35-43) On or about June 28, 1998, plaintiff left a message with her department head that she would not be returning to work. (D.I. 36, Exh. A at 41-42)

III. STANDARD OF REVIEW

A court shall grant summary judgment only "when the admissible evidence fails to demonstrate a genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." *Wetzel v. Tucker,* 139 F.3d 380, 383 n. 2 (3d Cir.1998) (citing Fed.R.Civ.P. 56(c)) (emphasis added). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance*

Co., 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial." ' *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

With respect to summary judgment in discrimination cases, the court's role is " 'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." ' *Revis v. Slocomb Indus., Inc.,* 814 F.Supp. 1209, 1215 (D.Del.1993) (quoting *Hankins v. Temple Univ.,* 829 F.2d 437, 440 (3d Cir.1987)).

IV. DISCUSSION

A. Race Discrimination

*4 Initially, plaintiff contends that Dentsply's decision to impose a two-day suspension for her infraction of company policy was motivated by racial animus. Title VII prohibits discrimination against an employee:

> It shall be an unlawful employment practice for an employer--
> (1) to fail or refuse to hire or to discharge any in-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1800527 (D.Del.)
(Cite as: 2000 WL 1800527 (D.Del.))

dividual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ...; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race....

42 U.S.C. § 2000e-2(a). Claims of race-based discrimination brought pursuant to the Title VII are analyzed under a burden-shifting framework, the particulars of which vary depending on whether the suit is characterized as a "pretext" suit or a "mixed motives" suit. Since review of the record does not reveal any direct evidence of race-based discrimination and plaintiff does not purport to assert such, the court will analyze plaintiff's discrimination claim using the burden-shifting framework for "pretext" suits set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir.1997).

Under this framework, a plaintiff must first establish a *prima facie* case of race discrimination under Title VII. In order to state a *prima facie* case of race discrimination based on a suspension, a plaintiff must prove: "(1) that he is a member of a protected class; (2) that he suffered some form of adverse employment action; (3) under circumstances that give rise to an inference of unlawful discrimination such as might occur when a person not of the protected class is not suspended." *Boykins v. Lucent Techs., Inc.*, 78 F.Supp.2d 402, 409 (E.D.Pa.2000) (citing *Jones v. School Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir.1999)). The Court of Appeals for the Third Circuit has recognized, however, that the elements of a *prima facie* case may vary depending on the facts and context of the particular case. *Pivirotto v. Innovative Sys. Inc.*, 191 F.3d 344, 352 (3d Cir.1999).

Once a plaintiff has established a *prima facie* case, the burden shifts to the defendant to "clearly set forth through the introduction of admissible evidence" reasons for its actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the motivating force behind the adverse employment action. *See Burdine*, 450 U.S. at 254-55. If the defendant rebuts the *prima facie* showing by demonstrating legitimate, nondiscriminatory reasons for the adverse employment action, the presumption of discrimination drops from the case, and the plaintiff must "cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible." *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir.1996) (en banc), *cert. denied*, 117 S.Ct. 2532 (1997); *see also Smith v. Borough of Wilkinsburg*, 147 F.3d 272, 280 (3d Cir.1998) ("[T]he jurors must be instructed that they are required to infer, but need not, that the plaintiff's ultimate burden of demonstrating intentional discrimination by a preponderance of the evidence can be met if they find that the facts needed to make up the *prima facie* case have been established and they disbelieve the employer's explanation for its decision."); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993); *Reeves v. Sanderson Plumbing Prods., Inc.*, --- U.S. ---, 120 S.Ct. 2097, 2106 (2000). A plaintiff can demonstrate that there is "sufficient doubt" by showing " 'weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them 'unworthy of credence.' " *Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994) (citations omitted)). Alternatively, a Title VII plaintiff can defeat a motion for summary judgment by showing "that the reason for the employer's act was discrimination." *Bray v. Marriott Hotels*, 110 F.3d 986, 990 (3d Cir.1990).

**\*5** In the instant action, defendant does not dispute that plaintiff meets the first two elements of the *prima facie* case but denies that plaintiff has made the specific allegations required to establish the third factor. Defendant, however, mischaracterizes the third prong of the analysis by requiring plaintiff to demonstrate that "members outside the protected group received more favorable treatment." (D.I. 36

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Page 5

Not Reported in F.Supp.2d, 2000 WL 1800527 (D.Del.)

**(Cite as: 2000 WL 1800527 (D.Del.))**

at 9) Such a requirement flies in the face of recent Third Circuit case law. The Third Circuit in *Matczak v. Franford Candy & Chocolate Co., 136 F.3d 933 (3d Cir.1998),* expressly held that a showing of favorable treatment towards employees outside the relevant protected class was not a necessary element for every employment discrimination case. *See id. at 939-40.* The Third Circuit reiterated its intention in this regard in *Pivirotto* when, after acknowledging that it had used "some occasionally imprecise language in dicta in certain cases," it explained that allowing a plaintiff to meet her *prima facie* burden by demonstrating generally that she was subjected to an adverse employment action under circumstances that give rise to an inference of unlawful discrimination was consistent with Third Circuit and Supreme Court precedent. *See Pivirotto, 191 F.3d at 357.* Thus, the fact that plaintiff in the instant action has failed to provide any evidence that individuals not in the protected class received favorable treatment does not preclude her, as a matter of law, from establishing the existence of a *prima facie* case.

Nevertheless, plaintiff has not presented any evidence from which an inference of discrimination on the basis of race can be drawn. Plaintiff speculates that race was the motivating factor in her suspension but provides nothing to substantiate that allegation. Speculation alone cannot establish a *prima facie* case of discrimination. Nor is her disagreement with the severity of the punishment that was meted out sufficient to establish a presumption of discrimination. Short of plaintiff's unsupported conclusory allegations, the record is devoid of anything that indicates her suspension without pay was motivated in any part by racial animus. Therefore, the court finds that plaintiff has failed to satisfy the third element of a *prima facie* case of race-based discrimination.

Assuming, arguendo, that plaintiff could establish a *prima facie* case, the court finds that plaintiff has not rebutted the legitimate, nondiscriminatory justification offered by Dentsply for suspending her. It is undisputed that plaintiff removed the boxes of cookies from her co-worker's locker without per-

mission and that such unauthorized removal of property is in contravention of Dentsply's rules governing workplace conduct, subjecting the violator to appropriate corrective action. Because Dentsply has offered a legitimate, nondiscriminatory justification for its disciplinary action, the burden shifts to plaintiff to offer evidence of pretext. *See Bray, 110 F.3d at 990.* Having carefully reviewed the record, the court finds that plaintiff has offered no such evidence. Accordingly, plaintiff has failed to "cast sufficient doubt" upon Dentsply's proffered reason for plaintiff's suspension to enable a rational trier of fact to find that Dentsply discriminated against plaintiff. The court shall grant Dentsply's motion for summary judgment on plaintiff's race discrimination claim.

### B. Retaliation

**\*6** Plaintiff further alleges that Dentsply officials retaliated against her after she filed the charge of discrimination with the DDOL. Title VII prohibits discrimination against an employee who has exercised her rights under the Act:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [s]he [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated, in any manner in an investigation, proceeding, or hearing under this title.

*42 U.S.C. § 2000e-3(a).* Claims of retaliation brought pursuant to Title VII are analyzed under the same burden-shifting frameworks mentioned above. In the case at bar, plaintiff has presented only indirect evidence of retaliation, thus, the *McDonnell Douglas* pretext framework applies.

As with a race-based discrimination claim, a plaintiff claiming retaliation must first establish a *prima facie* case for retaliation under Title VII. In order to do so, a plaintiff must demonstrate by a preponderance of the evidence that: (1) she engaged in protected activity; (2) that the defendant took adverse employment action against her; and (3) that a causal link exists between the protected activity and

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1800527 (D.Del.)

**(Cite as: 2000 WL 1800527 (D.Del.))**

Page 6

the adverse action. *See* *Kachmar v. Sungard Data Sys., Inc.,* 109 F.3d 173, 177 (3d Cir.1999). Once the plaintiff has established a *prima facie* case, the defendant must state a clear and reasonably specific legitimate, non-discriminatory reason for the adverse employment action. *See* *Olson v. General Elec. Astrospace,* 101 F.3d 947, 951 (3d Cir.1996). If the defendant does so, the presumption of discrimination drops from the case, and the plaintiff must prove that the defendant's proffered reasons are not the "true reasons" for its decision, but are merely pretext for discrimination. *Id.*

In the instant action, Dentsply does not dispute that plaintiff engaged in protected activity within the purview of Title VII when she filed the charge of discrimination. Dentsply argues, however, that the retaliatory act alleged by plaintiff does not amount to "adverse employment action" as that term has been defined by the Third Circuit. In *Robinson v. City of Pittsburgh,* 120 F.3d 1286 (3d Cir.1997), the Third Circuit held that the "adverse employment element" of a retaliation claim requires that the "retaliatory conduct rise to the level of a violation of 42 U.S.C. § 2000e-2(a)(1) or (2)." *Id.* at 1300-01. That provision makes it "an unlawful employment practice for an employer"

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ...;
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee because of such individual's race....

*7 42 U.S.C. § 2000e-2(a). As interpreted in *Robinson,* this provision proscribes retaliatory conduct other than discharge or refusal to rehire "only if it alters the employee's 'compensation, terms, conditions, or privileges of employment,' deprives him or her of 'employment opportunities,' or 'adversely affect[s] his [or her] status as an employee." ' *Robinson,* 120 F.3d at 1300. According to the Third Circuit, "[i]t follows that 'not everything that makes an

employee unhappy' qualifies as retaliation, for '[o]therwise, minor and even trivial employment actions that an 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." ' *Id.* (quoting *Smart v. Ball State University,* 89 F.3d 437, 441 (7th Cir.1996)). Consistent with this interpretation, the *Robinson* court found that allegations of "unsubstantiated oral reprimands" and "unnecessary derogatory comments" did not rise to the level of "adverse employment action" required for a retaliation claim because while such conduct might constitute harassment, it did not affect the "terms, conditions, or privileges of employment' or future employment opportunities. *Id.* at 1301.

In the instant action, plaintiff alleges that Dentsply officials retaliated against her when at such a late date in her employment they asked her to produce documentation verifying that she had not been convicted of a felony. Such an action does not constitute an "adverse employment action" as that term has been defined by the Third Circuit. Plaintiff does not allege that any stigma attached as a result of defendant's inquiry into her criminal record. Nor has she claimed that the inquiry resulted in any change in her employment conditions, privileges, or opportunities of employment. Moreover, even if such an act satisfied the standard set forth above, plaintiff has failed to establish a causal connection between defendant's conduct and her protected activity. That Dentsply officials requested the documentation several months after plaintiff filed a charge of discrimination is insufficient to establish an inference of causation. *See* *Krouse,* 126 F.3d at 503 (stating that timing must be unusually suggestive to establish causation and that under the facts before it, "the timing of the allegedly retaliatory employment action cannot, standing alone, support a finding of causal link"). The court finds, therefore, that plaintiff has not established that she suffered an adverse employment action with respect to Dentsply's inquiry into her criminal record.

**V. CONCLUSION**

For the reasons stated above, the court concludes

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                               Page 7
Not Reported in F.Supp.2d, 2000 WL 1800527 (D.Del.)
**(Cite as: 2000 WL 1800527 (D.Del.))**

that plaintiff has failed to establish the essential elements of her claims of race discrimination and retaliation under Title VII. In addition, after defendant satisfied its burden of production by articulating a legitimate, non-discriminatory reason for suspending plaintiff, plaintiff failed to satisfy her burden of showing that defendant's articulated reason was a pretext for race-based discrimination. Accordingly, plaintiff's motion for summary judgment (D.I.34) shall be denied and defendant's motion for summary judgment (D.I.35) shall be granted. An appropriate order shall issue.

Not Reported in F.Supp.2d, 2000 WL 1800527 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 2

Westlaw.

1998 WL 103302                                                      Page 1
Not Reported in F.Supp., 1998 WL 103302 (E.D.Pa.)
**(Cite as: 1998 WL 103302 (E.D.Pa.))**

**C**
Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Thomas COOPER, Plaintiff
v.
BINNEY & SMITH, INC., Defendant
**No. Civ.A. 96-6230.**

Feb. 26, 1998.
Allen R. Washington, Phila, PA, Chauncey Harris,
Phila, PA, for Thomas Cooper, plaintiff.

Julia E. Vaughters, Morgan, Lewis & Bockius,
Phila, PA, for Binney and Smith, defendant.

**MEMORANDUM**
TROUTMAN, Senior J.

*1 Plaintiff Thomas Cooper has been employed by
defendant Binney & Smith, a wholly owned subsi-
diary of Hallmark Cards, Inc., since 1978. During
his tenure at Binney, where he has worked as a
floor laborer and forklift operator, plaintiff received
one documented disciplinary warning, was never
denied requested shift changes and was never ter-
minated.  Nevertheless, Cooper alleges that he has
faced pervasive racial discrimination and harass-
ment during his employment, including threatening
conduct, closer scrutiny of his work habits than
white employees received, and denial of opportunit-
ies for overtime.  Consequently, plaintiff filed com-
plaints with the Pennsylvania Human Relations
Commission (PHRC) in 1985 and with the EEOC in
1995.  When the EEOC dismissed plaintiff's most
recent charge in June, 1996, he commenced this ac-
tion pursuant to Title VII of Civil Rights Act of
1964, 42 U.S.C. § 2000e-2(a). [FN1]

> FN1. In his complaint, plaintiff also cited
> 42 U.S.C. § 1983 as a basis for his
> claims.  Plaintiff has not, however, either
> alleged or established any facts to support
> a § 1983 claim.  Indeed, in his brief in op-
> position to defendant's motion for sum-
> mary judgment, he has not even attempted

to argue that the circumstances underlying
his claims constitute a violation of § 1983.
In order to establish defendants' liability
under § 1983, plaintiff is required to allege
and prove, at a minimum, the two essential
elements of a 51983 civil rights claim, *i.e.,*
1) deprivation of rights secured by the
Constitution or laws of the United States,
(2) by persons acting under color of state
law. *Piazza v. Major League Baseball,* 831
F.Supp. 420 (E.D.Pa.1993).  Plaintiff
must, therefore, demonstrate that the de-
fendants violated protected rights and that
their actions were "fairly attributable" to
the state. *McKeesport Hospital v. Accred-
itation Council,* 24 F.3d 519, 523 (3rd
Cir.1994) (Citation omitted)
Since plaintiff has made no effort establish
either of these essential elements and since
there is absolutely nothing in the record
which suggests that defendant is an instru-
mentality of the state, and, therefore, could
possibly be liable for a violation of rights
protected from government intrusion, we
conclude that plaintiff's § 1983 "claim"
was included in his complaint as mere
boilerplate and will not further discuss the
substantive legal standards applicable to a
§ 1983 claim.

Upon thorough review of the record produced by
defendant in support of its pending motion for sum-
mary judgment, the Court concludes that plaintiff
has failed to come forward with evidence to either
establish an adverse employment action, a basic
element of a claim for employment discrimination,
or to demonstrate that there are material issues of
fact in dispute with respect to whether he was sub-
jected to race discrimination in employment.  [FN2]
The purported incidents of discriminatory conduct
cited by plaintiff in his deposition testimony
amount to nothing more than speculation based
upon subjective feelings.  There are no reasonable
inferences possible from the record which suggest
that plaintiff was treated less favorably than white

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1998 WL 103302                                                          Page 2
Not Reported in F.Supp., 1998 WL 103302 (E.D.Pa.)
**(Cite as: 1998 WL 103302 (E.D.Pa.))**

employees or that he was threatened or harassed by his supervisors at work, or outside of work, by agents acting on behalf of Binney. Moreover, even if a cognizable Title VII claim could be based upon any of the alleged problems that plaintiff related in his deposition testimony, many such incidents occurred so long ago that any potential claims arising therefrom are clearly time-barred, or plaintiff's testimony was so vague with respect to when such alleged incidents occurred that it is impossible to determine whether they would be presently actionable. Summary judgment in favor of defendant is appropriate, therefore, on all of plaintiff's claims.

> FN2. The Court is forced to rely entirely upon the record produced by defendant since plaintiff produced none of the evidentiary materials enumerated in Fed.R.Civ.P. 56(e) to support his claims and to oppose the motion for summary judgment.
>
> Despite ample opportunity for discovery, it appears that plaintiff served no interrogatories until after expiration of the discovery period, and never served document production requests or noticed depositions at all. Consequently, the only evidence available in support of his claims would necessarily be found in plaintiff's own deposition. He has not, however, even attempted to argue that his testimony constitutes evidence sufficient to support his claims or to identify a dispute over material facts essential to his claims.

*Applicable Legal Standards*

1. Summary Judgment

Summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P 56(c).

To support denial of summary judgment, an issue of fact in dispute must be both genuine and material, *i.e.,* one upon which a reasonable factfinder could base a verdict for the nonmoving party and one which is essential to establishing the claim. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court is not permitted, when considering a motion for summary judgment, to weigh the evidence or to make determinations as to the credibility thereof. Our sole function, with respect to the facts, is to determine whether there are any disputed issues and, if there are, to determine whether they are both genuine and material. *Id.*

\*2 The Court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well. *Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358 (3d Cir.1987).

In order to obtain a summary judgment, the proponent of the motion has the initial burden of identifying, from the sources enumerated in Rule 56, evidence which demonstrates the absence of a genuine issue of material fact. When confronted by a properly supported motion for summary judgment, the opposing party is required to produce, from the same sources, some contrary evidence which could support a favorable verdict. Thus,

> [T]he mere existence of some evidence in support of the non-moving party will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-moving party on the issue.

*Petrucelli v. Bohringer and Ratzinger,* 46 F.3d 1298, 1308 (3rd Cir.1995).

Additionally, where the non-movant, usually the plaintiff, bears the burden of proof on the issue which is the subject of the summary judgment motion and is confronted by the defendant's argument that the facts established through the discovery process do not support the claim, that party must identify evidence of record sufficient to establish every element essential to the claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *Equimark Commercial Fin-*

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1998 WL 103302
Not Reported in F.Supp., 1998 WL 103302 (E.D.Pa.)
(Cite as: 1998 WL 103302 (E.D.Pa.))

*ance Co. v. C.I.T. Financial Services Corp.*, 812 F.2d 141 (3d Cir.1987).

To defeat summary judgment, the party opposing the motion may not rest upon mere denials of the facts identified by the movant as supportive of its position, nor upon the vague and amorphous argument that the record somewhere contains facts sufficient to support its claims. *Childers v. Joseph*, 842 F.2d 689 (3d Cir.1987). Instead, the party resisting the motion for summary judgment is required to identify, specifically, the evidence of record which supports the claim and upon which a verdict in its favor may be based. *Id.*

If the movant succeeds in demonstrating that there are no genuine issues of material fact in dispute, the Court must then be satisfied that the moving party is entitled to judgment as a matter of law. Obviously, it will avail the proponent of summary judgment nothing if the undisputed facts, considered in light of the legal standards applicable to the claim, do not support a judgment in its favor.

2. Title VII

The burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and more recently refined in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), is the appropriate analysis for summary judgment motions in cases alleging violations of Title VII based upon racial discrimination. Thus, to properly evaluate defendant's summary judgment motion, the Court must first determine whether plaintiff has adduced sufficient evidence to support a prima facie case, *i.e.*, (1) that he is a member of a protected class, in this case, a racial minority; (2) that he was qualified for the position in issue; (3) that he was subjected to an adverse employment action; (4) that employees not in the protected class were treated more favorably. *See, Josey v. Hollingsworth*, 996 F.2d 632 (3rd Cir.1993).

*3 If plaintiff succeeds in properly articulating a prima facie case, defendant must then come forward with evidence which would permit the fact-

finder to conclude that there was a legitimate, nondiscriminatory reason for its unfavorable action. *Id.* At that point, plaintiff must produce "evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3rd Cir.1994).

To the extent that plaintiff asserts a claim for employment discrimination resulting from an intimidating or offensive work environment,

[P]laintiff must show that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondent superior liability.

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3rd Cir.1996).

Thus, in order to defeat summary judgment in this case, plaintiff must first adduce sufficient evidence to establish a prima facie case of race discrimination. In particular, he must at least raise a genuine issue of material fact with respect to whether he suffered any adverse action resulting from disparate treatment, including whether he was subjected to a hostile work environment. Since we conclude that plaintiff has not done so, and, therefore, that he cannot establish the ultimate issue in the case, *i.e.,* that the employer unlawfully discriminated against him, the burden of production in this case does not shift to the employer. Rather, summary judgment is appropriate based upon plaintiff's failure to produce any creditable evidence that he was subjected to adverse employment conditions sufficient to support a claim of race discrimination.

*Discussion*

Plaintiff's claims of adverse employment conditions rest upon the specific allegation that he was, on

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

several occasions, denied the opportunity for over-time hours and upon more generalized complaints that he was harassed by white supervisors and co-workers. At his deposition, however, plaintiff was unable to support his claims by anything more than his own belief that he was the target of racially mo-tivated remarks and/or conduct intended to disad-vantage or harass him because of his race. [FN3]

> FN3. Our discussion of plaintiff's claims of race discrimination likewise encompasses his purported claim for retaliation based upon his 1986 PHRC complaint and his 1995 EEOC complaint, since plaintiff ap-pears to contend that the allegedly discrim-inatory conduct that he describes in his de-position had the dual purpose of harassing him because of his race and because of his prior complaints.
> The purported retaliation claims add noth-ing to the viability of this action. In the first instance, retaliation arising from the 1986 complaint, even if plaintiff could now prove that it occurred, is long barred by the statute of limitations. In addition, as noted, plaintiff has consistently failed to establish that when alleged instances of dis-criminatory conduct allegedly occurred. Consequently, it is difficult to determine whether alleged discrimination of more re-cent vintage occurred before or after plaintiff's 1995 EEOC complaint. Finally, plaintiff has failed to establish that super-visors who allegedly discriminated against him were aware that he had made a com-plaint or of the incidents upon which such complaint was based.

With respect to his claim that he was denied over-time, *e.g.*, plaintiff could not state, initially, how many times he was allegedly denied overtime or when such incidents occurred. (*See,* Plaintiff's De-position, Exh. C to Defendant's Motion for Sum-mary Judgment, (Doc. # 8), at 55). Although plaintiff stated that he "knew" of at least two occa-sions when someone with less seniority than he was given the opportunity for overtime, he actually test-ified that unspecified co-workers had told him that others had worked when he has not asked to do so. (*Id.*) Moreover, when plaintiff did testify, spe-cifically, that he had been denied overtime in Feb-ruary, 1997, he also testified that he had worked 70 hours of overtime in the month prior to his May, 1997, deposition, and that he had declined oppor-tunities for additional hours. (*Id.* at 158-59). In es-sence, when pressed by defendant's counsel con-cerning overtime, plaintiff stated that he would like to be given the option of taking overtime whenever it is available, but he does not intend to accept all the overtime that might be available (*Id.* at 161).

*4 Plaintiff's testimony in this regard establishes nothing more than that he might occasionally have been passed over for the opportunity to accept or decline overtime hours. Plaintiff could not state how often such incidents might have occurred with-in the period for which he can make a discrimina-tion claim. In addition, plaintiff did not testify that those with less seniority who were purportedly giv-en the overtime opportunities he was denied were white, or even that he has any basis for believing that the conduct of the supervisors who allegedly failed to offer him overtime was intentional rather than the result of mistakes or inadvertent over-sights.

With respect to plaintiff's more generalized com-plaints of a hostile work environment, he first cites several incidents dating to April and October, 1986. In the first instance, liability on plaintiff's current complaint cannot be based upon anything that occurred so long ago, and, therefore, need not be discussed in detail. Moreover, plaintiff has not and cannot produce any evidence, other than his own speculation, that such incidents were actually directed toward him, were perpetrated for the pur-pose of harassing him or retaliating against him for filing his 1986 PHRC complaint, or that anyone connected to defendant played any part in them.

Plaintiff's claims of more recent discrimination are similarly insubstantial. Plaintiff stated, *e.g.,* that a former supervisor was known for making racial re-marks. (*Id.* at 38). Plaintiff also testified, however,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

that he had never heard such slurs himself, but had been told of the supervisor's language by other employees. (*Id.*) Plaintiff also stated that the same supervisor would speak to him about talking to other employees for a short period of time while permitting white employees to talk among themselves or look at magazines for much longer periods. (*Id.* at 37, 45). Again, however, plaintiff could not state how often that occurred, or even that he was regularly, rather than occasionally, reprimanded. In addition, plaintiff provided no evidence from which a reasonable inference can be drawn that the supervisor scrutinized him more closely because of his race rather than for other reasons, such as personal animosity arising from factors other than plaintiff's race. Finally, there is no evidence that plaintiff was adversely affected by the supervisor's comments, much less that a reasonable person of the same race in the same position would be detrimentally affected by the conduct of which plaintiff complains.

Plaintiff testified to only one instance of actual discipline during his employment at Binney, a documented verbal warning for failing to date orders and documents. (*Id.* at 86). Although he does not deny that he did, indeed, make the mistake for which he was warned, plaintiff believes that the warning was racially motivated because he was the only black in the Receiving and Distribution Department, and a white co-worker told him that she made mistakes every day that the supervisor called to her attention. (*Id.* at 87). When questioned as to whether that employee or other white employees were given verbal warnings, plaintiff could not positively state that they were not warned, only that he was unaware of anyone else having received a warning.

*5 Once again, plaintiff's testimony in this regard falls far short of evidence of an adverse employment action. In the first instance, it is unclear from the record when the incident occurred. Second, there is no evidence to support plaintiff's suspicion that white co-workers who made mistakes were treated differently. Plaintiff simply does not know that white co-workers were not warned for repeated

mistakes, and he has provided no documents suggesting that he or other black employees were subjected to more frequent formal discipline than white employees.

### Conclusion

It is quite clear that plaintiff has suffered no adverse employment action with quantifiable or even tangible effects, such as loss of compensation or position. Moreover, the perceived slights that plaintiff contends amount to pervasive employment discrimination do not rise to the level of racial harassment in the workplace. During more than nineteen years of employment, plaintiff can pinpoint only a few concrete instances of treatment that even he considers evidence of discrimination, and those are so subjective that no reasonable factfinder could conclude that the events plaintiff described would detrimentally affect a reasonable person of the same race in the same position. Indeed, plaintiff provided no evidence that he himself had been detrimentally affected, in terms of describing manifestations of either physical or mental distress resulting from the purportedly discriminatory treatment of which he complains. Plaintiff's failure to oppose defendant's motion for summary judgment with sufficient evidence to support a prima facie case of race discrimination under Title VII requires that defendant's motion be granted and that judgment be entered in favor of the defendant.

### ORDER

And now, this 25th day of February, 1998, upon consideration of defendant's Motion for Summary Judgment, (Doc. # 8), and plaintiff's response thereto, IT IS HEREBY ORDERED that the motion is GRANTED.

IT IS FURTHER ORDERED that judgment is entered in favor of the defendant, Binney & Smith, Inc., and against the plaintiff.

IT IS FURTHER ORDERED that the Clerk shall mark the above-captioned action CLOSED for statistical purposes.

Not Reported in F.Supp., 1998 WL 103302 (E.D.Pa.)

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1998 WL 103302                                                                    Page 6
Not Reported in F.Supp., 1998 WL 103302 (E.D.Pa.)
**(Cite as: 1998 WL 103302 (E.D.Pa.))**

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 3

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1065686 (D.N.J.)
(Cite as: 2002 WL 1065686 (D.N.J.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. New Jersey.
Venson C. DAVIS, Plaintiff,
v.
John ASHCROFT, in his official capacity as Attorney General for the United
States of America, Defendant.
**Civ. No. 00-584(WGB).**

March 8, 2002.

Gregory R. Preston, Esq., Preston & Wilkins, South Orange, NJ, for Plaintiff Venson Davis.

Robert Kirsch, AUSA, Newark, NJ, for the United States.

OPINION
BASSLER, District Judge.

*1 Plaintiff Venson C. Davis ("Davis") has brought this employment discrimination action against Attorney General John Ashcroft ("Defendant" or "the Government"), alleging that in the course of his employment with the Immigration and Naturalization Service ("INS") he was passed over for promotion on the basis of his race and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. Defendant now moves for summary judgment. Plaintiff opposes the motion. For the following reasons, Defendant's motion for summary judgment is granted.

*I. BACKGROUND*

Plaintiff Venson C. Davis is an African American employee of the INS, who began his career as a Border Patrol Agent in 1980. Between 1980 and 1996, Davis advanced through the ranks at INS, and in 1996 (the period relevant to this dispute) served at Newark International Airport as a GS-12 level Supervisory Immigration Inspector. [FN1]

FN1. In 1998, after the period relevant to this dispute, Davis laterally transferred to another GS-12 position, and now serves as a Special Agent, Criminal Investigator.

A. *The Elizabeth Detention Facility Supervisory Detention and Deportation Officer Position*

On May 29, 1996, the INS locally posted Vacancy Announcement No. ER MSP II 96- 60 (the "First Announcement") for a GS-13 Supervisory Detention and Deportation Officer position (the "Vacancy"). (Preston Decl. Ex. D.) Mr. Davis applied for the position, and based on his qualifications, was placed on a competitive staffing list by the INS's Office of Human Resources as one of the six applicants that were deemed "Best Qualified" for the position. (Preston Decl. Ex. H.) In addition to the six individuals on the competitive staffing list, one applicant, Mason Ruhlen ("Ruhlen"), who is Caucasian, was listed as "NonCompetitive" for the position. [FN2]

FN2. The distinction between competitive and non-competitive applicants is somewhat counter-intuitive. Non-competitive applicants are those who already serve at the same grade as the position applied for (in this case GS-13). Ruhlen, as a GS-13, did not need to "compete" for the position because he was deemed automatically eligible to apply for the position. Davis, on the other hand, as a GS-12, would have had to "compete" with the other GS-12 applicants before even being considered for the position.

The GS-13 Supervisory Detention and Deportation Officer position for which Davis and Ruhlen applied was at the INS's Elizabeth Detention Facility in Elizabeth, New Jersey. This facility had been closed in 1995 because of a violent detainee riot, but was being re-opened in 1996. Robert Brown, then INS's Acting Regional Director for the Eastern Region of the United States (which included the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1065686 (D.N.J.)
(Cite as: 2002 WL 1065686 (D.N.J.))

Detention Facility), stated of the riots that "[a] review had been conducted of what caused the problems, and a lot of it was laid to poor management." (Deposition of Robert Brown ("Brown Dep.") 63:12-18, Kirsch Decl. Ex. 9.) As part of the reopening process, which was viewed within the INS as a "particularly high priority and sensitive opening," (Decl. of Deputy Assistant Regional Director Michael Rozos ("Rozos Decl.") ¶ 4, Kirsch Decl. Ex. 8), Acting Regional Director Brown stated that it was "very important that if the facility was going to reopen, that we have the best possible persons in [management] positions possible before the [Elizabeth] facility was reopened." (Brown Dep. 63:12-18.)

At the time the First Announcement was made, selecting authority for GS-13 positions rested with INS Executive Associate Commissioner William Slattery ("Slattery"). Slattery served as third in command of the entire INS, subordinate only to the Commissioner and one Deputy Commissioner, and had supervisory authority over 20,000 to 25,000 INS employees worldwide. Because the Vacancy to be filled was a field position in New Jersey, Slattery sought the input of Acting Eastern Regional Director Brown. Brown, who himself supervised some 8,000 employees, sought the input of then New Jersey District Director Warren Lewis ("Lewis"), an African American.

*2 To aid in the selection process, the Eastern Region forwarded Lewis the list of qualified "Competitive" and "NonCompetitive" candidates for the vacancy that had been prepared by the INS's Human Resources office. Lewis reviewed the list, and also spoke with the newly installed officer-in-charge of the Elizabeth Detention Facility, Leroy Frederick. Frederick, an African American, suggested that Lewis recommend Earline Boyer, also an African American, for the position. (Deposition of Leroy Frederick ("Frederick Dep.") 51:1-23, Kirsch Decl. Ex. 14.)

Lewis ultimately wrote a letter memorandum to Eastern Region Director Brown recommending three candidates. The letter states:

I received your July 16, 1996 memorandum regarding the Elizabeth Detention Facility Assistant Officer in Charge (AOIC) position. Thank you for the opportunity to review the lists of candidates and make a recommendation for selection to that position, AOIC, (ER MSP II 96-60).

In priority order, my recommendations are:
• Venson DAVIS--(Supervisory Immigration Inspector) Presently, Mr. Davis has been detailed to the position of Acting Assistant Area Port Director, Newark International Airport (NIA). Mr. Davis has been a Supervisory Inspector at NIA approximately 4 years and had been in the Border Patrol Agent for 12 years. His airport supervisory experience will give balance to the extensive detention and deportation experience that the Officer in Charge (OIC) and Supervisory Detention Officer (SDO) possess. Additionally, his NIA supervisory expertise will be an asset at this user fee facility where our primary customers will be NIA and JFK International Airport.
• Mason RUHLEN--(Supervisory Special Agent) Mr. Ruhlen is presently a Supervisory Special Agent, having held that position for 8 years. He has been with the Service in excess of 18 years, all within the Investigations Program.

OTHER OPTION
• Earline D. BOYER--(Supervisory Deportation Officer) Presently, Ms. Boyer is a GS-13 SDO at NEW and has in excess of 11 years supervisory experience within the Deportation Program. She has 28 years INS experience and was previously an Investigator and Contact Representative. Although Ms. Boyer did not apply competitively for this position, she has expressed interest in this position several times since it has closed. Since she is presently a GS-13, she can be non-competitively selected (management need reassignment) for this position.
Her extensive deportation experience can only compliment the expertise of the OIC and SDO.
(July 30, 1996 Letter, Rozos Decl. Ex. A, Kirsch Decl. Ex. 8.) [FN3]

FN3. In his declaration, Lewis indicated

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1065686 (D.N.J.)
**(Cite as: 2002 WL 1065686 (D.N.J.))**

Page 3

that both the acting program manager and the detention program had reviewed the applicants and recommended Venson Davis. (Warren Lewis Interrogatory Answers ("Lewis Interrog.") ¶¶ 11,14, Preston Decl. Ex. J.) Aside from Lewis's assertion, there is no evidence in the record to support this contention. Lewis also stated that beyond his July 30, 1996 letter to Brown, he spoke to Brown at a headquarters meeting and requested Brown's support for the selection of Davis. (Lewis Interrog. ¶ 7.) Of that conversation, Brown recalled that "[Lewis] did approach me in Washington D.C. about filling vacancies in his district, and I believe he called me on the phone and asked me to help get his vacancies filled." (Brown Dep. 46:22-47:1.)

Deputy Assistant Regional Director Rozos, who worked under Brown at the Eastern Region, helped formulate the Eastern Region's recommendation to Slattery, and in so doing, coordinated any input from Lewis. (Rozos Decl. ¶¶ 8- 9.) After reviewing Lewis's July 30, 1996 letter, Rozos concluded that Lewis was not satisfied with the candidate pool, because his letter had listed more than one individual, and had proposed consideration to "management need" Earline Boyer, which would likely have presented Labor Management problems. (Rozos Decl. ¶ 11.)

*3 Based on Lewis's letter and based on alleged discussions with others in the District of New Jersey, Rozos drafted a memorandum to Slattery under Acting Regional Director Brown's signature. [FN4] (Rozos Decl. ¶ 13.) This memorandum, signed by Peter Batchelder [FN5] for Brown, stated in its entirety:

> FN4. Because Brown was frequently away from Washington, it was the common practice of his subordinates to draft, review, and approve correspondence under his title. (Brown Dep. 67:5-68:5; Rozos Decl. ¶ 13.) Typically management personnel would communicate and coordinate with

Brown by telephone during these periods. (*Id.*) Acting Director Brown stated at his deposition that he does not recall either receiving Lewis's letter or seeing/discussing the memorandum drafted by Rozos to Slattery in response. (Brown Dep. 30:13-18; 56:14-19.)

> FN5. Batchelder was Assistant Regional Director of the Border Patrol, and was authorized as next-in-command during Brown's travels. (Rozos Decl. ¶ 13.)

Based upon review of the candidates and discussion with Leroy Fredericks, [sic] Officer in Charge, Elizabeth, NJ and Warren A. Lewis, District Director, Newark, the following decision has been rendered:
Both the noncompetitive and competitive lists has [sic] not satisfied the need to draw qualified Detention & Deportation applicants for this position. The request to "management need" SDO Boyer to the position, while having merit, would create LMR issues that may not be properly defended.
Based upon the above it is recommended that this announcement be canceled and the position reannounced Department wide and an active recruitment campaign be instituted in an effort to solicit candidates.
While this approach is time consuming, I believe this to be in the best interest of the Service.
(August 6, 1996 Memo, Ex. C to Rozos Decl., Kirsch Decl. Ex. 8.) [FN6]

> FN6. According to Defendant, nonselections and reannouncements of the type recommended by Rozos and Batchelder are routine at the INS, for a variety of reasons. (*See, e.g.*, Rozos Decl. ¶ 16; Brown Dep. 65:21-66:3); Frederick Dep. 57:2-7.)

Although Slattery was the designated selecting official for the Vacancy at the Elizabeth Detention Facility, and although the August 6, 1996 memorandum was directed to his attention, Slattery claims to have had no knowledge about the Vacancy.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2002 WL 1065686 (D.N.J.)
(Cite as: 2002 WL 1065686 (D.N.J.))

(Declaration of William Slattery ("Slattery Decl.") ¶ 5, Kirsch Decl. Ex. 11.) This was because he did not get personally involved with evaluating GS-13 level field positions, such as the one in question. (*Id.*) According to Slattery, Correspondence for vacancies at this level would have been processed through his office by his managerial staff, who had been directed to seek the input of the Region with jurisdiction over the District in which the position was located. (*Id.*)

The Regions would typically make recommendations for selection which would be reviewed by Slattery's staff. (*Id.* at ¶ 7.) If the staff supported the Region's recommendation, Slattery would sign the Selection Certificate designating the individual selected. (*Id.*) Slattery indicated that "undoubtedly, a recommendation made by the Region overseeing this vacancy which sought a re-announcement due to insufficient candidates would be honored by my office. Thus, no selection would have been reannounced, which is, in fact, what occurred." (Slattery Decl. ¶ 8.)

A few days after Rozos and Batchelder sent their memorandum to Slattery under Brown's name, Warren Lewis was replaced by Andrea Quarantillo ("Quarantillo") as District Director for New Jersey. (Quarantillo Dep. 32:12-18, Kirsch Decl. Ex. 7.) Roughly contemporaneous with Lewis's replacement, the authorization to select certain field vacancies, including the GS-13 position at the Elizabeth Detention Facility, was delegated from Headquarters to the individual District Directors for the regions where the positions were located. (Slattery Decl. ¶¶ 3, 11.) As a result, Quarantillo became the designated selecting official for the Vacancy. (*Id.*)

*4 On August 23, 1996, a memorandum was sent to the Director of the INS's Administrative Center requesting that the Vacancy at the Elizabeth Detention Facility be re-listed. This memorandum read in relevant part:

Vacancy announcement ER MSP II 96-60 ... which was opened locally from 05/20/96 through 06/07/96 resulted in an insufficient number of applicants with detention experience from which to

make a selection. Therefore, we request this position be advertised on an Eastern Region Weekly Vacancy Listing.

(August 23, 1996 Memo, Preston Decl. Ex. N.) The memorandum bore Quarantillo's name and title, but was signed by William W. Bittner. (*Id.*) Based on the August 23, 1996 memorandum and a follow-up memorandum sent approximately 10 days later, [FN7] Plaintiff contends that Quarantillo made the actual decision to cancel and re-announce the Vacancy. Despite the existence of these memorandums bearing her name, Quarantillo claims that she was not involved in the decision to reissue the Vacancy, (Quarantillo Dep. 93:11), and instead states that the decision was made by Acting Regional Director Brown a few days before she came on board. (Quarantillo Interrog. ¶ 19, Preston Decl. Ex. K.)

> FN7. The second memorandum to the Personnel Services Branch also bears Quarantillo's name, and states "please re-announce the position for the reasons stated on my memorandum. I would prefer the listing state that those who applied previously will be considered and need not re-apply." (September 4, 1996 Memo, Preston Decl. Ex. O.) It appears to the Court that this memorandum may have been signed by Quarantillo herself.

On September 16, 1996, in response to the memorandums sent by Quarantillo, ER MSP II 96-106 (the "Second Announcement") was issued in order to fill the Vacancy at the Elizabeth Detention Facility. (September 16, 1996 Vacancy Announcement, Preston Decl. Ex. S.) The Second Announcement indicated that all those who had applied under the First Announcement did not need to reapply; because Davis and Ruhlen had previously applied they were again automatically considered for the position. (*Id.*) Davis and three previous candidates were again placed on the "Best Qualified" list; [FN8] Ruhlen was again placed on the "NonCompetitive" list, along with a new candidate. (Merit Staffing Plan II Selection Certificates, Preston Decl. Ex. I.)

Not Reported in F.Supp.2d                                                                              Page 5
Not Reported in F.Supp.2d, 2002 WL 1065686 (D.N.J.)
**(Cite as: 2002 WL 1065686 (D.N.J.))**

FN8. Two candidates who were listed as "Best Qualified" for the Vacancy after the First Announcement were not included on the "Best Qualified" list after the Second Announcement.

Human Resources sent the certified list of candidates along with the candidates' applications to Quarantillo's office for her consideration and/or selection. (Quarantillo Dep. 43:12-44:6.) Her office, in turn, sent the materials to Leroy Frederick, the officer in-charge at the Elizabeth Detention Facility, to whom the vacant position would report, for his recommendation. (*Id.* at 45:8-24; Frederick Dep. 58:16-59:7; 79:3-15.) After receiving the materials, Frederick conducted interviews of all the eligible candidates, including Davis and Ruhlen. (Frederick Dep. 62:13-15, 67:6-9, 82:11-14.)

Traditionally, prior to conducting interviews Frederick would create a list of questions based on a job's requirements to determine how applicants responded to certain situations, whether they thought logically, and whether they were abreast of recent INS developments. (Frederick Dep. 28:18-29:11.) He did this for the Vacancy at issue, and on his own devised a list of open-ended questions which he used as a framework for "follow-up questions." (*Id.* 65:8-19, 66:16- 22; Interview Questions, Kirsch Decl. Ex. 16.)

*5 Frederick hoped to find someone to serve as his deputy "who had strong decision-making abilities, somebody who I know can come into the position and function, make decisions and be able to run the facility when I'm not there. Somebody who is familiar with ... detention and deportation issues. People who have actually worked around criminal aliens and things like that ... I was looking for somebody who ... was going to have general supervisory experience, who was strong with the candidates, with employees, who has some knowledge, again ... of the detention facility ... I was just looking for somebody with strong managerial skills who would be able to walk in there and run the place while I had the overall picture and taking care of the facility." (Frederick Dep. 63:19-64:19.)

Frederick interviewed each candidate for about an hour, without taking notes, and sought to get a sense of the candidates' opinions and how they thought. (*Id.* at 62:16-18, 88:12-18.) He found that while the experience levels of the applicants varied, all who were included on the certified lists were "qualified" to be considered for the Vacancy. (*Id.* at 68:11-13.) This included both Davis and Ruhlen. (*Id.*)

Although both candidates had supervisory experience, Frederick found that Davis, who had been with the Border Patrol, and Ruhlen, who had been in Investigations, had very different backgrounds. (Frederick Dep. 71:7-12.) Plaintiff's experience in the Border Patrol would have, in Frederick's estimation, primarily involved apprehension of illegal aliens coming into the country, as well as some anti-smuggling investigation. (*Id.* 72:15-21.) Ruhlen's experience in Investigations would have involved apprehending fugitive aliens, working with deportation and detention officers, and even staffing the detention facility in certain circumstances. (*Id.* 71:15-72:1.)

Unlike Davis, whom Frederick had met for the first time at his interview, Frederick had known Ruhlen for fifteen or twenty years. (*Id.* 79:16-19, 84:8- 12.) During that period, Frederick had interacted with Ruhlen at the detention facility when Ruhlen had either brought in new detainees, or had worked as a guard or a guard supervisor. (Frederick Dep. 84:19-85:9.) Ruhlen also worked under Frederick for a time when Frederick because a Section Chief in Investigations. (*Id.* 85:15-18.)

When asked to describe his impressions of Ruhlen, Frederick stated that he "always [knew] him to conduct himself in a professional manner," and "considered him to be hard working." (*Id.* 85:19-86:7.) He also stated that "I've known him for years and I've seen him work at [the detention facility]. I've seen him come over there and handle riots when we had riots and I've worked with him and I had strong confidence in him that he's a very straightforward, partial [sic] and hard-working individual." (*Id* . 86:17- 22.)

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1065686 (D.N.J.)
(Cite as: 2002 WL 1065686 (D.N.J.))

In explaining his impressions of Davis's interview, Frederick stated "Mr. Davis was qualified for the position. He had the experience. He knew immigration laws and stuff like that. He had experience as a supervisor manager. He had experience as a manager in inspections," however, "when I asked him the questions on that, I was not particularly impressed with the way he responded to some of my questions because he was kind of vague, you know, with some of his responses to my questions." (Frederick Dep. 87:20-88:3.) This was in contrast to Ruhlen, whom Frederick had found to be "straightforward and [who] answered the questions I asked him. I was direct and to the point ... I was looking for people's opinions, how they think, how they respond to situations because we were in a high profile situation there and Mason, again, was kind of straight and to the point." (*Id.* 88:10-18.)

*6 After his interviews with Plaintiff, Ruhlen, and the remainder of the candidates who had been certified, [FN9] Frederick, who is an African-American, recommended to Quarantillo that Ruhlen, who is a Caucasian, be selected. [FN10] Quarantillo claims that she deferred to Frederick's recommendation, because he would serve as the candidate's immediate supervisor. (Quarantillo Dep. 74:9-13; 95:10-12.) Accordingly, on November 15, 1996, Quarantillo selected Ruhlen to fill the position. (Signed Selection Certificate, Kirsch Decl. Ex. 18.)

    FN9. One candidate declined the interview. (Frederick Dep. 82:11- 14 .)

    FN10. Following the First Announcement, Frederick recommended to Lewis that Earline Boyer, an African-American, fill the Vacancy. (Frederick Dep. 81:11-82:4.) After her selection would present Labor Management issues (because she had neither applied for the position nor been certified as a candidate), the position was reannounced. The Court does not know whether Boyer formally applied for the position after the Second Announcement, but for whatever reason Boyer's name was neither included on the second certified list of candidates nor mentioned as a "management need" option for the Vacancy.

On May 15, 1997 Plaintiff filed an EEO Complaint against Quarantillo, alleging that she discriminated against him on the basis of his race and retaliated against him when she failed to promote him to the Supervisory Detention and Deportation position. (EEO Complaint, Kirsch Decl. Ex. 2A.) On September 27, 1999 ALJ Francis A. Polito issued detailed Findings and Conclusions, finding no discrimination. (Findings and Conclusions, Kirsch Decl. Ex. 3A.) Polito found that the INS articulated legitimate nondiscriminatory reasons for Plaintiff's non-selection; that Plaintiff failed to show the stated reasons were pretextual; and that Plaintiff failed to make a prima facie case of reprisal. (*Id.*, pp. 6-8.) Plaintiff's request to reject the ALJ's findings was denied, and on November 4, 1999, the Department of Justice issued its Final Decision, concluding that the "Administrative Judge's recommendation was clear and detailed ... [and that] there were no appropriate grounds to find discrimination or retaliation." (D.O.J. Final Decision, p. 2, Kirsch Decl. Ex. 4A.) On February 3, 2000 Plaintiff commenced this action.

**B. *Davis's Discrimination Allegations***

At the core of this dispute, Davis contends that when Quarantillo selected Ruhlen to fill the Vacancy, she impermissibly failed to promote him because of his race. Additionally, Davis claims that Quarantillo retaliated against him for his prior protected employment activity. [FN11]

    FN11. Plaintiff's Complaint also contained a number of disparate impact claims, but Plaintiff withdrew these claims by Letter dated May 7, 2001.

Plaintiff's Complaint states that in September, 1995 he engaged in activity protected under Title VII. Specifically, Plaintiff claims that in September, 1995 he submitted a written affidavit adverse to John Lonergan ("Lonergan"), as part of an EEOC proceeding commenced by Lonergan against then

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1065686 (D.N.J.)
**(Cite as: 2002 WL 1065686 (D.N.J.))**

District Director Lewis. (Davis EEO Interrog. pp. 3-4, Kirsch Decl. Ex. 6.) Plaintiff further claims that Lonergan's EEO Complaint stemmed from an investigation of corruption in the INS Newark District that had been conducted by Lewis. (Davis Dep. 76:11-25; Preston Decl. Ex. R.) Lonergan, who was allegedly a close personal friend of William Slattery, was ultimately terminated as a result of Lewis's investigation and was convicted of accepting bribes from immigrants. (*Id.*; Brown Dep. 29:16-21.)

Subsequent to the investigation of Lonergan, Slattery is alleged to have pressured Acting Regional Director Brown to discipline Lewis. (Brown Dep. 30:18-20, 61:20, 63:17-64:13.) Brown, who felt there was no basis to discipline Lewis, declined to do so. (Brown Dep. 113:3-114:3.) In response Slattery accused Brown of being derelict in his duties for failing to discipline Lewis. (*Id.*) As further evidence of Slattery's pattern of hostility towards Lewis, Plaintiff notes that when the position of District Director was upgraded from a GS-15 level, Quarantillo was selected for the position over Lewis. (Lewis Interrog. ¶ 21.)

*7 After he was passed over for promotion, Lewis brought a whistleblower's complaint against Slattery and the INS, and was ultimately vindicated. (Davis Dep. 76:15-77:9; Ex. R.) Plaintiff alleges that as a result of Lewis's successful whistleblower action, Slattery was given the option of either resigning from the INS or being indicted for criminal activities. (Davis Dep. 77:9-11; Ex. R.) Slattery ultimately resigned from the INS. (*Id.*)

Plaintiff now contends that he was not selected to fill the Vacancy at the Elizabeth Detention Facility because of his race and because of the affidavit adverse to Lonergan that he submitted in support of Lewis. Davis notes that when the Vacancy was first announced, he was told by Lewis that Lewis had made a recommendation for his selection for the position. [FN12] (Lewis Interrog. ¶ 16.) Rather than selecting Davis, however, Quarantillo re-announced the Vacancy, and ultimately selected Ruhlen, who is Caucasian, for the position. Noting that Quaran-

tillo had previously reported to Slattery (Quarantillo Dep. 15:6-25), Davis contends that Quarantillo's failure to act on Lewis's recommendation must have amounted to retaliation somehow directed by Slattery. [FN13] In support of his contention, he relies heavily on the statement of Lewis that "I am sure there is some connection with Mr. Ruhlen's selection, Ms. Quarantillo and Mr. Slattery." (Lewis Interrog. ¶ 21.)

> FN12. Because Lewis was not the selecting official for the position, he did not make a selection on either of the certificates for the Vacancy; he could only make a recommendation when asked.

> FN13. Davis contends that management (presumably including Quarantillo) was aware of his prior protected conduct. (Complaint, ¶ 7.)

By way of response, the Government points out that in October, 1998 Plaintiff applied for his present position of Criminal Investigator, Special Agent, and was selected to fill the position by Quarantillo. (Davis Dep. 47:17-48:4.) Despite this, Plaintiff has named Quarantillo in three separate unsuccessful EEO Complaints in less than three years, each setting forth assorted allegations of discrimination stemming from non-selection for promotion. (ALJ Findings, Kirsch Decl. Exs. 2A, 2B, 2C.) [FN14]

> FN14. These EEO Complaints are in addition to a class action discrimination suit against the INS Plaintiff joined in the mid1990's. (Davis Dep. 13:2-15:19.)

The Government has also noted that despite the fact that Plaintiff admitted he first met Quarantillo on August 15, 1996, [FN15] at her introductory staff meeting to the District, (Davis Dep. 89:17-21), he claimed that at this first meeting, "I detected her disdain for me through the tone of her voice. Ms. Quarantillo gazed insolently far off in a distance [sic] and defiantly stated that she was going to re-announce the AOIC position ." (Davis Interrog. p. 6.) He made this allegation while also conceding at his deposition that he did not know if Quarantillo,

Not Reported in F.Supp.2d                                                                          Page 8
Not Reported in F.Supp.2d, 2002 WL 1065686 (D.N.J.)
(Cite as: 2002 WL 1065686 (D.N.J.))

who supervised over 600 people, either knew who he was or knew that he had applied for the position at the time of the meeting. (Davis Dep. 88:24-89:6, 92:5-24.)

> FN15. Nine days after Rozos and Batchelder sent their memorandum recommending that the Vacancy be reannounced.

In further conflict with Plaintiff's allegations, several of the individuals responsible for either recommending that the position be reannounced or for selecting Ruhlen have also expressly stated that they were not pressured into making their decisions. Rozos stated his recommendation to Slattery on behalf of Brown that the position be reannounced "was made by me without any coercion or pressure from anyone." (Rozos Decl. ¶¶ 15-16.) Frederick testified that when he interviewed the candidates and recommended Ruhlen, he received no communications, recommendations, or directives from Quarantillo or anyone else with regard to influencing his assessment of the candidates for the vacancy. (Frederick Dep. 83:21-84:7.)

*8 Finally, Quarantillo stated that she had no conversations with Slattery regarding Davis or Ruhlen, and Slattery confirmed the same. (Quarantillo Dep. 32:10-12, 56:14-16; Slattery Decl. ¶¶ 5, 9, 12.) While Quarantillo had heard through "hallway conversation" that Lonergan had filed an EEO Complaint against Lewis, she did not know that Davis had any involvement with the matter until she prepared for her deposition in this matter in November, 2000. (Quarantillo Dep. 31:10-32:9, 40:9-14.) [FN16]

> FN16. Slattery, Brown, Batchelder, Rozos, and Frederick all stated under oath that they had no knowledge of Davis's involvement, in any way, in an EEO proceeding or other protected activity, prior to the commencement of this lawsuit. (Slattery Decl. ¶¶ 12,13; Brown Dep. 27:19-28:4; Batchelder Decl. ¶ 6; Rozos Decl. ¶ 17; Frederick Dep. 79:20-24.)

II. *DISCUSSION*

A. *The Summary Judgment Standard*

The standard for granting summary judgment pursuant to Federal Rule of Civil Procedure 56 is a stringent one. Summary judgment is appropriate only if all the probative materials in the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir.1986); Lang v. New York Life Ins. Co., 721 F.2d 118, 119 (3d Cir.1983). An issue involving a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Healy v. New York Life Ins. Co., 860 F.2d 1209, 1219 n. 3 (3d Cir.1988).

The court must resolve all reasonable doubts in favor of the nonmoving party when determining whether any genuine issues of material fact exist. Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n. 2 (3d Cir.1983); Smith v. Pittsburgh Gage & Supply Co., 464 F.2d 870, 874 (3d Cir.1972). Even though a court must resolve reasonable doubts in favor of the nonmoving party, because a motion for summary judgment is designed to go beyond the pleadings, factual specificity is required of a party who opposes such a motion. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Accordingly, in order to defeat a properly supported motion for summary judgment, a party may not merely restate the allegations of its pleadings, or rely upon self-serving conclusions, unsupported by specific facts in the record. Celotex, 477 U.S. at 322-23; Farmer v. Carlson, 685 F.Supp. 1335, 1339 (M.D.Pa.1988). A non-moving party must point to concrete evidence in the record which supports each essential element of its case. Id. If the party fails to provide such evidence, then it is not entitled to a trial and the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(e).

B. *Plaintiff's Failure to Promote Claim*

Plaintiff alleges that he was discriminated against on the basis of his race when a Caucasian (Ruhlen) was selected over him to fill the Vacancy at the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1065686 (D.N.J.)
(Cite as: 2002 WL 1065686 (D.N.J.))

Page 9

Elizabeth Detention Facility. An employer commits an unlawful employment practice and therefore violates Title VII of the Civil Rights Act of 1964 by:

fail[ing] or refus[ing] to hire or ... discharg[ing] any individual, or otherwise ... discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

*9 42 U.S.C. § 2000e-2(a)(1). To state a claim under Title VII, Plaintiff must first establish by a preponderance of the evidence a prima facie case of discrimination. See *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-56 (1981). In order to establish a prima facie case of discriminatory denial of promotion, Plaintiff must establish that (i) that he belongs to a protected class; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, a non-member of the protected class was hired. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994), citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 170 (3d Cir.1991).

Once a prima facie case is made, the burden shifts to the defendant to produce evidence that there was a "legitimate, non-discriminatory reason" why the plaintiff was not selected. *McDonnell Douglas*, 411 U.S. at 802. A defendant's burden is a relatively light burden of production and not of persuasion; Defendant need only introduce evidence of "reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993).

Assuming the defendant produces such evidence, the burden of persuasion, which has been plaintiff's throughout, shifts back to the plaintiff to show that the defendant's reasons are merely a pretext for discriminatory conduct. *Burdine*, 450 U.S. at 256; *Molthan v. Temple University of Com. System of Higher Educ.*, 778 F.2d 955, 961 (3d Cir.1985). To

establish pretext, Plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve [Defendant's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [Defendant's] action." *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1067 (3d Cir.1996), *cert. denied*, 117 S.Ct. 2532 (1997); *see Burdine*, 450 U.S. at 256.

Defendant does not seriously contest that Plaintiff has established a *prima facie* case of discriminatory denial of promotion: Davis is an African-American, who applied for and was qualified for the Vacancy, but was not hired for that position, while a similarly situated employee [FN17] outside the protected group, Mason Ruhlen (a Caucasian), was hired instead.

> FN17. The Government contends that a credible argument can be made Plaintiff and Ruhlen were not "similarly situated employees," for purposes of this vacancy, as Ruhlen had served at a higher grade than Davis for 8 years, and had more extensive detention and deportation experience. The Court need not reach the merits of this argument, however, given Plaintiff's failure to meet his burden of persuasion in demonstrating pretext.

To counter Plaintiff's *prima facie* case, Defendant has proffered evidence supporting a chain of events that demonstrate it had a legitimate, non-discriminatory reason for its decision not to promote Plaintiff. At its core, the Government's argument rests on its conclusion that the initial candidate pool did not generate enough applicants with detention and deportation experience, and that after the re-announcement Ruhlen demonstrated himself to be a better candidate for the position than Davis did. [FN18]

> FN18. The Government also contends that the re-announcement of the position to enlarge the pool of qualified applicants

Not Reported in F.Supp.2d                                                                    Page 10
Not Reported in F.Supp.2d, 2002 WL 1065686 (D.N.J.)
**(Cite as: 2002 WL 1065686 (D.N.J.))**

should not be considered an adverse em-
ployment decision sufficient to create a
*prima facie* case of discrimination. Be-
cause no one was selected for the position
and no one was rejected from considera-
tion by virtue of closing the First An-
nouncement, the Government argues that
the decision was necessarily nondiscrimin-
atory and non-pretextual. In support, the
Government relies on *Blong v. Secretary of
the Army,* 886 F.Supp. 1576 (D.Kan.1995),
*aff'd.,* 86 F.3d 1166 (10th Cir.1996). The
Court will not embrace the rule that the
Government suggests, i.e. that a re-
announcement can never, in and of itself,
be considered a discriminatory employ-
ment practice. In *Blong,* the district court
found that the re-announcement to expand
the applicant pool was not presumptively
discriminatory, as only one applicant had
originally applied, and an employer should
never be bound to select a candidate from a
pool of one. That is not the case here. Al-
though Plaintiff has failed to provide any
evidence to support a conclusion that the
Government's asserted basis for the re-
announcement was pretextual, the Court
can imagine other instances where an em-
ployer, confronted with a qualified applic-
ant from a protected class, might imper-
missibly re-announce the position solely to
justify not hiring a protected applicant.

**\*10** According to the Government, when the Va-
cancy at the Elizabeth Detention Facility was first
announced, selecting authority for all GS-13 level
positions rested with Executive Associate Commis-
sioner William Slattery. Slattery's policy was not to
become involved with GS-13 selections, and in-
stead to delegate authority over the process to his
staff. As a matter of normal procedure his staff
sought advice on how to fill the position from East-
ern Regional Director Brown. Brown's staff, in
turn, sought advice on how to fill the position from
New Jersey District Director Warren Lewis, an
African-American.

Warren Lewis, who was not the selecting official
for the position, sought input from several sources,
including Leroy Frederick, who had recently taken
over as head of the Elizabeth Detention Facility.
Frederick, an African-American, apparently without
interviewing any of the candidates, recommended
Earline Boyer for the position, even though she was
not a candidate. Lewis, without interviewing any
candidates himself, drafted a letter to Brown, which
recommended Venson Davis and Mason Ruhlen in
priority order. Acting on Frederick's suggestion,
Lewis also included Boyer as another recommen-
ded option for filing the position.

When Brown's staff received the letter, Michael
Rozos assumed that by listing three options
(including one nonapplicant), Lewis was indicating
a dissatisfaction with the candidate pool. Although
Rozos found Boyer, who is African-American, to
be an appealing option given her extensive deten-
tion and deportation experience, he also felt that the
selection of a non-applicant would create Labor
Management problems. For those reasons, he re-
commended that the position be re-announced na-
tionally to allow for more applicants with detention
and deportation experience. Peter Batchelder,
Brown's second-in-command, signed a letter for
Brown endorsing Rozos' recommendation, and sent
it to Slattery.

Slattery's staff, upon receiving a letter recommend-
ing that the position be re-announced because it had
failed to attract a sufficient number of candidates
with detention and deportation experience, would
have normally have acted upon this recommenda-
tion. It is not clear from the record whether Slat-
tery's staff actually acted upon the recommenda-
tion, because contemporaneous with Rozos' recom-
mendation two things occurred in a short span of
time. First, selecting authority for GS-13 positions
was handed down to District Directors, and second,
Andrea Quarantillo replaced Warren Lewis as Ne-
wark District Director. For those reasons, actual au-
thority to direct that the position be re-announced
likely fell to her.

Acting on the recommendation of Rozos, a memor-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1065686 (D.N.J.)
(Cite as: 2002 WL 1065686 (D.N.J.))

andum was issued under Quarantillo's name directing that the position be reannounced. In a follow-up memorandum, Quarantillo herself requested that all who had applied for the first announcement automatically be re-considered for the position after the reannouncement.

After the re-announcement, new selection certificates were sent directly to Quarantillo. Quarantillo sought the advice of Frederick, who would supervise the position to be filled. Frederick conducted hour-long interviews of the candidates, and found Ruhlen to be a better candidate than Davis who, although qualified, lacked Ruhlen's detention and deportation experience and had failed to answer Frederick's open-ended interview questions in as satisfactory a manner as Ruhlen. For those reasons, Frederick recommended to Quarantillo that Ruhlen be selected. Because Frederick would be Ruhlen's direct supervisor and would work with him closely, Quarantillo deferred to Frederick's recommendation and selected Ruhlen.

**\*11** According to the Government, Ruhlen was selected because he had generally broader experience than Davis, had more hands-on detention and deportation experience, and had served at a more senior level than Davis for approximately eight years. Ruhlen's qualifications and personality were better known by Leroy Frederick, the individual to whom Ruhlen would report, and in Frederick's estimation made him better suited to the position than Davis. Ultimately, the Government asserts that Frederick's recommendation and Quarantillo's adoption of it provide a more than legitimate basis to justify the selection of Ruhlen, on a basis other than race. Having reviewed all the evidence in the record, the Court agrees that the Government has more than met its burden in demonstrating legitimate reasons for both the reannouncement of the Vacancy and Ruhlen's selection for the job.

Because the Government has met its burden of production and has shown that legitimate reasons existed for the decisions it made in this case, the Court's analysis shifts back to Plaintiff's burden of persuasion, and to determining whether Defendant's assertion-

ted justifications are pretextual. In order to establish pretext, the burden is on the Plaintiff to demonstrate that his non-selection was something "more than a denial of promotion as a result of a dispute over qualifications." *Molthan,* 778 F.2d at 962. Although Plaintiff need not come forward with additional evidence of discrimination beyond his *prima facie* case, he must still point to evidence sufficient "to discredit the defendant's proffered reasons" for making the adverse employment decision in order to survive summary judgment. *Fuentes,* 32 F.3d at 764.

In *Fuentes,* the Third Circuit provided detailed clarification of a Plaintiff's burden on a motion for summary judgment. According to the Third Circuit, Plaintiff's burden is satisfied if, taking all of the evidence in a light most favorable to the plaintiff,

the plaintiff's evidence rebutting the employer's proffered legitimate reasons [allows] a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons ... was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext.) To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is wether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for the asserted nondiscriminatory reasons.

**\*12** *Fuentes,* 32 F.3d at 764-65 (Internal citations and footnotes omitted); *See also Shaner v. Synthes,* 204 F.3d 494, 501 (3d Cir.2000), *and Abramson v. William Paterson College of New Jersey,* 260 F.3d 265, 283 (3d Cir.2001), *quoting Fuentes.*

Plaintiff contends that Defendant's summary judgment motion should be denied because the Govern-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 1065686 (D.N.J.)

(Cite as: 2002 WL 1065686 (D.N.J.))

ment's asserted legitimate reasons for the non-selection of Davis suffer from weaknesses, implausibilities, inconsistencies, incoherencies and contradictions, such that a reasonable factfinder could rationally find them unworthy of credence. After a careful review, the Court concludes that, even if all of the evidence in the record is taken in a light most favorable to the Plaintiff, Plaintiff has not met the burden articulated in *Fuentes,* for the following reasons.

In his failed effort to show pretext, Davis relies on a shotgun list of facts to create weaknesses and contradictions where none exist. In support of his argument that Rozos gave a pretextual explanation of why the position was re-announced, the "evidence" that Plaintiff points to is: 1) Rozos' determination that Lewis was not satisfied with the candidate pool despite Lewis's unequivocal recommendation of Davis for the position, which is inconsistent with the plain reading of the Lewis recommendation letter; [FN19] 2) that it is implausible Rozos would have concluded that Lewis was not satisfied without first contacting Lewis; 3) that Defendant has failed to submit a declaration of Lewis indicating that he was in fact not satisfied; and 4) Rozos' Declaration does not state that he had responsibility for coordinating a response to Slattery regarding the Vacancy. The Court will address the forgoing items in turn.

> FN19. The Court notes that Plaintiff has repeatedly misstated the importance of Lewis's letter. While Plaintiff's brief repeatedly indicates that Lewis "selected" Davis for the Vacancy, this was not the case. The evidence clearly demonstrates that Lewis was not in a position to make a selection; instead, he merely "recommended" Davis as his first choice. More importantly, Lewis also "recommended" two alternate choices, one of whom had not even applied for the position.

Although Plaintiff is insistent that Lewis's recommendation letter was "unequivocal," the document on its face is anything but that. While the letter does demonstrate that Davis was Lewis's first choice, and while taken in a light most favorable to Davis the letter might allow a trier of fact to conclude that Davis was Lewis's clear favorite choice for the position, a jury would not be able to escape the fact that the letter recommends *three* individuals for the position, one of whom had not even applied for the job. Earline Boyer, listed as an "OTHER OPTION" in Lewis's letter, was described as having "extensive deportation experience," which the letter did not say of either Davis or Ruhlen. Far from demonstrating that Rozos' conclusions were pretextual, the letter lends ample credence to Rozos' conclusion in the memorandum he drafted for Brown that:

> Both the noncompetitive and competitive lists has [sic] not satisfied the need to draw qualified Detention & Deportation applicants for the position. The request to "management need" SDO Boyer to the position, while having merit, would create LMR issues that may not be properly defended.

(August 6, 1996 Memo, Ex. C to Rozos Decl., Kirsch Decl. Ex. 8.)

**\*13** Similarly, a reasonable trier-of-fact could not find pretext in Rozos' failure to contact Lewis to confirm that Lewis had doubts about the applicant pool. The relevant inquiry is not whether Lewis was actually dissatisfied with the candidate pool; the issue is whether Rozos' assertion that he believed Lewis to be dissatisfied is any less credible in light of Rozos' failure to contact Lewis. [FN20] "To discredit the employer's proffered reason ... the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes,* 32 F .3d at 765. While contacting Lewis may have been the wise or prudent thing to do, it escapes the Court how the failure to do so, in and of itself, would allow a reasonable juror to find that the re-announcement was motivated by animus. [FN21]

> FN20. For this reason, it is irrelevant that the Government has failed to introduce an affidavit demonstrating Lewis had doubts.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 13
Not Reported in F.Supp.2d, 2002 WL 1065686 (D.N.J.)
(Cite as: 2002 WL 1065686 (D.N.J.))

The Government's own evidence demonstrates Lewis supported Davis; unfortunately for Davis it also demonstrates that those who received Lewis's recommendation sought individuals with "detention and deportation experience."

FN2L. Relatedly, it escapes the Court what Plaintiff hopes to prove by pointing out that Rozos' Declaration fails to state that he had the responsibility for coordinating a response to Slattery regarding the Vacancy. The unrefuted evidence in the record is that Rozos DID coordinate this response.

In addition to his allegations about Rozos' veracity, Plaintiff also attempts to discredit Defendant's position by pointing to alleged inconsistencies in Acting Regional Director Brown's involvement with the re-announcement. Specifically, Plaintiff claims that 1) the re-announcement decision was undercut because Brown did not prepare or sign the memorandum sent to Slattery under his name, nor was he even aware of it; 2) even if Lewis's letter was vague, Lewis had a conversation with Acting Regional Director Brown where he requested that Brown support his recommendation of Davis; and 3) while Brown's memorandum stated that "based upon review of the candidates and discussion with Leroy Fredericks [sic] ... and Warren A. Lewis ... the following decision has been rendered," Brown does not recall any meeting or discussions with Frederick or Lewis regarding the Vacancy.

Plaintiff's first argument is easily discounted. There is unrefuted evidence in the record that Brown was responsible for supervising some 8,000 employees, and that he traveled frequently. There is also unrefuted evidence in the record that when he traveled, he designated responsibilities to his staff, and that his staff had the authority to generate and sign correspondence for him. Finally, there is unrefuted evidence in the record that members of his staff, namely Rozos and Batchelder, prepared the memorandum for Brown, and sent it out under his signature. For those reasons, there is was no contradiction when Brown stated that had never seen the document, did not sign the document, and was not aware of who had signed the document, because the document had been generated, signed, and mailed by his staff.

Turning to Plaintiff's second and third points, the Court finds that a contradiction does exist. The Court notes that the contradiction, however, lies not in Defendant's reasons for reannouncing the position, but in Plaintiff's argument. On the one hand, when challenging the validity of Rozos' memo Plaintiff states in his brief that "Mr. Brown however, does not recall any meeting or discussions with Messrs. Frederick or Lewis with regard to [the Vacancy]," (Pls.Oppo.Brief, p. 18.), presumably to document that Brown never actually met with Lewis. On the other hand, when claiming that even if Lewis's letter were vague, Brown would have known about Lewis's choice of Davis, Plaintiff states in his brief that "Mr. Lewis had a conversation with Mr. Robert Brown ... at an INS Washington headquarters meeting where Mr. Lewis requested that Mr. Brown support his recommendation for the selection of Mr. Davis." (Id., p. 16.)

*14 In order for Plaintiff's attack on the memorandum to succeed (i.e. to demonstrate that it is erroneous because Brown never met with Lewis), Lewis's contention about the meeting in Washington must be false. If, on the other hand, Lewis's contentions are true, then Brown's memory must have been at fault when he stated that "I have no recollection of any specific discussion about 96-60 with Warren Lewis." In either event, Plaintiff's second and third arguments are entirely irrelevant to the issue of pretext, because even if both of Plaintiff's allegations are assumed to be true, they fail to undermine Defendant's version of the reannouncement, for the following reasons.

Even if Lewis did have a conversation with Acting Regional Director Brown where he requested that Brown support his recommendation of Davis, and even if Brown did pledge support, there is no evidence in the record to refute the Government's contention that the decision to re-announce the Va-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1065686 (D.N.J.)
(Cite as: 2002 WL 1065686 (D.N.J.))

cancy was made by Brown's staff, and not by Brown. Similarly, while his memorandum to Slattery reads in relevant part that "based upon review of the candidates and discussion with Leroy Fredericks, [sic] Officer in Charge, Elizabeth, NJ and Warren A. Lewis, District Director, Newark, the following decision has been rendered ...," the memorandum does NOT state that Brown met with Frederick, or that Brown made the decision to re-announce the Vacancy; instead the language is neutral. Even in a light most favorable to Plaintiff, the mere fact that Brown personally does not recall meeting with Lewis or Frederick does not undermine the fact that a member of his staff may have. More importantly, assuming even that Brown knew Davis to be Lewis's first choice, it does not undermine the Government's contention that members of Brown's staff concluded that the applicant pool did not contain "qualified detention and deportation applicants" for the position. [FN22]

> FN22. It bears noting that Plaintiff has never stated that he has the "detention and deportation" experience that the Government claims it sought. Plaintiff only states that he was certified as "Best Qualified" for the position, in comparison to the other members of the applicant pool.

Similar to Plaintiff's efforts to undermine the testimony of Brown, Davis has also attempted to document inconsistencies in the statements of Quarantillo. Plaintiff argues that despite Quarantillo's statement that she was not involved with reissuing the vacancy, documents demonstrate that she was in fact involved with the decision to re-announce the position. Those documents are the two memorandums from Quarantillo to the INS Human Resources Office requesting that the Vacancy be re-announced. The initial memorandum indicated that the First Announcement "resulted in an insufficient number of applicants with detention experience from which to make a selection. Therefore we request that this position be advertized" more broadly. (Preston Decl. Ex. N.) The second memorandum reiterated the first, and asked that it be made known that all previous applicants would automat-

ically be reconsidered. (Preston Decl. Ex. O.)

Bearing in mind that the memorandums only ask that the position be re-announced, a close reading of Quarantillo's deposition testimony reveals no discrepancy at all:

> *15 Q: so the record is clear, were you involved in any way in *deciding* to reissue that vacancy?
> A: No.
> Q: And were you affiliated with the district of New Jersey at the time the *decision* was made to reissue 96-60?
> A: I don't know when the decision was actually made. So no, I was not aware of it.

(Quarantillo Dep. 93:9-18 (emphasis added.)) According to the Government, Quarantillo did not decide to re-announce the Vacancy herself, but instead acted on the decision that Brown's staff had made in their recommendation to Slattery, prior to her installation as District Director. Given the Government's version of events, the Court finds Quarantillo's testimony (that she did not help decide to re-announce the position) and her memorandums (implementing the re-announcement) are not at odds with one another, as making a decision and implementing someone else's decision are two entirely different things. The two pieces of evidence certainly do not help establish pretext, even when considered with a presumption in favor of the Plaintiff.

Beyond those instances where Plaintiff attempts to create contradictions where none exist, Plaintiff also attempts to generate weaknesses seemingly out of thin air. One of Plaintiff's arguments is that Slattery would not act on the Lewis's recommendation to promote Davis to fill the Vacancy. The Court finds two substantial problems with this argument. First, Plaintiff's argument is disingenuously based on a single segment of questioning in Regional Director Brown's deposition:

> Q: Did you ever speak to Mr. Slattery about the status of these vacancies [under Lewis] in the Newark office?
> A: Not directly, but I spoke with Scott Blackman.
> Q: What did Scott Blackman tell you about the reason why the vacancies were sitting there?

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1065686 (D.N.J.)
(Cite as: 2002 WL 1065686 (D.N.J.))

A: He says, "They're with Bill." *There was va-cancies from a lot of districts* under Bill Slattery. So he said, "They're in there. They're in there." (Brown Dep. 105:18-106:3 (emphasis added.)) The Court believes that, even giving Plaintiff all doubts, it would torture reality to conclude from the forego-ing language that Slattery 'would not act' on Lewis's recommendation of Davis out of some sort of anim-us specifically directed at Davis. Regardless, and fatal to Plaintiff's contention, the second flaw in Plaintiff's argument is that there is not a shred of evidence in the record that Brown, who was between Lewis and Slattery in the chain of com-mand, ever placed Lewis's recommendation of Dav-is in front of Slattery for Slattery to act on. Absent that evidence, no reasonable juror could conclude that Slattery vetoed Lewis's recommended selection of Davis out of animus.

Similarly, Plaintiff argues Defendant's proffer that Ruhlen was more qualified than Davis is inconsist-ent and contradictory with the testimony of Freder-ick. In this instance, Plaintiff mischaracterizes the following testimony of Frederick:

Q: Let me ask you this, how would you compare the qualifications of Mr. Davis to the qualifica-tions of Mr. Rueland [sic] or would you say they are qualified, less qualified, or better qualified for the position of 96-106?

*16 A: What I would say is that all of the candid-ates on this list were qualified. They had varied experience, but they were all qualified.

(Frederick Dep. 68:6-13.) The Government's asser-tion that Ruhlen was more qualified for the position given his past detention and deportation experience and given his more satisfactory answers to Freder-ick's questions does not run contrary to Frederick's preceding deposition testimony. No one, including the Court, doubts or could doubt that Davis was qualified for the Vacancy. Frederick recognized it. Unfortunately, Frederick ultimately decided that Ruhlen was *more* qualified, because Ruhlen had the valued detention and deportation experience that Davis did not. In essence, agreeing with Davis's ar-gument on this point would require the Court to find that pre-text is demonstrated whenever an em-ployer fails to hire a qualified member of a protec-

ted class and instead hires a more qualified member of a non-protected class. Such an outcome would turn Title VII law on its ear, and for that reason the Court can not embrace it.

Plaintiff's final contention is that the purported in-adequacy of the first pool of candidates cannot serve as a legitimate non-discriminatory reason for the re-announcement, because there were fewer candidates certified on the selection lists for the re-announced position than had been present on the original lists. This argument goes against logic it-self. Simply put, when an employer decides to re-announce a position in order to generate a larger qualified applicant pool, they have no way of knowing how many employees will chose to apply for it. They can not even ensure that all those who previously applied will elect to remain under con-sideration. For that reason, the fact that the re-announcement generated fewer candidates is simply not probative of whether the Government's asserted reasons for reannouncing the position were pre-textual.

Plaintiff's preceding collection of arguments not-withstanding, the Court finds that Plaintiff has failed to point to any genuine question of material fact that might support a finding of pretext. A reas-onable juror, viewing the facts available in the light most favorable to Plaintiff, could not conclude that the employer's proffered reasons are not worthy of belief. Defendant has failed to submitted clear evid-ence of anything more than a dispute over Plaintiff's qualifications; in the Court's estimation there is not a hint of evidence in the record which could establish the possibility of pretext, even when all of the evidence is taken in a light most favorable to the Plaintiff. Ultimately, Plaintiff's belief and his conclusory allegations that Defendant discriminated against him are insufficient to withstand Defend-ant's motion for summary judgment. *Avril v. Village S. Inc.*, 934 F.Supp. 412, 417 (S.D.Fla.1996) (citation omitted). Accordingly, Defendant's motion for summary judgment is granted.

C. *Plaintiff's Retaliation Claim*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1065686 (D.N.J.)
**(Cite as: 2002 WL 1065686 (D.N.J.))**

**\*17** Plaintiff's second cause of action is that Defendant's failure to promote him constituted retaliation against him. Specifically, Plaintiff claims that because he filed an affidavit adverse to John Lonergan, William Slattery (through Andrea Quarantillo) orchestrated Davis's being passed over for promotion.

Claims of retaliation against an employer for protected anti-discrimination activity follow the same framework as more traditional Title VII litigation. *Charlton v. Params Bd. Of Educ.*, 25 F.3d 194, 201 (3d Cir.1994). "To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) he or she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action." *Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir.2001)(collecting cases).

Having reviewed the submissions in this matter, it is apparent to the Court that Plaintiff cannot succeed on his retaliation claim. Even assuming for purposes of argument that Plaintiff engaged in a protected activity when he filed his affidavit, and assuming further that the INS took adverse employment actions when it re-announced the Vacancy and selected Ruhlen, Davis's retaliation claim must ultimately fail because he has failed to demonstrate that a causal link exists between his protected conduct and the adverse action.

Simply put, there is not a shred of evidence in the record to demonstrate that any of the individuals involved in the promotion process acted on the basis of Plaintiff's prior protected conduct when they either recommended that the Vacancy be re-announced or selected Ruhlen. More importantly, there is not a shred of evidence in the record to demonstrate that any of the individuals involved in the promotion process were even aware of Plaintiff's prior protected conduct.

Plaintiff has only argued that a causal link has been established "based upon the [previously articulated]

inconsistences, weaknesses, contradictions, and implausibilities of Defendants proffered reasons for the failure to promote Mr. Davis." (Plaintiff's Oppo. Brief, p. 24.) Having already determined that there is no merit to any of Plaintiff's claims of weakness or inconsistency, the only weapon remaining in Plaintiff's arsenal is the statement of Warren Lewis that "I am sure there is some connection with Ruhlen's selection, Ms. Quarantillo and Mr. Slattery ." (Lewis Interrog. ¶ 21.) As Defendant rightly notes, such unsupported assumptions are wholly insufficient for Plaintiff to withstand a motion for summary judgment.

Although Plaintiff has made it abundantly clear that he does not believe the Government's asserted chain of events, and that he instead believes a nefarious conspiracy robbed him of his promotion, he has presented no evidence to contradict the legitimate reasons articulated by the Government. Although Plaintiff was not required to provide direct evidence of discrimination, he was required to provide sufficient circumstantial evidence for a reasonable trier-of-fact to conclude that the Government's asserted reasons for failing to promote him were not credible, and were instead pretextual excuses designed to conceal discrimination. Because Plaintiff failed to point to any such evidence in the record, there is no factual foundation for his retaliation claims, and Defendant's motion for summary judgment must be granted.

### III. *CONCLUSION*

**\*18** For the foregoing reasons, the Court grants Defendant's motion for summary judgment in its entirety.

An appropriate Order follows.

Not Reported in F.Supp.2d, 2002 WL 1065686 (D.N.J.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 4

Westlaw.

Not Reported in F.Supp.2d                                         Page 1
Not Reported in F.Supp.2d, 2001 WL 856948 (E.D.Pa.)
**(Cite as: 2001 WL 856948 (E.D.Pa.))**

C

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Barbara KING,
v.
SCHOOL DIST. of PHILADELPHIA, et al.
No. 00-CV-2503.

July 26, 2001.

*MEMORANDUM*

PADOVA, J.

*1 Plaintiff Barbara King filed this action pro se against the School District of Philadelphia and various individuals alleging improper termination. Before the Court is Defendants' Motion for Summary Judgment. For the reasons that follow, the Court grants Defendants' Motion.

I. BACKGROUND

The Complaint alleges the following facts. Barbara King is an African-American woman and was originally hired as a teacher in the Philadelphia School District ("School District") on September 1, 1975. In September of 1992, Plaintiff was transferred from Fairhill Elementary School to George G. Meade Elementary School ("Meade School"). Upon arriving at the Meade School, Plaintiff was harassed by Defendant Cassandra Chapman-Ruffin ("Chapman-Ruffin"), the principal of the Meade School at that time. Chapman-Ruffin was subsequently removed in June 1997 for unfair treatment of staff and students, and replaced by Defendant Francis Murphy ("Murphy") in February 1998.

On September 24, 1998, following a parent-teacher meeting, Plaintiff spoke to some parents of students about their concerns about the school. Murphy attempted to prevent her from discussing the quality and effectiveness of the education and activities at the Meade School with the parents. Plaintiff complied. Four days after this incident, when reporting to work, Plaintiff was met at the doors of the Meade

School building by two School District police officers and a Meade School security officer. The officers handed Plaintiff a letter instructing her to report to the Ben Franklin Cluster Office. On October 21, 1998, Plaintiff received a certified letter recommending her termination from the Meade School.

II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial *Celotex* burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. Evidence introduced to defeat or support a motion for

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 856948 (E.D.Pa.)

**(Cite as: 2001 WL 856948 (E.D.Pa.))**

Page 2

summary judgment, however, must be capable of being admissible at trial. *Callahan v. AEV, Inc.,* 182 F.3d 237, 252 n. 11 (3d Cir.1999)(citing *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F.2d 1224, 1234 n. 9 (3d Cir.1993)). The Court must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson,* 477 U.S. at 255. "[I]f the opponent [of summary judgment] has exceeded the 'mere scintilla' [of evidence] threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. *Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992).

## III. DISCUSSION

**\*2** Plaintiff sues a number of individuals: Gaeton Zorzi, Plaintiff's cluster leader; Cassandra Chapman-Ruffin, former Meade School principal; Francis Murphy, Meade School principal at the time of Plaintiff's discharge; Floyd Alston, former president of the Philadelphia School Board; Rhe McLaughlin, School District rating supervisor; and David Hornbeck, School District superintendent. Primarily, Plaintiff claims that she was terminated and harassed on the basis of her race and gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons.Stat.Ann. § 951. Compl. ¶ 1. Plaintiff also asserts that she suffered retaliation based on her opposition to Defendants' discriminatory acts. *Id.* Plaintiff further contends that she suffered several adverse employment actions including termination without adequate notice or the opportunity to respond in violation of her due process rights under the Fourteenth Amendment. Compl. ¶ 3. The Court interprets this claim as brought pursuant to 42 U.S.C. § 1983. Defendants seek summary judgment on each of these claims. The Court will address each claim in turn.

A. *Disparate Treatment on Race/Gender--Title VII*

Defendants contest Plaintiff's Title VII and PHRA claims by challenging Plaintiff's ability to establish a prima facie case or to cast doubt on their legitimate explanation for her termination. Plaintiff responds first that Defendants' Motion should be denied because of their failure to comply with Plaintiff's discovery requests. Plaintiff alternatively argues that she has sufficient evidence to demonstrate a prima facie case and rebut Defendants' proffered justification for her termination. [FN1] For the reasons that follow, the Court concludes that Defendants are entitled to summary judgment on the Title VII and PHRA disparate treatment claims.

> FN1. An employment discrimination case under Title VII may be advanced on either a pretext theory of causation under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and its progeny, or a "mixed-motives" theory as outlined in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). *See Watson v. SEPTA,* 207 F.3d 207, 214 (3d Cir.2000). In "pretext" cases the plaintiff must prove that consideration of the impermissible factor was "a determinative factor" in the adverse employment action. *Id.* In "mixed-motive" cases, by contrast, a plaintiff need only show that the unlawful motive was a "substantial motivating factor" in the adverse employment action. *Id.* The same standards apply to claims under the PHRA. *See Jones,* 198 F.3d at 410; *Harris v. Smithkline Beecham,* 27 F.Supp.2d 569, 576 (E.D.Pa.1998). Plaintiff states that she may present her claims under either standard, "leaving it for the Court to decide which one applies." The Court will examine the adequacy of Plaintiff's claim under both standards.

1. *Failure to Comply with Discovery*
The Court interprets Plaintiff's argument that Defendant failed to comply with discovery as a motion pursuant to Rule 56(f), Federal Rule of Civil Pro-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 856948 (E.D.Pa.)
(Cite as: 2001 WL 856948 (E.D.Pa.))

Page 3

cedure 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f). In considering motions under Rule 56(f), the court should consider "what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not been previously obtained." *Contractors Assoc. v. City of Philadelphia*, 945 F.2d 1260, 1266 (3d Cir.1991) (citation omitted). Rule 56(f) motions must be properly supported by affidavits that specifically identify the sought information and how such information would preclude summary judgment. *Gambrell v. Hess*, 777 F.Supp. 375 (D.N.J.), *aff'd*, 970 F.2d 898 (3d Cir.1992).

Although the court has discretion in action under Rule 56(f), where the relevant information sought is in the hands of the moving party, the court should grant a Rule 56(f) motion "unless the information is otherwise available to the non-movant." *Contractors Assoc.*, 945 F.2d at 1267. Where, however, the motion is based on speculation or raises merely colorable claims, when the party has already had an adequate opportunity to discover the information, or when the discovery request is irrelevant, the court may deny a Rule 56(f) motion. *City of Rome v. Glanton*, 958 F.Supp. 1026, 1039 (E.D.Pa.), *aff'd without op.*, 133 F.3d 909 (3d Cir.1997).

*3 The Court determines that Rule 56(f) relief is inappropriate here. Plaintiff claims that Defendants failed or refused to produce information generally regarding comparative treatment or racial animus, but does not identify any particular documents or information that she sought. Furthermore, Plaintiff had adequate opportunity to obtain discovery. Defendants submit evidence indicating that answers and documents or objections were provided in response to all of Plaintiff's discovery requests. (*See* Defs. Reply Ex. A, B, C.) Plaintiff failed to file any

motions to compel or even raise the issue at the discovery conference held on April 5, 2001, in response to Defendants' motion to compel Plaintiff's deposition. For this reason, the Court denies Plaintiff's Rule 56(f) request.

### 2. *Mixed Motive Theory*

In a "mixed-motives" or *Price Waterhouse* case, the employee must produce "direct evidence that the decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Price Waterhouse*, 490 U.S. at 277; *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 n. 4 (3d Cir.1995). If the employee does produce direct evidence of discriminatory animus, the employer must then produce evidence sufficient to show that it would have made the same decision if illegal bias had played no role in the employment decision. *Price Waterhouse*, 490 U.S. at 244-45; *Starceski*, 54 F.3d at 1096 n. 4.

In order to shift the burden, the plaintiff must produce evidence that "is so revealing of discriminatory animus that it is not necessary to rely upon any presumption from the prima facie case [as is necessary in a pretext action]." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778 (3d Cir.1994)). Direct evidence of discrimination involves "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting a discriminatory attitude." *See Starceski*, 54 F.3d at 1096 (citing *Price Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring)). Stray remarks in the workplace, statements by nondecisionmakers, or even statements by decisionmakers unrelated to the decisional process itself, do not constitute direct evidence of discrimination. *See id.* Circumstantial evidence that directly reflects the alleged unlawful basis for the adverse employment decision may also be sufficient. *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 513 (3d Cir.1997). Because Plaintiff adduces no such evidence that her supervisors relied on an illegitimate criterion in writing their evaluations of her teaching performance or terminating her, she is unable to establish a case under this theory. Defendants, therefore, are entitled to summary judgment on the mixed motive claim.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 856948 (E.D.Pa.)
(Cite as: 2001 WL 856948 (E.D.Pa.))

### 3. Pretext Theory

*4 In cases in which the plaintiff lacks direct evidence of discrimination, courts apply a burden-shifting framework to cases under Title VII of the Civil Rights Act of 1964. *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir.1999). First, the plaintiff must produce evidence that is sufficient to convince a reasonable factfinder to find all of the elements of a prima facie case. *Id.* If the plaintiff establishes a prima facie case, then the burden of production shifts to the defendant to offer evidence that is sufficient, if believed, to support a finding that it had a legitimate, nondiscriminatory reason for the discharge. *Id.* Should the defendant fail to satisfy this burden, judgment should be entered for the plaintiff. *Id.* If the defendant satisfies this burden, then the burden of production shifts back to the plaintiff to proffer evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994).

After reviewing the record, the Court concludes that Plaintiff fails to establish a prima facie case of race or gender discrimination. The prima facie case for racial discrimination generally consists of four elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position she was seeking; (3) the plaintiff suffered an adverse employment action; and (4) the surrounding circumstances give rise to an inference of discrimination. *See Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352-54 (3d Cir.1999). Defendants do not dispute that Plaintiff is able to establish the first three elements: Plaintiff is an African-American woman, had ample qualifications to teach, and was terminated from her job. Rather, Defendants argue that Plaintiff lacks evidence creating a genuine issue of material fact that the circumstances of her termination give rise to an inference of discrimination.

The most common way that a plaintiff can raise an inference of discrimination is by presenting evidence that she was treated differently from other similarly-situated employees. Plaintiff asserts that her position was filled by a white woman, that other white or male employees were not treated the same way, and other African-American teachers were targeted, but submits no admissible evidence supporting these allegations. [FN2]

> FN2. Plaintiff argues that Defendants refused to provide her with proof that similarly situated employees were treated differently. The Court has already determined that additional discovery under Rule 56(f) is inappropriate because Plaintiff already had adequate opportunity to obtain the information.

The evidence in the record indicates that Plaintiff received satisfactory evaluations by her supervisors until she was administratively transferred to the Meade School in 1992. Once at the Meade School, she received five unsatisfactory evaluations on December 4, 1996, April 4, 1997, March 27, 1998, May 4, 1998, and June 5, 1998; an unsatisfactory rating for the 1996-97 school year, and unsatisfactory incident reports on June 11, 1998, September 14, 2001, and September 24, 1998. In her deposition, Plaintiff repeatedly states her belief that only African-American teachers were repeatedly observed and evaluated, and that her supervisors were acting based on her race or gender. *See, e.g.,* Defs. Mot. Ex. 3 at 14, 33-35, 76-78, 161-64. Plaintiff's conclusory and unsupported beliefs are insufficient to create a genuine issue of material fact as to Defendants' motivation or support an inference of discrimination based on race or gender. [FN3] Plaintiff therefore cannot establish a prima facie case of discrimination under Title VII or the PHRA, and Defendants are entitled to summary judgment on those claims.

> FN3. Plaintiff also submits newspaper reports and letters by councilpersons and ministers generally asserting that minority teachers were disciplined on the basis of their race, and a statement written by Jerome Avery, President of Coalition of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Page 5

Not Reported in F.Supp.2d, 2001 WL 856948 (E.D.Pa.)

**(Cite as: 2001 WL 856948 (E.D.Pa.))**

Education Advocates, arguing that Plaintiff's unsatisfactory evaluations and reports lack credibility. These documents do not appear to constitute or contain evidence that is admissible under the Federal Rules of Evidence, and hence cannot support Plaintiff's opposition to Defendant's Motion.

### B. *Retaliation--Title VII*

*\*5* Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment" because they have opposed any practice made unlawful under Title VII or filed or participated in a charge alleging violations of Title VII. 42 U.S.C. § 2000e-3(a) (1994). Retaliation claims follow the same burden-shifting pattern as ordinary discrimination cases under Title VII. *See Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 (3d Cir.1997). To establish a prima facie case of retaliation, a plaintiff must show that: (1) he or she engaged in protected speech or activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action. *Weston v. Commonwealth of Pa.,* 251 F.3d 420, 430 (3d Cir.2001).

The record contains sufficient evidence to create a genuine issue of material fact as to the first two elements. *See* Defs. Ex. 1; Defs. Ex. 9. With respect to the first element, the record indicates that Plaintiff filed a complaint with a panel designed to determine if the School District engaged in racial discrimination against African-American teachers in the 1996-97 school year ("Hall Panel"). Defs. Ex. 3 at 87; Defs. Ex. 9; Defs. Ex. 10. Plaintiff notified Defendants of her participation in the Hall Panel by letter dated December 31, 1997. Defs. Ex. 9. Because this letter could reasonably be construed as evidence that Plaintiff engaged in speech about her claims of discriminatory treatment, it is sufficient to create a genuine issue of material fact as to the first element of a prima facie case. [FN4]

FN4. Plaintiff also claims that she spoke at

public meetings and community events about policies that she perceived as racist including the removal of art, music and science classes at the Meade School, and about the harassment and discrimination against African-American teachers that she perceived. Plaintiff, however, fails to provide any admissible evidence supporting her claim. The only such incident identified in the record occurred on September 24, 1998. The record indicates that on September 24, 1998, Plaintiff spoke at an assembly attended by parents of Meade School students about the unfair treatment of Meade School teachers by the principal. Defs. Ex. 23. The record, however, does not indicate that the speech reflected opposition to conduct prohibited by Title VII, as opposed to generalized claims of unfair treatment. *See id.* In the absence of evidence indicating that Plaintiff's speech in this incident specifically reported or opposed conduct prohibited by Title VII, the incident cannot support a retaliation claim under Title VII. *See* 42 U.S.C. § 2003e-3(a) (1994); *Basith v. Cook County,* 241 F.3d 919, 932-33 (7th Cir.2001).

With respect to the second element, Title VII specifically prohibits action which would "deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee." 42 U.S.C. § 2000e-2(a). *Id.* The Supreme Court has defined a tangible, adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." *Id.* (quoting *Burlington Indus. Inc. v. Ellerth,* 524 U.S. 742, 749, 118 S.Ct. 2257, 141 L.Ed.2d 633(1998)). Plaintiff was terminated on October 21, 1998. Defs. Ex. 1 at 1.

Plaintiff, however, points to no admissible evidence supporting the existence of a causal link between her testimony before the Hall Panel and her termination. The record only contains Plaintiff's own conclusory suppositions which are insufficient to create

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2001 WL 856948 (E.D.Pa.)
**(Cite as: 2001 WL 856948 (E.D.Pa.))**

a genuine issue of material fact as to this issue. *See* Defs. Ex. 3. For this reason, Defendants are entitled to summary judgment on Plaintiff's retaliation claim.

### C. *Hostile Working Environment--Title VII*

Plaintiff claims, but provides no supporting evidence, that Murphy frequently interrupted her classes several times a week and that this constitutes harassment. The Supreme Court recognizes that Title VII's protection embraces not only "economic" or "tangible" discrimination, such as the denial or loss of a job or promotion, but includes work environments abusive to employees because of their race as well. *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 753 (3d Cir.1995). To be cognizable under Title VII, racial harassment must be sufficiently severe or pervasive to alter the terms, conditions, or privileges of the plaintiff's employment. *West*, 45 F.3d at 753. (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). In *Andrews v. City of Philadelphia*, the Third Circuit adopted the "totality of the circumstances" approach to determine whether a hostile work environment exists. *Andrews*, 895 F.2d 1469, 1482 (3d Cir.1990). The relevant circumstances may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it interferes with an employee's work performance." *West*, 45 F.3d at 753. Five elements must be fulfilled by a plaintiff to establish a prima facie case of hostile work environment: "(1) the plaintiff suffered intentional discrimination because of his or her membership in the protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would have detrimentally affected a reasonable person of the same protected class in that position; and, (5) the existence of respondeat superior liability." *West*, 45 F.3d at 753 (quoting Andrews, 895 F.2d at 1482). Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment does not violate Title VII. *Harris v. Forklift Sys.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295,

(1993). The totality of the circumstances must be considered, including the frequency of the discriminatory conduct, its severity, whether its physically threatening or humiliating or a mere offensive utterance, and whether it reasonably interferes with an employee's work performance. *Gautney v. Amerigas Propane, Inc.*, 107 F.Supp.2d 634, 643 (E.D.Pa.2000).

**\*6** There is no admissible evidence supporting Plaintiff's claim that Defendant Murphy repeatedly interrupted her classes, that he verbally abused her, or that his verbal abuse was linked to her race. Plaintiff points to no evidence indicating the nature or content of any harassment, its pervasiveness or regularity, or whether the harassment would have detrimentally affected another reasonable person in the same position. Accordingly, Plaintiff fails to create a genuine issue of material fact as to any element of a prima facie case of racial or gender-based harassment under Title VII.

### D. *Due Process*

**\*7** Plaintiff also brings a claim pursuant to § 1983 alleging that Defendants deprived her of her constitutional due process rights in disciplining and ultimately terminating her. In a Supplemental Memorandum filed on July 9, 2001, Defendants address Plaintiff's due process claim and assert that Plaintiff lacks evidence to establish a deprivation of procedural or substantive due process. Although Plaintiff failed to file a response to Defendants' Supplemental Memorandum, the Court will examine the merits of the Supplemental Memorandum under the Rule 56 standard. *See* Local R.Civ.P. 7.1(c).

To establish a claim under § 1983, a plaintiff must allege (1) a deprivation of a federally protected right, and (2) commission of the deprivation by one acting under color of state law. *Lake v. Arnold*, 112 F.3d 682, 689 (3d Cir.1997). The Fourteenth Amendment to the United States Constitution protects a person from state action that deprives her of life, liberty or property without due process of law. U.S. Const. am. XIV. While on its face this constitutional provision speaks to the adequacy of state

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                          Page 7
Not Reported in F.Supp.2d, 2001 WL 856948 (E.D.Pa.)
(Cite as: 2001 WL 856948 (E.D.Pa.))

procedures, the Supreme Court has held that the clause also has a substantive component. _Nicholas v. Pa. State Univ., 227 F.3d 133, 138 (3d Cir.2000)_ (citing _Planned Parenthood of S.E. Pa. v. Casey, 505 U.S. 833, 846-47, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)_). Plaintiff does not specify in the Complaint whether she alleges a violation of her procedural or substantive due process rights. Since Plaintiff is pro se, the Court will address a claim arising under both due process prongs.

### 1. Procedural Due Process

The essential principle of procedural due process is that a deprivation of life, liberty or property should be preceded by "notice and opportunity for a hearing appropriate to the nature of the case." _Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)_. For procedural due process to apply, the plaintiff must establish a property interest in her employment. _Poteat v. Harrisburg Sch. Dist., 33 F.Supp.2d 384, 390 (M.D.Pa.1999)_ (citing _Abbott v. Latshaw, 164 F.3d 141, 146 (3d Cir.1998)_). Well-established federal law recognizes the existence of a property interest in public employment where state law supports a claim of entitlement to continued employment. _Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1077 (3d Cir.1990)_. State law restricting discharge of a public employee except 'for cause' supports such an entitlement to continued employment and thereby creates a protectable property interest. See _Gilbert v. Homar, 520 U.S. 924, 928-29, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997); Bradley, 913 F.2d at 1077_.

Defendants do not dispute that Plaintiff has a property interest in her employment that is protectable under procedural due process. Instead, Defendants assert that Plaintiff lacks proof of any deprivation of procedural due process in connection with any adverse employment actions imposed over the course of her employment with the School District. The Court agrees.

**\*8** Due process requires that a deprivation of prop-

erty "be preceded by notice and opportunity for hearing appropriate to the nature of the case, and the opportunity to be heard must be at a meaningful time and in a meaningful manner." _Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 680 (3d Cir.1991)_ (citing _Loudermill, 470 U.S. at 542_). Defendants submit evidence that the collective bargaining agreement applicable to Plaintiff provided for a formal grievance procedure to contest discipline or discharge. Defs. Supp. Mem. Ex. 3. Where a collective bargaining agreement provides for grievance procedures, the dictates of procedural due process are satisfied. See _Dykes v. Southeastern Pa. Transp. Auth., 68 F.3d 1564, 1571 (3d Cir.1995); Yearling v. Bensalem Township Sch. Dist._, No. Civ.A. 94-7711, _1997 WL 128096, at \*6 (E.D.Pa. Mar.18, 1997)_ (listing cases). Furthermore, the record evidence uniformly indicates that at each instance of discipline and upon her termination, Plaintiff was given the opportunity for a hearing and appeal of the action. Accordingly, there is no genuine issue of material fact as to Plaintiff's procedural due process claim. Defendants, therefore, are entitled to summary judgment on this claim.

### 2. Substantive Due Process

Substantive due process may apply when a plaintiff challenges the arbitrary exercise of power by a government official through a non-legislative act. _Nicholas, 227 F.3d at 139_. Generally, the state may not take away a property interest that falls within the scope of substantive due process for reasons that are "arbitrary, irrational, or tainted by improper motive," or by means so egregious as to "shock the conscience." _Id._ (quotations omitted). To prevail on such a substantive due process claim, a plaintiff must establish possession of a protected property interest to which the Fourteenth Amendment's due process protection applies. _Id._ at 139-40 (citing _Woodwind Estates Ltd. v. Gretkowski, 205 F.3d 118, 123 (3d Cir.2000)_).

"Not all property interests worthy of procedural due process protection are protected by the concept of substantive due process." _Id._ at 139 (quoting _Reich v. Beharry, 833 F.2d 239, 243 (3d Cir.1989)_).

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                      Page 8
Not Reported in F.Supp.2d, 2001 WL 856948 (E.D.Pa.)
**(Cite as: 2001 WL 856948 (E.D.Pa.))**

Rather, successful claims under substantive due process require deprivation of a property interest that is fundamental under the United States Constitution. *Id.* at 142. Fundamental property interests are those that are "deeply rooted in the Nation's history and traditions," or are "implicit in the concept of ordered liberty like personal choice in matters of marriage and family." *Id.* at 143. Public employment is not a fundamental property interest protected by substantive due process. *Id.* Accordingly, Plaintiff cannot maintain her claim under substantive due process.

IV. CONCLUSION

*9 For the above-stated reasons, the Court grants Defendants' Motion for Summary Judgment on all claims in the Complaint. An appropriate Order follows.

                        *ORDER*
AND NOW, this day of July, 2001, upon consideration of Defendants' Motion for Summary Judgment (Doc. No. 22), and all attendant, responsive and supplemental briefing, IT IS HEREBY ORDERED that Defendants' Motion is GRANTED with respect to all claims in the Complaint. The Clerk of Courts is ORDERED to CLOSE this case for statistical purposes.

Not Reported in F.Supp.2d, 2001 WL 856948 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 5

Westlaw.

Not Reported in F.Supp.2d                                                     Page 1
Not Reported in F.Supp.2d, 2002 WL 1586280 (D.Del.)
**(Cite as: 2002 WL 1586280 (D.Del.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Robin MCINTYRE, Plaintiff,
v.
CITY OF WILMINGTON, Defendant.
No. C.A. NO. 01-396 GMS.

July 9, 2002.

Black employee sued city, claiming racial discrim-
ination in connection with his dismissal as code en-
forcement officer and reassignment to lower posi-
tion of meter reader. City moved to dismiss. The
District Court, Sleet, J., held that: (1) there was
subject matter jurisdiction, and (2) employee failed
to state claim.

Complaint dismissed.

West Headnotes

**[1] Civil Rights** ⇐1532
78k1532 Most Cited Cases
    (Formerly 78k375)
Claim of city employee, that he was dismissed from
position as code enforcement
officer and reassigned to lower position as meter
reader, when caucasian was not similarly disci-
plined for comparable offense, would not be dis-
missed for lack of subject matter jurisdiction; es-
sentials of racial discrimination in employment
claim under Title VII were alleged. Civil Rights
Act of 1964, § 701 et seq., as amended, 42
U.S.C.A. § 2000e et seq.; Fed. Rules Civ.
Proc.Rule 12(b)(1), 28 U.S.C.A.

**[2] Civil Rights** ⇐1128
78k1128 Most Cited Cases
    (Formerly 78k146)
Black city employee failed to state claim of racial
discrimination, in violation of Title VII, in connec-
tion with his dismissal as code inspector and demo-
tion to water meter reader; there was no direct evid-
ence that removal was racially motivated, and there

were unrefuted race neutral reasons for action, in-
volving inappropriate conduct while in contact with
public. Civil Rights Act of 1964, § 701 et seq., as
amended, 42 U.S.C.A. § 2000e et seq.; Fed. Rules
Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.
Robin McIntyre, Wilmington, DE, for Plaintiff, pro
se.

*MEMORANDUM AND ORDER*
SLEET, J.

I. INTRODUCTION

*1 On June 12, 2001, Robin McIntyre
("McIntyre"), a *pro se* plaintiff, filed a complaint
alleging that his employer, the City of Wilmington,
wrongfully dismissed him from his job as a Code
Enforcement Officer with the Department of Li-
censes and Inspections ("DLI") and unfairly reas-
signed him to a lower level position as a water
meter reader for the Department of Finance, Water
Division ("DFWD"). Prior to filing his complaint
with the court, McIntyre properly exhausted his
state and federal administrative remedies by filing
claims with both the Delaware Department of
Labor ("DDOL") and the Equal Employment Op-
portunity Commission ("EEOC"). After his claims
were dismissed by both agencies, McIntyre timely
filed his complaint within ninety days of receipt of
the EEOC's right to sue letter. *See* 29 C.F.R. §
1601.19(a).

Presently before the court is the City of Wilming-
ton's motion to dismiss the plaintiff's complaint
pursuant to Federal Rules of Civil Procedure
12(b)(1) and 12(b)(6). McIntyre's complaint and its
attachments are sufficient to constitute a basis for
subject matter jurisdiction. Therefore, the City of
Wilmington's motion to dismiss pursuant to Rule
12(b)(1) will be denied. McIntyre cannot, however,
prove any set of facts consistent with the allega-
tions in the complaint which would entitle him to
relief. As a result, the City of Wilmington's motion
to dismiss pursuant to Rule 12(b)(6) will be gran-
ted.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1586280 (D.Del.)
**(Cite as: 2002 WL 1586280 (D.Del.))**

Page 2

## II. FACTS

Prior to September 14, 1998, McIntyre was employed by the DFWD. On September 14, 1998, McIntyre was promoted to a job with the DLI. Within the first three months of McIntyre's employment with the DLI, the department received several complaints regarding McIntyre's lack of professionalism. Shortly thereafter, the DLI Commissioner was replaced by a new Commissioner, James Mosely. While the outgoing commissioner had looked past the complaints regarding McIntyre, Commissioner Mosely took them more seriously. As a result, McIntyre was placed on extended probation.

During this extended probation, while inspecting an apartment building, McIntyre "had words" with a resident of the building in the presence of a DLI Senior Inspector. The resident with whom McIntyre argued turned out to be the future son-in-law of City of Wilmington Councilman Demetrio Ortega. Coincidentally, Councilman Ortega is chairman of the DLI. On March 1, 1999, McIntyre was dismissed from the DLI for inappropriate behavior and reassigned to his old job with the DFWD.

On October 29, 1999, McIntyre, an African American, filed a claim with the DDOL alleging racial discrimination in connection with his dismissal from the DLI. The completed DDOL claim form is attached to McIntyre's complaint. In the claim, McIntyre complains of the DLI's failure to terminate a Caucasian employee whose conduct was allegedly more egregious than his own. The claim states, "I was discharged from that dept. [sic] because of words with councilman's future son in law, after being on extended probation since then. A caucasion [sic] was not discharged after, allegedly kicking a door in (in uniform) put back on probation, while during he was allegedly (1) impersonating a police officer, (2) drunk and disorderly, (3) racial slurs, etc." On June 30, 2000, the DDOL dismissed McIntyre's charge, finding no reasonable basis to conclude that the DLI had discriminated against McIntyre. Soon thereafter, McIntyre filed a claim with the EEOC. Subsequent to the filing of

the EEOC claim, the Caucasian employee McIntyre mentioned in his DDOL claim was also terminated. After adopting the factual findings of the DDOL, the EEOC also dismissed the claim. A right-to-sue letter was issued on June 4, 2001.

*2 McIntyre filed a timely complaint with the court on June 12, 2001. Upon filing his complaint, McIntyre completed and signed a JS-44 civil cover sheet which lists the City of Wilmington as the only captioned defendant. The form further designates the basis of jurisdiction as a federal question, the nature of the suit as Civil Rights-Employment, and the cause of action as "employment discrimination."

The complaint itself outlines the above-mentioned chain of events leading to his dismissal. It further states that Councilman Ortega's daughter was hired by the DLI shortly after he was fired. McIntyre also alleges in his complaint that he has been "harassed since returning to work [at the DFWD]." To support this assertion, McIntyre provides a list of two instances in which he believes he was harassed. The first reads, "I was suspended for 2 days for misreading 1 water meter." The second reads, "I was suspended for 2 weeks for misreading about 7 meters, allegedly." He ends his complaint by stating, "Somewhere in here, there has to be some wrong doings on the part of the city, and I need someone to help me find it, because I want to sue the city for a couple of reasons, harrassment [sic], favoritism, etc."

## III. STANDARDS OF REVIEW [FN1]

> FN1. Since the plaintiff is a *pro se* litigant, the court has a special obligation to construe his complaint liberally. *Zilch v. Lucht*, 981 F.2d 694, 694 (3d Cir.1992) (citing *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)).

### A. Rule 12(b)(1) Standard

A motion to dismiss under Rule 12(b)(1) challenges the jurisdiction of the court to address the merits of a plaintiff's complaint. A motion to dismiss under

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1586280 (D.Del.)
(Cite as: 2002 WL 1586280 (D.Del.))

Rule 12(b)(1) for lack of subject matter jurisdiction can take two forms: it can attack the complaint on its face (facial attack), or it can attack the existence of subject matter jurisdiction in fact (factual attack). *Mortensen v. First Federal Savings and Loan,* 549 F.2d 884, 891 (3d Cir.1977). When reviewing a facial attack the court must consider the allegations of the complaint as true, making all reasonable inferences in the plaintiff's favor. *Id. See also Barrister v. Wendy's Int'l, Inc.,* 1993 WL 293896, *3 (E.D.Pa. July 30, 1993).*

When reviewing a factual attack, however, the court is free to weigh evidence outside the pleadings to resolve factual issues bearing on jurisdiction and to satisfy itself as to the existence of its power to hear the case. *Mortensen,* 549 F.2d at 891. Therefore, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the court from evaluating the merits of jurisdictional claims for itself. *Id.* The plaintiff bears the burden to prove that jurisdiction does in fact exist. *Id.* However, the plaintiff's burden is relatively light, since "dismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as to not involve a federal controversy.' " *Kulick v. Pocono Downs Racing Ass'n,* 816 F.2d 895, 899 (3d Cir.1987) (quoting *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 666, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974)).

B. Rule 12(b)(6) Standard

*3 In ruling on a motion to dismiss, the factual allegations of the complaint must be accepted as true. *See Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir.1997); *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996). Moreover, a court must view all reasonable inferences that may be drawn from the complaint in the light most favorable to the non-moving party. *See Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991). A

court should dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See Graves,* 117 F.3d at 726; *Nami,* 82 F.3d at 65 (both citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

IV. DISCUSSION

A. Rule 12(b)(1) Motion to Dismiss

[1] "When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot." *In Re Corestates Trust Fee Litigation,* 837 F.Supp. 104, 105 (E.D.Pa.1993), *aff'd* 39 F.3d 61 (3d Cir.1994). Therefore, the court will first turn its attention to the 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.

In its motion, the City of Wilmington attacks McIntyre's complaint on both facial and factual grounds. First, the City attacks McIntyre's complaint on its face, noting that it fails to aver any basis for jurisdiction. While this is true, since McIntyre is a *pro se* plaintiff, the court must construe his complaint liberally. *Zilch,* 981 F.2d at 694. Although McIntyre's handwritten complaint does not itself state any specific basis for the court's jurisdiction, it does convey that McIntyre believes he was unfairly discharged and harassed by his employer. Additionally, the JS-44 civil cover sheet which McIntyre completed, signed and filed with the Clerk of Court upon filing his complaint designates the basis of jurisdiction as a federal question, the nature of the suit as Civil Rights-Employment, and the cause of action as "employment discrimination." Furthermore, the claim form that McIntyre filed with the DDOL alleges racial discrimination. [FN2] The pleading standard under the Federal Rules is generally liberal, and even more so for *pro se* plaintiffs. The court thus finds that it is not unreasonable to conclude that McIntyre is attempting to assert a racial discrimination claim against his employer pursuant to Title VII of the Civil Rights

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1586280 (D.Del.)
(Cite as: 2002 WL 1586280 (D.Del.))

Page 4

Act of 1964, 42 U.S.C. § 2000e-2(a)(1). Since Title VII is a federal statute, the court has federal question jurisdiction over the dispute. Therefore, the defendant's facial attack fails.

> FN2. Since the DDOL claim form was attached to the complaint, it may be considered by the court in the determination of this motion to dismiss. *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir.1993) (stating that when deciding a motion to dismiss, courts can generally consider the complaint, exhibits attached to the complaint, and matters of public record).

The defendant also argues that the facts of the case do not give rise to federal jurisdiction. The court cannot accept this assertion. Although McIntyre has the burden of proving that jurisdiction exists, this burden is light. *Id.* Basically, McIntyre need only demonstrate that his claim is not wholly insubstantial, frivolous, devoid of merit, or made for the purpose of obtaining jurisdiction." *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *Kulick*, 816 F.2d at 899. McIntyre's DDOL claim alleges racial discrimination by his employer. It states that a Caucasian employee whose conduct on the job provided grounds for dismissal was not fired while he, an African-American, was fired for less egregious infractions. A racial discrimination claim is unquestionably within the purview of Title VII. McIntyre's claim, although perhaps weak, is substantially asserted so as to establish a basis for subject matter jurisdiction. Any other conclusion would overstep the bounds of a jurisdictional inquiry and lead into an evaluation of the merits of McIntyre's case. This would be an improper inquiry for a district court to make when reviewing a Rule 12(b)(1) motion. *See Growth Horizons, Inc. v. Delaware County*, 983 F.2d 1277, 1281 (3d Cir.1993). Therefore, the defendant's factual attack on subject matter jurisdiction also fails.

*4 For these reasons, the court concludes that the defendant's factual and facial attacks on the court's subject matter jurisdiction are without merit. The court will, therefore, decline to dismiss the complaint pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.

**B. Rule 12(b)(6) Motion to Dismiss**

[2] The standard governing a Rule 12(b)(6) motion to dismiss for failure to state a claim is not as constrained as the standard for a Rule 12(b)(1) motion. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir.1991). A federal claim being reviewed under Rule 12(b)(6) does not have to be "wholly insubstantial" to be dismissed. *Id.* Rather, a court should dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See Graves*, 117 F.3d at 726. Although McIntyre's complaint cannot be dismissed for lack of subject matter jurisdiction, it fails the 12(b)(6) test.

A racial discrimination case under Title VII can be made in one of two ways. First, under the *Price Waterhouse* analysis, *see Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), a plaintiff must produce direct evidence that race was a motivating factor in the employment decision. *See Armbruster v. Unisys Corp.*, 32 F.3d 768, 778 (3d Cir.1994). "Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Nixon v. Runyan*, 856 F.Supp. 977, 983 (E.D.Pa.1994).

McIntyre's claim fails under the *Price Waterhouse* analysis. McIntyre's complaint contains broad allegations of harassment and favoritism, but absolutely no references to any specific facts that constitute direct proof of racial animus. In fact, McIntyre's complaint makes no mention of race at all. There are no references to racial jokes, epithets, gestures or any other racially tinged activity that could constitute direct evidence of a racial motivation of the part of the DLI. Thus, there is no direct evidence that race was a motivating factor in the DLI's decision to fire McIntyre.

A Title VII plaintiff can also prevail under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1586280 (D.Del.)
(Cite as: 2002 WL 1586280 (D.Del.))

802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) framework. In the *McDonnell Douglas* analysis, the plaintiff can attempt to demonstrate, through indirect evidence, that the defendant's actions were racially motivated. Under *McDonnell Douglas,* the plaintiff must first establish a prima facie case by demonstrating that he is a member of a protected class. The plaintiff must then establish that he or she was qualified for an employment position, but was not hired or was fired from the position "under circumstances that give rise to an inference of unlawful discrimination." *See Waldron v. SL Industries, Inc.,* 56 F.3d 491, 494 (3d Cir.1995). When the plaintiff establishes this prima facie showing, the burden shifts to the defendant to articulate one or more legitimate, non-discriminatory reasons for its employment decision. *Id.* If the defendant produces one or more legitimate reasons, the presumption of discrimination is rebutted. The plaintiff must then prove that the employer's reasons were pretextual-that is, that they are false and that the real reason for the employment decision was discriminatory. *Id.*

*5 McIntyre's claim also fails under the burden-shifting regimen of *McDonnell Douglas.* First, McIntyre cannot establish a prima facie case of race discrimination. Although McIntyre is a member of a protected class, the circumstances surrounding his dismissal do not give rise to an inference of unlawful discrimination. The only allegation McIntyre has made which could possibly give rise to an inference of racial discrimination is his assertion that he was fired for less egregious infractions than those committed by a Caucasian employee. Subsequent to McIntyre's filing of the DDOL claim, however, this employee was also fired. The fact that both African American and Caucasian employees were discharged extinguishes any inference of unlawful discrimination.

Even if McIntyre could make a prima facie case, the court can easily determine, based solely on the complaint and its attached exhibits, that the City of Wilmington had several legitimate, non-discriminatory reasons for dismissing McIntyre from his position with the DLI. First, McIntyre

states in his complaint that the commissioner of the DLI received complaints regarding McIntyre, and therefore, placed him on "extended probation." Secondly, McIntyre states that, while on probation, he "had words" with the Councilman Ortega's future son-in-law in the presence of a DLI Senior Inspector. The court ventures no opinion, but it might not be unreasonable to infer that McIntyre was dismissed from his job at the DLI because of the incident with the councilman's future son-in-law. In other words, the events surrounding McIntyre's dismissal might support the conclusion that he was fired for "stepping on the wrong toes," not because he is African-American. While this is unfortunate for McIntyre, there is absolutely no evidence which could support the assertion that McIntyre's dismissal was racially motivated.

Since the City of Wilmington has several legitimate, non-discriminatory reasons for dismissing McIntyre from the DLI, the burden shifts to McIntyre to prove that these reasons are pretextual. *See Waldron,* 56 F.3d at 494. McIntyre has not met this burden. The only evidence which could support the assertion that the City of Wilmington's reasons for dismissing McIntyre were pretextual is the allegation that a Caucasian employee who had engaged in more egregious conduct than McIntyre was not fired. However, as previously noted, the fact that this co-worker was fired soon after McIntyre's DDOL claim was filed vitiates any argument that the reasons for McIntyre's termination were pretextual.

McIntyre has not demonstrated that his termination was either the direct or indirect result of racial animus. Consequently, he cannot prevail on his Title VII claim under either the *McDonnell Douglas or Price Waterhouse* standard. Thus, the court concludes that McIntyre's complaint fails to state a claim.

The conclusion that McIntyre's complaint does not state a claim upon which relief may be granted does not end the court's inquiry, however. The court must decide whether to grant leave to amend the complaint. The Supreme court has granted discre-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1586280 (D.Del.)
**(Cite as: 2002 WL 1586280 (D.Del.))**

Page 6

tion to the District Courts in determining whether to grant or deny leave to amend. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). However, refusal to grant leave to amend without any justifying reason is an abuse of that discretion and is inconsistent with the spirit of the Federal Rules of Civil Procedure. *Id.* Furthermore, *pro se* plaintiffs should be given the opportunity to amend their complaints unless it clearly appears that the deficiency cannot be overcome by amendment. *Weaver v. Wilcox,* 650 F.2d 22, 27 (3d Cir.1981). "Among the grounds that could justify the denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice and futility." *In Re Burlington Coat Factory Sec. Litig.,* 144 F.3d 1410, 1434 (3d Cir.1997).

*6 In McIntyre's case, any amendment would be futile. Futility, in this context, means that the complaint, as amended, would fail to state a claim upon which relief may be granted. *Id.* In assessing futility, the district court should use the same standard of legal sufficiency that applies under Rule 12(b)(6). *Id.* The court is convinced that were McIntyre granted leave to amend, he would nevertheless be unable to state a claim upon which relief might be granted. In his DDOL claim, McIntyre failed to produce any facts or allegations which could convince the DDOL that he had a legitimate racial discrimination claim. Similarly, upon filing a claim with the EEOC, McIntyre failed to produce any evidence of racial discrimination. Finally, in the present lawsuit, McIntyre has failed to adduce facts which support a claim upon which relief could be granted. Thus, although McIntyre has had three opportunities to present facts supporting his claim, he has failed to do so on each occasion. Consequently, the court concludes that permitting McIntyre to amend his complaint will not result in the production of any new facts to support his claim. Therefore, leave to amend will not be granted.

V. CONCLUSION

McIntyre's complaint, when considered together with its attachments and the JS-44 civil cover sheet,

is sufficient to establish subject matter jurisdiction. Therefore, the court will not dismiss the complaint pursuant to Rule 12(b)(1). Nevertheless, McIntyre has not and cannot prove any set of facts that might demonstrate that his dismissal from the DLI was racially motivated. Therefore, the court will grant the defendant's motion to dismiss pursuant to Rule 12(b)(6).

NOW, THEREFORE, IT IS HEREBY ORDERED that:

1. The City of Wilmington's motion to dismiss (D.I.# 9) is GRANTED.
2. The Clerk shall close the case.

Not Reported in F.Supp.2d, 2002 WL 1586280 (D.Del.)

END OF DOCUMENT

# EXHIBIT 6

LEXSEE



Positive
As of: Jan 09, 2008

**ROBIN D. NICHOLS, Plaintiff, v. BENNETT DETECTIVE & PROTECTIVE AGENCY, INC., a Delaware corporation, and ALLEN'S FAMILY FOODS, INC., a Delaware corporation, Defendants.**

Civil Action No. 05-55-KAJ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2006 U.S. Dist. LEXIS 35491

**May 31, 2006, Decided**

**SUBSEQUENT HISTORY:** Affirmed by Nichols v. Bennett Detective & Protective Agency, Inc., 2007 U.S. App. LEXIS 20673 (3d Cir. Del., Aug. 28, 2007)

**CORE TERMS:** deposition, summary judgment, transferred, prima facie case, tortious interference, discriminated, plant, favorable, employment contract, discriminate, pretext, woman, security officers, material fact, genuine issue, interfered, disruptive, removal, hearsay, at-will, sex, security guards, training, job site, protected class, non-discriminatory, transferring, altercation, male, intentional act

**COUNSEL:** [*1] William D. Fletcher, Jr., Esq., Noel E. Primos, Esq., Schmittinger and Rodriguez, P.A., Dover, Delaware, for Plaintiff.

Roger D. Landon, Esq., Philip T. Edwards, Esq., Murphy Spadaro & Landon, Wilmington, Delaware, for Defendant Bennett Detective & Protective Agency, Inc.

Matthew F. Boyer, Esq., Connolly Bove Lodge & Hutz, Wilmington, Delaware, for Defendant Allen's Family Foods, Inc. Of Counsel: Arthur M. Brewer, Esq., Laura A. Pierson Scheinberg, Esq., Shawe & Rosenthal, LLP, Baltimore, Maryland.

**JUDGES:** Kent A. Jordan, District Judge.

**OPINION BY:** Kent A. Jordan

**OPINION**

**MEMORANDUM OPINION**

Wilmington, Delaware

May 31, 2006

Kent A. Jordan

**JORDAN, District Judge**

**I. INTRODUCTION**

Before me are two Motions for Summary Judgment, one filed by defendant Bennett Detective & Protective Agency, Inc. ("Bennett") (Docket Item ["D.I."] 43), and the other filed by defendant Allen's Family Foods, Inc. ("Allen") (D.I. 45). [1] The complaint, filed by plaintiff Robin D. Nichols, alleges that Bennett discriminated against her on the basis of her race and sex, in violation of the Delaware Discrimination Act ("DDA"), 19 Del. C. § 710, et seq. [*2] (D.I. 1, Ex. A at PP 24-25), and that both Defendants discriminated against her on the basis of her race, in violation of 42 U.S.C. § 1981 (id. at PP 27-28). Nichols also alleges that Allen tortiously interfered with her contract with Bennett (id. at PP 30-31 ), and that an agent of Allen, Raymond Miller, made false statements about her that constitute slander per se (id. at PP 33-38).

    1  Bennett and Allen will be referred to collectively herein as "Defendants."

Nichols initially filed her complaint in the Delaware Superior Court, but the case was removed to this court pursuant to 28 U.S.C. § 1441. [2] Jurisdiction over the §

2006 U.S. Dist. LEXIS 35491, *

1981 claim is appropriate under 28 U.S.C. § 1331. Supplemental jurisdiction over all other claims is proper under 28 U.S.C. § 1367. For the reasons that follow, the Motions for Summary Judgment will be granted.

2   The Notice of Removal was filed only by Bennett, a failing because all defendants must join a petition for removal. _Hanrick v. Hanrick, 153 U.S. 192, 196, 14 S. Ct. 835, 38 L. Ed. 685 (1894)_ ("the suit could not be removed by one of several plaintiffs or defendants"). However, "a motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the motion of removal." 28 U.S.C. § 1447(c); see also _Roe v. O'Donohue, 38 F.3d 298, 301-02 (7th Cir. 1994)_, overruled on other grounds by _Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 119 S. Ct. 1322, 143 L. Ed. 2d 448 (1999)_ (finding that where only one defendant filed a notice of removal, removal was improper, but where plaintiff did not move to remand within 30 days, remand was improper). Thus, jurisdiction can properly be exercised in this case.

[*3]  II. BACKGROUND [1]

3   The following rendition of background information does not constitute findings of fact and is cast in the light most favorable to the non-moving party.

Bennett is a security business that contracts with various companies, including Allen, to provide security guards and related services. (Deposition of Wayne Keller, [4] D.I. 47, Ex. 7 at 7:11-17.) Bennett's contract with Allen provides that Bennett will supply security officers at Allen's plants in Harbeson, Delaware, and Cordova, Maryland. (D.I. 47, Ex. 2 at A003.) The contract further provides that "[i]t is mutually understood that Bennett is an independent contractor and that all guards employed by Bennett to perform the services as herein provided are and shall be employees of Bennett and not employees of [Allen]." (_Id._ at A004.)

4   Wayne Keller is the Vice-President at Bennett. (Keller Deposition, D.I. 47, Ex. 7 at 4:14.)

[*4]  Nichols, an African-American female, worked as a Bennett security guard at Allen's Harbeson plant from July 30, 2001 until December 13, 2003. (Keller Deposition, D.I. 47, Ex. 7 at 29:4-12.) On beginning her employment with Bennett, Nichols signed a document entitled "Condition of Employment," which provided that "Bennett Security has the right to move any security officer to another job site at any time." (D.I. 47, Ex. 1 at A001.) On December 11, 2003, Nichols, who served as a supervisor of other guards, had an altercation with Joseph Joshua Whiteman, one of her subordinates. (Nichols Deposition, D.I. 47, Ex. 4 at 39:21-40:9.) Nichols had received a call from Raymond Miller [5] asking her to send Whiteman to see him. (_Id._ at 39:24-40:2.) According to Nichols, when she told Whiteman to go see Miller, Whiteman argued with her and then pushed her. (_Id._ at 40:3-22.) Nichols pushed him back, and the two continued to push each other back and forth until Whiteman pushed Nichols into a file cabinet and CB radio. (_Id._ at 40:22-41:3.)

5   Raymond Miller is the manager of human resources for Allen's Harbeson, Delaware plant. (Miller Deposition, D.I. 47, Ex. 5 at 4:16-20.)

[*5]  Eventually, Whiteman went to speak with Miller, at which point Nichols called the police to report her altercation with Whiteman. (_Id._ at 41:7-9.) Although Nichols informed her superiors at Bennett, Mark Habicht [6] and Wayne Keller, that she had called the police, she did not inform Miller. (_Id._ at 47:19-21.) When the police arrived, Nichols knocked at Miller's office door to inform Whiteman that the police were there and wanted to speak to him. [7] (_Id._ at 41:9-19.) The police took a statement from Whiteman. (_Id._ at 41:19-22.) Whiteman later apologized to Nichols, and no charges were filed. (_Id._ at 42:7-17.)

6   Mark Habicht is the Vice-President of Operations at Bennett. (D.I. 47, Ex. 6 at 5:22-24.)

7   Miller asserts that he was alone in his office when he was informed that the State Police were on the premises. (Miller Deposition, D.I. 47, Ex. 5 at 10:16-19.) Miller testified that when he heard about the incident, he went to the security post and spoke to both Nichols and a state trooper about the incident. (_Id._ at 11:10-12:13.) The discrepancy between Miller's and Nichols's recollection in that regard is not material to the outcome of the motions for summary judgment.

[*6]  Later that same day, Miller called Habicht to discuss the incident. Habicht recalled that Miller stated,

I called out to the guardhouse a couple of times and [Nichols] answered the phone and there was yelling in the background and then she slammed the phone down. And I called back and she did the same thing ... I can't have that out there ... Enough is enough, she's got to go.

2006 U.S. Dist. LEXIS 35491, *

(Habicht Deposition, D.I. 47, Ex. 6 at 20:8-15.) The next day, Habicht and Keller went to meet with Miller. (*Id.* at 22:6-18.) Miller "reiterated the fact that [Nichols] had to go, that he couldn't have that kind of activity going on in his plant, it was too disruptive." (*Id.* at 23:15-19.) [*] Miller had previously requested the transfer of two other Bennett security guards, David Leggins, a black male, and Daniel Steele, a white male. (Habicht Deposition, D.I. 44, Ex. A at 41:3-42:24.)

> 8  There is a dispute between Allen and Bennett as to who initially suggested that Nichols be transferred. Keller confirms Habicht's testimony, stating that it was Miller who initially suggested that Nichols be transferred. (Keller Deposition, D.I. 47, Ex. 7 at 16:23-17:2.) Miller, however, testified that Keller and Habicht suggested the transfer, and that he simply agreed. (Miller Deposition, D.I. 49, Appendix at B38-39, 39:10-12, 39:24-40:9.) Miller claims that he was upset that the police were called because it "created kind of a disruptive environment. And when you hear about these things out of the blue, you don't know if some act of violence may have taken place or exactly what, if somebody got hurt on the job. You just don't know. And so that was my concern." (Miller Deposition, D.I. 47, Ex. 5 at 15:4-10.) The source of the suggestion that Nichols be transferred, however, is not material, as it has no bearing on the outcome of the motions for summary judgment. *See infra* note 11 and accompanying text.

[*7] Miller, Habicht, and Keller agreed that, to avoid further disruption, Nichols could finish her work week, but that she would not return to the plant the following week. (Keller Deposition, D.I. 47 at 22:4-8.) On December 15, Nichols received a message from Bennett telling her not to return to work at Allen the next day. (Nichols deposition, D.I. 47, Ex. 4 at 42:18-23.) Bennett replaced Nichols at the Harbeson Plant with another African-American woman. (D.I. 44, Ex. A at 43-44.)

Bennett did not immediately have another job for her to go to. (D.I. 47, Ex. 4 at 101:24-102:1.) Within days, Bennett offered Nichols a thirty-two hour a week job working at another customer's site, and she was set to start training for that position around December 19, 2003. (Keller Deposition, D.I. 47, Ex. 7 at 32:21-24.) However, she called out sick the first day of training, and, because the customer needed someone to start immediately, Bennett put another officer in that position. (*Id.* at 33:19-34:4.) On December 23 and 24, Nichols filled in for another officer at yet another location, and she worked there again on December 29. (*Id.* at 35:3-22.) When the security guard for whom she was filling [*8]

in returned to work on December 29, however, Bennett was once more without a position for Nichols. (Nichols Deposition, D.I. 47, Ex. 4 at 106:19-107:1.) On January 5, 2004, Nichols called Bennett and informed them that she was going to resign in two weeks. (*Id.* at 107:15-18.) Nichols last day of employment at Bennett was January 19, 2004. (*Id.* at 29:2-15.)

While Nichols says that she cannot "say for a fact" that Whiteman told his version of the incident to Allen employees (*id.* at 54:24-55:4), she nevertheless alleges that someone at Allen questioned Whiteman about the December 11 incident but that no one ever allowed her to tell her side of the story. (*Id.* at 53:24-54:2.) Miller claims, however, that he spoke only to Nichols about the incident, and that he never spoke to Whiteman about it. (Miller Deposition, D.I. 47, Ex. 5 at 11:22-12:24.)

Nichols also alleges that, at some point in the days after the incident, she had a conversation with Valerie Brittingham, an Allen employee who worked for Miller. According to Nichols, their conversation was as follows:

> [Brittingham said] What in the world happened? ... [Whiteman] talk[ed] to Mr. Miller, and Mr. Miller [*9] is down there telling everybody that everything was your [Nichols's] fault, and like, you know, I wasn't capable of doing my job. And I was: Well, why in the world would Mr. Miller say something like that about me? And she was like: Well, you know, he's a racist.

(*Id.* at 58:1-12.) [9]

> 9  Brittingham recalls things differently. She testified at her deposition that she never talked to Nichols about the incident, and that she never told Nichols that Miller was a racist. (Brittingham Deposition, D.I. 47, Ex. 8 at 10:24-11:13.)

On January 19, 2004, Nichols began training to become a certified nursing assistant ("CNA"). (Nichols Deposition, D.I. 47, Ex. 4 at 108:15-18.) During the period of her training, Nichols was paid seven dollars an hour, and when her training was completed, she was paid about nine dollars and thirty-five cents an hour (*id.* at 109:4-19), which was more than the seven dollars an hour she made at Bennett (*id.* at 122:8-16). Nichols worked as a CNA until May 2004. (*Id.* At [*10] 20-24.) Nichols subsequently worked as a school bus driver from September 2004 until April 2005, and as a security guard for Allied Security for about two weeks in April 2005. (*Id.* at 110:1-113:14.) She has been unemployed since leaving the job at Allied Security. (*Id.* at 113:15-17.)

2006 U.S. Dist. LEXIS 35491, *

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Celotex v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). [*11] If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). However, a court should not make credibility determinations or weigh the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

## IV. DISCUSSION

### A. Discrimination in Violation of 42 U.S.C. § 1981 and the Delaware Discrimination Act

Nichols has alleged that both Bennett and Allen discriminated against her based on her race, in violation of § 1981, and that Bennett also discriminated against her based on her race and sex, in violation of the DDA. [10] Claims under 42 U.S.C. § 1981 and claims under the DDA, 19 Del. C. § 710 et seq., [*12] both must be evaluated according to the burden-shifting analysis set forth by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999) ("disparate treatment race discrimination claims under Title VII [and] section 1981 ... require application of the familiar burden-shifting framework the Supreme Court articulated in McDonnell Douglas Corp. v. Green"); Giles v. Family Court of Delaware, 411 A.2d 599, 602 (Del. 1980) (applying McDonnell Douglas burden-shifting to claim under the DDA). That analysis proceeds in three steps. First, the plaintiff "must carry the initial burden ... of establishing a prima facie case of ... discrimination." McDonnell Douglas, 411 U.S. at 802. "The burden then must shift to the [defendant] to articulate some legitimate, nondiscriminatory reason for the [plaintiff]'s rejection." Id. The burden then shifts again to the plaintiff "to show that [the defendant's] stated reason for respondent's rejection was in fact pretext." Id. at 804.

10  In her Answering Brief to Allen's Motion for Summary Judgment, Nichols asserts, apparently for the first time, a claim against Allen for discrimination under the DDA. (D.I. 49 at 13-14.) However, Nichols cannot assert a claim against Allen under the DDA for a number of reasons. First, she did not assert such a claim in her complaint. (D.I. 1 at PP 23-25 ("Defendant Bennett discriminated against Plaintiff with regard to the terms and conditions of her employment on the basis of her race and sex in violation of 19 Del. C. § 710 et seq.").) Second, Allen asserts, and Nichols has presented no evidence to the contrary, that Nichols never filed a claim of discrimination with the Delaware Department of Labor, a necessary prerequisite to filing a complaint under the DDA. 19 Del. Code § 712(b). Finally, even had she filed a claim of discrimination, Nichols cannot make a claim under §711(a) of the DDA against Allen, because such claims are cognizable only against an "employer." See 19 Del. Code § 711(a). Although Nichols argues that Allen was her "joint employer" because Allen exercised control over aspects of her employment and because she interacted on a daily basis with Miller, her argument is contradicted by Allen's contract with Bennett, which provided that "[i]t is mutually understood that Bennett is an independent contractor and that all guards employed by Bennett to perform the services as herein provided are and shall be employees of Bennett and not employees of [Allen]." (D.I. 47, Ex. 2 at A004.) Accordingly, Nichols has not and cannot state a claim of discrimination against Allen under the DDA, 19 Del. C. § 711(a).

[*13]  I. § 1981 Claims

42 U.S.C. § 1981 provides that:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to

2006 U.S. Dist. LEXIS 35491, *

like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

To establish a prima facie case of racial discrimination under 42 U.S.C. § 1981, Nichols must show "(1) that [she] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts[.]" Brown v. Philip Morris Inc., 250 F.3d 789, 797 (3d Cir. 2001); see also Pryor v. NCAA, 288 F.3d 548, 569 (3d Cir. 2002). The United States Court of Appeals for the Third Circuit has also stated that "the elements [*14] of employment discrimination under Title VII are identical to the elements of a section 1981 claim." Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 499 (3d Cir. 1999). Those elements are (1) that the plaintiff is a member of a protected class; (2) that she is qualified for the position; (3) that she suffered an adverse employment action; (4) under circumstances that give rise to an inference of unlawful discrimination. Jones, 198 F.3d at 410-11. It appears that the Third Circuit applies the first standard where there is a claim under § 1981, but not an accompanying claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. See Brown, 250 F.3d at 797; Pryor, 288 F.3d at 569. However, it appears that Court applies the second standard when there is an accompanying Title VII claim. Jones, 198 F.3d at 411-12; Schurr, 196 F.3d at 499. Because Nichols has not made a claim under Title VII here, I will use the standard set out in Brown and Pryor.

A claim under § 1981 requires proof of purposeful or intentional discrimination. General Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391, 102 S. Ct. 3141, 73 L. Ed. 2d 835 (1982) [*15] ("We conclude, therefore, that § 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination."). Additionally, proof of "discrimination concerning one or more of the activities enumerated in the statute" is required to establish a claim under § 1981. Brown v. Philip Morris Inc., 250 F.3d 789, 797 (3d Cir. 2001). The statute defines the term "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

**a. Allen**

Nichols appears to base her allegation that Allen discriminated against her under § 1981 on her assertion that Miller requested she be transferred. '' Nichols cannot show, however, that Allen discriminated against her under § 1981, as Nichols has not shown that Allen's actions interfered with any contract she may have had with Bennett. Nichols's "Condition of Employment" agreement with Bennett provided that Bennett "has the right to move any security officer to another job site at any time." (D.I. 47, Ex. 1 at A001.) Assuming [*16] that Miller requested that she be moved, that did not interfere with the performance, modification, or termination of her employment relationship with Bennett. Even if one were to characterize that relationship as being governed by a contract, it specifically provided for her transfer. (D.I. 47, Ex. 1 at A001 ("Bennett Security has the right to move any security officer to another job site at any time.").) In other words, Miller's request that she be transferred could not constitute an interference with her enjoyment of the benefits, privileges, terms or conditions of her contractual relationship since she had no right to remain at Allen. Hence, Nichols fails to establish the third prong of the three-part test for the establishment of a prima facie case.

> 11   Nichols asserts that the disagreement over whether Miller requested that she be transferred, or whether Keller and Habicht suggested it, creates a genuine issue of material fact that precludes summary judgment. However, as I hope will be clear from the analysis here, determining who suggested that Nichols be transferred is not relevant to the outcome of this motion, and thus, there is no genuine issue of material fact.

[*17] Even if Nichols could establish a prima facie case, however, summary judgment for Allen would still be appropriate. Had Nichols established a prima facie case of discrimination, the burden would shift to Allen to establish a legitimate, non-discriminatory reason for requesting her transfer. See McDonnell Douglas Corp., 411 U.S. at 802. Allen asserts that Miller requested Nichols's transfer not because of her race, but "because of the disruptive environment Ms. Nichols's call to the police caused and her failure to notify [Miller] of the call." (D.I. 46 at 14.) Miller's statements to Keller and Habicht that "[Nichols] had to go, that he couldn't have that kind of activity going on in his plant, it was too disruptive" support Allen's assertion that Miller requested Nichols's transfer because she was disruptive. (Habicht Deposition, D.I. 47, Ex. 6 at 23:15-19.) Nichols bears the burden of showing that this explanation is merely a pretext for discrimination. See McDonnell Douglas Corp., 411 U.S. at 804.

However, Nichols has come forward with no evidence to meet that burden. In support of her claims, Nichols relies heavily on her own testimony that [*18] Brittingham told her that Miller is a racist who "[told] everybody that everything was [Nichols's] fault, and ...

2006 U.S. Dist. LEXIS 35491, *

[that she] wasn't capable of doing [her] job." (Nichols Deposition, D.I. 47, Ex. 4 at 58:1-12.) Assuming that Nichols version of that conversation were true, [12] Nichols's testimony about what Brittingham told her is hearsay and cannot be considered on a motion for summary judgment. *Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 (3d Cir. 1996) ("the hearsay statement ... is not capable of being admissible at trial, and could not be considered on a motion for summary judgment") (internal citations and quotation marks omitted). Thus, even viewing the facts in the light most favorable to Nichols, I may not consider that hearsay testimony.

12    Again, Nichols's testimony in that regard is flatly contradicted by Brittingham's own testimony. (*Supra* note 9.)

The only admissible evidence in the record that can be stretched to connect Nichols's transfer, or Miller's other actions, [*19] to her race is the fact that Whiteman, who is a white man, was not transferred while Nichols, an African-American woman, was. Previously, however, Bennett, at Miller's request, transferred Daniel Steele, a white man, and David Leggins, a black man from Allen. Thus, the sole fact that Nichols was transferred while Whiteman was not is insufficient to rebut Allen's proffered reason for requesting Nichols transfer. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 646 (3d Cir. 1998) ("a black plaintiff cannot establish racial discrimination by singling out one white person who was treated more favorably when there were other white persons who were treated less favorably than other black persons"). Therefore, Allen's Motion for Summary Judgment on Nichols's claim of discrimination under 42 U.S.C. § 1981 would be granted, even if Nichols had provided a prima facie case of discrimination.

**b. Bennett**

Again, viewing the facts in the light most favorable to Nichols, it still appears that Bennett did nothing more than transfer Nichols to placate an angry client. The transfer, however, raises more complicated issues with respect to [*20] Bennett than it does with respect to Allen. Allen said it wanted her off its site. It said nothing about, and had no input into, what happened to her next. Bennett did have that control, and though it had the right to transfer Nichols, and worked to find her a new position, it did not find her one right away, and the two positions it offered her were part-time positions. Thus, Nichols's transfer, while not an interference with any contractual right Nichols had, could be seen as an adverse employment action. *See infra* section IV.A.2.

Nevertheless, Nichols cannot show that her transfer was evidence of an intent to discriminate on the basis of race on the part of Bennett. In fact, in her deposition,

Nichols stated that she did not believe that Keller or Habicht intended to discriminate against her on the basis of her race. (D.I. 47, Ex. 4 at 116:5-14.) [13] Again, the only connection between Nichols race and her transfer is that she was transferred while Whiteman was not. However, Bennett had, in the past, transferred at least two other employees at Miller's request, a white man and a black man. Moreover, Bennett replaced Nichols with another African-American woman. (D.I. 44, Ex. [*21] A at 43-44.) Thus, Nichols has not shown that Bennett intended to discriminate against her on the basis of her race. *Lin v. Rohm and Haas Co.*, 293 F. Supp. 2d 505, 518 (E.D. Pa. 2003) (finding insufficient evidence of intent to discriminate where the defendant identified employees outside of the protected class that were treated similarly to plaintiff). Consequently, Nichols has failed to make out a prima facie case of discrimination against Bennett, and Bennett's Motion for Summary Judgment will be granted as to Nichols's claims under § 1981.

13    Nichols testified as follows:

Q: Do you believe that Bennett's actions in this matter against you were actions based on their intent to discriminate [against] you on the basis of your race?

A: Do you mean Mark [Habicht] and Wayne [Keller] or by -

Q: I mean Bennett, the company.

A: The company?

Q: Yes.

A: Other than Josh [Whiteman] at the time - I don't think Mark [Habicht] and Wayne [Keller]; but Josh [Whiteman] my coworker that I had the incident from or with. (D.I. 47, Ex. 4 at 116:5-14.)

[*22]    Even if Nichols had made out a prima facie case of discrimination, however, Nichols cannot show that Bennett's stated reason for transferring her was a pretext for discrimination. Bennett asserts that Nichols, by calling the police to the plant after her altercation with Whiteman, caused a disruption that caused a potential breakdown in Bennett's client relationship with Allen. (D.I. 44 at 17.) Therefore, in order to maintain that relationship, it was necessary to transfer Nichols. (*Id.*) Nichols has come forward with no evidence to show that that explanation was a pretext for discrimination. Again, the only evidence that connects her transfer to her race is that Whiteman was not transferred, while Nichols was, and again, that fact alone is not sufficient to rebut Bennett's non-discriminatory reason for transferring Nichols. *See Simpson*, 142 F.3d 639, 646. Therefore, summary

Page 6

2006 U.S. Dist. LEXIS 35491, *

judgment will be granted to Bennett on Nichols's claim under § 1981.

## 2. DDA Claim Against Bennett

To establish a prima facie case of discrimination under the DDA, a plaintiff must establish the same elements as are required for a claim under Title VII. *Giles, 411 A.2d at 601-02* [*23] ("While the *McDonnell Douglas* test was developed in the context of Title VII cases, in our view it is appropriate for a *§711(a)* action [under the DDA] as well, because the language of the Delaware statute is substantially the same as the Title VII language defining an unlawful employment practice."). Those elements are (1) that the plaintiff is a member of a protected class; (2) that she is qualified for the position; (3) that she suffered an adverse employment action; (4) under circumstances that give rise to an inference of unlawful discrimination. *Jones, 198 F.3d at 410-11*. The precise elements to be proven, however, will vary with the facts of the case. *McDonnell Douglas, 411 U.S. at 802 n.13 (1973)* ("The facts necessarily will vary in Title VII cases, and the specification above of the prima fade proof required from respondent is not necessarily applicable in every respect to differing factual situations.")

Nichols alleges that Bennett discriminated against her on the basis of her race and sex in violation of the DDA. (D.I. 1 at PP 24-25.) At least for the purposes of this motion, Bennett does not dispute that Nichols is a member of a [*24] protected class, and that she was qualified for her position. (D.I. 44 at 16-21.) However, Bennett asserts that Nichols cannot establish a prima facie case of discrimination under the DDA, *19 Del. C. § 711(a)*, because she did not suffer an adverse employment action, and because there can be no inference of discrimination because her position was filled by an African American woman. (D.I. 44 at 10-15.) Additionally, Bennett asserts that even if Nichols can establish a prima facie case of discrimination, her claims must fail because she cannot show that Bennett's legitimate, nondiscriminatory reason for transferring her was pretextual. (*Id.* at 16-21.)

An "adverse employment action is one which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001)*. A job transfer can be considered an adverse employment action. *Torre v. Casio, Inc., 42 F.3d 825, 831 n.7 (3d Cir. 1994)* ("It is clear, however, that a transfer, even without loss of pay or benefits, may, in some circumstances, constitute an adverse job action"). [*25] As already noted, *supra* at section IV.A.1.b., Nichols's transfer could be viewed as an adverse employment action. [14] When Bennett transferred Nichols, it did not immediately have another position for her. (Nichols deposition,

D.I. 47, Ex. 4 at 101:24-102:1.) Further, both of the positions it offered her were part-time positions (Keller Deposition, D.I. 47, Ex. 7 at 32:21-35:22), while her position at Allen was full-time. Thus, for the purposes of this motion, Nichols has provided sufficient evidence to raise a material issue of fact as to whether she suffered an adverse employment action.

> 14  I emphasize that, at this stage, I am required to view these circumstances in the light most favorable to Nichols.

But Bennett also contends that the circumstances of Nichols's transfer cannot give rise to an inference of discrimination. (D.I. 44 at 15.) Nichols was transferred from Allen after an altercation with Whiteman, which, viewing the facts in the light most favorable to her, was caused by Whiteman. (Nichols [*26] Deposition, D.I. 47, Ex. 4 at 40:3-41:3.) Whiteman was not disciplined after this incident, while Nichols, a black female, was transferred and reassigned only to part-time positions. (Habicht Deposition, D.I. 47, Ex. 6 at 29:2-5.) While these circumstances may not be sufficient to show that a business explanation was merely a pretext for discrimination, they may be sufficient at the prima facie stage of the analysis to allow a reasonable jury to infer that unlawful discrimination took place. *See Simpson, 142 F.3d at 646* (finding that an "inference of discrimination anytime a single member of a non-protected group was allegedly treated more favorably than one member of the protected group ... may be acceptable at the prima facie stage of the analysis").

However, even assuming that Nichols could make out a prima facie case, for the reasons enumerated *supra* in section IV.A.1.b., Nichols cannot show that Bennett's legitimate, non-discriminatory reason for transferring her was a pretext for discrimination. This is true as to discrimination on the basis of both her race and her sex, as Bennett replaced her with an African-American woman and had previously transferred [*27] a white male and a black male from Allen. Therefore, summary judgment will be granted to Bennett on Nichols's DDA claim. [15]

> 15  It is noteworthy that Nichols actually resigned her position at Bennett. To establish that her transfer was actually a constructive discharge, Nichols
>
> must be able to show that [her] former employer deliberately made [her] working conditions intolerable, and thereby forced [her] to quit. Demotion can constitute a

2006 U.S. Dist. LEXIS 35491, *

constructive discharge, especially where the demotion is essentially a career-ending action or a harbinger of dismissal. However, mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.

*James v. Booz-Allen & Hamilton, Inc.,* 368 F.3d 371, 378 (4th Cir. 2004) (internal citations and quotations omitted). Nichols argues only that the fact that no full-time position was made available to her after her transfer was "a sufficiently undesirable and abhorrent action to cause a reasonable person to feel compelled to terminate her employment." (D.I. 51 at 12.) In her briefing, Nichols has brought nothing to my attention to show that her transfer was "essentially a career-ending action or a harbinger of dismissal" or that the discrimination she experienced made her work situation intolerable.

[*28] **B. Tortious Interference with Contract**

Allen has also moved for summary judgment on Nichols's claims that Allen tortiously interfered with Nichols's contract with Bennett. (D.I. 46 at 14-17.) A plaintiff alleging a claim for tortious interference with contract must prove: "(1) a valid contract; (2) about which the defendants have knowledge; (3) an intentional act by the defendants that is a significant factor in causing the breach of the contract; (4) done without justification: and (5) which causes injury." *Gill v. Delaware Park, LLC,* 294 F. Supp. 2d 638, 645 (D. Del. 2003).

Allen asserts that Nichols cannot make out any of the elements of a prima facie case of tortious interference with contract. Allen claims that Nichols did not have a contract with Bennett, that, even if she did, Miller did not know about it, that Miller committed no intentional act to interfere with any contract, that Miller was justified, and that Nichols was not injured. (D.I. 46 at 14-17.) Nichols claims that she did have a contract with Bennett, even though she was an employee at will, that Miller's actions in asking for her transfer were not justified, and that Miller's demand that [*29] she be transferred interfered with her otherwise healthy employment relationship with Bennett. (D.I. 49 at 14-17.) [16]

16   Nichols also appears to assert that her tortious interference claim can be maintained because at-will employees are entitled to good faith

and fair dealing in their employment relationships, and that the claim is sustainable under 42 U.S.C. § 1981. (*Id.* at 17-18.) However, Nichols has not pleaded a claim for breach of the covenant of good faith and fair dealing. Additionally, she cannot make out a claim for tortious interference with contract based on § 1981 alone; she must establish all of the elements of the tortious interference claim. Thus, neither of those arguments provide a reason to deny summary judgment. Furthermore, she cannot sustain her § 1981 claims against Allen or Bennett and, therefore, even if § 1981 provided a legal basis to make a tortious interference claim, that claim could not be made against Allen here.

The Delaware Supreme Court has not [*30] addressed the issue of whether an at-will employee can make a claim of tortious interference with contract. *Nelson v. Fleet Nat. Bank,* 949 F.Supp. 254, 261 (D. Del. 1996). However, this court has previously predicted that "the Supreme Court of Delaware would hold an action for tortious interference with contract may be maintained in conjunction with an at-will employment contract." *Id.* Thus, Nichols's action is not subject to summary judgment simply because she is an at-will employee.

However, in *Nelson,* although the employees were employees at-will, they apparently had some sort of employment contract. *Id.* (noting that the plaintiff's manager presented her "with a less favorable employment contract than her previous one, and threatened to fire her if she did not sign it"). To make out a claim that Allen, through Miller, tortiously interfered with her employment contract with Bennett, Nichols must show both that she had some such contract with Bennett and that Allen was aware of that contract. *Gill v. Delaware Park, LLC,* 294 F. Supp. 2d at 645. [17]

17   Both Nichols and Keller testified that she had no such contract. (D.I. 47, Ex. 4 at 62:1-5; *id.,* Ex. 7 at 39:16-19.)

[*31]   At that last point, at least, Nichols suffers a failure of proof. Even if Nichols could show that the "Condition of Employment" document she signed (D.I. 47, Ex. 1) amounts to an employment contract, she has put forward no facts to show that Miller, or anyone else at Allen, was aware of the "Conditions of Employment." Moreover, Nichols has provided no evidence that Miller committed an intentional act that was a significant factor in causing a breach of her contract with Bennett. The "Conditions of Employment" document explicitly states that "Bennett Security has the right to move any security officer to another job site at any time." (*Id.* at A001.) Thus, even if this document is considered an employment contract, Miller's request that Nichols be trans-

2006 U.S. Dist. LEXIS 35491, *

ferred did not cause a breach of that contract, since such a transfer was explicitly allowed by the contract.

Furthermore, Nichols has presented no evidence that she was injured by her transfer, as is required to make out a claim of tortious interference with contact. After being transferred, Nichols resigned from Bennett, and immediately started a new job making more money than she had made while working for Bennett. Nichols leaves [*32] it to speculation that she suffered a loss during the brief period between her transfer and resignation. For all of these reasons, summary judgment will be granted to Allen on Nichols's tortious interference with contract claim.

## C. Defamation

To establish a cause of action for defamation in Delaware, a plaintiff must show that defendant made a "false and defamatory statement of fact concerning the plaintiff ... in an unprivileged publication to a third party. But a statement is not defamatory unless it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Ramunno v. Cawley*, 705 A.2d 1029, 1035 (Del. 1998) (internal quotation marks omitted). "[T]he general rule is that oral defamation is not actionable without special damages." *Spence v. Funk*, 396 A.2d 967, 970 (Del. 1978). However, where the defamatory oral statement "(1) malign[s] one in a trade, business or profession, (2) impute[s] a crime, (3) impl[ies] that one has a loathsome disease, or (4) impute[s] unchastity to a woman," a cause of action for slander can be maintained [*33] without proof of special damages. *Id.*

Here, Nichols alleges that Miller told people that she could not do her job and blamed her for the incident with Whiteman, thus maligning her in her business or profession. (D.I. 49 at 18-19.) However, Nichols's only evidence of Miller's alleged statements is her own hearsay testimony about what Brittingham told her. (*Id.*) As was stated above, that hearsay is inadmissible and cannot be considered in support of her motion. *Philbin*, 101 F.3d at 961. Therefore, Nichols has no evidence to support her claim of slander, and summary judgment on this claim will be granted to Allen.

## V. CONCLUSION

Accordingly, Bennett's Motion for Summary Judgment (D.I. 43) and Allen's Motion for Summary Judgment (D.I. 45) will be granted. An appropriate order will follow.

## ORDER

For the reasons set forth in the Memorandum Opinion issued in this matter today,

IT IS HEREBY ORDERED that the Motion for Summary Judgment filed by defendant Bennett Detective & Protective Agency, Inc., (D.I. 43), and the Motion for Summary Judgment filed by defendant Allen's Family Foods, Inc., (D.I. 45), are GRANTED.

Wilmington, [*34] Delaware

May 31, 2006

Jordan

UNITED STATES DISTRICT JUDGE