# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TRAFINNA WILSON,

         Plaintiff,

         v.

CHRISTIANA CARE HEALTH
SERVICES, INC.,

         Defendant.

C.A. No. 06-CV-00705 (MPT)

---

## APPENDIX OF EXHIBITS IN SUPPORT OF
## DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION
## FOR SUMMARY JUDGMENT

David H. Williams (DE 616)
James H. McMackin, III (DE 4284)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
P.O. Box 2306
Wilmington, DE 19899-2306
302.888.6900/5849
dwilliams@morrisjames.com
jmcmackin@morrisjames.com

Michael J. Ossip (admitted pro hac vice)
Sean W. Sloan (admitted pro hac vice)
Yordanos Teferi (admitted pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
215.963.5761
Fax: 215.963.5001
Attorneys for Defendant Christiana Care Health
Services, Inc.

Dated: January 11, 2008

## INDEX

| Appendix Range | Description |
| --- | --- |
| 1-103 | Relevant excerpts from the Deposition of Trafinna Wilson taken on November 13, 2007 |
| 104-149 | Relevant excerpts from the Deposition of Melinda Fitzgerald taken on November 20, 2007 |
| 150-168 | Relevant excerpts from the Deposition of Larry Bryson taken on November 20, 2007 |
| 169-176 | Policy A-7 – Coaching and Positive Discipline |
| 177-194 | Health Services, Health Initiatives and Home Health and Community Services Employee Handbook |
| 195 | February 25, 2005 email from Melinda Fitzgerald to Team regarding Cell Phones |
| 196 | April 3, 2002 e-mail from Trafinna Cuff to Melinda Fitzgerald regarding internet use |
| 197 | July 17, 2002 Memo from Trafinna Cuff to April Habich regarding Trafinna Cuff |
| 198 | June 16, 2004 Memo from Melinda Fitzgerald and April Habich to Trafinna Cuff regarding First Step Reminder for Overall Attendance |
| 199-200 | November 18, 2002 Email from April Habich regarding E-Z Time |
| 201 | November 6, 2003 Disciplinary Action Record |
| 202 | March 23, 2005 Disciplinary Action Record |
| 203-211 | Phone Log Summary for Trafinna Cuff |
| 212 | March 23, 2005 Memo from Trafinna Cuff to Melinda Fitzgerald and April Habich |
| 213-222 | 2005 Job Description/Performance Review for Trafinna Cuff |
| 223-232 | 2004 Job Description/Performance Review for Trafinna Cuff |
| 233-243 | 2003 Job Description/Performance Review for Trafinna Cuff |
| 244 | August 15, 2005 e-mail from Trafinna Cuff to Larry Bryson regarding Statements |

1649495/1

| Appendix Range | Description |
|---|---|
| | |
| 245 | August 23, 2005 Disciplinary Action |
| 246-247 | Problem Solving Form |
| 248 | September 26, 2005 letter from The Peer Review Panel to Trafinna Cuff |
| 249-254 | September 26, 2005 Delaware Department of Labor Charge filed by Trafinna Cuff |
| 255-259 | December 12, 2005 Decision of Appeals Referee of Stephanie Fitzgerald of the Delaware Department of Labor |

**Trafina Wilson**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TRAFINA WILSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. |
| v. | ) 06-CV-00705 (MPT) |
| | ) |
| CHRISTIANA CARE HEALTH SYSTEMS, | ) |
| | ) |
| Defendant. | ) |

Deposition of TRAFINNA WILSON, taken pursuant to notice at the law offices of Schmittinger & Rodriguez, P.A., Odessa Professional Park, First Floor, Odessa, Delaware, beginning at 10:30 a.m., on Tuesday, November 13, 2007, before Terry Barbano Burke, RMR-CRR and Notary Public.

APPEARANCES:

        NOEL E. PRIMOS, ESQUIRE

        Schmittinger & Rodriguez, P.A.

          414 South State Street

          Dover, Delaware  19901

          For the Plaintiff

        MICHAEL J. OSSIP, ESQUIRE

        Morgan, Lewis & Bockius, LLP

          1701 Market Street

          Philadelphia, Pennsylvania 19103-2921

          For the Defendant

ALSO PRESENT:

        CARRY DELGADO

        Christiana Care

WILCOX & FETZER

1330 King Street - Wilmington, Delaware 19801

(302) 655-0477

www.wilfet.com

A-1

Trafina Wilson

1    on the issue of employment and production so that we

2    can follow up with counsel.

3                    COURT REPORTER:  Yes.

4                    MR. OSSIP:  Thank you.

5    BY MR. OSSIP:

6        Q.    When did you start working for Christiana

7    Care?

8        A.    I started working for Christiana Care

9    August -- I'm sorry, not August.  March of '96, I

10   believe it was.

11       Q.    We have your hire date as March 16th, 1998?

12       A.    Is it '98?

13       Q.    March 16, 1998?

14       A.    Okay, '98.  I don't remember the year.

15       Q.    What was your first position with the

16   hospital?

17       A.    I was a community advocate.

18       Q.    What did that entail?

19       A.    My position was a community advocate, and what

20   we were responsible for doing was trying to help infant

21   mortality within the City of Wilmington, trying to help

22   and reduce and educate the community, at risk community

23   of infant mortality.

24                    How can I say this?  And to educate

A-2

**Trafina Wilson**

1      women concerning -- what is it?

2          Q.      Abuse?

3          A.      No.  Birth defects or making sure that they

4      have well babies.

5          Q.      Prenatal --

6          A.      Prenatal, yes.

7          Q.      -- treatment and things like that?

8          A.      Yes.

9          Q.      And how long did you remain in that position?

10         A.      I believe I was in that position for about

11     three years.

12         Q.      So until about 2001?

13         A.      I would say yes.

14         Q.      And what position did you then move into?

15         A.      I was into, I went to a secretarial position.

16         Q.      In what area or what department?

17         A.      I was in secretarial for the department of

18     psychiatry.

19         Q.      How did that position come about?

20         A.      Well, we were downsized from the community

21     advocate -- I mean from the, yeah, community advocate

22     position.  There was no longer any funds to keep the

23     community advocates employed, so therefore we had to

24     find other jobs within Christiana Care, and they gave

A-3

**Trafina Wilson**

1    us a certain amount of time to find those jobs.

2                    I put in a request to -- you know, I put

3    in a transfer to go to the Christiana Care pool, the

4    secretarial pool.

5        Q.    To your knowledge, did everybody who was in

6    the community advocate position that ended up not

7    getting funded find other positions?

8        A.    Yes.

9        Q.    How many people --

10       A.    Wait a minute, wait a minute.

11                    I think one person didn't get in, one

12   person didn't find a position.

13       Q.    How many people were in the --

14       A.    It was three community advocates.

15       Q.    There were three of you?

16       A.    Yes.

17       Q.    And all three of you had your positions

18   defunded, if you will?

19       A.    Yes.

20       Q.    And what were their names, the other two, do

21   you remember?

22       A.    Marisol Ortiz and the other girl's name was --

23   I know Marisol, and then it was -- I can't think of her

24   name.  Because she wasn't an advocate for a long time.

**Trafina Wilson**

1      Q.    And then what happened?

2      A.    I requested a lateral move and I went to the

3  billing department.

4      Q.    And why did you request a lateral move?

5      A.    I wanted -- I didn't -- I really wasn't a

6  secretary.  I mean I really wasn't a secretary, so I

7  requested to go -- and my supervisors and the other

8  people understood my complaint and they agreed, and I

9  went to the billing department.

10     Q.    Who was your supervisor in the community

11  advocate position?

12     A.    My supervisor in the community advocate

13  position was -- I am bad with names.  Her last name was

14  Cornwall.  I can't think of her first name.  Her last

15  name was Cornwall.

16     Q.    While you were a community advocate working

17  for Christiana Care, did you experience anything that

18  you considered to be discriminatory?

19     A.    Say it again?

20     Q.    While you worked as a community advocate at

21  Christiana Care, did you experience any type of

22  discrimination?

23     A.    No.

24     Q.    Did you feel you were treated unfairly in any

A-5

40

Trafina Wilson

```
1     way by Christiana Care or by your supervisors in that

2     position?

3          A.    No.

4          Q.    Who was your supervisor in the department of

5     psychiatry?

6          A.    In the department of psychiatry, my supervisor

7     was -- I told you I'm bad with names.  I could see her

8     face.

9          Q.    Do you remember what position she had?

10         A.    She was the head of the psychiatry for --

11         Q.    Was she a physician?

12         A.    No, she wasn't a physician.

13               That's it, Poppiti.

14         Q.    That's fine.  I asked Carry if she knew, and

15    she whispered her name to me, which you overheard.

16    Kathy Poppiti?

17         A.    Kathi Poppiti, yes.

18         Q.    How do you spell that?

19               MS. DELGADO:  K-A-T-H-I, P-O-P-P-I-T-I.

20    BY MR. OSSIP:

21         Q.    So Miss Poppiti was your supervisor?

22         A.    Yes, she was.

23         Q.    And during your service as a secretary in the

24    department of psychiatry, did you feel you were the
```

A-6

**Trafina Wilson**

1    victim in any way of discrimination or were you treated

2    unfairly in any way?

3        A.    No, I don't feel I was a victim, no.

4        Q.    How did you go about obtaining the position in

5    the billing department in 2003?

6                    Actually, let me back up a second.   Are

7    you sure it was 2003 when you entered the billing

8    department?

9        A.    Actually, I don't recall.

10       Q.    It might have been 2002?

11       A.    It might have been.   I don't recall.

12       Q.    How did you go about obtaining that position

13    in the billing department?

14       A.    Actually, I guess -- I'm trying to think what

15    occurred.   I was in Kathi Poppiti's group, and then

16    they needed somebody in another area, so I transferred

17    to another area, which was the -- which was up there

18    with the children -- I guess it is the mental health

19    department where the children are, with Mary Sweeney.

20    I don't know if these people are still there any more.

21    Anyway, I was transferred to another department.   We

22    wanted to find out whether that would be a better

23    suitable job for me because we recognized that, you

24    know, I wasn't a supervisor -- I mean a secretary.

A-7

Trafina Wilson

1     Q.     Secretary.

2     A.     So therefore, I wanted to change positions and

3     come out of that position.

4              So I went to my human resource person

5     and talked it over with her.  Actually, the human

6     resource lady brought it to my attention that she knew

7     that there was a position available in the billing

8     department and asked me if I would consider, you know,

9     going over to the billing department and transferring

10    over to the billing department.  And I told her, yes, I

11    would consider that because, actually I was always

12    interested in accounting.  So we made that transaction.

13    So we made that happen.

14    Q.     And who is the person in human resources that

15    you were dealing with?  You knew I was going to ask you

16    that.

17    A.     I know.

18              Her name was, I want to say Marlene, but

19    it wasn't Marlene.

20    Q.     Melanie?

21    A.     Yes.

22    Q.     Melanie Winship?

23    A.     Okay, that sounds more -- I'm sorry.

24    Q.     I don't want you to agree with me just because

A-8

**Trafina Wilson**

1    I sound authoritative.

2        A.    No, you are fine.

3        Q.    Is that the name?

4        A.    Yes, that's the name.

5        Q.    And Carry passed me another note with that

6    name.

7        A.    I'm sorry.  I just cannot recall people's

8    names.

9        Q.    Was she helpful to you?

10        A.    Uh-huh.  I was going to say, she was very

11    helpful and she was the one that let me know about that

12    position, and I applied for it.

13        Q.    And got it?

14        A.    Well, yeah.  I interviewed with

15    Miss Fitzgerald, and I guess that Miss Fitzgerald

16    thought I was a good candidate for the position.  And

17    she went back and talked to April, and I interviewed

18    with April after that and I got the position.

19        Q.    Just so we are clear, Miss Fitzgerald is

20    Melinda Fitzgerald?

21        A.    Yes, ma'am -- I'm sorry, sir.

22        Q.    That's all right.  I have been called worse.

23              And what position does she have?

24        A.    She's the supervisor for -- she was the

A-9

44

Trafina Wilson

1    supervisor for health initiatives.

2        Q.    And was she your supervisor during -- I'm

3    sorry.

4        A.    I guess that could be -- I don't know.  I know

5    it was the billing.  She had three different -- she

6    was -- it was three different positions that she was

7    supervising for.  The department is health initiatives.

8        Q.    Was she your direct supervisor when you worked

9    in billing?

10       A.    Yes, she was.

11       Q.    You also mentioned a woman named April.  Is

12   that April Habich, H-A-B-I-C-H?

13       A.    Yes.

14       Q.    Was she Melinda's supervisor?

15       A.    Yes, she was.

16       Q.    These interviews with April and Melinda, were

17   they separate interviews?

18       A.    Yes.

19       Q.    Were they one-on-one interviews?

20       A.    Yes, they were.

21       Q.    Were they in person?

22       A.    Yes, they were.

23       Q.    Do you remember anything about your interview

24   with Melinda?

A-10

**Trafina Wilson**

1    A.    I just remember she was cordial and we talked

2    about the position and what my responsibilities would

3    be, and she seemed like she needed a person and so

4    therefore she accepted me.

5    Q.    What did she tell you about the job?

6    A.    She told me that there would be some data

7    entry and accounting and posting of bills.

8             And she told me that I would be working

9    with another person that is in that job also.

10            She told me that she would train me, the

11   other person would train me for what I needed to know.

12            And she talked about -- I guess she

13   talked about correspondence and things like that.

14   Q.    Do you recall how long the interview lasted?

15   A.    I don't think it lasted that long.  Maybe half

16   an hour.

17   Q.    Do you recall anything about your interview

18   with April?

19   A.    Not much.  I think April just wanted to know

20   where I was coming from, what I was doing, what was my

21   experience.  Not much.

22   Q.    Did you also find her to be cordial and

23   friendly?

24   A.    At the time, yes.

A-11

Trafina Wilson

1        Q.    At the time of the interview?

2        A.    Yes.

3        Q.    Did either Melinda or April say anything to

4    you during the interview that gave you any reason to

5    believe that they were biased against you or prejudiced

6    against you because of your race?

7        A.    No, not at the interview.

8        Q.    At any time during the course of your

9    employment, did either Melinda or April give you that

10    impression?

11        A.    Any time?

12        Q.    Yes.

13        A.    I would say yes.

14        Q.    One or both?  Which one or both of them?

15              Let's break it down.  At any time did

16    Melinda -- let me back up.

17              When you interviewed with Melinda for

18    this position, was that the first time you had met her?

19        A.    Yes.

20        Q.    So you had had no prior dealings with her

21    before you interviewed for the billing position; is

22    that correct?

23        A.    Correct.

24        Q.    During the interview, she didn't say or do

A-12

47

Trafina Wilson

1    what I would expect and just --

2        Q.    What did he tell you to expect?

3        A.    He told me to expect that you were going to

4    put documentations in front of my face and ask me to --

5    I shouldn't say in front of my face.

6        Q.    I'm not putting anything in front of your

7    face.

8        A.    I'm sorry.  I shouldn't say that.

9        Q.    I'm nicely handing them over to you.

10       A.    I'm sorry.  He just told me you would show me

11   documentations and, you know, ask me to refresh my

12   memory whether I seen this before or seen that before

13   or asked me, you know, to review things that I had

14   signed and things like that.

15       Q.    Anything else that you remember from that

16   meeting?

17       A.    Just where the location was going to be, which

18   was, at that time, up in Wilmington.

19       Q.    Are you alleging in this case, Ms. Wilson,

20   that you have been discriminated against because of

21   your gender, because you're a woman?

22       A.    No.

23             MR. OSSIP:  Noel, do you know why the

24   complaint alleges sex discrimination, then?

A-13

**Trafina Wilson**

1          MR. PRIMOS:  I don't know.  Was that

2    included in the charge as well?

3          MR. OSSIP:  No, it wasn't.

4          MR. PRIMOS:  Then I'm not sure.  I really

5    don't know.

6          MR. OSSIP:  We would ask that that be

7    withdrawn because there was never a charge of sex

8    discrimination.  She has just now said she's not

9    alleging it.

10   BY MR. OSSIP:

11      Q.    Do you believe that you have been treated

12   somehow differently from any male co-workers?

13      A.    There was no male co-workers.

14      Q.    That's what I thought.

15            So the answer is no?

16      A.    Correct.

17          MR. OSSIP:  We are going to seek that

18   dismissal.

19          MR. PRIMOS:  Okay.

20   BY MR. OSSIP:

21      Q.    Let me move into something else, then.

22            When you were an employee of Christiana

23   Care, did you receive any sort of employee handbook?

24      A.    Employee handbooks were online.

A-14

**Trafina Wilson**

1     Q.    As an employee, did you have access to the

2    employee handbook or other employment policies?

3    A.    Yes.

4    Q.    And did you ever take the time to go through

5    and review any of those policies or handbooks online?

6    A.    Yeah.  The ones I was interested in, yes.

7    Q.    Were there particular policies or provisions

8    of the handbook that you were interested in?

9    A.    Yes.

10    Q.    What were they?

11    A.    I guess basically, you know, what everybody

12    else is interested in.  Time off, vacations, benefits.

13                 MR. OSSIP:  Let's have this marked as

14    Wilson-1.

15                 (Wilson-1 was marked for identification.)

16    BY MR. OSSIP:

17    Q.    I want to show you, it's an 18-page document.

18    It's been Bates stamped in the middle of the page DP --

19    meaning we produced it -- 382 through 399, and I'm not

20    going to ask you to read it.  I just generally want to

21    know whether you are familiar with this document or a

22    version of this document very similar to this?

23                 It's called Employee Handbook, Health

24    Services, Health Initiatives and Home Health and

**Trafina Wilson**

1    Community Services Employee Handbook.

2    A.    (Pause.)

3    Q.    Do you recall my question?

4    A.    No.  I'm sorry.

5    Q.    The question is whether this document is

6    familiar to you as an employee handbook?

7    A.    No.

8    Q.    Do you recall seeing an employee handbook

9    online while you worked for Christiana Care?

10    A.    I did visit an employee handbook maybe a few

11    times online.

12    Q.    Let me ask you to look at 5 of 18, down at the

13    bottom it's actually marked "electronic communication."

14            Do you recall ever being aware of a

15    policy that Christiana Care had on electronic

16    communication, in particular the computer and other

17    electronic systems?

18    A.    Yes.

19    Q.    Did you have an understanding as to what

20    Christiana Care policy was with regard to the use of

21    those systems?

22    A.    Yes.

23    Q.    What was your understanding?

24    A.    My understanding was the use of the internet

**A-16**

Trafina Wilson

1   was Christiana Care's property and that it was not

2   supposed to be used for personal use.

3       Q.    If you take a look at Page 7 of 18, there's a

4   section that says, "Telephone messages, personal cell

5   phones and pagers."  There's three paragraphs there.

6                 Were you familiar with this specific

7   policy during the time you worked for Christiana Care?

8       A.    Well, I was familiar with the policy and that

9   we could -- I mean that -- I was familiar with

10  Christiana Care's telephone policy.

11      Q.    And what was your understanding of the policy?

12      A.    It was property of Christiana Care, and that

13  in case of an emergency, or something like that, you

14  know, you could use the telephone or -- basically in

15  case of emergencies, but it was the property of

16  Christiana Care and it was supposed to be conducted for

17  business.

18      Q.    Let me read into the record the first

19  paragraph of this policy on Page 7.

20                "Because Christiana Care receives

21  thousands of telephone calls daily through our

22  telephone system, employees may not use departmental

23  telephones for personal business.  While at work, you

24  may only receive calls for hospital business or

Trafina Wilson

1    personal emergencies.  Paid telephones or personal cell

2    phones may be used when it is necessary to make

3    personal calls on non-working time."

4              Was this your understanding of

5    Christiana Care policy regarding personal telephone

6    calls?

7        A.    I have a problem with when it says, While

8    working only may receive calls from the hospital for

9    personal use -- I mean for business and personal

10   emergencies.

11             That is true, but -- that's what it

12   says.

13       Q.    And while you worked there, was this your

14   understanding of Christiana Care policy?  Let me ask it

15   this way.  While you worked there, was your

16   understanding consistent with this statement?

17       A.    It was, my understanding was consistent with

18   the statement.

19       Q.    Did you comply with Christiana Care policy

20   regarding personal telephone calls while you worked for

21   the hospital?

22       A.    No.

23       Q.    Did you comply with Christiana Care policy

24   regarding the use of the internet while you worked for

Trafina Wilson

1    Christiana Care?

2        A.    No.

3        Q.    And as a result, you were disciplined on

4    occasion; is that right?

5        A.    Correct.

6        Q.    And ultimately terminated; correct?

7        A.    Correct.

8        Q.    Did you ever have occasion to look at a

9    Christiana Care policy regarding coaching and positive

10   discipline?

11       A.    Did I have -- say it again?

12       Q.    Did you ever have occasion to look at a

13   policy, a Christiana Care policy titled "Coaching and

14   Positive Discipline"?

15       A.    I can't recall.

16       Q.    Did you have a general understanding of what

17   the term progressive discipline means while you worked

18   for Christiana Care?

19       A.    Yes.

20       Q.    What is your understanding of that

21   term "progressive discipline"?

22       A.    That means that they would -- progressive

23   discipline to me means that they would -- you would

24   get, like if you were on Stage I, you would go to Stage

Trafina Wilson

1    II.    It would progress if you continued to go ahead

2    with that behavior.

3        Q.    And while you worked for Christiana Care,

4    weren't you subjected to progressive discipline?

5        A.    Yes.

6        Q.    In fact, didn't you first receive a verbal

7    warning, then a written warning, then a decision making

8    leave, and then a termination?

9        A.    For?  For the internet?  For the telephone?

10   For what?

11       Q.    For different infractions.

12       A.    That's what it end up to be, yes.

13       Q.    While you worked at Christiana Care or after

14   your termination, were you familiar with a Christiana

15   Care policy called "Employee Problem Solving

16   Procedures"?

17       A.    I don't recall.  I don't recall.

18       Q.    After your employment with Christiana Care was

19   terminated, you filed an appeal of that decision; is

20   that right?

21       A.    Yes.

22       Q.    And did you file an appeal under a peer review

23   procedure?

24       A.    Yes, I did.

A-20

Trafina Wilson

1              (Wilson-2 was marked for identification.)

2    BY MR. OSSIP:

3        Q.    This one you can read completely because it is

4    only one page and two lines.  This is DP 000142, two

5    e-mails from April 3rd, 2002.

6              First of all, would you agree with me

7    that the bottom e-mail would be the first e-mail in

8    this chain?

9        A.    Yes, I will.

10       Q.    So on April 3rd, 2002, at 7:09 a.m., Melinda

11   Fitzgerald sent you an e-mail, and at that time you

12   were known as Trafinna Cuff.  Subject:  Internet use.

13             And then you responded on the same day

14   at 8:36 a.m.; is that correct?

15       A.    Yes.

16       Q.    So would this indicate that at least by

17   April 3rd, 2002, you were in the billing department

18   reporting to Melinda?

19       A.    Yes.

20       Q.    First of all, do you recall receiving this

21   e-mail and do you recall responding to this e-mail?

22       A.    Yes.

23       Q.    For how long were you in the department prior

24   to this e-mail exchange?

A-21

**Trafina Wilson**

1    A.    2002?  When did we say?

2    Q.    I don't know.  That's what I'm trying to find

3    out.

4    A.    I'm trying to remember what was the date that

5    I went into the department.

6    Q.    That's what I'm trying to find out, and I

7    thought maybe if I asked you how long you were in the

8    department when you received this, it might help.

9    A.    I don't remember.

10    Q.    Okay, that's fine.

11                Was this the first time, April 3rd,

12    2002, that you had any discussion or communication with

13    Melinda about your internet usage?

14    A.    I don't remember.

15    Q.    Did you disagree with the facts that she set

16    forth here that said, "The internet report is showing

17    your usage is very high"?

18    A.    Did I disagree?

19    Q.    Did you disagree?

20    A.    It doesn't look like it.  It looks like I was

21    apologizing.  I said "Sorry.  I will discontinue my

22    use."

23    Q.    Do you know what she was referring to when she

24    referred to "the internet report"?

A-22

Trafina Wilson

```
 1     A.     Evidently -- well, she's seen something
 2    showing that I was -- no, I don't.
 3     Q.     Do you remember having a discussion with
 4    Melinda at or about this time about your internet
 5    usage?
 6     A.     No.
 7     Q.     Do you remember having a discussion with
 8    Melinda at a later time about your internet usage?
 9     A.     At a later time?  Yes.
10     Q.     Do you recall when that was?
11     A.     No.  I know it has happened, but, no, I can't
12    really pinpoint when it was.
13     Q.     Do you remember how many separate discussions
14    you have had with Melinda over your internet usage,
15    during the period of time that you reported to her?
16     A.     Maybe about two or three.  I'm not sure.
17     Q.     Do you have any memory as to when they were?
18     A.     I know one time she had brought all of us into
19    a staff meeting and was telling all of us that, you
20    know, we all had excessive internet actions.
21            And then I remember another time where
22    April brought around a paper for us to sign stating
23    that, you know, we knew the policy of the telephone and
24    internet use.
```

A-23

Trafina Wilson

1          And then another time, I was reprimanded

2     because of internet excessive use.  Well, they said

3     internet and telephone use.

4     Q.     We will get to all of those.

5          Now, you said on April 3rd, 2002, to

6     your supervisor, "Sorry.  I will discontinue my use."

7     A.     Uh-huh.

8     Q.     That's what it says here?

9     A.     Yes, it does.

10    Q.     Did you mean that?

11    A.     Yes, I did.

12    Q.     Did you do that?

13    A.     I guess for a while.

14    Q.     How long?

15    A.     I don't remember.

16    Q.     But then you continued to use the internet for

17    personal usage?

18    A.     Actually, to tell you the truth -- I don't

19    want to say yes to that because there is a lot of --

20    there was a lot of popups and junk mail that used to

21    come through on that internet, and if you just

22    responded to anything, well, then, it looked like that

23    you were using it for personal use.

24          So, therefore -- I mean as far as me

A-24

Trafina Wilson

1    going in and doing whatever, I didn't do that.  I

2    didn't even send other people e-mails.  I used to read

3    them or I might have replied to them, but I never just

4    sat on the computer and engaged in sending e-mails back

5    and forth.

6        Q.    I'm not talking about e-mails.  I'm talking

7    about going to the internet.

8        A.    Uh-huh.

9        Q.    And looking at websites on the internet.

10       A.    Like I said, there was a lot of popups.  There

11   was popups came on the computer, and if you looked

12   at -- if something interested me and I looked at it,

13   that showed that I was using the internet.

14       Q.    Is that the only time that you used the

15   internet for personal usage when you responded to

16   popups?

17       A.    Most of the time, yes.

18       Q.    That's your testimony, that most of the time

19   your personal internet usage was simply responding to

20   popups?

21       A.    I can't really say that I used to come in and

22   just use the internet for personal use.

23       Q.    In 2002, where did you do your personal

24   banking?

A-25

Trafina Wilson

1       A.    Oh, at Artisans.

2       Q.    And would there be occasion for you to go to

3    artisansbank.com while you were at work?

4       A.    Yes.

5       Q.    And would that have been for personal uses?

6       A.    That would be for my uses, yes.

7       Q.    Did you ever see internet reports that showed

8    your personal usage of the computer?

9       A.    Not until recently.

10      Q.    In connection with this lawsuit?

11      A.    In connection with this, yes.

12      Q.    And so you have seen reports that Christiana

13   Care printed out that showed the number of hits and the

14   number of user sessions at artisansbank.com?

15      A.    Yes.

16      Q.    At youravon.com?

17      A.    Uh-huh.

18      Q.    Is youravon.com an internet site that you went

19   to for personal use?

20      A.    Yes.

21      Q.    And you did that at work?

22      A.    I did.

23      Q.    And it had nothing to do with your work as a

24   biller for Christiana Care; right?

A-26

78

Trafina Wilson

1      A.    It didn't.

2      Q.    You didn't just respond to a popup, you

3   actively had to go to youravon.com?

4      A.    You are right, that's correct.

5      Q.    You did that even after your supervisor told

6   you that you shouldn't do that; correct?

7      A.    That's correct.

8      Q.    Why did you do that?

9      A.    I had a little small business with Avon, and I

10  was supplying my supervisor as well with Avon, and that

11  was convenient for me.  Especially when people would

12  give me orders and I would put them in the computer.

13              MR. OSSIP:  Let's mark this as Wilson-3.

14              (Wilson-3 was marked for identification.)

15  BY MR. OSSIP:

16     Q.    I have marked as Wilson-3 DP 000146, which is

17  a memo to April from you dated July 17th, 2002.  I will

18  ask you to read it and then I will ask you some

19  questions about it.

20     A.    (Pause.)

21     Q.    Have you read this document?

22     A.    Uh-huh.

23     Q.    Is that a yes?

24     A.    Yes.

**A-27**

Trafina Wilson

1     Q.     Do you remember it?

2     A.     Yes.

3     Q.     Do you recall why you wrote it?

4     A.     I had gotten back from lunch late and I was

5     called and April had questioned me about, you know, why

6     I was back from lunch late.  And she asked me to write

7     it in the statement.

8     Q.     Were you disciplined for being late?

9     A.     Probably, yes.  I don't remember.

10    Q.     Do you specifically remember being warned or

11    given discipline?

12    A.     I'm sure, yes.  That's why I had to write

13    this, yes.

14    Q.     Do you know if that became formal discipline

15    or was it simply counseling?

16    A.     I believe it was formal.

17    Q.     The last paragraph of this document you write,

18    "Miss Habich" -- meaning April -- "has a big concern

19    with my internet usage."

20                    How did she express that concern to you

21    in 2002?

22    A.     I guess she was the one who probably had

23    alerted Melinda about the internet usage and Melinda

24    brought it to my attention, and so maybe it was relayed

A-28

Trafina Wilson

1    to me in that manner.

2        Q.    In this period of time when you joined the

3    billing department and when you worked there in 2002,

4    what was your job, what were you responsible for doing

5    on a day-to-day basis?

6        A.    Actually, I was responsible for -- in 2002?

7        Q.    Yes.

8        A.    I was responsible for -- see, it's very vague

9    to me because when I accepted the job, the job

10   description that they gave me when I accepted the job,

11   I only did it for like a month and a half.  And then

12   there was a lapse in the period because they had to get

13   back up, they had to change systems and they got --

14   when they changed systems, I was just doing whatever

15   they needed me to do at that time until they got things

16   up and running.

17            Once they got things up and running, I

18   became what they call a follow-up person, and that's

19   when, a follow-up person is when you would follow up on

20   the delinquent accounts and try to, you know, research

21   the accounts and collect all the documentation so that

22   the bills could be paid.

23       Q.    Now, delinquent accounts, does that refer to

24   patients?

A-29

Trafina Wilson

1       A.    It refers to the patient's bills.

2       Q.    What kind of followup did you have to do on

3    those bills?

4       A.    Actually, I would call the insurance company,

5    find out what the insurance company's phone number was,

6    find out the contact person for that insurance company,

7    and find out what documentation that they did not have

8    in order to get this bill paid.

9              A lot of times they would tell us, you

10   know, well, we didn't receive this, or we didn't

11   receive that.  And I would go into the person's file

12   and try to collect that.  Or I would have to go

13   downtown and try to collect that, you know, try to

14   collect the original copy, make a copy of it.

15      Q.    So your focus was trying to get the insurance

16   companies to pay the bills?

17      A.    Right.

18      Q.    And you wanted to find out from the insurance

19   companies what information they needed in order to

20   process the bills and to be able to get them the

21   information so that they could pay the bills?

22      A.    Correct.

23      Q.    And did that involve sometimes communicating

24   with the patients themselves?

A-30

**Trafina Wilson**

```
1      A.    Sometimes, yes.  Sometimes the patients would,

2    in rare occasions, the patients would call.  And if

3    they received a bill, they would call us to find out

4    why, you know, things weren't submitted to their

5    insurance companies for payment.

6      Q.    So, in other words, somebody would come to the

7    hospital, they'd have services performed.  It would be

8    submitted to the insurance company.  For some reason

9    the insurance company wouldn't pay.  The patient would

10   then get a bill.  The patient could then sometimes call

11   up and say, Why did I get this bill, why isn't my

12   insurance company paying for it?

13     A.    Right.  Sometimes, yes.

14     Q.    This happened to me.  And then you would then

15   have to call and follow up with the insurance

16   company --

17     A.    Right.

18     Q.    -- why didn't you pay this, what's the story?

19     A.    Right.  Or then we would have, on our AR

20   report, we could see where, you know, where bills are

21   still -- they are accumulating on our AR report, but

22   they should be moved over to the pay part of it.  So,

23   you know, I used to work closely with the AR report

24   also.
```

**A-31**

**Trafina Wilson**

1      Q.    Looking back at this memo, which is Wilson-3,

2      again, the last paragraph, you stated that Ms. Habich

3      has a big concern with my internet usage.  And you said

4      I received a large volume of junk mail.  I tried to

5      unsubscribe to some of them.

6                  Was it your explanation here that your

7      internet usage had to do with the receipt of junk mail?

8      A.    I felt as though it wasn't my doings.  Some of

9      this wasn't my doings.  A lot of it wasn't.  A lot of

10     it did come through mail that popped up.  I don't want

11     to say pop up, but there was a lot of e-mail that came

12     through the system that was on there, and whether or

13     not I plugged into it or not, it seemed to me that it

14     must have been registering.

15     Q.    Do you remember ever going onto a website

16     called winfreestuff.com?

17     A.    Win free?

18     Q.    Winfreestuff.com?

19     A.    Right now I don't remember.

20     Q.    Did you continue to use the internet for

21     personal use in 2002?

22     A.    As far as my banking was concerned and things

23     like that, yes.

24     Q.    As far as your Avon also was concerned?

**A-32**

**Trafina Wilson**

1      A.    Yes.

2      Q.    Did you continue to use the internet for

3    personal use in 2003?

4      A.    If I had the Avon business, yes.

5      Q.    And for banking?

6      A.    Yes.

7      Q.    How about for shopping?

8      A.    I think I did.  I think I ordered a couple

9    things from there.

10     Q.    At work?

11     A.    Yes.

12     Q.    While on work time?

13     A.    I did use it at work.

14     Q.    And did you also use the internet at work from

15   time to time to go to websites that talked about your

16   horoscope?

17     A.    I remember checking my horoscope, yes.

18     Q.    At work using the company computer?

19     A.    Yes.

20     Q.    On work time?

21     A.    Yes.

22              MR. OSSIP:  Let me mark this as Wilson-4.

23              (Wilson-4 was marked for identification.)

24   BY MR. OSSIP:

**A-33**

**Trafina Wilson**

1    Q.    Do you remember this?

2    A.    Yeah.

3    Q.    This document says that it is a "first step

4    reminder for overall attendance."

5    A.    Uh-huh.

6    Q.    Is that right?

7    A.    Yes.

8    Q.    And do you understand this to have been a step

9    in the disciplinary process, the progressive

10   disciplinary process?

11   A.    Yes.

12   Q.    And what was this given to you for?

13   A.    For being late.

14   Q.    And this document details the dates of your

15   lateness in the third paragraph?

16   A.    Yes, it does.

17   Q.    Did you disagree with any of the facts that

18   are set forth in this memo?

19   A.    Yes, I did.

20   Q.    What did you disagree with?

21   A.    Because when I was presented with this

22   lateness, I believe that this was the one that showed

23   that I was like one minute late, and I had went to

24   April's supervisor and talked to him about one minute

**Trafina Wilson**

1    late.  And he told me that the overall system, the

2    system doesn't really calculate you as being late until

3    you're like seven minutes late.  So, you know, that's

4    what he told me.

5         Q.    Who is that?

6         A.    I want to say Joe Caruchi, or something like

7    that.

8         Q.    Would that be Joe Richici, R-I-C-H-I-C-I?

9         A.    Okay.  Yes.

10                MS. DELGADO:  Richici.

11                MR. OSSIP:  Richici.

12   BY MR. OSSIP:

13        Q.    When did he tell you this?

14        A.    I had went to him when they first brought this

15   to my attention about the one minute being late.  It

16   was like for like maybe a week, it was one minute.  I

17   was hitting the clock at one minute late, and I had

18   went to Joe and was talking to him about being one

19   minute late.  By the time I got to the clock it was one

20   minute late.

21        Q.    Do you know if it was before or after your

22   receipt of this June 16, 2003 memo?

23        A.    I believe it was before I got this.

24        Q.    But it was after you received the memo, which

**A-35**

**Trafina Wilson**

1    is Wilson-4, from April, which stated that Christiana

2    Care's policy was that if you were one-minute late, you

3    were considered late; right?

4        A.    Yeah.

5        Q.    Did you ever see anything in writing that

6    contradicted this statement about being one minute

7    late?

8        A.    No.

9        Q.    And you did understand that this memo,

10   Wilson-5, was the first step reminder in the

11   disciplinary process?

12       A.    Yes.

13       Q.    The second paragraph says, "On April 7, 2003,

14   we talked in reference to your overall attendance and

15   how your inability to report when scheduled impacts

16   your overall performance.  We also talked about

17   changing your hours from seven to 3:30 to 7:30 to

18   four."

19                    Do you remember having a discussion with

20   Melinda or April in April of 2003 on those subjects?

21       A.    Yes.

22       Q.    Tell me how that meeting came about?

23       A.    Well, we discussed my time, me coming in, you

24   know, a minute late, and I believe that that's when, at

**A-36**

**Trafina Wilson**

```
1     that time they were saying that, you know, I could move

2     my time, I could, you know, they would -- I could have

3     flex time where they would give me a half an hour so

4     that, you know, so that I can get to work on time.

5          Q.    Were you having problems getting to work at

6     seven o'clock?

7          A.    In a way, yes.  My children catch the bus and

8     I wanted to make sure that -- and at the time they were

9     young, and they are twins.  I just wanted to make sure

10    that they got on the bus properly and there was no

11    disturbance.

12         Q.    Where were you living at this time, April and

13    June of '03?

14         A.    In Green Acres.

15         Q.    Which is where?

16         A.    North Wilmington.

17         Q.    Reporting to work where?

18         A.    At Rockland Road.

19         Q.    So how long a commute would that be at 6:30 or

20    seven o'clock in the morning?

21         A.    That was, I would say, about ten minutes.

22         Q.    So on April 7th of '03, who did you speak

23    with?

24         A.    Melinda.
```

**A-37**

**Trafina Wilson**

1    Q.    So you spoke to Melinda about your overall

2    attendance and she told you that she had concerns about

3    your attendance?

4    A.    Well, she had told me that, you know, it was

5    brought to her attention that, you know, I had punched

6    in late for consecutive times and that, you know, it

7    was going to be disciplinary action brought against me,

8    and so therefore we talked about flex time.

9    Q.    Were your hours then changed from seven to

10   3:30 to 7:30 to four?

11   A.    I believe we did talk about that and then we

12   started -- I started coming in at that time.

13   Q.    Then you had another occasion of lateness in

14   June, which put you out of standard --

15   A.    Uh-huh.

16   Q.    -- as reflected in here; right?

17   A.    Yes.  If I remember correctly, I believe I was

18   reporting downtown at that time, and I got caught in

19   traffic trying to get to Wilmington, and I don't

20   remember if it was an accident on the road or whatever.

21   But I got to work late that day, and so therefore that

22   put me out of compliance.

23   Q.    Do you remember getting a second step reminder

24   later in the year?

**A-38**

**Trafina Wilson**

1       A.     When that occurred?

2       Q.     No.  Later in 2003.

3       A.     Yeah.

4              MR. OSSIP:  6.

5              (Wilson-6 was marked for identification.)

6    BY MR. OSSIP:

7       Q.     This is a document that's called Disciplinary

8    Action Record.  It's DP 001403.  It's signed by you and

9    several others on the bottom right.

10             Do you recall receiving this?

11      A.     Yes.

12      Q.     Did you understand that this was a second step

13   in the disciplinary process, the progressive discipline

14   process?

15      A.     Well, actually it looks like both of them

16   were.

17      Q.     Well, under disciplinary action to be taken,

18   which is about three-quarters of the way down, the box

19   that says "second step reminder" is checked; is that

20   right?

21      A.     Yes.

22      Q.     And it says, "The consequences of continued

23   unacceptable behavior or performance."  It reads, "This

24   second step reminder is being issued for being out of

**A-39**

**Trafina Wilson**

1    standard for attendance.  If you do not accrue any

2    additional disciplinary actions within the next two

3    years, this reminder will be deactivated.  Any

4    additional attendance, performance issues or violations

5    of any Christiana Care policies or procedures will be

6    reviewed for further discipline, up to and including

7    termination."

8              Did you read that?

9    A.    Yes.

10    Q.    And did you understand it at the time you

11    signed it on November 6th, 2003?

12    A.    Yes.

13    Q.    This reflects that in the last pay period you

14    were late for work on six occasions; is that right?

15    A.    In the last pay period?

16    Q.    In other words, if you look at the dates here,

17    you were late October 16, 17th, 20th, 22nd, 23rd, and

18    24th.  In other words, you were late six days in one

19    pay period?

20    A.    Yes, one minute late, yes.

21    Q.    And you said that the reason was all due to

22    traffic?

23    A.    No, uh-uh.  I said that -- I didn't -- I don't

24    think I said anything about those dates.  I don't

**Trafina Wilson**

1    remember.  There was one particular day that I was late

2    like I guess ten minutes or eight minutes, or something

3    like that, is when it was due to traffic.

4                    The other days that I was one minute

5    late, it was just that I was trying to get to work.

6    But the time I got into the parking lot, it might have

7    been seven o'clock, and by the time I got from my car

8    to punch in, it might have been one minute after.

9        Q.    Were there ever any times when you worked for

10   Christiana Care, Ms. Wilson, where you would punch in

11   and then go park your car?

12       A.    I had done that so that I could try to save

13   time, yes.

14       Q.    So you would swipe in, meaning that you would

15   register for work, run back to park your car, and then

16   come in a few minutes later?

17       A.    After I parked my car.

18       Q.    Right.

19       A.    Yeah.

20       Q.    It was your understanding, was it not, that

21   when you swiped in, you were supposed to be ready for

22   work?

23       A.    That's true.

24       Q.    But there were times you admit you would swipe

**A-41**

**Trafina Wilson**

1    in, meaning tell people or suggest you were ready for

2    work?

3        A.    No, I didn't tell anyone.

4        Q.    But when you swipe in, it suggests that you're

5    ready for work?

6        A.    Ready for work.

7        Q.    And in fact you go on the clock; right?

8        A.    Yes.

9        Q.    So in order to avoid being late, you would

10   swipe in, run back to park your car, and then come back

11   in a few minutes later?

12       A.    I did that a couple times, yes.

13       Q.    And Melinda counseled you about that for a few

14   times?

15       A.    Yes.

16       Q.    You understood that that was not acceptable,

17   though?

18       A.    I stopped, yes.

19       Q.    But you understood that it wasn't acceptable?

20       A.    A lot of times when I got to work I would just

21   go, swipe the clock, and go park my car and I would

22   come back, yes.

23             Sometimes even if I did it, I wasn't

24   late.

**Trafina Wilson**

1    Q.    Well, you weren't late because you swiped your

2    card.

3    A.    Right.

4    Q.    But you swiped in --

5    A.    There's no excuse for it.  I'm sorry, yes,

6    yes.  Yes, it happened.

7    Q.    Now, you handwrote in here, "I was under the

8    influence that CCHS policy is employee's have seven

9    minutes' grace period before management considered one

10   as being late.  In any rate, I will be on time

11   hereafter."

12              Is the seven-minute explanation from

13   Mr. Richici that you just described?

14   A.    Yes.

15   Q.    And that's despite the fact that you received

16   a document that said one minute late was considered

17   late; correct?

18   A.    Yes.

19              MR. OSSIP:  One last document and then we

20   can break.

21              (Wilson-7 was marked for identification.)

22   BY MR. OSSIP:

23   Q.    Let me know when you have finished reading

24   that.

**Trafina Wilson**

```
1       A.      (Pause.)

2               All right.

3       Q.      Do you recall writing this memo in October of

4       2003?

5       A.      Yes.

6       Q.      And this is in connection with the second step

7       reminder that we just saw?

8       A.      Okay.

9       Q.      Do you agree with that?

10      A.      Yes.

11      Q.      And you said, "I have been asked to give a

12      statement/reason why I have been late for six days in a

13      two-week period."

14      A.      Uh-huh.

15      Q.      And you explained that on October 16th, you

16      ran into slow moving, heavy traffic, and then said on

17      the other days this could also be due to traffic.

18      A.      Uh-huh.

19      Q.      Does that refresh your memory about the

20      statement in the second step reminder that says, "You

21      stated the reason for your late occurrences were all

22      due to traffic"?

23      A.      Yes.

24      Q.      As far as you know, was the statement that you
```

**Trafina Wilson**

1    gave, Wilson Exhibit 7, accurate?

2        A.    As far as I'm concerned, it was accurate.

3                    MR. OSSIP:  It is a couple of minutes

4    before one.  Why don't we shoot for 45.  It may take an

5    hour.

6                    MR. PRIMOS:  Okay.

7                    (Recess, 12:57 p.m.)

8                    (Resumed, 2:00 p.m.)

9                    MR. OSSIP:  Wilson-8.

10                    (Wilson-8 was marked for identification.)

11    BY MR. OSSIP:

12        Q.    Ms. Wilson, welcome back from lunch.

13                    I have shown you what I have marked as

14    Wilson Exhibit 8, which is Bates stamped DP 00183.  It

15    is a February 25, 2005 memo from Ms. Fitzgerald to

16    several people, including yourself.

17                    If you could take a look at that and

18    then let me know when you have read it.

19        A.    (Pause.)

20                    Okay.

21        Q.    Do you recall receiving this?

22        A.    Yes, I guess I have.

23        Q.    Do you recall whether there was a meeting of

24    some sort that Melinda had or any discussion that she

**A-45**

**Trafina Wilson**

1    had with you, either individually or with others, about

2    this at the time?

3        A.    I don't recall.

4        Q.    Do you know why this memo was issued when it

5    was?

6        A.    I don't think it had anything to do with me

7    personally.

8        Q.    That's not what I asked, though.

9              Do you know why the memo was issued to

10    the group by Melinda at the time that it was?

11        A.    I would say maybe some kind of circumstances

12    came up that they needed to reiterate this.

13        Q.    Do you know what those were?  I don't want you

14    to guess.  If you know, you know; if you don't know.

15        A.    I'm not sure.  I'm not sure.

16        Q.    Had you seen this policy before, the policy on

17    telephone messages, personal cell phones, and pages?

18        A.    Previously.

19        Q.    Yes.

20        A.    Previously.

21        Q.    And in fact, isn't that exactly the same words

22    as we saw in Exhibit 1?

23        A.    Yes, that's what I'm saying.  Previously, yes.

24        Q.    Before you saw this memo in February of 2005,

**A-46**

**Trafina Wilson**

1    had you seen the policy on telephone messages, cell

2    phones and pagers?

3        A.    Yes.

4        Q.    Do you understand the policy as it was set

5    forth in this memo, Exhibit 8?

6        A.    Yes.

7        Q.    Did you have any questions about it at the

8    time?

9        A.    No.

10        Q.    Did you comply with this policy?

11        A.    In 2005, in 2005?

12        Q.    2005.

13        A.    To the best of my ability.

14        Q.    Does that mean that you did or you didn't?

15        A.    That means that I complied to it to the best

16    of my ability.

17                    Yes, I did.

18        Q.    You made personal telephone calls at work, did

19    you not?

20        A.    Yes, I did.

21        Q.    And did you understand that that was in

22    violation of the policy?

23        A.    Well, I made personal telephone calls at work

24    and I was supposed to have notified my supervisor when

**A-47**

**Trafina Wilson**

1    those telephone calls were going to be made.

2        Q.    And did you do that?

3        A.    I did on occasion.

4        Q.    Not always, though?

5        A.    Correct.

6        Q.    Do you know somebody by the name of Lisa

7    Blanton, B-L-A-N-T-O-N?

8        A.    No.

9        Q.    Isn't that your aunt?

10       A.    No.

11       Q.    No?

12       A.    No.

13       Q.    You don't know anybody named Lisa Blanton?

14       A.    No.

15       Q.    Do you remember being asked about Lisa

16   Blanton?

17       A.    I don't know Lisa Blanton.

18       Q.    Do you remember being asked about her?

19       A.    No.

20       Q.    Do you have any relatives by the name of

21   Blanton?

22       A.    No.

23       Q.    Do you have any close friends of the family by

24   the name of Blanton?

**Trafina Wilson**

1       A.     No.

2                   MR. OSSIP:  Wilson-9.

3                   (Wilson-9 was marked for identification.)

4                   THE WITNESS:  Okay.

5    BY MR. OSSIP:

6       Q.     I have shown you Exhibit 9, which is pages

7    DP 172 to 173, which is a series of e-mails beginning

8    on the bottom of the second page on February 25, 2005,

9    at 7:09 a.m., and continuing at the top of the first

10   page reading backwards March 1st, at 2:44 p.m.

11                  Do you recall these e-mails?

12      A.     Yes.

13      Q.     Let's start at the bottom of the second page

14   and then work our way forward.

15                  Do you recall getting an e-mail from

16   Melinda asking you what number you were calling in

17   Swarthmore and then giving you a number?

18      A.     Yes.

19      Q.     And then you were responding that the number

20   was Unlimited Staffing?

21      A.     Yes.

22      Q.     How did you know that that number was

23   Unlimited Staffing?

24      A.     I took a guess.

**A-49**

**Trafina Wilson**

1    Q.    You took a guess?

2    A.    Yeah.  I thought that that was Unlimited

3    Staffing.

4    Q.    What was Unlimited Staffing?

5    A.    A staffing agency it looks like.

6    Q.    Would that have been a company that you would

7    have needed to call as part of your job duties?

8    A.    It could have been.  I'm not sure.

9    Q.    I am not asking you whether it could have

10   been.  I am asking if it was?

11   A.    It was nothing I would have called on a

12   regular basis, no.

13   Q.    So is it your testimony that to the best of

14   your recollection it was not a company that you would

15   have had to call as part of your job?

16   A.    Unlimited Staffing.

17   Q.    Please don't speak over me.

18         To the best of your recollection, is

19   Unlimited Staffing a company that you would not have

20   had occasion to call as part of your job duties?

21   A.    Yes, I would have called Unlimited Staffing.

22   If an employee got hurt on the job, or something, and

23   they came in, yes, I would have called them.

24   Q.    What kind of a company was Unlimited Staffing?

**A-50**

**Trafina Wilson**

1      A.    I'm not certain.

2      Q.    So you replied to Melinda at 9:39 a.m., "This

3   phone number is Unlimited Staffing."

4            And she replied to you six minutes

5   later, "I can't find that account on Stolas.  Is it

6   listed under another name?"

7            What is Stolas, S-T-O-L-A-S?

8      A.    Stolas is the computer system that I was

9   trying to figure out what we changed over to.  Stolas

10  was our new computer system.

11     Q.    So what does it mean, that she couldn't find

12  Unlimited Staffing on Stolas?

13     A.    We had accounts by name, and if a client had

14  came in and they were listed under Unlimited Staffing,

15  well, we would have documented that and it would be in

16  the system and we would have a person's name next to

17  Unlimited Staffing and we would have their

18  documentation of them coming in with the treatments

19  that we treated them and things like that.

20     Q.    So if this account Unlimited Staffing was not

21  found on Stolas, would that indicate that that was not

22  a company that Christiana Care did business with?

23     A.    That would indicate that, yes.

24     Q.    Did you answer Melinda's question about

**A-51**

**Trafina Wilson**

1    whether Unlimited Staffing was listed under another

2    name?

3        A.    No.

4        Q.    Why not?

5        A.    I just wrote back what she asked me.

6        Q.    No.  She asked you is it listed under another

7    name, and you didn't answer her.  You said, "If they

8    call back, I will forward the call to you."

9        A.    Oh, okay.

10       Q.    Why didn't you answer her question?

11       A.    Because I wasn't sure.

12       Q.    Why didn't you tell her that?

13       A.    I wasn't sure.

14       Q.    Why didn't you tell her you weren't sure?

15       A.    I just wrote back.  At the time I just wrote

16   what I wrote.

17       Q.    Well, then she replies to that e-mail, and

18   this is now the bottom of the first page, and she

19   changes the subject to add "response needed today!"

20   And changes the importance of the e-mail to "high

21   importance," and gives you a list of all of the calls

22   that were made to that number starting on January 3rd

23   and continuing until February 23rd, six hours and 12

24   minutes in total, and tells you, "I need a response

**A-52**

**Trafina Wilson**

```
1      today on the nature of business to this phone number."

2                    Do you remember receiving that?

3      A.    Yes, I do.

4      Q.    And what did you do in response to that?

5      A.    I gave her a response back.

6      Q.    Did you do anything to try to find out what

7      the nature of business to that phone number was in the

8      multiple calls and six hours of phone calls that you

9      made to this number?

10     A.    Yes, I did.

11     Q.    What did you do?

12     A.    I called the number and I spoke to the person

13     that answered the telephone and asked them if they knew

14     anybody -- who was the person on this line, and things

15     like that.

16     Q.    Now, these were calls that were made from your

17     phone number at work to this number in Swarthmore, or

18     610-543-5399; right?

19     A.    Yes.

20     Q.    These were not calls that were made to the

21     number, these were calls that were made from your

22     number to this number?

23     A.    Yes, it was.

24     Q.    And is your answer at 11:35 in the morning, "I
```

**A-53**

**Trafina Wilson**

```
 1    asked her" -- meaning the lady I spoke to -- "about

 2    Unlimited Staffing, which she is unaware of."  Is that

 3    what you told Melinda?

 4        A.    Yes, I indicated that to Melinda.

 5        Q.    So does that indicate to you that 610-543-5399

 6    was not Unlimited Staffing?

 7        A.    No, that wasn't Unlimited Staffing, no.

 8        Q.    And then she told you a little while later,

 9    "I've looked up the number and it came up Lisa Blanton

10    in Ridley, Pennsylvania.  Do you know anyone with that

11    last name?"

12                    And you replied, "No, I don't."

13                    Is that correct?

14        A.    Yes.

15        Q.    Didn't you tell Melinda that Lisa Blanton was

16    your aunt?

17        A.    Nope.

18        Q.    You have no idea who Lisa Blanton is?

19        A.    Nope.

20        Q.    Do you know anybody who lives in Ridley,

21    Pennsylvania?

22        A.    No, I don't know anybody who lives in Ridley,

23    Pennsylvania.

24        Q.    Do you have any explanation for why six hours
```

**A-54**

**Trafina Wilson**

1    and 12 minutes of telephone calls would have been made

2    to this number from your line between January 3rd and

3    February 23rd, 2005?

4        A.    Yes, I do.

5        Q.    What is that?

6        A.    I know that -- I didn't know whose telephone

7    number that was.  I mean -- excuse me.  I'm not going

8    to say.  I didn't know that -- when I first seen the

9    telephone number, I didn't recognize the telephone

10   number, although I might have called there several

11   times, but I didn't see -- I didn't know whose

12   telephone number -- when she asked me about

13   Miss Blanton, I didn't know who Miss Blanton was.  But

14   later I found out that I have a girlfriend that's a

15   nurse and that she is the one who was using this

16   telephone number.  At the time my father was in the

17   hospital and he had cancer.  She was -- I would call

18   her periodically and we would talk about what type of

19   cancer he had and things like that.

20              So --

21       Q.    Who is the name of your girlfriend?

22       A.    Darlene Operieadou.

23       Q.    Do you know how to spell that?

24       A.    Uh-uh.

**A-55**

**Trafina Wilson**

1    Q.    How would you pronounce it?

2    A.    It's Operieadou.  Operieadou.

3    Q.    O-P-A-R-I-E --

4    A.    Or E-R.

5    Q.    A-D-O-U?

6    A.    A-D-O-U.

7    Q.    Are you still friendly with her?

8    A.    Yes.

9    Q.    Where does she live now?

10   A.    She lives in Chester, Pennsylvania.

11   Q.    When did you find out that Darlene's number

12   was 543-5399?

13   A.    Actually, when all of this stuff occurred, I

14   was talking to her on the telephone and we were talking

15   about -- and I was telling her what was going on with

16   my job, and she told me that that is the number of the

17   residence, that she takes care of a residence at that

18   number -- I mean she takes care of a lady at that

19   number.

20   Q.    So she was a home health aid or something?

21   A.    Yes.

22   Q.    So Darlene was working at the home of Lisa

23   Blanton?

24   A.    I don't know whose home it is, but I guess, if

**A-56**

**Trafina Wilson**

1    that's what it is.

2        Q.    She was working at the home associated with

3    543-5399?

4        A.    Yes.

5        Q.    So these are all personal telephone calls?

6        A.    Yes.

7        Q.    Did you ever admit that to Melinda?

8        A.    Yes.

9        Q.    Did you tell her that it was the number that

10   your friend Darlene was working at?

11       A.    I don't know if we got into that.

12       Q.    So these calls, these 15 calls that were made

13   between January 3rd and February 23rd, 2005, for a

14   total of six hours and 12 minutes, these are all

15   personal phone calls made while you were at work during

16   working time?

17       A.    Correct.

18       Q.    Do you realize that that was a violation of

19   Christiana Care policy?

20       A.    Yes, I do.

21       Q.    And you intentionally violated that policy by

22   making those phone calls?

23       A.    Well -- yes.

24       Q.    And in fact, you received discipline for that,

**Trafina Wilson**

1    did you not?

2        A.    Yes.

3        Q.    What was the nature of the discipline you

4    received?

5        A.    The nature of that discipline was, I guess

6    that was second warning or third warning.

7        Q.    Wasn't that your decision making leave?

8        A.    Okay.

9                  MR. OSSIP:   10.

10                 (Wilson-10 was marked for

11    identification.)

12   BY MR. OSSIP:

13       Q.    I have shown you Exhibit 10, which is DP 191,

14   a disciplinary action record, which you have signed on

15   March 23rd, 2005, so review that and then let me know

16   when you are finished.

17       A.    I'm familiar with it.

18       Q.    Do you recognize this as the decision making

19   leave that you received in March of 2005?

20       A.    Yes.

21       Q.    And did you understand at the time that

22   decision making leave was the final step in the

23   disciplinary process?

24       A.    Yes.

**A-58**

**Trafina Wilson**

1    Q.    And did you realize that any future violation

2    of any Christiana Care policy or procedure requiring

3    formal disciplinary action would be reviewed for

4    termination?

5    A.    Yes.

6    Q.    At the top of the page -- let me just go over

7    this -- it lists the previous disciplinary record; is

8    that right?

9    A.    Yes.

10    Q.    So it indicates what we have seen before,

11    June 16, '03, a first step reminder for attendance, and

12    then October 25, '03, a second step reminder for

13    attendance, and we saw that before too; correct?

14    A.    Uh-huh.

15    Q.    Yes?

16    A.    Yes.

17    Q.    And then this is the decision making leave for

18    idleness?

19    A.    Yes.

20    Q.    And this indicates -- I'm not going to read it

21    into the record -- but did you read this and understand

22    it before you signed it on March 23rd, 2005?

23    A.    When I signed this, it didn't have anything in

24    it.  They told me it was my third disciplinary action

**A-59**

**Trafina Wilson**

1    this document?

2        A.    After I was terminated, yes.

3        Q.    Your testimony is under oath that you didn't

4    receive a document that had your decision making leave

5    until after you were terminated in August?

6        A.    Correct.

7        Q.    Didn't you have to give a statement in

8    response to your decision making leave?

9        A.    A statement in response --

10       Q.    Yes.

11       A.    -- to my decision making leave?

12       Q.    Yes.  What is your understanding of a decision

13   making leave?

14       A.    I made -- that's when I wrote about what

15   occurred with the telephone numbers or something, and I

16   told them -- I'm trying to remember.

17              When I had a decision making leave, I

18   wrote a statement letting them -- telling Melinda and

19   April about my conversations, and that's when I wrote

20   that I would -- I'm trying to remember.  That's when I

21   wrote that I would try to let her know before I used

22   the telephone or the internet on whatever the case may

23   be about me using the phone for personal use, or

24   something like that.  I can't recall.

**A-60**

**Trafina Wilson**

1      Q.    I will get to those.  But you understood as of

2    March of 2005 that you were at the final step in the

3    disciplinary process?

4      A.    Yes, I did.

5      Q.    Now, I want you to look at this.  The first

6    paragraph says, "In reviewing the phone logs for

7    January and February 2005, it was noticed you had 15

8    long distance calls, many over ten minutes, during work

9    time, totaling six hours and 12 minutes."

10              Are those the calls that we just saw in

11    the previous exhibit?

12      A.    Yes.

13      Q.    "These calls were placed to a personal

14    residence in Swarthmore, Pennsylvania.  Although you

15    indicated that you do not recognize the phone number,

16    these calls were made numerous times during your work

17    hours from your work phone."

18      A.    Okay.

19      Q.    "Additionally, on February 21, 21 minutes and

20    32 minutes, and February 28, 2005, 54 minutes, you

21    received a personal call during working hours, which

22    totaled 107 minutes."

23              Was that true?

24      A.    That's what it says, yes.

**A-61**

**Trafina Wilson**

1      Q.    Was that true, that you got those personal

2   calls for a total of 107 minutes?

3      A.    I didn't count it up.  I'm not sure.

4      Q.    Did you receive two or three lengthy personal

5   phone calls at work on those dates?

6      A.    That's what it says, yes.

7      Q.    Do you have any knowledge or any information

8   or any evidence that would say that that's not true?

9      A.    Right now, I can't recall.

10      Q.    "On March 17th, we requested you provide a

11   written statement explaining the above calls on 2-21

12   and 2-28, by the end of the day."

13              Do you remember being asked to do that?

14      A.    Yes, I did.

15      Q.    "After requesting the statement three times,

16   we received it on 3-18-05."

17              Do you remember being asked multiple

18   times to give a statement like that?

19      A.    Uh-uh.

20      Q.    No?

21      A.    No.

22      Q.    Do you remember presenting your statement?

23      A.    March 18th?  I don't recall.  This has been

24   two years ago.  I don't remember.

**A-62**

**Trafina Wilson**

1      Q.    Do you remember slamming the door coming in,

2    presenting your statement, and walking out slamming the

3    door?

4      A.    No.

5      Q.    Is that a lie, that it didn't happen?

6      A.    I don't remember coming in, slamming the door

7    and going out slamming the door, no.

8      Q.    Do you agree that --

9      A.    I don't remember.  It may be the door might

10   have -- maybe -- I don't remember slamming the door.  I

11   mean maybe the door shut and it might have shut louder

12   than it was supposed to.  But I don't think that I

13   intentionally slammed the door.  But maybe someone else

14   perceived it like that, but.

15     Q.    Do you agree that the job you had at

16   Christiana Care in February and March of 2005 required

17   you to be on the phone contacting employers and

18   insurance companies?

19     A.    Say it again?

20     Q.    Do you agree that the job you had at the time

21   at Christiana Care required you to be on the phone

22   contacting employers and insurance companies?

23     A.    Yes.

24     Q.    And did you understand that it was expected

**A-63**

**Trafina Wilson**

1    that while you were on work time at your desk, you were

2    conducting Christiana Care business and not using

3    Christiana Care productive time for personal use?

4        A.    Yes.

5        Q.    Do you agree that the personal calls that are

6    outlined in here were excessive?

7        A.    Yes.

8        Q.    And did it cut into your productive time?

9        A.    I don't think so.

10       Q.    If you made six hours' worth of phone calls

11   while you were at work, didn't that cut into your

12   productive time?

13       A.    It did not cut into my productive time.

14       Q.    You were just as productive as if you hadn't

15   been on the phone for six hours?

16       A.    I thought so.

17       Q.    What else would you have been doing during

18   those six hours when instead you were on the phone to

19   your friend Darlene?

20       A.    We had multiple lines, so if any of my phone

21   calls -- I know I didn't miss any phone calls.

22       Q.    Weren't you supposed to be making phone calls?

23       A.    We made phone calls and we received phone

24   calls.

**A-64**

127

**Trafina Wilson**

1    explain that.  I'd ask that you please allow her to

2    explain that.

3                    MR. OSSIP:  I understand fully, Noel.

4    She's not answering my question.

5                    MR. PRIMOS:  You're trying to talk over

6    her and you don't want the explanation that she's

7    giving.

8                    MR. OSSIP:  I am perfectly happy to hear

9    whatever explanation she has.

10                   MR. PRIMOS:  Then please allow her to

11   give it.

12   BY MR. OSSIP:

13     Q.    I understand you to say that when you were

14   talking to your friend Darlene on this personal phone

15   call, if another call came into your line you would put

16   Darlene on hold and you would answer that call; right?

17     A.    Correct.

18     Q.    You would still have Darlene on hold and still

19   know that you wanted to get back to continuing your

20   conversation with Darlene; correct?

21     A.    Correct.

22     Q.    However, if you were on the phone with

23   Darlene, you could not be making another phone call at

24   the time you were talking to Darlene; correct?

**A-65**

**Trafina Wilson**

1    A.    Correct.

2    Q.    Didn't your job involve making outgoing

3    telephone calls to employers and insurance companies to

4    follow up on billing information?

5    A.    If necessary.

6    Q.    So when you are on the phone for 61 minutes to

7    Darlene on January 3rd, from 11:05 a.m. on, how could

8    you have been making phone calls?

9    A.    I wasn't making phone calls.

10    Q.    And didn't that make you less productive than

11    if you hadn't been on the phone with Darlene for 61

12    minutes?

13    A.    I'm trying to tell you, I wasn't on the

14    telephone for 61 minutes.

15    Q.    So do you think that Melinda just made this

16    up, 61 minutes and 36 seconds?

17    A.    No, I am not saying that she made it up.  I'm

18    saying that if an event -- we can put people on hold.

19    When you put somebody on hold, the meter's still

20    running, okay?  So if I was talking to Darlene and

21    Melinda came to my desk and said, Trafinna, I need you

22    to find a document, and I put Darlene on hold and I

23    went over there and found the document, the meter's

24    still running.

**Trafina Wilson**

1              If another call came in and I answered

2    that call and I put somebody on hold, the meter's still

3    running.  That's all I'm saying.  I'm not saying that I

4    was on the phone for six consecutive hours talking to

5    one person.

6        Q.    And nobody ever accused you of being on the

7    phone for six consecutive hours, did they?

8        A.    That's what I'm hearing from you that I was on

9    the phone for 61 minutes.

10       Q.    61 minutes and 36 seconds on January 3rd.

11       A.    Okay.

12              No, I don't agree with that.

13       Q.    Do you have any excuse for violating the

14   company policy?

15       A.    Do I have any excuse?

16       Q.    Yes.

17       A.    I don't have an excuse.

18       Q.    Okay.

19              MR. OSSIP:  Let's mark this as 11.

20              (Wilson-11 was marked for

21   identification.)

22   BY MR. OSSIP:

23       Q.    I have shown you a document marked Wilson-11,

24   which is DP 190.  It's a memo from you to Melinda in

**Trafina Wilson**

1    April dated March 17, 2005.

2                    I'd ask you to read it and then let me

3    know when you have read it?

4    A.    (Pause.)

5                    I wrote it.

6    Q.    I know you wrote it.  I'd like to give you an

7    opportunity to read it now before I ask you any

8    questions about it.

9    A.    You can proceed.

10   Q.    Have you read it?

11   A.    I know what it says.

12   Q.    Why did you write this?

13   A.    I wrote this because they asked me to write a

14   paper explaining my actions and where did I want to --

15   and how did I want to proceed in Christiana Care.

16   Q.    Actually, there was another letter that you

17   wrote a week later that did that.

18                    Isn't this a letter that they asked you

19   to explain these personal phone calls?  Why don't you

20   read it before you start answering questions.  Okay?

21   A.    (Pause.)

22   Q.    Have you finished?

23   A.    Uh-huh.

24   Q.    Yes?

**A-68**

**Trafina Wilson**

1      A.    Yeah.

2      Q.    Do you want to change your testimony?  This is

3  not in response to the decision making leave, is it?

4      A.    No.  This was in response to a telephone call

5  that an employee called me on my phone and I accepted

6  the call.

7      Q.    Who was the employee?

8      A.    The employee's name was -- I can't remember

9  her name.

10     Q.    Was it a work-related call or a personal call?

11     A.    I don't know.

12     Q.    This says, "Melinda said one day last month I

13  returned a call or called a co-worker's home."

14            So from that should we assume it was not

15  a work-related call if it was a call to or from her

16  home?

17     A.    She must have called me and I called her back

18  or something.

19     Q.    If that's what happened, would it have had

20  anything to do with work?

21     A.    Possibly, because she's a co-worker.

22     Q.    And you can't remember the person's name and

23  you can't remember what you talked about?

24     A.    Her name was -- I haven't talked to her since

**Trafina Wilson**

1    I left Christiana Care.

2                    I can see her face, but I can't remember

3    her name.

4    Q.    What job did she have?

5    A.    She worked for another person there.  I can't

6    remember her name.

7                    She was in -- I can't remember names.

8    Sarah.  Her name was Sarah.

9    Q.    Where did she work?

10   A.    Sarah worked for -- Sarah worked for -- I

11   can't think of her name.

12   Q.    If you think of it, let us know.  Can you

13   recall any work-related reason why you would have had

14   to talk to her from her house?

15   A.    She called, I believe she called first and

16   left a message and I returned her call.  I don't

17   remember why she called.

18                    MR. OSSIP:  12.

19                    (Wilson-12 was marked for

20   identification.)

21   BY MR. OSSIP:

22   Q.    I have shown you Exhibit 12, which is DP 5.

23   It's a memo from you to Melinda, copy to April, dated

24   March 23, 2005.

**A-70**

Trafina Wilson

1        A.    (Pause.)

2        Q.    Do you remember writing this?

3        A.    Yes.

4        Q.    Why did you do it?

5        A.    I was asked to write a -- I was asked to write

6    it.

7        Q.    By whom?

8        A.    By Melinda and April.

9        Q.    For what purpose?

10       A.    For the purpose of me keeping my job.

11       Q.    What is a decision making leave at Christiana

12   Care?

13       A.    It's a decision that either -- well, the way

14   they explained it to me was this was a decision making

15   leave saying whether or not I wanted to continue my

16   employment with Christiana Care or I wanted to

17   terminate my employment and go somewhere else.

18       Q.    And in writing this, were you indicating that

19   you wanted to remain employed?

20       A.    Yes.

21       Q.    And were you taking personal responsibility

22   for your violations of Christiana Care policy?

23       A.    Yes.

24       Q.    And did you believe that?

A-71

**Trafina Wilson**

1      A.    I did.

2      Q.    Were you sincere?

3      A.    I was.

4      Q.    When did your father pass away, Ms. Wilson?

5      A.    My father passed away February.

6      Q.    Of what year?

7      A.    Well, actually, he died the end of January and

8    we had his funeral the beginning of February of 2005.

9      Q.    Did you take some time off --

10     A.    No.

11     Q.    -- at that time?

12     A.    You know three days, or whatever.

13     Q.    The bereavement days?

14     A.    Yes.

15     Q.    The statement in here that says, "I understand

16    the issues, the serious violation and the disciplinary

17    action given.  I take full responsibility for my

18    actions and," it says, "except" -- E-X-C-E-P-T, which I

19    think probably should be spelled accept,

20    A-C-C-E-P-T -- "the consequences set forth."

21              Did you write that?

22     A.    I did.

23     Q.    And did you mean it?

24     A.    I typed it, yes.

**A-72**

**Trafina Wilson**

1      Q.    Then you said, "I am requesting to remain in

2    my present position and apart of the health initiative

3    team.  I will not make any personal calls unless I

4    notify my supervisor first.  My supervisor will be

5    notified whenever I am away from my desk and for an

6    extended period of time."

7      A.    Yes.

8      Q.    Did you mean that?

9      A.    Yes.

10     Q.    Did you intend to comply with that?

11     A.    Yes.

12     Q.    Did you comply with that?

13     A.    Yes.

14     Q.    In all respects?

15     A.    I felt so.

16     Q.    Didn't you continue to make personal telephone

17    calls in April and May and then throughout the summer

18    of 2005?

19     A.    My telephone calls that I made, like I said

20    before, I had notified Melinda on occasions that I

21    needed to make personal telephone calls, and at other

22    times I told -- at other times Melinda wasn't

23    available.  If a call came in and Melinda wasn't

24    available and I took the call and I wasn't going to run

**Trafina Wilson**

1    around -- she smoked, so therefore I wasn't going to go

2    outside and try to find her and let her know that I

3    have a personal call.  I just took the call.

4         Q.    And didn't you make personal calls?

5         A.    Yes, I did make a personal call.

6         Q.    A personal call?

7         A.    I made a couple, within -- it wasn't

8    consecutive, but, yes, I did.

9         Q.    Approximately how many personal calls do you

10   believe you made in July and August of 2005?

11        A.    I can't remember.

12        Q.    Was it only one or two?

13        A.    I'm not going -- I cannot say.

14        Q.    Have you looked at the telephone logs that

15   have been produced in connection with this lawsuit?

16        A.    Not recently.

17        Q.    At any time have you looked at those logs?

18        A.    Yes, I did.

19        Q.    And based on that, have you made a

20   determination as to how many personal calls or

21   approximately how many personal calls you made?

22        A.    I can't recall.

23        Q.    It was more than one or two, though, wasn't

24   it?

**A-74**

**Trafina Wilson**

1     A.     Yes.

2     Q.     And weren't you asked to make a statement in

3     August of 2005 about your personal phone calls and

4     internet usage?

5              Do you remember that?

6     A.     No.

7              In August of 2005?

8              MR. OSSIP:  13.

9              (Wilson-13 was marked for

10    identification.)

11    BY MR. OSSIP:

12    Q.     I have shown you Exhibit 13, which is a memo

13    you sent to Larry Bryson on August 15th, 2005,

14    Subject:  Statements, DP 322.

15             Do you recall this?

16    A.     Yes.

17    Q.     Do you remember writing this?

18    A.     Yes.

19    Q.     And what was the purpose of your writing this?

20    A.     The purpose of me writing this was, this was,

21    the way I feel about it is, the purpose of me writing

22    this is so that they can have a log for termination.

23    Q.     Who asked you to write this?

24    A.     Melinda.

**Trafina Wilson**

1       Q.    When was that?

2       A.    It must have been on the 15th.

3       Q.    Do you remember having a meeting with Melinda

4    and Joseph Richici?

5       A.    I do.

6       Q.    What happened at that meeting?

7       A.    I'm getting things confused.

8             I think what happened at this meeting is

9    Melinda had asked -- Melinda had asked me to meet with

10   them, I guess she had pulled telephone logs because I

11   wouldn't comply with her changing my job from one

12   person to another, from me moving over to the other

13   lady's position.

14            So they wanted to find something to

15   terminate my position, so therefore she pulled

16   telephone logs and internet logs, I guess.

17      Q.    I don't want you to guess.

18      A.    Well, that's what happened.

19      Q.    Now, you had been aware of the hospital policy

20   against personal phone calls and personal internet

21   usage for several years at this point; correct?

22      A.    Yes.

23      Q.    You had been in meetings where this policy was

24   discussed; correct?

**A-76**

**Trafina Wilson**

1      A.    (Witness nods.)

2      Q.    You have to say yes or no.

3      A.    Yes.

4      Q.    You had, in fact, been counseled and warned

5    against personal telephone calls and internet usage;

6    correct?

7      A.    Yes.

8      Q.    You had been placed on a decision making

9    leave, which is the final step in the disciplinary

10   process, for excessive personal telephone calls;

11   correct?

12     A.    Yes.

13     Q.    And yet you continued to make personal

14   telephone calls; right?

15     A.    Yes.

16     Q.    You continued to intentionally violate the

17   policy; correct?

18     A.    To me it was inevitable.

19     Q.    It was what?

20     A.    To me it was unavoidable.

21     Q.    Your making personal telephone calls was

22   unavoidable?

23     A.    Yes.

24     Q.    Why do you say that?

**Trafina Wilson**

1     A.     It was unavoidable for me to make personal

2     phone calls and for me to receive personal phone calls.

3     My job was to answer telephones.  If someone called me

4     and I needed to get back with them -- at the same time

5     that this occurred, I was purchasing a house, and my

6     lawyer called.  I needed to call them back, I would

7     call them back.

8                 If when the new insurance company needed

9     to verify things, I needed to call them back.

10                There were personal -- you know, there

11     were things that I needed to use the telephone for.

12     Q.     Did you have a lunch break at this time?

13     A.     Yes, we had lunch breaks.

14     Q.     How long was your lunch break?

15     A.     A half an hour.

16     Q.     Could you make personal telephone calls during

17     your lunch break?

18     A.     Yes, you could, I guess.

19     Q.     Did you get other breaks during the course of

20     the day?

21     A.     I'm not going to -- no.

22     Q.     You had no other breaks that you were

23     permitted to --

24     A.     I never took them.

**A-78**

**Trafina Wilson**

1    Q.    Could you have taken a break?

2    A.    You know what?  I need to say no.

3    Q.    If a personal friend of yours called you while

4    you were working, is there anything that prohibited you

5    from telling them, I can't talk right now, I'll call

6    you later?

7    A.    No.

8    Q.    Was there a reason that you would have had to

9    talk to Jamie Ross or other personal friends of yours

10   for 15, 20, 25 minutes at a time?

11   A.    At the time, I needed to talk to them.

12   Q.    Why did you need to talk to them?

13   A.    Well, that was my fiance at the time, and we

14   were buying a house, and so therefore I needed to talk

15   to him.

16   Q.    Jamie Ross was your fiance?

17   A.    Yes.

18   Q.    And did you need to talk to him during working

19   hours when you were being paid by Christiana Care to

20   make telephone calls?

21   A.    He called and I would talk to him, just like

22   everybody else, you know.  I'm not going to go there.

23          Yes, sir.

24   Q.    You needed to talk to him whenever he called

**A-79**

**Trafina Wilson**

1    you no matter what else you were doing?

2        A.    I talked to him.  I took the call, yes, I took

3    the call.

4        Q.    On this Exhibit 13, you state, "I am aware of

5    Christiana Care policy for personal calls and

6    non-business internet use."

7        A.    I was aware of it.

8        Q.    "I have made non-business calls," and that was

9    true?

10       A.    Yes, I did.

11       Q.    "A few calls were very important to my

12   personal living (i.e. housing/finances)."

13       A.    Correct.

14              MR. OSSIP:  14.

15              (Wilson-14 was marked for

16   identification.)

17   BY MR. OSSIP:

18       Q.    I have shown you Exhibit 14, which is DP 1524

19   to 1532.

20              Have you ever seen this before?

21       A.    Yes.

22       Q.    Was this presented to you some time in August

23   of 2005?

24       A.    Yes.

**A-80**

**Trafina Wilson**

1    Q.    Is this a report of telephone calls made to or

2    from your station?

3    A.    Yes.

4    Q.    And whose handwriting is on here on like the

5    first page and the second page and a few of the other

6    pages?

7    A.    On the first page it's my handwriting.

8    Q.    What does that say, Birch?

9    A.    "Bunch & Associates."

10    Q.    Who was that?

11    A.    That was one of my collectors, that was one of

12    my insurance companies.

13    Q.    So that was a legitimate call.

14          Calls to Travelocity, would that have

15    been job-related?

16    A.    No, they were not.

17    Q.    So the calls that were made on July 19th and

18    20th to Travelocity, those were personal calls?

19    A.    Yes, they were.

20    Q.    The call to John Gangi, attorney, was that a

21    personal call?

22    A.    Yes, it was.

23    Q.    The call to New Century Mortgage, was that a

24    personal call?

**A-81**

**Trafina Wilson**

1      A.    Yes, it was.

2      Q.    Who is A. Cuff?

3      A.    A. Cuff.  That's my daughter.

4      Q.    So calls from your daughter, those would have

5  been personal?

6      A.    Yes.

7      Q.    Calls from Jamie Ross, that was your fiance?

8      A.    Yes.

9      Q.    Suzanne Mohammed, who is she?

10     A.    Actually, that was my minister.

11     Q.    So that was a personal call?

12     A.    That was.

13     Q.    And the handwriting on the next page that

14  says "New Century Mortgage."

15     A.    It must have been Melinda's.

16     Q.    That's not your handwriting?

17     A.    No, it is not.

18     Q.    The rest of the handwriting, that says Jamie

19  Ross?

20     A.    Melinda's.

21     Q.    So do you recognize that these calls list a

22  certain number of personal calls, either made to you or

23  made from your number at work during this period of

24  time?

**A-82**

**Trafina Wilson**

1     A.     Yes.

2     Q.     Any reason for you to believe that this list

3     is inaccurate in reflecting the number of personal

4     calls either made to or from your call number at work?

5     A.     It looks like it's accurate.

6     Q.     You also continued to use the internet for

7     personal use during work time during the summer of

8     2005; is that right?  Is that right?

9     A.     I'm not sure.  You might want to show me.

10    Q.     Is it your testimony that you did not use the

11    internet for personal use at all in July of 2005 or

12    August of 2005?

13    A.     I don't remember.

14    Q.     Are you familiar with a website

15    called "myhealthwealthandhappiness.com"?

16    A.     Well, health, wealth and happiness?

17           I'm not really sure.

18    Q.     Do you know of any reason why you would have

19    had to go to that website for purposes of doing your

20    job?

21    A.     No.

22           MR. OSSIP:  15.

23           (Wilson-15 was marked for

24    identification.)

**A-83**

**Trafina Wilson**

1     MR. OSSIP:  Off the record.

2     (A discussion was held off the record.)

3  BY MR. OSSIP:

4  Q. These are Pages DP 1534 through 1549, which

5  appear to be an e-mail that was sent to you on Friday,

6  May 13th, at 1:06 p.m. to T. Cuff at christianacare.org

7  from somebody at myhealthwealthandhappiness.com, and it

8  looks like it is six pages.  The first six pages are

9  that document.

10     And then there are some pages printed out

11  from Yahoo Health.  That's four pages.

12     Then there's some Artisans Bank pages,

13  two of those.  And then there's five more pages or four

14  more pages from My Health, Wealth and Happiness.

15     So let's look at each of these.

16     Do you recognize the first six pages of

17  this, the e-mail from Rochelle Gordon to T. Cuff at

18  christianacare.org?

19  A. Yes, I do.

20  Q. What is it?

21  A. It's an e-mail from Rochelle Gordon from

22  Health, Wealth and Happiness where I printed out

23  documentation that she sent me.

24  Q. And you had previously gone to this website,

**A-84**

**Trafina Wilson**

```
1    hadn't you?

2        A.    I must have went to her website, yes.

3        Q.    And you had gone to that website during

4    working hours?

5        A.    That's how I printed it out, yes.

6        Q.    And before that, you had gone to her website

7    during working hours; correct?

8        A.    I would read what she sent, yes.

9        Q.    But how did she know to send you stuff?

10       A.    Because evidently I must have responded to

11   something that she had -- I must have responded to a

12   horoscope or something, and that's how she got in touch

13   with me.

14       Q.    Look at Page 1546 toward the back of this

15   exhibit, which is another e-mail from her earlier in

16   the day, May 13th, 7:05 a.m.

17             Do you see the first paragraph that

18   says, "Trafinna, because you were born on February 16,

19   1959, a Monday."

20       A.    Yes.

21       Q.    Do you know how she got that information?

22       A.    Like I said, I must have responded to

23   something that she had sent me and she got that, and I

24   must have put in that information.
```

**A-85**

**Trafina Wilson**

1          It was -- yes.

2      Q.    So any hits that you had or any visits to my

3    healthwealthandhappiness.com would not have been

4    job-related; correct?

5      A.    That's correct.

6      Q.    Do you recognize the pages printed out from

7    Yahoo Health on the lumbar spine?

8      A.    Yes.

9      Q.    And what was that?

10     A.    Lumbar spine.  Evidently one of my clients --

11    I mean one of the people that we were serving needed to

12    know more information about the lumbar spine, so I

13    looked it up on the internet, which was my job, and I

14    printed it out and used it.

15     Q.    So this printout and your access to Yahoo

16    Health would have been job related?

17     A.    Yes.

18     Q.    How about the Artisans Bank transaction

19    sheets, do you recognize those, the next two pages?

20     A.    Sure, I do.  Evidently I printed it out

21    because it was checking my account.

22     Q.    To check your account, you have to go to the

23    Artisans Bank website?

24     A.    Yes, sir.

**Trafina Wilson**

1      Q.     And you did that during working time --

2      A.     Yes, sir.

3      Q.     -- from your Christiana Care computer?

4      A.     Yes, sir.

5      Q.     And you did that knowing that that was a

6      violation of Christiana Care policy; correct?

7      A.     Correct.

8      Q.     Is there any particular reason why you had to

9      go to the Artisans Bank website during working hours?

10     A.     Maybe I wanted to spend some money after work.

11     Q.     Is there any reason why you couldn't have done

12     that after your shift was over?  Is that a no?  No

13     reason why you couldn't have done that after work?

14     A.     After work I don't think it would have made a

15     difference.

16     Q.     What do you mean?

17     A.     It wouldn't have made a difference if I had

18     done it after work or during work.  It was still --

19     it's still the company's computer.

20     Q.     Is there any reason why you couldn't have done

21     this from your home computer at home?

22     A.     Maybe I didn't have one at the time.  I don't

23     remember.

24     Q.     Don't guess here and don't start making things

**A-87**

**Trafina Wilson**

1    your employment?

2        A.    When they asked me to come to Joe's office,

3    they told me that they were terminating my employment.

4        Q.    Did they tell you why?

5        A.    On the grounds of idleness.

6        Q.    And idleness, meaning excessive telephone use,

7    personal phone use and personal internet use?

8        A.    Yes.

9        Q.    And in fact you had been guilty of those

10   offenses, had you not?

11       A.    According to them.

12       Q.    Just looking at the records that we have seen,

13   you continued to make personal telephone calls and

14   continued to use the internet even though you had been

15   told not to; correct?

16       A.    Yes.

17       Q.    Why do you believe you were fired?

18       A.    I believe that I was fired because I would not

19   cooperate with Melinda and April's requests to change

20   my job from one -- from occupational health to

21   physician billing.

22       Q.    Why do you believe your telling Melinda and

23   April that you didn't want to do that led to your

24   termination?

**A-88**

**Trafina Wilson**

```
1    yes.

2        Q.    Who else in the department, in your view, was

3    engaged in excessive telephone or internet usage?

4        A.    Everybody.

5        Q.    Give me the names.

6        A.    Melinda Fitzgerald.  Jennifer Hisey.  Donna

7    Dever.  Stacie Lovett.

8                    They were the people that Melinda

9    reported to.

10       Q.    Who reported to Melinda?

11       A.    Yes, who reported to Melinda.

12       Q.    Is it your belief that Melinda, Jennifer,

13   Donna and Stacie all engaged in personal telephone and

14   internet usage to the same extent that you did?

15       A.    I don't know.  I can't say that they engaged

16   to the same extent that I did, but I know that we all

17   had personal calls.  We all talked personally on the

18   telephone.  We all sent e-mails and viewed e-mails and

19   made travel arrangements and everything else, yes.

20       Q.    But you don't know whether they did so to the

21   same extent that you did?

22       A.    I have no idea.

23       Q.    Do you know whether any of those individuals

24   has ever been disciplined or counseled for violating
```

**A-89**

**Trafina Wilson**

1    the Christiana Care policy on internet usage and phone

2    usage?

3        A.    To the extent that I have, I'm not aware of.

4        Q.    Melinda, Jennifer and Donna are Caucasian and

5    Stacie is African-American?

6        A.    Yes, Stacie is.

7        Q.    Do you believe that Stacie was treated better

8    than you were?

9        A.    I don't know.  I can't say I believe that she

10   was treated better than me.  I don't know how they

11   treated -- we never talked about it.  I don't know how

12   they treated her.

13       Q.    You believe that you were fired in August of

14   2005 by Melinda and April because you wouldn't

15   cooperate with them about changing positions?

16       A.    Yes.

17       Q.    Do you have an explanation for why you were

18   given a first step reminder, a second step reminder,

19   and a decision making leave before you told them that

20   you wouldn't cooperate with them?

21       A.    No.

22       Q.    Do you remember --

23       A.    I --

24       Q.    Go ahead.  Do you want to say something?

**A-90**

**Trafina Wilson**

1    find out if it was something that could be done.  I

2    mean if that was -- if it was correct.  If it was

3    something that they could do.

4        Q.    Okay, I understand that.

5              You spoke to Mr. Bryson about that?

6        A.    I did.

7        Q.    And Larry told you that he didn't think that

8    that was appropriate; is that right?

9        A.    Yes.

10       Q.    And to your knowledge, did he tell Melinda and

11   April that as well?

12       A.    Yes.

13       Q.    At any point, did you tell Mr. Bryson that you

14   thought that this idea of a job swap was being proposed

15   because of your race?

16       A.    No.

17       Q.    Earlier you referred to an August 16th

18   discussion.  Do you remember there being a meeting on

19   August 16th with Melinda and April about this?

20       A.    About --

21       Q.    About this job swap issue?

22       A.    August 16th?  I don't remember what day that

23   was.

24              August 16th?

**A-91**

**Trafina Wilson**

1      Q.    Well, you mentioned it earlier.  I will mark

2      the next exhibit and then maybe that will help us.

3                    MR. OSSIP:  17.

4                    (Wilson-17 was marked for

5      identification.)

6      BY MR. OSSIP:

7      Q.    Let me show you what has been marked as

8      Exhibit 17, which is Bates stamped DP 316, which is an

9      e-mail you sent to Larry Bryson on August 9th,

10     subject "supposedly cross-train."

11                   Let me know when you have read that?

12     A.    (Pause.)

13     Q.    Do you recall this?

14     A.    Uh-huh.

15     Q.    Yes?

16     A.    Yes.

17     Q.    What was your reason for sending this to

18     Larry?

19     A.    Because I was giving him information on what's

20     going on in the department that I wasn't -- that I was

21     concerned about.

22     Q.    Did you have a meeting with Larry to discuss

23     this?

24     A.    I did.

**A-92**

**Trafina Wilson**

1       Q.    Tell me as best you can recall what took place

2    at that meeting?

3       A.    Well, I went to see Larry.  This actually was

4    like a briefing, you know, a little brief description

5    on my concerns.  And he asked me some other questions.

6       Q.    Do you know if he was familiar with your

7    disciplinary record?

8       A.    No.

9       Q.    Do you remember if he asked you any questions

10   about your disciplinary record?

11      A.    I'm not sure that he did.

12      Q.    How long did the meeting last?

13      A.    It lasted for about, I guess about -- I guess

14   about 30 minutes or so.

15      Q.    And I think you said earlier this is the first

16   time you ever dealt with Larry?

17      A.    Yes.

18      Q.    And did you find him to be fair and reasonable

19   in dealing with your concerns?

20      A.    At that time I did.

21      Q.    At any time since, have you thought that he

22   was unfair or unreasonable?

23      A.    Just after everything happened, I couldn't

24   understand why he changed his opinion and changed his

**A-93**

**Trafina Wilson**

1       Q.      Do you recall that?

2       A.      Yes, you did.

3                       MR. OSSIP:  18.

4                       (Wilson-18 was marked for

5       identification.)

6       BY MR. OSSIP:

7       Q.      I have shown you a two-page document, which is

8       your problem solving procedure appeal form, and it is

9       DP 580 to 581.

10                      I will ask you to read through that.

11      A.      (Pause.)

12                      Okay.

13      Q.      Do you recall this?  In other words, do you

14      recall preparing this?

15      A.      Oh, yes.

16      Q.      Is this all in your handwriting?

17      A.      Yes, it is.

18      Q.      Does this accurately set forth the nature of

19      your complaint regarding your termination?

20      A.      Yes.

21      Q.      What was the next step in this process?

22      A.      What was the next step after that?

23      Q.      Yes.

24      A.      We went through a peer review board.

**A-94**

**Trafina Wilson**

1     Q.    How was the peer review board selected?

2     A.    I picked six or seven -- well, we went through

3    about 12 or 13 people, names of possible candidates

4    that would sit on the board that I did not know, just

5    people that are on their selection committee.  And I

6    was asked to pick names, and they notified the people

7    to try to coordinate a date and a time to sit on the

8    review board.

9     Q.    Are you saying you didn't know the names of

10   the people?

11    A.    I did not know any of them, no.

12    Q.    So how did you select them?

13    A.    It was names that they had on the piece of

14   paper that he gave me, and so that was it.

15    Q.    Who is "he," who are you working with?

16    A.    Larry Bryson.

17    Q.    And do you remember participating in the peer

18   review panel?

19    A.    I remember coming to the peer review panel and

20   stating the same thing that I wrote on paper, and

21   explaining to the peer review panel my version of how

22   we all led up to this point.  And that was it.  And the

23   peer review panel made a decision, which I was not a

24   part of, and I got a letter in the mail stating the

**Trafina Wilson**

1    review panel's decision.

2         Q.    And what was that decision?

3         A.    The decision -- well, the decision in the

4    beginning was whether or not I should return to work,

5    and the decision was denied.

6                        MR. OSSIP:  19.

7                        (Wilson-19 was marked for

8    identification.)

9    BY MR. OSSIP:

10         Q.    Do you feel you received a fair opportunity to

11    present your case to the peer review panel?

12         A.    I felt that it was one-sided.  The peer review

13    panel was not able to -- they ask questions about what

14    happened and how things occurred, and that was it.

15         Q.    Why do you say you feel it was one-sided?

16         A.    Because I just told what happened in my case

17    or the way I presented myself.  I just, you know, told

18    them what I wanted -- you know, what I felt as though

19    was going on.

20                        And then they, I guess, took their own

21    consumptions and collectively made a decision.  I don't

22    know.

23         Q.    Do you know who else testified or presented

24    information to the panel?

**A-96**

**Trafina Wilson**

1      A.    No.

2      Q.    Was there a human resources facilitator that

3    worked with the panel?  For example, Carla, you

4    mentioned Carla Devose before.  Do you know whether she

5    was involved, do you remember her being at the meeting?

6      A.    Maybe.  I'm not sure.  I just know it was --

7    like I said, I don't know Carla either, so.

8      Q.    Do you have an understanding that the panel

9    that heard your case consisted of three non-managers

10   and two managers?

11     A.    I just know that they told me that it was

12   people of my peers.

13     Q.    And was it your understanding that the panel

14   had the authority to overturn the termination?

15     A.    Yes.

16     Q.    I have shown you Exhibit 19, which is a letter

17   from the, quote, peer review panel to you dated

18   September 22, 2005, DP 1562.

19           Do you recall receiving that?

20     A.    Yes.

21     Q.    And that's the result of the peer review

22   panel?

23     A.    Yes.

24     Q.    Now, after your employment with Christiana was

**Trafina Wilson**

1    Q.    I think he was with you on appeal?

2              MR. PRIMOS:  One time.

3              THE WITNESS:  One time.

4    BY MR. OSSIP:

5    Q.    And then there was a Mr. Gerber?

6    A.    Yes.

7    Q.    So both times, though, you had a hearing?

8    A.    Yes, I did.

9              MR. OSSIP:  Let's mark this as 20.

10              (Wilson-20 was marked for

11    identification.)

12    BY MR. OSSIP:

13    Q.    I am not going to ask you to read everything

14    here, but are you familiar generally with this

15    referee's decision?

16    A.    I read it, yes.

17    Q.    I want you to look at the last page of this,

18    Page 5.  The paragraph that begins, "the claimant

19    received."

20              I want to read you some of this and then

21    ask you whether you agree or disagree.

22              "The claimant received numerous warnings

23    during her employment at Christiana Care for both

24    tardiness and idleness."

**A-98**

**Trafina Wilson**

1              Is that a true statement?

2      A.    Yes, it was.

3      Q.    "The claimant" -- and the claimant is you --

4   "received a final warning for excessive personal

5   telephone time."

6              Is that a true statement?

7      A.    Yes.

8      Q.    "The claimant disregarded the employer's final

9   warning and continued to use company time to conduct

10  personal business."

11     A.    Yes.

12     Q.    Is that true?

13     A.    Yes.

14     Q.    "It is understood that other employees were

15  discovered making personal phone calls as well, but

16  these employees were not on final warning, as was the

17  claimant."

18     A.    That's true.

19     Q.    "The bottom line is that the claimant was

20  warned that personal telephone usage was not permitted,

21  and the claimant ignored the warning and continued to

22  use company time and resources to conduct her personal

23  business."

24              Is that a true statement?

**A-99**

**Trafina Wilson**

1       A.      Yes.

2       Q.      "The claimant acknowledged that she had breaks

3   throughout the day when she could have appropriately

4   made her personal phone calls without violating company

5   policy."

6                       Is that a true statement?

7       A.      Yes.

8       Q.      "The claimant acted in disregard of her

9   employer's legitimate interests."

10                      Do you agree with that?

11      A.      I have some reservations about it.

12      Q.      What kinds of reservations?

13      A.      I didn't do anything maliciously, but if I

14  needed to use the telephone or if I needed to use

15  something, I did.  I mean everybody else did also, so.

16  I mean I know this is not a case of everyone else, but

17  I don't feel that I did anything that no one else was

18  doing.

19      Q.      Was anybody else on a final warning, though,

20  like you?

21      A.      Like I said before, I am unaware of that.  I

22  don't know.

23                      I mean that's not something that people

24  run around and say, tell everybody.

**A-100**

171

**Trafina Wilson**

1    Q.    No.  But you sat through the hearings and

2    heard the evidence that was presented about other

3    employees who may or may not have been using the

4    telephone and the internet; right?

5    A.    No.

6    Q.    Wasn't there testimony presented at these

7    hearings about the internet usage or telephone usage by

8    other people?

9    A.    Hearings where?  When?

10   Q.    The Unemployment Compensation.

11   A.    Oh, after the fact?

12   Q.    Yes, after the fact.

13   A.    I mean they did say that some people were

14   warned and some people were reprimanded, you know, for

15   their telephone use also.

16   Q.    Reprimanded?

17   A.    Yes.

18   Q.    But to your knowledge, nobody else was on

19   final warning?

20   A.    That never came out.

21   Q.    Have you spoken to anybody, other than your

22   lawyer, about this lawsuit?

23   A.    Yes.

24   Q.    Who else have you spoken to about the lawsuit?

**A-101**

**Trafina Wilson**

1      Q.    Have you sought any -- I'm sorry, you weren't

2    finished.

3      A.    It's stressful.  It's stressful trying to find

4    a job.  It's stressful trying to get, trying to make my

5    mortgage payment that I used to be able to make

6    comfortably and now I'm not able to do that.  So now --

7    and then I have to rely on, you know, I ask people to

8    help me and sometimes they can, sometimes they can't.

9      Q.    Financial help?

10      A.    Yes.

11      Q.    Who have you gotten financial help from?

12      A.    My sisters, my sister, my son.  My daughter.

13    My mother.

14      Q.    Have you sought any psychological or

15    psychiatric counseling or treatment?

16      A.    I have no money.

17      Q.    Is the answer no?

18      A.    That's correct.

19      Q.    How about a pastor or a minister, have you

20    sought counseling --

21      A.    I never disclosed that information to my

22    pastor.

23      Q.    Okay, I understand.

24               Do you feel personally, Ms. Wilson, that

**A-102**

**Trafina Wilson**

1    you bear any personal responsibility for what happened

2    to you at Christiana Care for losing your job?

3        A.    I do.  I do take -- I do think that there are

4    some things that I could have changed that I would not

5    do today in any job that I go into.  I don't use their

6    computer at all.

7        Q.    Anything else that you would do differently

8    today?

9        A.    Like I said, with the internet, I don't get on

10   the internet, I don't use their computer.  I don't talk

11   on their phone.  I have a cell phone.  I use my own

12   cell phone.  I don't do any of that.

13       Q.    Have you spoken with any of your co-workers,

14   any of the other women who worked in the billing

15   department or any of the people who reported to Melinda

16   about this lawsuit?

17       A.    No.

18            MR. OSSIP:  Let me just take a couple of

19   minutes with Carry.  We may be done.

20            (Recess.)

21   BY MR. OSSIP:

22       Q.    For what period of time were you also an Avon

23   salesperson?

24       A.    For what period of time?  I would say about a

Wilson v. Christiana Care Health Systems, Inc.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TRAFINNA WILSON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. |
| | ) | 06-CV-00705 MPT |
| CHRISTIANA CARE HEALTH | ) | |
| SERVICES, INC., | ) | |
| Defendant. | ) | |

Deposition of MELINDA FITZGERALD, taken
before Cheryl A. Anthony, Court Reporter, in the offices
of Schmittinger & Rodriguez, Odessa Professional Park,
Odessa, Delaware, on Tuesday, November 20, 2007,
beginning at 10:00 a.m.

APPEARANCES:

 SCHMITTINGER & RODRIGUEZ
 BY:  WILLIAM D. FLETCHER, JR., ESQUIRE
 and NOEL E. PRIMOS, ESQUIRE
 414 South State Street
 Dover, Delaware  19901
 Attorneys for Plaintiffs.

 MORGAN, LEWIS & BOCKIUS
 BY:  MICHAEL J. OSSIP, ESQUIRE
 1701 Market Street
 Philadelphia, Pennsylvania  19103-2921
 Attorney for Defendant.

ALSO PRESENT:

 MS. KERRY DELGADO,
 Christiana Care.

ORIGINAL RETAINED BY NOEL E. PRIMOS, ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware  19903
(302)674-8884

Wilson v. Christiana Care Health Systems, Inc.

10

1    Q.    But not regularly?

2    A.    No.

3    Q.    And then Ms. Wilson did not have occasion to

4  use it in her work?

5    A.    No.

6    Q.    Okay.  Now, as far as the titles of the

7  positions, you indicated that both Ms. Lovett and

8  Ms. Wilson were called follow-up.  Now, can you explain

9  why Ms. Lovett would have had to use the internet with

10  her work, but Ms. Wilson would not, if they had the same

11  title to their position?

12    A.    Stacie did follow up for Blue Cross, Aetna,

13  Coventry, your main, major carriers.  They are online.

14  You can check claim status, checks, denials.  Trafinna

15  Wilson did workman's comp and employers.  Workman's comp

16  is not online.  And employers, you have to call.

17    Q.    When did you begin supervising Ms. Wilson?

18    A.    I believe it was '02.

19    Q.    Do you remember what month?

20    A.    Not the exact month; I wouldn't -- I can go

21  back and look, but not the exact month.

22    Q.    What was the name of your department when

23  Ms. Wilson came to it?

24    A.    It was Occupational Health, through Health

Wilson v. Christiana Care Health Systems, Inc.

11

1    Initiatives.

2         Q.    Health Initiatives, is that the name of a

3    company?

4         A.    Our division.

5         Q.    Oh, your division?

6         A.    Correct.

7         Q.    Your division was Health Initiatives?

8         A.    Correct.

9         Q.    And your department was Occupational Health?

10        A.    Correct.

11        Q.    What was her title when she first started in

12   '02?

13        A.    She was a billing rep through charge entry.

14        Q.    What do you mean through charge entry?

15        A.    That was her job description at that time.

16        Q.    But I'm trying to just understand what that

17   term is, billing rep through charge entry.

18        A.    Every person in our division is a billing

19   representative slash what their role is.  It could be

20   follow-up.  It could be charge entry.  It could be a

21   cash poster.  At that particular time when she was

22   hired, she was charge entry.

23        Q.    So when she was hired, she did the same

24   function that Terri Eastburn and Ms. Biddle did at the

Anthony Reporting    PO Box 234, Dover, DE    19903    (302)674-8884

**A-106**

Wilson v. Christiana Care Health Systems, Inc.

12

1    time that Ms. Wilson was terminated?

2        A.    Correct.

3        Q.    So in other words, when Trafinna started in

4    your department, she had the same position that Terri

5    Eastburn and Ms. Biddle had when Trafinna was

6    terminated?

7        A.    Correct.

8        Q.    For that period of time that Ms. Wilson was

9    in your department, '02 to '05, you supervised her

10   during that entire time?

11       A.    Correct.

12       Q.    Now, at the time that she was terminated, at

13   the time Ms. Wilson was terminated, your supervisor was

14   April Habich or Habich?

15            (Following a discussion off the record:)

16            THE WITNESS:  It's my manager, April Habich.

17            MR. OSSIP:  H-A-B-I-C-H.

18            MR. PRIMOS:  Okay.  Thank you.

19            (Following a discussion off the record:)

20   BY MR. PRIMOS:

21       Q.    So was Ms. Habich your supervisor during the

22   entire time that Ms. Wilson was in the department?

23       A.    Correct, manager; she's the manager, yes.

24       Q.    But she was your immediate supervisor?

Wilson v. Christiana Care Health Systems, Inc.

13

1      A.    Right.

2      Q.    Now, was Ms. Habich the manager of Health

3  Initiatives during that time?

4      A.    No.  Joe Richichi, he was the director.

5            MR. OSSIP:  R-I-C-H-I --

6            THE WITNESS:  C-H-I.

7  BY MR. PRIMOS:

8      Q.    What was Ms. Habich the manager of?

9      A.    The billing department.

10     Q.    Which would include other areas besides

11 Occupational Health?

12     A.    Yes.

13     Q.    How many other areas besides Occupational

14 Health were included in her purview or her area?

15     A.    I believe there were approximately four or

16 five.  Some had come; some had gone, moved.

17     Q.    How would you describe Ms. Wilson's

18 performance as an employee?

19           MR. OSSIP:  Overall?

20           MR. PRIMOS:  Overall.

21           THE WITNESS:  Overall she did her job when

22 she was at her high peak, with extreme direction.  I

23 mean she did do what she was supposed to do.

24

Anthony Reporting    PO Box 234, Dover, DE    19903      (302)674-8884

**A-108**

Wilson v. Christiana Care Health Systems, Inc.

14

1    BY MR. PRIMOS:

2        Q.    She did what she was supposed to do?

3        A.    Mainly, yes.

4        Q.    What do you mean when she was at her high

5    peak?

6        A.    I think when she was motivated; I don't know

7    what other word I can use for that, when she was

8    motivated to do her job.

9        Q.    Was she motivated most of the time?

10       A.    There was peaks and valleys, I guess you

11   could say.  There were times when she was very

12   motivated, and there were times that she wasn't.

13       Q.    Would these be periods of time as in weeks

14   or months when she would be motivated or not motivated,

15   or would it be shorter periods of time?

16       A.    I can't put an exact timeline.  I would say

17   it could be weeks, you know.  It depends.

18       Q.    In other words, were there certain periods

19   of time in her employment when you would say, as a

20   supervisor, she's really struggling or she's really

21   having problems?

22       A.    Yes.  When we had moved her into the

23   follow-up role, I think she was starting to struggle.

24   When she was in the charge entry position, she was doing

Wilson v. Christiana Care Health Systems, Inc.

15

1    very well.

2         Q.    What period of time was she in the charge

3    entry position?

4         A.    It was not a long period of time, four or

5    five months.  The reason --

6         Q.    I'm sorry.  Go ahead.

7         A.    The reason for the change was a new computer

8    system, and it wasn't us electing her to now change

9    roles.  We had no choice.

10        Q.    So when was she moved into the follow-up

11   position?

12        A.    I would say about four or five months after

13   she started, maybe longer.  I don't know the exact time.

14   I know that the project of the new system had our time

15   tied up, and I don't know exactly when that went live.

16        Q.    Would you say it was still in 2002 when she

17   was moved?

18        A.    Yes.  Yes, I believe so.

19        Q.    Was that considered a promotion?

20        A.    No.

21              (Ms. Kerry Delgado entered the room.)

22   BY MR. PRIMOS:

23        Q.    Now, you said when Trafinna was moved to the

24   follow-up position in 2002, that's when she started to

Wilson v. Christiana Care Health Systems, Inc.

16

1    struggle?

2         A.    Yes.  I think -- yes, she did.

3         Q.    So would you say from 2002 until she was

4    terminated in 2005, she struggled during that entire

5    period?

6         A.    There were peaks and valleys, I believe.

7    There were times that she struggled.  There were times

8    that she really worked hard.

9         Q.    But I'm trying to get an idea of how long

10   were these different periods.

11        A.    I can't put an exact timeline on how long.

12   A lot of times the employees would come to me, and I

13   knew that she was struggling because of her performance.

14        Q.    Employees would come to you?

15        A.    Yes.

16        Q.    And what would they say?

17        A.    Personal phone calls, lengthy phone calls, I

18   need help, I'm not getting the help.  I would go back to

19   Trafinna, direct her, give her things to complete in a

20   timeline.

21        Q.    When did employees first come to you about

22   Trafinna's personal phone calls?

23        A.    I can't put an exact time.  I know there was

24   a time that I addressed the personal phone calls.  I

Anthony Reporting    PO Box 234, Dover, DE    19903    (302)674-8884

**A-111**

Wilson v. Christiana Care Health Systems, Inc.

18

1      A.    I'm sorry.  Then it must have been '04.  I

2  don't know the exact date when we moved.

3      Q.    But you believe it was December?

4      A.    I know it was in December.

5      Q.    Okay.

6      A.    I was currently at the health care center.

7  I moved up to Rockland Road for a few years, and then I

8  moved back down to the health care center.  So it was --

9      Q.    What was --

10      A.    It was very -- it was moving.

11            MR. OSSIP:  Hold on.  Make sure you listen

12  to his question, and try to answer his question without

13  getting into all kinds of extra stuff and sidetracking

14  us.

15            THE WITNESS:  I'm sorry.

16  BY MR. PRIMOS:

17      Q.    When Trafinna started with your department

18  in 2002, was your department located on Rockland Road?

19      A.    Correct.

20      Q.    And then you were at Rockland Road until you

21  moved, which to the best of your recollection, was in

22  December of '04, correct?

23      A.    I believe so, yes.

24      Q.    Now, would you agree that the first written

Wilson v. Christiana Care Health Systems, Inc.

19

1    discipline that you issued to Ms. Wilson regarding phone

2    usage was in March of 2005?

3         A.    Written, yes, I believe so.  I have to --

4         Q.    Do you remember the discipline that was

5    issued, that you issued to Ms. Wilson that was entitled

6    a decision-making leave, having to do with personal

7    phone usage?

8         A.    Yes.

9         Q.    Was that in March of 2005, to the best of

10   your recollection?

11        A.    To the best of my -- yes, I believe so.

12        Q.    And prior to that time, say February or

13   March, January, or say prior to 2005, had you addressed

14   the problem of personal phone usage with Ms. Wilson?

15        A.    Yes.

16        Q.    When was the first time that you addressed

17   it with her?

18        A.    I can't remember the exact date.  I know

19   that we addressed -- I don't remember the exact date.

20        Q.    Was it while your department was still at

21   Rockland Road?

22        A.    It could have been.  I know I had several

23   verbal conversations about phone usage.

24        Q.    But you are not sure?

Wilson v. Christiana Care Health Systems, Inc.

20

1    A.    I don't want to tell you the exact dates,

2    because I could be wrong.

3    Q.    So you addressed this with Ms. Wilson

4    verbally, correct?

5    A.    Yes.

6    Q.    And this was after other employees had come

7    to you and complained about Trafinna's personal phone

8    usage?

9    A.    Yes.

10    Q.    How many times did you address it with

11    Ms. Wilson, with Trafinna, before this decision-making

12    leave in March of '05?  How many times did you address

13    the issue of personal phone usage?

14    A.    I don't know the exact number, but it could

15    have been three or four times.

16    Q.    After the second time or even the third

17    time, was there a reason why you didn't issue a written

18    discipline to her for this issue prior to March of 2005?

19    A.    I believe when I verbally spoke to her,

20    verbally spoke to the group, I also contacted HR.  And I

21    believe that's when they told me to pull the records.

22    That's when we put her on second step.  But prior to

23    that, I don't know exactly how many times I spoke to

24    her.

Wilson v. Christiana Care Health Systems, Inc.

21

1     Q.    But was there a reason that you didn't take

2   it to the written discipline step prior to March of '05?

3     A.    It could have been --

4           MR. OSSIP:  He's not asking you to guess.

5           THE WITNESS:  I don't know exact.  I

6   don't --

7   BY MR. PRIMOS:

8     Q.    You don't know?

9     A.    Not exact; I would have to go back and look

10   at my --

11     Q.    So you don't know why you didn't go to that

12   next step?

13     A.    No, I don't.

14     Q.    What are the names of the employees who

15   complained about Trafinna's phone usage that prompted

16   you to address the issue verbally with her?

17     A.    Donna Dever and Jennifer Hisey.

18     Q.    Any others?

19     A.    There could have been, but those two were

20   the closest to her.

21     Q.    At the time that Ms. Dever and Ms. Hisey

22   complained, what were their positions?

23     A.    Donna Dever was cash poster follow-up for

24   occupational help, and Jenny was a cash poster for the

Wilson v. Christiana Care Health Systems, Inc.

22

1   health care center.

2        Q.    And you are saying they said they needed

3   help?

4        A.    Donna Dever said she needed help.  She

5   pretty much worked with Trafinna.  Jenny sat near

6   Trafinna and could overhear her.

7        Q.    But Jennifer Hisey did not work with her?

8        A.    No.

9        Q.    So why was Jennifer Hisey coming to you if

10  she wasn't working with Trafinna?

11       A.    Extensive phone conversations, she could

12  overhear her phone conversations.

13       Q.    But was that harming Ms. Hisey in some way?

14       A.    Distracting.

15       Q.    Is that what she told you?

16       A.    Yes.

17       Q.    So you are not sure when Ms. Hisey and

18  Ms. Dever came to you, and you are not sure when you

19  verbally addressed it.  But when you were aware that

20  Trafinna was having this problem with personal phone

21  usage, what was your assessment of her performance at

22  that time, her overall performance?

23       A.    I think it could have been improved.  The

24  way I judge performance is showing how much money is

Wilson v. Christiana Care Health Systems, Inc.

24

1      Q.    Do you remember indicating that?

2      A.    Uh-huh.

3      Q.    And how did you become aware that it got

4  worse?

5      A.    Fellow employees, management.

6      Q.    What fellow employees are we talking about

7  now?

8      A.    Her employees, I mean her fellow employees.

9      Q.    What names?

10     A.    Donna Dever, Terri Eastburn; I had another

11  supervisor come to me and tell me that she was on the

12  phone, which was Diane Conrad.

13     Q.    Diane Conrad supervised what area at that

14  time?

15     A.    Physical Therapy Plus.

16     Q.    Was she another billing supervisor?

17     A.    Correct.

18     Q.    Why did Terri Eastburn come to you about the

19  situation?

20     A.    Terri Eastburn?  Did I --

21     Q.    Yes.  Didn't you say that Terri Eastburn was

22  one of the ones who came to you?

23     A.    Jennifer Hisey and Donna Dever.

24     Q.    Oh, I'm sorry.

Wilson v. Christiana Care Health Systems, Inc.

27

1    Q.    And they complained to you or informed you

2  of Trafinna's personal phone usage.  And what did you do

3  at that point?

4    A.    I spoke to April Habich about pursuing

5  further discipline.  I also contacted employee

6  relations.  They advised me to pull a phone report, and

7  I did so.

8    Q.    Who did you speak to at employee relations?

9    A.    Kathleen?

10    MR. OSSIP:  Don't look at us.

11    MR. PRIMOS:  Yes, you can't get help from

12  the audience.

13    THE WITNESS:  There were several that I

14  spoke to there, Winship.

15  BY MR. PRIMOS:

16    Q.    You are not sure?

17    A.    I'm not exactly sure.  I'm sorry.

18    Q.    Now, let me just ask you this.  The previous

19  times that Ms. Hisey and Ms. Dever had come to you at

20  Rockland Road and when you had verbally addressed this

21  issue with Trafinna, had you informed Ms. Habich about

22  it at that time?

23    A.    I believe I did.  I don't know exactly if I

24  did or not.

Wilson v. Christiana Care Health Systems, Inc.

28

1      Q.    So you are not sure?

2      A.    I'm not sure.

3      Q.    You spoke to these people.  Employee

4  relations told you to pull the phone records.  Were the

5  phone records pulled?

6      A.    Yes.

7      Q.    And what happened then?

8      A.    I surmised a report.  I had to research the

9  report to find out whether or not these were personal

10  phone calls.  I put it in a -- One of the phone calls,

11  it was about surmised together in one period of time,

12  about six hours.  So I questioned Trafinna.

13      Q.    One phone call was six hours long?

14      A.    In the month period of time, if you added up

15  the time, I believe it was over six hours long.

16      Q.    So it was several phone calls on different

17  days that added up to six hours for one phone number; is

18  that correct?

19      A.    Correct.

20      Q.    And the one phone number that was six hours,

21  were those phone calls made by Trafinna?  Made to

22  Trafinna?  Both?

23      A.    They were outbound calls.

24      Q.    What about the other calls?  Were they all

Anthony Reporting    PO Box 234, Dover, DE    19903    (302)674-8884

**A-119**

Wilson v. Christiana Care Health Systems, Inc.

30

1      A.    Right.

2      Q.    And what was her response?

3      A.    Initially, on the six-hour conversation

4   or on --

5      Q.    On any of these numbers that you questioned

6   her about.

7      A.    That they were personal.

8      Q.    She admitted that they were personal?

9      A.    Correct.

10     Q.    And what was her explanation?

11     A.    At the time?

12     Q.    Yes.

13     A.    She didn't have an explanation at the time.

14     Q.    Did she have an explanation at a later time?

15     A.    Not to me directly.

16     Q.    Did she give the explanation to someone

17   else?

18     A.    I believe it was in her statement down the

19   road about her father.  And I did not see that, I

20   believe, until after she was terminated.  I believe so.

21     Q.    The statement was never given to you?

22     A.    Not about her father; I don't --

23     Q.    I'm sorry.  Was the statement given to

24   someone at Christiana?

Wilson v. Christiana Care Health Systems, Inc.

34

1  money wasn't coming in and you could tell that her

2  performance was slipping because the money wasn't coming

3  in, after she was issued this decision-making leave,

4  what was the money situation with Trafinna, as far as

5  money coming in?  Was it still below where it needed to

6  be?

7  　　　　A.　　Yes, improving.

8  　　　　Q.　　It was improving.  Did it ever get up to the

9  point where it needed to be before she was terminated?

10 　　　　A.　　No, not completely.

11 　　　　Q.　　So no?  Your answer would be no?

12 　　　　A.　　No.

13 　　　　Q.　　Okay.  Would your answer be no, that it

14 never got up to where it needed to be?  Yes or no?

15 　　　　A.　　No.

16 　　　　Q.　　At some point prior to Trafinna's

17 termination, did you decide to move her to another

18 position?

19 　　　　A.　　Yes.

20 　　　　Q.　　And when did you make that decision?

21 　　　　A.　　I don't know the exact date.

22 　　　　Q.　　Okay.  She was terminated around mid August

23 of 2005.  Does that help you determine about when you

24 made that decision?

Wilson v. Christiana Care Health Systems, Inc.

35

1        A.    It may have been sometime in July, the end
2    of July.
3        Q.    Was it definitely in the summer of 2005?
4        A.    Yes.
5        Q.    And did you come to that decision all of a
6    sudden, or was it a gradual process, in your mind?
7        A.    There were multiple reasons why I came to
8    that decision.
9        Q.    And could you tell me what those reasons
10   were?
11       A.    The main reason was her job performance, and
12   that it probably could help her improve with the change
13   of the job.  Secondly, it was good for the division.
14   And thirdly, Terri Eastburn, it would be good for her
15   morale, as well, because she needed a change.  But the
16   main reason was to help Trafinna focus.
17       Q.    So the main reason was Trafinna's job
18   performance?
19       A.    Yes.
20       Q.    And would you say it was because her job
21   performance was below par?  Below standard?
22       A.    At that particular time, yes.
23       Q.    Okay.  And can you tell me specifically what
24   were the problems with her job performance at that

**A-122**

Wilson v. Christiana Care Health Systems, Inc.

36

1    particular time?

2           A.    The phone.

3           Q.    Okay.  I thought you had addressed the phone

4    in March.

5                 MR. OSSIP:  Is that a question?

6    BY MR. PRIMOS:

7           Q.    Is that correct?  You testified you

8    addressed it in March?

9           A.    Yes.

10          Q.    Are you saying that as soon as she got back,

11   the phone was a problem again?

12          A.    Not as soon as she got back.

13          Q.    At some point after she got back?

14          A.    At some point.

15                MR. OSSIP:  Wait until he finishes.

16   BY MR. PRIMOS:

17          Q.    At some point after she got back, it became

18   a problem again, correct?

19          A.    Not immediately.

20          Q.    Not immediately?

21          A.    No.

22          Q.    But at some point after she got back, it

23   became a problem again, correct?

24          A.    Yes.

Wilson v. Christiana Care Health Systems, Inc.

37

1        Q.     When did the phone become a problem again?

2        A.     I started receiving more complaints from

3   fellow employees sometime, I believe, maybe in July.

4        Q.     Maybe in July?

5        A.     I'm not sure.

6        Q.     And what employees complained to you?

7        A.     Donna Dever.

8        Q.     Who else?

9        A.     Jennifer Hisey.

10       Q.     Anyone else?

11       A.     I believe at that time it was also Janet

12  Biddle.

13       Q.     Okay.  Did Janet Biddle have occasion to

14  work with Trafinna?

15       A.     Near her.

16       Q.     Just near her?

17       A.     Correct.

18       Q.     But she didn't actually work with her?

19       A.     No.

20       Q.     Donna Dever was still sitting next to

21  Trafinna?

22       A.     Yes.

23       Q.     Was anyone else sitting next to Trafinna at

24  the time?

Anthony Reporting    PO Box 234, Dover, DE    19903     (302)674-8884

**A-124**

Wilson v. Christiana Care Health Systems, Inc.

38

1          A.     The other side of the cubicle was empty, no.

2          Q.     What did these employees specifically say

3     about Trafinna's phone usage?

4          A.     It was more that she was whispering on the

5     phone continuously.

6          Q.     And that was distracting to them?

7          A.     Yes.

8          Q.     Other than these complaints of phone usage

9     that you believe started up again in July, were there

10    any other problems with Trafinna's job performance?

11         A.     Not that I could pinpoint, no.

12         Q.     The second reason that you gave for this

13    intended switch between Trafinna and Carrie was it was

14    good, I think you said, for the division or the

15    department?

16         A.     Division.

17                MR. OSSIP:  Division.

18    BY MR. PRIMOS:

19         Q.     The division.  Okay.  And why would that

20    switch be good for the division?

21         A.     We were going through a period of time where

22    our director, Joe Richichi, were encouraging us to

23    cross-train the employees.  So we are not having an

24    employee solely does one job out on FMLA, and we now

Wilson v. Christiana Care Health Systems, Inc.

39

1    have to figure out who is going to do it.  So his

2    encouragement was probably sometime in July, which is

3    the fiscal year, to see if we can accomplish this and

4    cross-train employees.  And that was one of our goals to

5    do.

6         Q.    Any other reason why you felt it would be

7    good for the division?

8         A.    No.  That's --

9         Q.    And you said the third reason was good for

10   Terri Eastburn's morale.  What was the problem with

11   Terri Eastburn's morale?

12        A.    Terri had been doing charge entry for

13   several years, and she had just received her

14   certification for coding.  She felt at this time that

15   she wanted to try something different and at that point,

16   with trying to accommodate her with her skills.

17        Q.    Did Terri come to you and tell you she

18   wanted to do something different?

19        A.    I don't believe she did come to me.

20        Q.    Well, how did you know she wanted to try

21   something different?

22        A.    I believe she applied for a job in follow-up

23   outside of Health Initiatives.  I think that is what it

24   was.  I don't remember exactly.  I know she just

1    received her coding certificate.

2          Q.    How did you know that Terri had applied for

3    a job outside your department?

4          A.    I don't remember.  I don't know if she came

5    to me after she got her certification.

6          Q.    When you found that out, did you approach

7    Terri?

8          A.    I don't believe I did.

9          Q.    So you never had a conversation with Terri

10   to find out why she was applying for this other position

11   or whether she wanted to move to follow up within the

12   department.

13         A.    Before she had her certification, when she

14   was going to take the course, I knew once that that's

15   what she wanted to do eventually.  And that was probably

16   six months prior.

17         Q.    And how did you know that?

18         A.    She came to me about wanting to take the

19   course.

20         Q.    And did she tell you:  I would like to move

21   to a different position?

22         A.    She liked to do different things, I think.

23   I think that she wanted to have more knowledge.

24         Q.    Did Terri ever tell you:  I'm having a

Wilson v. Christiana Care Health Systems, Inc.

41

1    morale problem with my job?

2          A.    No.

3          Q.    Did you discuss this planned switch with

4    anyone else in management or supervision?

5          A.    April Habich.

6          Q.    And when did you bring it up with April?

7          A.    I don't know the exact date.  I believe it

8    was sometime maybe in August.  I don't know the exact

9    date.

10         Q.    And you told April what you were considering

11   doing?

12         A.    I presented the idea.

13         Q.    And what was April's response?

14         A.    She thought it would probably be good for

15   her, Trafinna.

16         Q.    Did she think it would be good for Terri?

17         A.    I think it would be good for Terri just

18   to -- yes.

19         Q.    Did April think it would be good for Terri?

20         A.    I believe so.

21         Q.    You're not sure?

22         A.    I don't remember her exact response.

23         Q.    Did you discuss the planned switch with

24   anyone else other than April?

Anthony Reporting    PO Box 234, Dover, DE    19903    (302)674-8884

Wilson v. Christiana Care Health Systems, Inc.

42

1        A.     At that time, no.

2        Q.     At a later time, did you?

3        A.     I discussed it with Trafinna.

4        Q.     So prior to your bringing or presenting this

5   to Trafinna, the only person you had talked to about the

6   planned switch was April?

7        A.     Correct.

8        Q.     Do you remember when you first raised the

9   subject with Trafinna?

10       A.     I don't remember the exact date, but I

11  believe it was in August.

12       Q.     Okay.  And did you just walk up to her

13  cubicle and say:  I've got something to talk to you

14  about?

15       A.     Yes.

16       Q.     Did you call her back to your office, or did

17  you discuss it right there at her cubicle?

18       A.     I pulled her in my office.

19       Q.     You had a separate closed office?

20       A.     Yes.

21       Q.     And did you tell her what it was about when

22  you asked her to come into your office?

23       A.     No, I don't believe I did.

24       Q.     You just said:  I need to talk to you?

Wilson v. Christiana Care Health Systems, Inc.

46

1    further reports or complaints about her phone usage?

2         A.    Not at that time, no.

3         Q.    So you just referred to the past phone usage

4    problems?

5         A.    Yes.  I believe I -- I don't know the exact

6    words that I used.

7         Q.    But the real reason for the planned switch

8    was because the phone problems were continuing, correct?

9         A.    Well, like I said, there were multiple

10   reasons.

11        Q.    But you said that was the main reason?

12        A.    One of the -- yes, because I had more

13   complaints.  Plus with the direction of my management,

14   with cross-training, I felt that this would probably

15   work to her benefit.

16        Q.    But you didn't tell Trafinna that.  In other

17   words, you didn't tell her that the main reason was she

18   was having performance problems again with phone usage?

19        A.    I don't believe I did.

20        Q.    So you talked about the past phone usage.

21   What were the other reasons you gave her?

22        A.    Cross-training.  Also, when she was hired,

23   she was doing charge entry.  She did very well at that.

24   She seemed to like it.  When she changed over to

Wilson v. Christiana Care Health Systems, Inc.

53

1        A.    Yes.  My timelines aren't the best.

2        Q.    And Larry wanted to meet with you and April?

3        A.    Correct.

4        Q.    How did Larry know about this situation?

5              MR. OSSIP:  Objection to form.  You can

6    answer, if you can.

7    BY MR. PRIMOS:

8        Q.    Let me ask you this way.  First of all, did

9    he call you?

10       A.    Yes.

11       Q.    And what did he say?

12       A.    He was in contact -- Trafinna contacted him

13   about what we were going to do with the two positions

14   between Trafinna and Terri.  He then wanted to come over

15   and meet with us to discuss the issue.  And we set up a

16   timeline for him to come over.

17       Q.    What time did you set up?

18       A.    I know it was in the morning.  I don't know

19   if it was within a few days.  I don't remember exactly

20   when that meeting occurred.

21       Q.    Okay.  Now, if this conversation with Larry

22   occurred the same day you first went to Trafinna, then

23   the next morning when you went to her, did you bring

24   that up?  Did you say:  We know you went to Larry?

Anthony Reporting    PO Box 234, Dover, DE    19903    (302)674-8884

**A-131**

Wilson v. Christiana Care Health Systems, Inc.

54

1        A.     No.

2        Q.     Why?

3        A.     That's privileged between the employees.

4    They have every right to go there.  Our conversation --

5    My conversation with Larry was, basically, he wants to

6    meet with us about the two positions.  At this point, I

7    didn't even know what he wanted to meet about.  I don't

8    remember.

9        Q.     Is it possible that you spoke with Larry

10   after you had that second meeting with Trafinna?

11       A.     Very possible; it happened very quickly.

12       Q.     Okay.  Eventually you met with Larry?  You

13   and April?

14       A.     Yes.

15       Q.     And can you tell me about that conversation?

16       A.     Larry brought to our attention that because

17   Terri and Trafinna were in two different cost centers,

18   that we could not --

19              MR. OSSIP:  Cost?

20              THE WITNESS:  Cost.

21              MR. OSSIP:  Cost centers.  I thought you

22   said call.

23              THE WITNESS:  Oh.

24              MR. OSSIP:  Cost centers.

Case 1:06-cv-00705-MPT    Document 54-5    Filed 01/11/2008    Page 13 of 30
Wilson v. Christiana Care Health Systems, Inc.

55

```
 1                 THE WITNESS:  Cost centers, that I just

 2    couldn't switch the two positions.  I could not

 3    cross-train them or switch them.

 4    BY MR. PRIMOS:

 5         Q.   April didn't know that?

 6         A.   I don't --

 7                 MR. OSSIP:  Objection to form.

 8    BY MR. PRIMOS:

 9         Q.   Did April not know that when you went to her

10    initially about that?

11                 MR. OSSIP:  Objection to form.

12    BY MR. PRIMOS:

13         Q.   You can answer.

14         A.   No.  I currently had two cost centers in my

15    division.  I cross-trained all of my employees between

16    the two divisions, if I needed help.  So I never knew

17    that I could not switch the two.

18         Q.   Did Larry tell you why you couldn't switch

19    the two between the two cost centers?

20         A.   What had happened is that Terri was a lower

21    grade, and we did not know that.

22         Q.   What do you mean by cost center, two cost

23    centers?

24         A.   It's the division you're working in, so your
```

Wilson v. Christiana Care Health Systems, Inc.

56

1   payroll is in that cost center.  So it could have been

2   Occupational Health.  It could be the health center.

3   It could be a different part of the division.

4          Q.    So is the real reason you couldn't switch

5   them because they were two different pay grades, or was

6   it because they were in two different cost centers?

7          A.    Both, yes.

8          Q.    There were two reasons?

9          A.    Yes.

10         Q.    So it is possible, even if they had been in

11  the same cost center, that they might have been

12  different pay grades?

13         A.    Yes.

14         Q.    So there were two reasons he gave you?

15         A.    Yes.

16         Q.    When he told you you couldn't switch them,

17  what happened then?

18         A.    He had actually asked me why I wanted to

19  switch them.  And because of the phone problems we had

20  in the past, the job was more a job off the phones, not

21  on the phones, and it may better suit her.

22         Q.    I'm sorry.  Can you say that again?  I'm not

23  sure I followed you.

24         A.    Terri's position was charge entry, very

Case 1:06-cv-00705-MPT    Document 54-5    Filed 01/11/2008    Page 15 of 30
Wilson v. Christiana Care Health Systems, Inc.

57

1    limited on phone usage.  If I switched the two, Trafinna

2    could have a more structured environment to do her job

3    without the use of phones, since we had such a past

4    history with phone problems.

5            Again, I told him that she was on a

6    decision-making leave and that I had more complaints

7    coming in from fellow employees again.  And I also said

8    that this could help her focus more on the job and not

9    the phone.

10        Q.    And what was his response?

11        A.    That I needed to pursue the phone problem

12    and not try to switch her in another position.  I needed

13    to go back and pull her phone records again.

14        Q.    Okay.  And so what did you do then?

15        A.    I pulled her phone records.

16        Q.    Okay.  So in the course of all of this

17    taking place, you're not sure when Larry called you,

18    correct?

19        A.    Not an exact time or date; I don't remember

20    the timeline.

21        Q.    You don't know if it was the first day you

22    talked to Trafinna or the second day you talked to her?

23    You're not sure about that?

24        A.    It very well could have been the first or

Wilson v. Christiana Care Health Systems, Inc.

58

1   the second.  I don't know.  The timeline went pretty

2   quick.

3        Q.    And at some later time, you and April had a

4   meeting with Larry?

5        A.    Correct.

6        Q.    Do you think that was the first day?  If we

7   say the first day is when you first brought it up,

8   brought the subject up with Trafinna, did the meeting

9   with Larry take place the second day?

10       A.    No.  It was a few days out.

11       Q.    A few days out?

12       A.    Correct.

13       Q.    And then after that, you pulled the phone

14   records?

15       A.    Correct.

16       Q.    So how long after the first time you brought

17   this up with Trafinna did you pull the phone records?

18       A.    I don't know the exact timeline.  When we

19   met with Larry, he had told me to go back that day.  I

20   don't know the exact date, but I had to go back and call

21   and get her phone records pulled.

22       Q.    But it was at least a couple of days before

23   you went back to Trafinna?

24       A.    I believe so, yes.

Wilson v. Christiana Care Health Systems, Inc.

59

1    Q.    And what did you discover?

2    A.    More personal phone calls.

3    Q.    And what did you do when you discovered that

4    information?

5    A.    I contacted Larry Bryson.  I surmised and

6    sent him the phone records.  I also spoke to April

7    Habich.

8    Q.    What did you say to April?

9    A.    I told her about the phone reports.  She was

10   in the meeting with me.  She reviewed them.

11   Q.    And what was April's reaction?

12   A.    We needed to talk to Larry on direction.

13   Q.    Now, you were not surprised at what you

14   found, correct, because people had already come to you

15   and complained?

16         MR. OSSIP:  Objection to form.

17   BY MR. PRIMOS:

18   Q.    Is that a fair statement?  You weren't

19   surprised when you got these phone records that showed

20   personal phone calls because it was consistent with

21   these complaints that you received in July?

22   A.    Disappointed but not surprised.

23   Q.    And so you and April met with Larry at that

24   point?

Wilson v. Christiana Care Health Systems, Inc.

60

1      A.    Albeit the phone conversation, we never met

2  again.

3      Q.    And what was discussed?

4      A.    The continual use of the phone, because

5  there were more phone conversations.

6      Q.    And what did Larry say?

7      A.    We needed to go back to Trafinna and get her

8  statement.

9      Q.    And Larry's position -- I don't think I

10  asked this.  Larry's position at the time was --

11      A.    Employee relations director.

12          MR. OSSIP:  Manager.

13          THE WITNESS:  Manager, sorry.

14  BY MR. PRIMOS:

15      Q.    He was the head of the employee relations

16  department?

17      A.    Yes.

18          MR. OSSIP:  Well --

19          MR. PRIMOS:  I'm asking for her

20  recollection.  I know he'll be here later today.

21  BY MR. PRIMOS:

22      Q.    So you said you need to meet or we need to

23  meet with Trafinna, I guess, was his --

24          MR. OSSIP:  No, get her statement.

Case 1:06-cv-00705-MPT    Document 54-5    Filed 01/11/2008    Page 19 of 30
Wilson v. Christiana Care Health Systems, Inc.

61

1              MR. PRIMOS:  Oh, get her statement.

2     BY MR. PRIMOS:

3         Q.    Did you get her statement?

4         A.    Yes, I did.

5         Q.    Was that a written statement?

6         A.    I believe -- yes, it was.

7         Q.    Okay.  Now, at this point, when you are

8     getting her statement, about how long after that initial

9     meeting with Trafinna are we?

10        A.    I can't tell you exactly a timeline.  I

11    don't know exactly when Larry and I met.  I know that it

12    probably was a few days after that initial meeting with

13    Larry.

14        Q.    Okay.  And didn't you say that initial

15    meeting with Larry was actually you, April, and Larry?

16        A.    Correct.

17        Q.    So you got Trafinna's statement.  Was this

18    in the course of a meeting between you and Trafinna and

19    April?

20        A.    I don't believe April was there at the time.

21    I believe wait is Joe Richichi.

22        Q.    You and Joe and Trafinna?

23        A.    Correct.

24        Q.    And Trafinna wrote out a written statement?

Wilson v. Christiana Care Health Systems, Inc.

62

1        A.    I believe at that time we had her come into

2    the office, and I presented her with the phone report

3    again.  And she indicated to me that that -- the longest

4    phone call was her boyfriend.  But I don't remember the

5    exact statement.  I knew there were several in the

6    increments.  I don't remember exactly when.

7        Q.    And what happened then?

8        A.    I reported back to Larry Bryson.  I was to

9    fill out the forms for disciplinary action, give it back

10   to him for review, and then he sent it back to me.

11       Q.    And then what happened?

12       A.    We had a discussion with April, Larry.  I

13   don't remember if he was present at that time or if he

14   came here on her termination.

15       Q.    And what was that discussion?

16       A.    Going through her past history, going

17   through the issues we had with the phones, the

18   commitment letters that she said that she would stop

19   with the phone use, the personal phone use, and it

20   hadn't.

21       Q.    And what did Larry say at that time?

22       A.    I don't know the exact words.

23       Q.    What was the outcome of the meeting?

24       A.    That she would be terminated.

Case 1:06-cv-00705-MPT    Document 54-5    Filed 01/11/2008    Page 21 of 30
Wilson v. Christiana Care Health Systems, Inc.

64

1    personal phone usage that you had discovered?

2            A.    Yes.

3            Q.    Was that the only reason for her

4    termination?

5            A.    She had a progressive disciplinary action.

6    Part of it was latenesses, phone and internet usage, as

7    well.  The phone was a bit more abused than the

8    internet.

9            Q.    Okay.  Now, this is the first time you have

10   mentioned internet usage.  How did that come into the

11   picture?

12           A.    That was part of her disciplinary action

13   with the internet.  She was --

14           Q.    What was part of her disciplinary action?

15           A.    The internet.

16           Q.    Do you mean the disciplinary action in

17   August?

18           A.    No.  It also was in March.

19           Q.    So you are saying she was disciplined for

20   internet usage in March, as well?

21           A.    Yes.  The main focus was the phones.

22           Q.    Okay.  Well, when we talked about the March

23   incident, you didn't mention the internet.  Was there a

24   reason why?

Case 1:06-cv-00705-MPT    Document 54-5    Filed 01/11/2008    Page 22 of 30
Wilson v. Christiana Care Health Systems, Inc.

66

1              MR. OSSIP:  She answered your questions.

2      The document --

3      BY MR. PRIMOS:

4          Q.    Ms. Fitzgerald, would you like to go back

5      and add something to what you said before, when I asked

6      you about Ms. Wilson's performance problems?

7          A.    Can you repeat that exact question?  I don't

8      know --

9          Q.    Okay.  We were talking about performance

10     problems before.  And you had said that other employees

11     had come to you and complained about phone usage.  You

12     never mentioned internet usage.  When did internet usage

13     come into the picture, as far as Ms. Wilson's

14     performance?

15         A.    I believe that is also in her past

16     disciplinary action.  When the phone reports were

17     brought up, I believe they also requested the internet

18     usage.

19         Q.    Who requested the internet usage?

20         A.    I believe -- I don't know exactly who.  I

21     don't know.  But that was part of her disciplinary

22     action.

23         Q.    Part of her disciplinary action in March was

24     internet usage?

Wilson v. Christiana Care Health Systems, Inc.

67

1          A.    Yes.

2          Q.    But had any employees come to you and

3    complained about internet usage?

4          A.    No.

5          Q.    Had any management come to you and

6    complained about internet usage?

7          A.    I believe so.  I don't want -- I don't

8    remember what initially -- I believe in the past

9    history, there were internet problems and that was

10   addressed verbally.  So when the phone issues came up, I

11   believe we addressed both of them at the same time.

12         Q.    When was internet usage first a problem with

13   Trafinna?

14         A.    I don't know the exact date.  I know that

15   there was an address, but I don't know.

16         Q.    Was it while your department was at Rockland

17   Road?

18         A.    I believe so.

19         Q.    But you don't know when?

20         A.    No.

21         Q.    And how did it come up?

22         A.    I don't remember exactly.  I believe that

23   April Habich had witnessed her on the internet, and I

24   don't know if she addressed it at that point.  I don't

Wilson v. Christiana Care Health Systems, Inc.

68

1    remember the exact time.

2          Q.    You don't know if she addressed it?

3          A.    I believe she did.

4          Q.    Oh, you believe she did address it?

5          A.    Uh-huh.

6          Q.    But you don't know when that was?

7          A.    No, not the exact timeline.

8          Q.    Had you ever addressed it?

9          A.    I believe I gave her the Christiana Care

10   policy regarding phone and internet usage, which is one

11   policy, saying this is our policy on this.

12         Q.    But you don't know when that was?

13         A.    No.

14         Q.    But then in March of '05, she was

15   disciplined for both phone usage and internet usage?

16         A.    Yes.

17         Q.    And some kind of report had been generated

18   in March regarding internet usage?

19         A.    I believe it was ran before that, maybe

20   sometime in February.  I'm not sure of the exact date,

21   but yes.  You have to request both of them.

22         Q.    So she was disciplined in March for both

23   phone and internet usage.  And then when did you become

24   aware that internet usage was a problem again?

Wilson v. Christiana Care Health Systems, Inc.

78

1      A.    Stacie Lovett was follow-up.  She

2   cross-trained with Janet Biddle on charge entry.

3      Q.    And when did that happen?

4      A.    I don't know the exact date.

5      Q.    Did you actually -- I'm sorry.

6      A.    It was prior.  I don't know.

7      Q.    Did you actually have them switch positions?

8      A.    They trained with each other.

9      Q.    But they didn't actually switch positions?

10     A.    No, no.

11     Q.    When did you ever, if ever, do

12  cross-training by having two employees switch positions?

13     A.    Never.

14     Q.    So this attempt to do this with Trafinna and

15  Terri Eastburn would have been the first time ever?

16     A.    Yes.

17     Q.    I just want to clarify something for the

18  record.  As far as the race of these different employees

19  in your department, Ms. Hisey was what race?

20     A.    White.

21     Q.    Miss Lovett was what race?

22     A.    Black.

23     Q.    Ms. Dever was what race?

24     A.    White.

A-145

Wilson v. Christiana Care Health Systems, Inc.

79

1       Q.    Ms. Eastburn was what race?

2       A.    White.

3       Q.    Miss Biddle was what race?

4       A.    White.

5       Q.    Ms. Rollo was what race?

6       A.    White.

7       Q.    And your race is --

8       A.    White.

9       Q.    Okay.  We have to put that on the record.

10  And what is Ms. Habich's race?

11      A.    White.

12      Q.    Now, going back again to your thought or

13  intention to have Terri and Trafinna switch positions,

14  you said or you have testified that one of the most

15  important reasons or perhaps the most important reason

16  was because of these new complaints you had about

17  Trafinna's phone usage, correct?

18      A.    Correct.

19      Q.    If you had been able to switch Trafinna and

20  Terri, you would not have terminated Trafinna, correct?

21      A.    No.

22      Q.    In other words, you had no intention to

23  terminate her when you were thinking about this switch?

24      A.    No.

Anthony Reporting    PO Box 234, Dover, DE    19903    (302)674-8884

**A-146**

Case 1:06-cv-00705-MPT    Document 54-5    Filed 01/11/2008    Page 27 of 30
Wilson v. Christiana Care Health Systems, Inc.

97

```
 1    Did you put that checkmark on page three of Fitzgerald

 2    2?

 3         A.    I don't believe I did.  I believe it's

 4    Trafinna.

 5         Q.    Okay.  What about the one on page one, the

 6    checkmark next to K on page one?  Did you check that

 7    one?

 8         A.    No.

 9         Q.    So Trafinna did all of the circling of Ks

10    and checkmarks, and you reviewed it and agreed with it,

11    correct?

12         A.    Correct.

13         Q.    What about the checkmark on page nine?

14         A.    I honestly don't know.

15         Q.    You don't know who checked that?

16         A.    I don't remember.

17         Q.    Now, on page nine it talks about

18    cross-training with other divisions.

19         A.    Yes.

20         Q.    Do you see that?

21         A.    Yes.

22         Q.    But there are no checkmarks there, correct?

23         A.    Correct.

24         Q.    Would that have been an opportunity for you,
```

Wilson v. Christiana Care Health Systems, Inc.

98

1    if you had wanted to, to indicate that Trafinna should

2    cross-train with other divisions?

3        A.    I don't know if I had that conversation with

4    her.

5        Q.    No.  But could you have checked those off,

6    any of those items off, indicating a desire for her to

7    cross-train?

8            MR. OSSIP:  Objection; lack of foundation.

9    BY MR. PRIMOS:

10       Q.    You can answer.

11       A.    I couldn't check them off, no.

12       Q.    Could Trafinna have checked them off if she

13   had wanted to?

14       A.    I don't believe -- That's a hard question to

15   answer.  She hasn't been cross-trained, so I don't know

16   why she would have checked them off.

17       Q.    Do you know who would have had the authority

18   to put checkmarks on any of those boxes under critical

19   skills on page nine?

20       A.    I don't understand the question.

21       Q.    We see boxes there, and we see instructions

22   above this critical skills section that says:  Check the

23   boxes that apply when completing the evaluation.  Who

24   would have been able to check those boxes?

Wilson v. Christiana Care Health Systems, Inc.

99

1          A.      Trafinna.

2          Q.      And what would that have indicated had she

3    checked those boxes?

4          A.      That she was cross-trained in some of these

5    different areas.

6          Q.      And because she wasn't cross-trained, she

7    couldn't check those boxes?

8          A.      Correct.

9          Q.      On the last page, page ten, we see some more

10   typed information under reviewer comment.  Did you type

11   in that information?

12         A.      Yes.

13         Q.      And in that section you indicated that

14   Trafinna's performance has fully met the established job

15   expectations, correct?

16         A.      Correct.

17         Q.      And you said:  Trafinna generally performs

18   very well and requires little additional guidance,

19   correct?

20         A.      Correct.

21              MR. OSSIP:  Required.

22              MR. PRIMOS:  Required little additional

23   guidance.  I'm sorry.

24

Anthony Reporting    PO Box 234, Dover, DE    19903      (302)674-8884

**A-149**

Case 1:06-cv-00705-MPT    Document 54-5    Filed 01/11/2008    Page 30 of 30
Wilson v. Christiana Care Health Systems, Inc.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TRAFINNA WILSON,                          )
     Plaintiff,                          )
                              )
          v.                          ) C.A. No.
                              ) 06-CV-00705 MPT
CHRISTIANA CARE HEALTH                    )
SERVICES, INC.,                           )
     Defendant.                          )

               Deposition of LARRY BRYSON, taken
before Cheryl A. Anthony, Court Reporter, in the offices
of Schmittinger & Rodriguez, Odessa Professional Park,
Odessa, Delaware, on Tuesday, November 20, 2007,
beginning at 2:37 p.m.
APPEARANCES:
        SCHMITTINGER & RODRIGUEZ
        BY:  WILLIAM D. FLETCHER, JR., ESQUIRE
        and NOEL E. PRIMOS, ESQUIRE
        414 South State Street
        Dover, Delaware  19901
        Attorneys for Plaintiffs.

        MORGAN, LEWIS & BOCKIUS
        BY:  MICHAEL J. OSSIP, ESQUIRE
        1701 Market Street
        Philadelphia, Pennsylvania  19103-2921
        Attorney for Defendant.

    ALSO PRESENT:
        MS. KERRY DELGADO,
        Christiana Care.

   ORIGINAL RETAINED BY WILLIAM D. FLETCHER, JR., ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware  19903
(302)674-8884

Wilson v. Christiana Care Health Systems, Inc.

3

1          Q.     And who was your last employer?

2          A.     Christiana Care.

3          Q.     All right.  And when was your last date of

4     employment with Christiana Care?

5          A.     I believe it was January 26, 2007.

6          Q.     Okay.  How long had you worked for

7     Christiana Care or any predecessor interest?

8          A.     39 years.

9          Q.     When you retired in January of '07, what was

10    your position?

11         A.     I was manager for employee relations in the

12    human resources department.

13         Q.     Okay.  And how long had you held that

14    position, approximately?

15         A.     I'm trying to recall when I first assumed

16    that position, and I'm thinking that it was somewhere in

17    1990, '91, although that may not be exactly accurate.

18         Q.     All right.  So anyway, somewhere between 10

19    and 15 years, would it be fair to say, you held that

20    position prior to the incident in '05 involving the

21    termination of Trafinna Wilson?

22         A.     Yes.

23         Q.     As manager for employee relations, who was

24    your immediate supervisor?

Wilson v. Christiana Care Health Systems, Inc.

7

1      Q.    Now, Ms. Fitzgerald had told us about

2  Trafinna Wilson and some issues that arose in March of

3  2005 that dealt, apparently, with the use of company

4  phones.  Were you aware of that issue back in March of

5  '05?

6      A.    No.

7      Q.    Was that brought to your attention at all at

8  any time in March of '05?

9      A.    Not that I recall.

10      Q.    Were you involved in any issues involving

11  Trafinna Wilson's employment with Christiana Care before

12  August of '05?

13      A.    No.

14      Q.    How did you first receive any information

15  regarding the employment status of Trafinna Wilson at

16  any time after March of '05?

17      A.    Look, I'm not really sure what you're asking

18  me now.

19      Q.    Would you tell us how you were contacted, by

20  whom and when, as it relates to Trafinna Wilson's

21  employment at Christiana Care at any time after March of

22  '05?

23      A.    My first contact -- and the contact was not

24  really about her employment.  It was about an issue that

Case 1:06-cv-00705-MPT   Document 54-6   Filed 01/11/2008   Page 3 of 30
Wilson v. Christiana Care Health Systems, Inc.

8

1   she had, and the contact came from Trafinna via an

2   e-mail.

3        Q.    I'm going to show you a couple of e-mails

4   that have been provided to us by your former employer.

5   And I'm going to put the first one in front of you.

6   They are all attached right now.

7             MR. OSSIP:  Do you want to mark this as an

8   exhibit?

9             MR. FLETCHER:  I'm sorry.  We will get them

10  marked in a minute.

11            (Following a discussion off the record:)

12  BY MR. FLETCHER:

13       Q.    Looking at the first one, is that the e-mail

14  that you had a recollection of a moment ago that you

15  referred to?

16            MR. OSSIP:  Just so the record is clear, you

17  are referring to an e-mail from Trafinna Cuff to Larry

18  Bryson on August 9, 2005.  It's Bates-stamped DP 000316.

19            MR. FLETCHER:  Yes.

20            THE WITNESS:  Yes.  This is the e-mail.

21            MR. FLETCHER:  I would like to just take

22  that from you for a moment.  I would e-mail marked as

23  the Exhibit 1 to Mr. Bryson's deposition.

24            MR. OSSIP:  Do you want just that e-mail or

Wilson v. Christiana Care Health Systems, Inc.

10

1    billing.  And I had divided up the cost centers among

2    the reps so that there could be consistency in terms of

3    dealing with the managers and the employees and there

4    could be a pretty even distribution of workload.

5        Q.    Okay.  This e-mail, obviously, it speaks for

6    itself.  But this is what you received from -- and will

7    you agree, just so to keep the record clear, we will

8    call her Trafinna Wilson.  But we know who we are

9    talking about?

10       A.    Yes.

11       Q.    In response to this e-mail, what did you do?

12       A.    I set up an appointment with Trafinna to

13   meet with me to discuss what her issue and concern was.

14       Q.    And do you recall when that was?

15       A.    I believe it was the following day.

16       Q.    And where did you meet with her that

17   following day?

18       A.    In my office.

19       Q.    Where was that located at that time?

20       A.    It was located in the Christiana Hospital on

21   the first floor, just off the main lobby.

22       Q.    Where was that relative to where she worked

23   at that time?

24       A.    She worked in what we call the Health Care

Anthony Reporting   PO Box 234, Dover, DE   19903      (302)674-8884

**A-154**

Wilson v. Christiana Care Health Systems, Inc.

12

1    to contact you in this interim period between your

2    reading this e-mail and your meeting with Trafinna; is

3    that fair to say?

4         A.    No.   That's fair to say.

5         Q.    When you met with Trafinna Wilson, what was

6    discussed?

7         A.    Basically, what was discussed was her

8    perception that she was being asked to change jobs.  She

9    call it flip-flop.  I believe she had indicated that

10   they had mentioned cross-training, but she did not

11   believe that that was what was actually being asked of

12   her.  So that was the gist of her concern, that she had

13   met with both Melinda and April to discuss what, again,

14   she called the flip-flop.

15        Q.    Okay.  And did this flip-flop involve a

16   co-employee by the name of Terri Eastburn?

17        A.    Yes.

18        Q.    After she told you that information, what

19   did you do?

20        A.    I contacted -- and I think I spoke with

21   Melinda to set up a time to meet with her.  And I'm not

22   sure if I asked April to be there, as well, but April

23   was there at that meeting.

24        Q.    Let me back up a moment.  Going back to the

Wilson v. Christiana Care Health Systems, Inc.

14

1    I was using to respond to those situations.

2          Q.    Do you know where those notes were at the

3    time that you left Christiana Care?

4          A.    Not specifically.

5          Q.    Do you know if they were destroyed?

6          A.    I don't believe they were destroyed.  We

7    don't destroy that type of information.

8          Q.    Okay.  And when you say notes -- and I'll

9    use that term -- are we talking about multiple pieces of

10   paper or one piece of paper or what?

11         A.    I don't recall how many pieces of paper were

12   involved.

13         Q.    Would this have been your handwriting?  It

14   would have been in your handwriting?

15         A.    Yes, yes.

16         Q.    Okay.  Now, moving chronologically, I

17   believe the next thing you had is that you had this

18   meeting with Ms. Fitzgerald and April?

19         A.    Yes.

20         Q.    Okay.  Was it just the three of you?

21         A.    Yes.

22         Q.    Okay.  Can you tell me what was said and by

23   whom in that meeting?

24         A.    I really can't say specifically who said

Case 1:06-cv-00705-MPT    Document 54-6    Filed 01/11/2008    Page 7 of 30
Wilson v. Christiana Care Health Systems, Inc.

15

1    what and when.

2         Q.    All right.

3         A.    I could basically give you the general gist

4    of the conversation.

5         Q.    Please do that.

6         A.    My role was to explain to April and Melinda

7    what Trafinna's concerns were in terms of the request

8    from her perception to flip-flop positions.  Their

9    response was basically what they were trying to do was

10   to cross-train Trafinna.  And Terri and April had

11   indicated -- and this is one that I can remember -- that

12   in other areas that she supervised, they were doing

13   cross-training.  And this is something that they were

14   attempting to do in Melinda's area.

15              The concern was that there needed to be

16   flexibility, number one, in terms of different people

17   being able to perform the same function.  And they

18   indicated there was also a concern with Trafinna's

19   performance.  There was a concern that she was expending

20   a lot of time on the phone and the internet.  The

21   position that she had made it very difficult for them to

22   monitor whether she was actually doing the work that she

23   was supposed to be doing.

24              So this was a way that they were going to be

Case 1:06-cv-00705-MPT    Document 54-6    Filed 01/11/2008    Page 8 of 30
Wilson v. Christiana Care Health Systems, Inc.

16

1    able to put her in a position where they could monitor

2    and assure that she was doing what she should be doing,

3    and she would have limited opportunity to be on the

4    telephone or the internet in that position.  So it would

5    be beneficial to Trafinna.  It would have been

6    beneficial to Terri.  And it would have been beneficial

7    to the department.

8        Q.    And that's how they explained it to you

9    pretty much?

10        A.    Yes.

11        Q.    This idea of cross-training, to your

12    understanding of it, did it involve permanently changing

13    people's positions?

14        A.    Not to my understanding.

15        Q.    Okay.  Was it, to your understanding, a

16    temporary situation where one person would in effect

17    learn from the other how that person does their job?

18        A.    Yes.

19        Q.    Okay.  Is that what was being proposed to

20    you by Fitzgerald and Habich?

21        A.    Yes.

22        Q.    That it was just going to be a temporary

23    thing that each would learn the others job?

24        A.    Yes.

Wilson v. Christiana Care Health Systems, Inc.

20

1    sound right to you?

2        A.    It's about right.

3        Q.    From the time of this first meeting that we

4    have been talking about with you and Fitzgerald and

5    Habich to the date that Ms. Wilson was discharged, did

6    they give you evidence to show and support their claim

7    that Ms. Wilson was not doing her job or meeting

8    expectations?

9        A.    I think one of the things that I had said

10   earlier -- and this was an issue -- it was difficult for

11   them to be able to show -- and I can't really explain

12   what would have been needed to be taking place in order

13   to show that she was not -- I think they had a concern

14   that she was spending so much time on the phone that she

15   was not getting the work done that she was supposed to

16   get done.  I'm not sure what evidence they would have

17   been able to provide.

18       Q.    Okay.  What was your understanding of what

19   Ms. Wilson's work was?

20       A.    I don't recall specifically what it was she

21   did.  I think that she was responsible for making calls.

22       Q.    Was there any indication that she wasn't

23   making the calls that she was supposed to be making?

24       A.    Not that was presented to me.

Wilson v. Christiana Care Health Systems, Inc.

23

1          Q.      But you do not have a recollection; is that
2    fair to say?

3          A.      That's fair to say.

4          Q.      This meeting, this first meeting that you
5    had with Ms. Fitzgerald and Ms. Habich, did you keep
6    notes of that meeting?

7          A.      I probably did.

8          Q.      Would they probably have ended up in that
9    Trafinna Wilson file that you described earlier --

10         A.      Yes.

11         Q.      -- or would they have been placed someplace
12   else?

13         A.      No.  They probably would have been put in
14   that file.

15         Q.      And would they have been handwritten notes?

16         A.      Yes.

17         Q.      And can you think of any reason why they
18   would be destroyed or unavailable?

19         A.      No.

20         Q.      What was decided by the end of the meeting
21   with Ms. Fitzgerald and Ms. Habich?  What was decided as
22   to how to proceed regarding Ms. Wilson's concerns?

23         A.      What was decided was, number one, they were
24   going to hold off on cross-training, and they were going

Case 1:06-cv-00705-MPT    Document 54-6    Filed 01/11/2008    Page 11 of 30
Wilson v. Christiana Care Health Systems, Inc.

24

1    to, at my recommendation, pull telephone records and

2    internet records of the staff to see what, in fact, was

3    taking place with the use of the phone and the internet.

4        Q.    Okay.  Why were they going to hold off on

5    cross-training?

6        A.    They were going to hold off at my

7    recommendation, because they were indicating there was a

8    performance issue.  My recommendation was if there is a

9    performance issue, if there is a behavioral issue, in

10   terms of not dealing with policy and practice, let's

11   deal with that issue.

12       Q.    Did you advise them or did you at any time

13   advise Ms. Wilson that this proposed cross-training

14   could not take place because Ms. Eastburn and Ms. Wilson

15   held different job classifications or different pay

16   levels, and you can't be moving people back and forth

17   from these different classifications?

18           MR. OSSIP:  You are asking did he tell that

19   to Ms. Wilson?

20           MR. FLETCHER:  Did he tell it to Ms. Wilson,

21   to Ms. Fitzgerald, or to Ms. Habich.

22           THE WITNESS:  I had a concern about the

23   grade and the pay, which I believe was one of

24   Ms. Wilson's concerns.  And I, therefore, had an issue

Wilson v. Christiana Care Health Systems, Inc.

25

1    with doing the cross-training under those circumstances.

2    BY MR. FLETCHER:

3        Q.    Can you explain that?

4        A.    And this was to April and to Melinda.   I

5    don't recall sharing that with Ms. Wilson.   But if one

6    of the individuals is at a lower grade, they were going

7    to be asking that individual to perform duties that are

8    in a higher grade and vice versa, the higher grade

9    individual performing duties in a lower grade.   That was

10   my concern.

11       Q.    Now, why were you proposing that the phone

12   records -- and did you say internet records, also?

13       A.    Yes.

14       Q.    Why were you proposing that the phone

15   records and internet records of all of the workers under

16   Ms. Fitzgerald be looked at?

17       A.    Basically, if we are going -- and I think we

18   do this normally.   If we are going to look at an

19   individual in an area, we don't just look at the one

20   individual.   This was a small group.   So my

21   recommendation was:  Let's take a look at everybody and

22   see what's going on.

23       Q.    What do you mean by you don't look at just

24   one individual?

Wilson v. Christiana Care Health Systems, Inc.

34

1      Q.      What happened next, from your perspective,

2   from what you know and your involvement, after you had

3   your meeting with Fitzgerald and Habich?

4      A.      I believe they pulled the records, verified

5   that there was use of the telephone inappropriately, use

6   of the internet inappropriately.  There was quite a bit

7   of time spent, which would constitute idleness.  It

8   meant that discipline would be in order.  Having

9   received decision-making leave, the next step of the

10  disciplinary process was termination.

11     Q.      Now, was termination mandatory, given that

12  status?

13     A.      Given that status, if the discipline were

14  called for, yes.

15     Q.      Let me hand you what I believe is a copy of

16  the Christiana Care's disciplinary policy in effect at

17  the time of this incident.

18             MR. FLETCHER:  And we will mark this one as

19  Bryson 2.

20             (Bryson Exhibit Number 2 was marked for

21  identification and attached to the record.)

22  BY MR. FLETCHER:

23     Q.      Have you had a chance to look at it?

24     A.      Yes.

Wilson v. Christiana Care Health Systems, Inc.

35

1        Q.      Are you familiar with this policy?

2        A.      Yes.

3        Q.      That was part of your duties, was it not, to

4    see that this policy was followed throughout the

5    company?

6        A.      Yes.

7        Q.      Can you tell me where it states that if you

8    are disciplined, went on decision-making leave,

9    termination is mandatory?

10       A.      If you look at page two of six, step three,

11   decision-making leave, this step is the final step in

12   the form of discipline process.  It explains what the

13   decision-making leave is.  It is a one-day paid leave,

14   which is used to offer the employee an opportunity to

15   correct performance problems or rule violations

16   following a written reminder.

17              Decision-making leaves may also be used for

18   major violations or when unrelated performance problems

19   and/or when rule violations occur.  Deactivation period

20   is three years for this discipline.

21              Supervisors are to inform the employee, the

22   purpose of a decision-making leave, the purpose is to

23   give the employee the opportunity to reflect on the

24   problems and make a decision to stay or change a

Anthony Reporting    PO Box 234, Dover, DE    19903    (302)674-8884

**A-164**

Case 1:06-cv-00705-MPT    Document 54-6    Filed 01/11/2008    Page 15 of 30
Wilson v. Christiana Care Health Systems, Inc.

36

1    behavior or to voluntarily resign.

2              Before initiating a decision-making leave,

3    the supervisor will review the proposed action with and

4    employee relations representative to ensure consistency

5    with Christiana Care guidelines and obtain departmental

6    management approval.

7              So the decision-making leave which she

8    received in March was the final step.  Any violations --

9    and that is normally spelled out in the disciplinary

10   action form.  Any violations will be reviewed for term.

11        Q.   I'm sorry.  Any violations will be reviewed

12   for what?

13        A.   Will be reviewed for termination.

14        Q.   Does that make it mandatory?

15        A.   It's the final step in the process.

16        Q.   I understand your explanation and what you

17   have just cited in page two of six.  Would you agree

18   that nothing you just read spells out that any other

19   disciplinary issue while on decision-making leave status

20   manditorily requires termination?

21        A.   No.  There's nothing there that says

22   mandatory.

23        Q.   In looking through some of the papers that

24   were provided to us by Christiana Care, we were able to

Wilson v. Christiana Care Health Systems, Inc.

52

1    retrieved again?

2            A.      That was my understanding, yes.

3            Q.      Who gave you that understanding?

4            A.      I can't say who specifically gave that to

5    me, but it would be one of the supervisors or managers

6    in our telecommunications department.

7            Q.      So something that a memory has been created

8    of in the computer system can never be retrieved after

9    60 days?

10           A.      I'm not sure how that is memorialized,

11   whether there is a computer log or some other log.  All

12   I know is that we were told that it could not be

13   retrieved after 60 days.

14           Q.      Okay.  Do you know who Christiana Care

15   receives their telephone service from?

16           A.      No.

17           Q.      Did you have any participation in the

18   decision to terminate Trafinna Wilson?

19           A.      The decision to terminate is made by the non

20   management employee relations -- in this case, myself --

21   and would have reviewed the termination to ensure that

22   it is consistent with policy and practice.  I reviewed

23   that.  I did revise, to some degree, the disciplinary

24   action record.  And that was the extent of my

Wilson v. Christiana Care Health Systems, Inc.

58

1   A.  Yes.

2   Q.  Did you review with Ms. Fitzgerald and/or

3 Ms. Habich the decision to terminate Ms. Wilson in this

4 particular situation?

5   A.  Yes.

6   Q.  Did you personally have any disagreement

7 with that decision?

8   A.  No.

9   Q.  Were you satisfied that that decision was in

10 conformity with Christiana Care policies and procedures?

11   A.  Yes.

12   MR. OSSIP:  No further questions.

13   THE WITNESS:  I would say, if I can, that if

14 I had concerns and could not convince Melinda or April

15 to not terminate, then we would have pushed it up to the

16 next level.

17 BY MR. OSSIP:

18   Q.  What did you mean by that?  I'm sorry.

19   A.  That is if I had concerns or issues with the

20 termination, I would have talked with Melinda and April

21 about it and would have tried to influence them.  I

22 don't know overrule them, but to influence them in terms

23 of my concerns.  If they did not acquiesce, then I would

24 have gone to the next level of management.  That is the

Wilson v. Christiana Care Health Systems, Inc.

59

1    management above them.

2    BY MR. OSSIP:

3         Q.    And in this case, did you have any such

4    concerns?

5         A.    No.

6               MR. OSSIP:  Okay.  Nothing further.

7    BY MR. FLETCHER:

8         Q.    The issue of whether or not these certain

9    employees were exempt versus non exempt, the ones that

10   you knew were salaried, anyway, that you were just asked

11   about, by being a salaried employee are you exempt from

12   the prohibited uses of business equipment, such as

13   phones or internet?

14        A.    There is no exemption.  However, when you

15   take it into the context of time worked or worked time,

16   exempt employees, actually, for the most part, would

17   work beyond an eight-hour day.  So they weren't really

18   confined to nine to five.  So that would be the

19   difference.

20        Q.    Well, other than being not confined from

21   nine to five, would they be exempt from the policies

22   that you have spoken about and we have documented

23   regarding the personal use of e-mails or the personal

24   use of the internet or the personal use of phones or

Policy A-7 - Coaching and Positive Discipline

Print this Policy

Policy A-7 - Coaching and Positive Discipline

DATE EFFECTIVE: May 16, 2005
Revisions:   05/16/05; 10/04/02; 09/25/01; 09/30/96; 05/01/86

## I.   POLICY STATEMENT

The purpose of this policy is to provide guidance in encouraging employees to grow and support Focus on Excellence, and correcting employee performance problems or rule violations in a fair and equitable manner.

## II.   SCOPE

The following applies to Christiana Care Health Services, Health Plans, Health Initiatives, and Home Health & Community Services.

## III.   PURPOSE

- Maintain a set of standards for behavior that are reasonable, fair, and applied equally.
- Communicate these standards to employees to promote behavior that supports Christiana Care's mission, vision, values and strategies.
- Take corrective action when employee behavior or performance is unacceptable.
- Provide ongoing positive feedback to reinforce skills and behavioral competencies and recognize when performance/behavior changes to meet expectations.

## IV.   GUIDELINES

The five (5) step process detailed below is to be used in preparing for and taking disciplinary action.

- **Fact Finding**
  It is important to consider all relevant facts from all persons including the affected employees regarding a performance problem before making a decision regarding disciplinary action.

  The fact finding is to include a discussion with affected employee to offer the employee the opportunity to present his or her perspective before deciding on a course of action. When a specific incident has taken place where witnesses are involved, written statements are to be requested.

- **Problem Identification**

  If the fact finding warrants disciplinary action, then the supervisor is to prepare for the discussion with the employee and be able to:
  - clearly identify the gap between desired and actual performance;
  - describe and focus on the specific behavior that is creating a problem; and,
  - explain the impact of the problem and consequences to the employee if the problem is not corrected.

- **Discussion**

  The purpose of the disciplinary action discussion with the employee is to accomplish the following:
  - Agreement - explain the reason(s) for the discipline (the business reasons why the performance standard or rule exists). Ask for and obtain agreement that a problem exists. If agreement is not reached, explain the consequences, that is, the next step in the disciplinary process and ask for agreement. If agreement cannot be reached, then simply mandate compliance and the required action to meet performance standards.

DP 000400

EXHIBIT

Bryson 2
Cae 11/20/07

A-169

- ■ Alternative solutions - ask the employee how the problem will be corrected (what will the employee do differently). Ask the employee to explore alternative solutions and agree on the action that will best solve the problem.
- ■ Action - decide on the action and obtain a commitment to a change in behavior in order to meet all performance standards and avoid future discipline.
- ■ Consequences - discuss the consequences employee will face if they violate their agreement to change and unacceptable behavior or performance occurs in the future.

- **Documentation**

Documentation takes place after holding the discussion with the employee and confirms, in writing, a summary of the discussion including the agreed upon corrective action.

- **Follow-up**

The focus of the supervisor should be on the future in terms of follow-up and not on the past. Follow-up assures that the problem discussed is being corrected. Reinforce any improvement that is occurring even though the problem may not be completely resolved.

## V. PROCEDURES

- **Coaching**

Coaching is an ongoing informal process to be used to reinforce positive performance and to immediately address performance deficiencies or rule violations. Coaching is not discipline. Documentation of coaching discussion(s) is suggested but not required.

- **Formal discipline Process**

The formal discipline process has 3 steps:

**Step 1 - 1st Step Reminder** - this step typically follows informal coaching. The 1st step reminder is used to address persistent unresolved performance problems and/or minor rule violations.

- ■ The 1st step reminder is initiated by the supervisor. The supervisor is to clearly state to the employee that the 1st step reminder is part of the formal disciplinary process. The supervisor is to document the 1st step reminder discussion held with the employee and maintain a copy of the documentation in the departmental record. Deactivation period is one (1) year with no discipline.

**Step 2 - 2nd Step Reminder** - this step is to be used for on-going performance problems or rule violations that were previously addressed in step 1, but remain unresolved and/or serious rule violations.

- ■ The 2nd step reminder is initiated by the supervisor and is reviewed by an employee relations representative after fact finding, but before a final discussion takes place with the employee. Deactivation period is two (2) years with no discipline.

**Step 3 - Decision Making Leave** - this step is the final step in the formal discipline process. The decision making leave is a one (1) day paid leave which is used to offer the employee an opportunity to correct performance problems or rule violations that continue following a written reminder. Decision making leave may also be used for major rule violations or when unrelated performance problems and/or rule violations occur. Deactivation period is three (3) years with no discipline.

The supervisor is to inform the employee of the purpose of a decision making leave. The purpose is to give the employee the opportunity to reflect on the problem(s) and to make a decision to stay and change the behavior or to voluntarily resign.

DP 000401
A-170

Policy A-7 - Coaching and Positive Discipline

Before initiating a decision making leave, the supervisor will review the proposed action with an employee relations representative to ensure consistency with Christiana Care guidelines and obtain departmental management approval.

■ **Multiple Unrelated Disciplines**

The third 1st step reminder for unrelated disciplines that have occurred within a twelve (12) month period may be processed as a 2nd step reminder.

The second 2nd step reminder for unrelated disciplines that have occurred within a twenty-four (24) month period may be processed at the decision making leave step.

■ **Deactivation of Discipline**

The following guidelines will be used for the deactivation of discipline from an employee's record who has remained discipline free.

| Type | Location | Years |
|------|----------|-------|
| 1st Step Reminder | Department Record | 1 |
| 2nd Step Reminder | Personnel Record | 2 |
| Decision Making Leave | Personnel Record | 3 |

The Human Resources department will retain copies of deactivated discipline(s) at the 2nd step reminder and decision making step to maintain a history of disciplines for fairness, consistency and legal reasons.

■ **Termination of Employment**

1. **Involuntary Termination**

   Involuntary termination of employment is a management action to be taken when all efforts in the formal discipline process have failed or when the rule violation is so serious in nature that the discipline process is not considered to be a viable option

   The action to terminate is to be initiated by the supervisor with departmental management approval. Prior review with an employee relations representative is required to ensure consistency with CCHS guidelines.

   The supervisor initiating the action to terminate an employee's employment is to privately discuss the reasons for termination and explain the employee's right to appeal.

2. **Leave Pending Investigation**

   A supervisor may require an employee to go on paid leave pending investigation when immediate action is required to prevent danger to other employees, patients, or property; or where the seriousness of the situation may require an in-depth investigation.

   If time permits, the supervisor is to obtain as much information as possible and discuss with an employee relations representative to assess the need to take this action. A leave pending investigation is not considered a disciplinary action.

DP 000402

■ **Documentation of Discipline**

All formal discipline must be documented. Where necessary, the direct testimony of witnesses and/or evidence acquired should be included in the documentation.

A-171

**1st Step Reminder**

A memorandum to the file detailing the discussion with the employee is the required supportive documentation. The 1st step reminder will not become part of an employee's record unless there is subsequent disciplinary action.

**2nd Step Reminder and Decision Making Leave (use Form 15267)**

The 2nd step reminder and decision making leave disciplinary actions are to be completed in triplicate. The original is to be placed in the employee's personnel record with a copy for the supervisor and the employee. Previous 1st step reminder(s) or coaching record(s) are to be attached to the formal discipline record and placed in the employee's personnel record.

The supervisor and the employee are to sign the formal discipline record after the discussion has been completed. The employee should receive a copy of the discipline record at this time. Management signatures are obtained after the supervisor/ employee sign off. Should the employee refuse to sign, then the document should note a "refusal to sign". When refusal to sign occurs, referral and intervention by an employee relations representative is recommended. All employees are to be informed of the appeal process available to them if they disagree with the decision to discipline.

- **Supervisor's Formal Discipline Checklist**

  It is suggested that supervisors review the attached checklist before taking any action to assure that the discipline being considered is appropriate, justified and consistent.

- **Human Resources Department Review**

  All decisions from 2nd step reminder to termination of employment are to be reviewed with the Human Resources department before implementation. It is the responsibility of the employee relations representative and the supervisor to advise the next level of management when there is a lack of agreement regarding a proposed disciplinary action.

- *Retaliation*

  Christiana Care does not permit nor will it condone intimidating or retaliatory acts against employees who report perceived or actual work rule or other regulatory violations. Disciplinary action up to and including termination may be warranted based on the outcome of Christiana Care's fact finding investigation.

**Coaching and Positive Discipline Process**

**Coaching**
A. Fact finding and listening to the employee before any action is taken or forms filled out.
B. If fact finding and the employee's side of the story warrants further action, then identify the problem. What is the difference between actual and expected attendance/performance behavior?
C. What are the business reasons why the problem should be solved?
D. Determine the logical consequences if the problem is not corrected.
E. Hold discussion with employee.

DP 000403

Ask for employee's agreement that a problem exists.

| If Employee Agrees | If Employee Doesn't Agree |
|---|---|
| Discuss way to solve problem. | Describe the logical consequences that employee faces if the problem |

A-172

Policy A-7 - Coaching and Positive Discipline

| | continues. |
|---|---|
| Have the employee decide what action they will take to resolve their problem. | If employee still does not agree, let him/her know that action that you want them to take to solve the problem. |

F.   Documentation is optional.
G.   Follow-up. Recognize improvement.

### Positive Discipline Process

A.   Fact finding and listening.
B.   Problem identification.
C.   What are the business reason why the problem should be resolved?
D.   Determine the logical consequences if the problem is not corrected.
E.   Discussion with employee.

**Gain agreement that problem exists.**

| If Employee Agrees | If Employee Doesn't Agree |
|---|---|
| Discuss way to solve problem. | Describe the logical consequences that employee faces if the problem continues. |
| Have employee decide what action they will take to resolve their problem. | If employee still does not agree, let him/her know that action that you want them to take to resolve the problem. |
| Describe probably consequences if problem continues. | Describe probably consequences if problem continues. |

F.   Disciplinary action to be administered.
G.   Document.
H.   Follow-up. Recognize improvement.

### Addendum I: Addressing Performance in a Culture of Safety

#### Overview

Christiana Care has an ongoing commitment to patient safety and has many systems in place to reinforce that commitment. In light of our commitment to patient safety, Christiana Care is taking a planned approach to create a culture of safety that places learning before blame, openness before secrecy and safety before pride.

Short-term solutions obtained in an environment of blame create fear, hinder true problem solving, and undermine an individual's willingness to share information, develop their skills and increase accountability.
The following guidelines for fact finding and action plan development are provided to managers to support openness in reporting and organizational learning in the identification and prevention of errors, while maintaining individual esteem and self worth.

#### I. Guidelines

DP 000404

A-173

Employees are responsible for identifying and reporting potential as well as actual errors, events or near misses in order to support continuous performance improvement, organizational learning, and the achievement of our vision to focus on excellence.

Christiana Care has established a process for performance management, Policy A-9; Working Planning and Performance Review as well as coaching and positive discipline, Policy A-7, Coaching and Positive Discipline. The following guidelines are philosophically aligned with the approach outlined in these policies, and provides management flexibility in addressing work performance issues identified through the fact finding process.

## II. Fact Finding

Upon identification of an error, event or near miss fact finding/ problem analysis should occur. Problem analysis should include a thorough review of the incident and include an assessment of the following:

**Identification** - what happened and why did it happen?

**Systems review** - is there anything in our systems, processes, or procedures that increases the likelihood of an error, event or near miss and reduces the chances of creating the results we want?

**Outcomes** - What do we need to do to obtain the results we want? What strategies or actions can be taken to reduce the likelihood of the situation occurring in the future?

**Openness** – Lets talk about the issue so we can learn and do a better job next time through prevention.

## IV. Action Planning

Based on the completion of fact finding, action steps should be developed to support and reinforce Christiana Care's culture of safety. In some instances, action steps may include individual as well group education or changes in systems, processes, and procedures. In some instances, fact finding may relate to individual accountability in that established and appropriate practices or procedures were not properly followed and were within the individual's control.

## VI. Individual Accountability

When fact finding reveals that appropriate systems, processes, and procedures are in place, and the error is due to individual work performance, steps should be implemented to increase awareness, provide education, and assure competency as well as ongoing patient/employee safety.

Action steps should include an individual development plan including re-education for the individual as well as any other actions deemed necessary to increase awareness and establish appropriate competencies.

### A. Documentation of Individual development plans

Similar to coaching, individual development plans are generally documented *only* in the individual's departmental file. Development plans may also be shared when required through Christiana Care's internal performance improvement or safety review processes.

### B. Disciplinary Action

Individual development plans should be documented as outlined above. Managers should take into account an individual's overall work performance history, core value behaviors and any other relevant factors such as frequency of errors, before considering disciplinary action. In most cases, disciplinary action is generally not warranted as the first step in addressing work performance issues. The Employee Relations section of the Human Resources department should be consulted before initiating disciplinary action.

### C. Annual Performance Review

Isolated instances of below standard work performance do not necessarily reflect an individual's overall level of work performance. Managers should assess an individual's overall level of work performance and not a single isolated incident in reviewing annual work performance and level of individual contribution.

DP 000405
A-174

Policy A-25 - Non-Retaliation Policy

<u>Print this Policy</u>

**Policy A-25 Non-Retaliation Policy**

**DATE EFFECTIVE:** June 21, 2007
**Revisions:** 06/21/07; 02/01/04

## I. <u>POLICY STATEMENT</u>

Christiana Care's mission, vision, strategic goals and objectives can only be accomplished in an environment that promotes core value behavior and open communication which is free from any form of discrimination, harassment or retaliation. All policies shall be implemented without regard to race, color, sex, religion, natural origin, sexual orientation, age, veteran status, physical or mental disability or any other factor that may form the basis for discrimination. Retaliation on the part of management and/or employees against any employee for the good faith reporting of any real or perceived incident involving poor work performance, alleged discrimination or harassment or the unethical, illegal or unsafe conduct, or for participating in the investigation of any such allegations will be reviewed for discipline up to and including termination.

## II. <u>SCOPE</u>

This policy applies to all employees in Christiana Care Health Services, Health Plans, Health Initiative and Home Health & Community Services.

## III. <u>DEFINITION</u>

A. **Retaliation** -- action(s) taken by management and/or other employees that result in a hardship, loss of benefit or penalty imposed on an employee as punishment for:

1. Reporting a good faith complaint of alleged poor work performance, discrimination or harassment, or alleged unethical, illegal or unsafe conduct
2. Participating as a witness or in the investigation of a complaint
3. Investigating a complaint

**DP 000406**

## IV. <u>PURPOSE</u>

This policy has been established to promote open communication and ensure that all employees are able to work in an environment free from harassment, discrimination or any form of retaliation for reporting in good faith, conduct that is allegedly unethical, illegal, or unsafe or which conflicts with sound business practice.

Christiana Care encourages the reporting of all allegations of retaliation and upon notification, will immediately begin a fact finding investigation. Disciplinary action, up to and including termination of employment will be taken against any member of the management team or employee(s) who engages in or participates in retaliatory behavior. Members of management will be held to the highest standard of conduct.

## V. <u>PROCEDURE</u>

A. Any employee who believes he or she has been subjected to retaliatory treatment is to report or should be directed to report the alleged act immediately to the attention of the Employee Relations section of the Human Resources department. The Employee Relations section of the Human Resources department will provide guidance and conduct fact finding as warranted. Employees who wish to file a complaint upon consultation with Employee Relations, should submit the complaint in writing, outlining the date and nature of the complaint. When necessary, the employee can affix their signature to a prepared statement.

B. Fact finding conducted by Employee Relations will include an investigation of the initial incident, and the alleged retaliatory or adverse action to determine if there is a causal connection between the two. Appropriate action will be taken based on the individual facts of the case.

C. Allegations of retaliatory treatment found not to have been raised in good faith will be reviewed for

**A-175**

Policy A-25 - Non-Retaliation Policy

Page 2 of 2

disciplinary action.

D. All reported information will be treated in confidence except to the extent necessary to investigate and resolve the matter.

E. As representatives or agents of Christiana Care, members of management including supervisory personnel will be held to the highest level of accountability for adhering to and enforcing this policy.

## VI. RESPONSIBILITIES

### A. Human Resources

The Employee Relations Section of the Human Resources Department is responsible for investigating employee concerns and providing appropriate guidance to management.

The Human Resources Department will orient members of management to this policy and assist management in the investigation and handling of such complaints consistent with this policy and applicable law.

The Human Resources Department will notify employees of this policy including how to obtain assistance in addressing retaliation complaints.

### B. Management

Management is to comply with and enforce Christiana Care's non-retaliation policy, ensuring that all employees are aware of the policy and consulting with the Employee Relations section of the Human Resources department as necessary.

Management will notify the Employee Relations Section immediately upon notification by an employee of a retaliation complaint.

DP 000407

A-176

Employee Handbook

Print Handbook

**Health Services, Heath Initiatives and**
**Home Health and Community Services**
**Employee Handbook**



### Introduction

This guide highlights policies, practices, services and other benefits provided to employees in Christiana Care Health Services, Health Initiatives, Health Plans and Home Health and Community Services. The guide is intended to be informational and is not a contract between you and Christiana Care. Statements of policy and procedure in this guide are subject to change, and final interpretation of current policies and practices rests with Christiana Care.

### An Equal Opportunity Affirmative Action Employer

Christiana Care is an equal opportunity employer, committed to carrying out all employment practices - including but not limited to recruitment, selection, education and promotion - without regard to race, color, religion, sex, sexual orientation, national origin, age, disability or veteran status.

Christiana Care is also committed to an affirmative action program to encourage and promote opportunities for women, minorities, veterans and the disabled. The senior vice president of Human Resources is responsible for coordinating Christiana Care's efforts to comply with all aspects of equal opportunity employment legislation.

### About Christiana Care

Welcome to the Christiana Care Health Services family. Christiana Care is the region's leading health care provider, serving Delaware and neighboring areas of Pennsylvania, Maryland and New Jersey.

Established as a single hospital in 1888, today Christiana Care includes hospitals, rehabilitation and wellness facilities, primary care physician offices, home health care services, health insurance plans, a long-term care facility and many more health-related resources to keep our community healthy and care for our neighbors when illness or injuries do occur.

At a Christiana Care facility, you'll find the caring, compassionate, interpersonal approach you expect, and deserve, from your health care providers. More than 1,000 community physicians and surgeons, representing every medical practice and specialty, are affiliated with Christiana Care. Hundreds of the country's brightest medical and surgical residents from Jefferson Medical College of the Thomas Jefferson University in Philadelphia gain extensive knowledge on the latest diagnostic and treatment techniques by training under our experienced physicians, surgeons and dentists.

**You and Your Job**

DP 000382

### Employee Relations Philosophy

Christiana Care is committed to maintaining a positive employee relations climate through voluntary adoption of policies and practices which assure our employees a competitive level of pay and benefits, including a variety of programs that support worklife balance, safe working conditions, consistent administration of policies, open two-way communication and the opportunity to resolve problems through Christiana Care's problem solving procedure.

In light of our employee relations philosophy, Christiana Care views outside representation of our employees through a union as unnecessary and undesirable as it is inconsistent with Christiana Care's mission.

You are encouraged to meet with your supervisor to discuss any matter of concern. In addition to your supervisor, an employee relations support system is available to answer your questions, and provide guidance for job-related concerns, problems or complaints. Remember, the only way we can help solve your problem is for you to tell us about it.

### Employee Classifications

Christiana Care employees are classified as full time, part-time, or relief employees. Your eligibility for Christiana

Employee Handbook

Care benefits depends on your classification.

**Full-time:** You qualify for full benefits if you are employed in an authorized, budgeted position that requires 80 hours of work during each biweekly pay period, and conforms to the regular and established work schedule of the position.

**Part-time:** You qualify for pro-rated benefits if you are employed in an authorized, budgeted position that requires you to work at least sixteen, but less than 80 hours, during each biweekly pay period, and conforms to the regular and established work schedule of that position. Part-time employees may also qualify for a higher pay, limited benefits option. (Note: Option not applicable to all subsidiaries.)

**Relief:** Employees hired in a casual, temporary or per diem classification are hired to serve as supplemental staff for a temporary period of time or to be utilized on an "as needed" basis. Employees in such classifications do not qualify for benefits.

**Weekend Incentive Program (WIP):** Many departments within Christiana Care also offer a weekend incentive program which provides a higher level of pay for an increased commitment to work on weekends.

## Orientation
During your first day as a Christiana Care employee, or as soon as possible thereafter, you will have the opportunity to attend a general orientation program. The program will acquaint you with our policies and benefits.

Your supervisor will conduct the majority of your orientation on a day-to-day basis, reviewing in greater detail our policies and benefits, and guiding you in learning your job. Your supervisor will explain your duties, keep you informed of your progress and, when appropriate, make recommendations for improvement. If you have difficulty with your job or you don't understand certain job requirements, your supervisor will be happy to talk with you.

An employee relations representative is assigned to each of our hospitals and is available to employees at off campus facilities to assist you with job-related concerns.

## Appearance Standard
As a health care provider, Christiana Care desires to portray an image that instills a sense of confidence, security and professionalism to those who have entrusted their care to us and to those with whom we work. Each employee is a representative of Christiana Care and presents an image of the organization to those we serve. Therefore, standards of appearance have been established to ensure that employees present the appropriate corporate image. Although you may work in a non-public area, at times you will have interaction in public areas in the view of patients and other customers. Each department may establish additional guidelines based on the specific needs of their department.

Christiana Care's appearance standards address personal hygiene as well as the avoidance of odors that may impact our patients such as strong perfumes, cologne and the odor of tobacco. Employees who do smoke should take necessary precautions to avoid the odor of tobacco or smoke residue while at work.

## Work Assignment and Location
Although you are initially assigned to a specific position, it may be necessary to reassign you to another shift, department, hospital, or facility, where your particular abilities can best be used to assure proper care of our patients.

## Breaks
Work breaks are determined on a departmental basis based on workload demands. Since such breaks are paid time, breaks are not guaranteed.

## Public Areas
Employees are encouraged to utilize staff lounges and cafeterias for break periods. Staff may utilize the public main lobbies; however professional behavior must be demonstrated at all times. Lounging with feet on table, sleeping, and personal cell phone use is not acceptable in any public space on Christiana Care campuses as it may send a less than positive message to our patients and visitors.

## Workday
Christiana Care operates around-the-clock 365 days a year to provide vital services to our patients. To do this, we plan our work schedules to ensure personnel are available and patient care remains at a consistently high level.

DP 000383

Employee Handbook

Your supervisor arranges your work schedule and will explain any necessary changes to you. We must all remember that our patient care obligations ultimately determine our work schedules.

All Christiana Care employees are considered essential personnel. During emergencies and periods of critical needs, it is expected that employees report for work as required by their department.

**Trial Period**
Your first three months of work at Christiana Care are considered a trial period - a time for you to demonstrate that you are the right person for the job and Christiana Care is right for you. Your supervisor has the opportunity to review and discuss your work performance with you during your trial period. During this period, you may decide the position does not meet your needs. Also, Christiana Care may feel you are not meeting work performance standards for the position, and either party may decide to terminate employment for any reason at any time during your trial period. When you are transferred or promoted to a new position, you are subject to a similar three-month trial period.

**Employment of Relatives**
Immediate family members may be permitted to work in the same department as long as there is not a close working relationship (same physical location, shift, etc.). Immediate family is defined as parent, child, spouse, and/or sibling. However, employment, promotion or transfer will not be considered where ANY relative would be placed in a position of supervising another, or is in a position to influence employment decisions of another, or if a conflict of interest may result.

**Promotions and Transfers**
Christiana Care is committed to promoting from within whenever vacancies occur. Vacancies are posted on bulletin boards in each facilities' Employee Information Center and on the INet. Full or part-time employees who have been in their present job for six months without corrective disciplinary action, who are meeting standards for performance and attendance, and who meet the qualification requirements for the posted position, are encouraged to apply for posted positions. Positions are filled based on performance and qualifications. Seniority will only be used as a determining factor when there are two equally qualified candidates.

Employees interested in applying for posted positions should obtain a job transfer/promotion from an employee relations representative or via the INet. Job transfer/promotion forms must be approved by your supervisor and forwarded to the Human Resources department.

If an employee is unsuccessful in a new position, and there is not an opportunity to return to their former position, Christiana Care will permit the employee to apply for available positions for which they are qualified. If the employee is unable to successfully apply for another position, Christiana Care may have no alternative but to terminate their employment.

**If You Have a Problem**
Christiana Care is committed to open communication and participative problem solving. In keeping with that commitment, Christiana Care has established a problem solving procedure, which may include a peer review option at the final step. An Employee Relations Representative program is available to provide guidance for job related concerns, problems or complaints.

Christiana Care's problem solving procedure is designed to enhance effective communication between an employee and his or her supervisor. For this reason, the employee is encouraged to informally discuss the problem with his or her supervisor. If the informal discussion fails to produce an acceptable resolution, the employee should contact an Employee Relations Representative within fifteen (15) calendar days of the informal discussion. The Employee Relations Representative will provide the employee with detailed information concerning the problem solving procedure including identification of the appropriate individuals at each level of the problem solving procedure. Failure to maintain contact with an Employee Relations representative during the appeals process may result in forfeiture of an employee's right of appeal.

Employees are permitted to use this procedure to resolve any work related problem, including complaints related to discriminatory treatment based on race, color, religion, sex, sexual orientation, national origin, age, disability or veteran's status without fear of reprisal.

For further information on this process, employees should contact an Employee Relations Representative.

**Sexual Harassment**

A-179

Christiana Care is committed to a work environment which is free of sexual harassment. Sexual harassment is defined as unwelcome advances, requests for favors or other verbal, written (including electronic messages or graphics) or physical conduct of a sexual nature. Any complaints related to sexual harassment should be brought to the attention of an Employee Relations Representative who will conduct an investigation. Employees who engage in sexual harassment will be subject to disciplinary action, up to and including termination of employment.

**Retaliation**

Christiana Care's mission, vision, strategic goals and objectives can only be accomplished in an environment that promotes Core Value behavior and open communication which is free from any form of discrimination, harassment or retaliation. All policies shall be implemented without regard to race, color, sex, religion, national origin, sexual orientation, age, veteran status, physical or mental disability or any other factor that may form the basis for discrimination. Retaliation on part of management and/or employees against any employee for good faith reporting of any real or perceived incident involving alleged poor work performance including a failure to demonstrate core value behaviors, discrimination or harassment or the unethical, illegal or unsafe conduct, or for participating in the investigation of any such allegations will be reviewed for discipline up to and including termination. Individuals are encouraged to report concerns regarding retaliation directly to the Employee Relations Department at 733-1121.

**False Claims Act**

Christiana Care will not submit or cause to be submitted false claims. Furthermore, employees of Christiana Care can be held liable for filing or causing to be filed false claims. Christiana Care strictly prohibits the submission or participation in the submission of any false claims.

The Federal False Claims Act (FCA) outlines the liability for individuals who file or cause to be filed false or fraudulent claims. A false or fraudulent claim is basically something that is untrue. Examples include billing twice for the same service, billing a higher level of service when a lower level was provided, billing for equipment or supplies that were never provided, documenting misleading or inaccurate information in charts or providing services that were ordered or are not medically necessary. These are just a few examples. In addition, Delaware also has its own False Claims Act which is very similar to the Federal FCA.

Christiana Care has implemented policies and procedures to prevent the filing of false claims and has established a Hotline to allow employees to confidentially report suspected false claims directly to the Compliance Officer via the Hotline at 877-REPORT-0 (877-737-6780) or by calling the compliance office at 302-428-2873.

If you know of, or suspect that false claims are being filed, you are required to report this to the Compliance Officer. Employees are required to take mandatory compliance training upon hire and annually thereafter. Employees will be provided with more detailed information about the compliance program and Christiana Care's reporting requirements during that training.

The federal and state False Claims Acts also have what is known as "Whistleblower Protections". Individuals with specific knowledge of false claims submissions have the right to file a claim. Whistleblowers are protected under both the federal and the state False Claims Act for doing so. Whistle blower protections extend to any employee who is discharged, demoted, suspended, threatened, harassed or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others. The employee would be entitled to relief necessary to make the employee whole.

Under Christiana Care's Compliance Program, employees are required to report suspected or known violations of The False Claims Act to the Compliance Officer or to another member of management.

## Standards of Conduct and Performance

Christiana Care has established an organizational code of ethics and is committed to carrying out all of its business operations in an ethical manner. These standards have been developed to promote and protect the integrity of the organization. These practices include but are not limited to conflicts of interest, the environment of care, and all aspects of patient care as well as business operations. You should consult your supervisor with questions or concerns. Christiana Care also provides a 24 hour corporate compliance hot line 1-877-REPORT-0 (1-877-737-6780).

A-180

As a Christiana Care employee, you are expected to demonstrate Christiana Care's values of Caring, Excellence, Integrity, Leadership, Service and Teamwork in the performance of your duties and conduct yourself with the best interest of our patients and Christiana Care in mind. It is also expected that all employees conduct their personal affairs in a manner that does not adversely reflect upon Christiana Care. Individual sets of circumstances will be reviewed on a case by case basis. Employees who are charged with misconduct outside of Christiana Care may be granted a leave of absence to resolve the charge. Termination of employment may result in instances where the charge is not satisfactorily resolved.

### Performance Review

During your trial period, and periodically thereafter, your supervisor will review your performance to determine how well you meet the job standards for the major responsibilities of your position. Your supervisor will discuss this review with you, pointing out your strengths, as well as areas that need improvement, and perhaps suggest how such improvement might be accomplished.

### Attendance and Lateness

As a normal condition of employment, you are expected to be on the job when scheduled. If you are unable to report as scheduled, please notify your supervisor as early as possible prior to your scheduled reporting time, or as required by the policies in your department. **Be sure to check with your supervisor concerning departmental requirements.**

Failure to notify your supervisor as required, may result in disciplinary action. If you are absent for three consecutive days without notifying your supervisor, you are considered to have voluntarily terminated your employment.

Christiana Care guidelines for unplanned absences and lateness are based on a system of occurrences. An occurrence is an unplanned absence of one day away from scheduled work without prior approval, or a number of consecutive, unplanned absences. Each lateness is considered an occurrence. The number of occurrences which may result in disciplinary action is based on the shifts of duty for which you are regularly scheduled to work and your length of service (if less than one year) as outlined below.

If you are regularly scheduled to work 10 shifts of duty biweekly and you exceed six occurrences and/or are late for work more than five times in a rolling 12 month period, you may be subject to disciplinary action.

If you are regularly scheduled to work less than 10 shifts of duty bi-weekly, your guidelines for unplanned absences and lateness are based on the number of shifts of duty for which you are regularly scheduled during a bi-weekly pay period.

If you have less than one year of service, guidelines for unplanned absences and lateness are pro-rated based on your months of service and shifts of duty for which you are regularly scheduled during a bi-weekly pay period.

Please check with your supervisor for additional policy information.

DP 000386

### Confidentiality of Patient and Employee Information

It is essential that we keep information about patients and employees absolutely confidential. Such information may only be shared with others at Christiana Care on a "need to know" basis to enable them to effectively carry out their responsibilities. Unauthorized access or release of patient, employee or corporate information may result in disciplinary action including termination of employment.

### Smoking

For the health of our patients and employees, Christiana Care is a smoke free work place. Smoking is NOT permitted in any Christiana Care facility, on any Christiana Care campus or on an employee's work time. Christiana Care does not require that employees quit smoking, however does not permit smoking or the use of chewing tobacco as noted above. Smoking cessation resources are available to employees who would like to quit. Employees who do not wish to quit smoking are encouraged to develop strategies to remain smoke free throughout their work day.

A-181

### Electronic Communication

Christiana Care owns and maintains office/computer technologies and electronic systems to assist employees in meeting the business needs of the organization and are not the private property of any employee. Electronic communications include but are not limited to e-mail messages, graphics, screen savers, wallpaper, auto reply and signature responses as well as Internet access and usage. Christiana Care supports employee's use of the

Internet, Intranet, and e-mail for professional purposes that do not interfere with the individual's job duties. Professional usage includes access to worklife support tools, personal information, internal communications and other Christiana Care sponsored or approved resources. Christiana Care reserves and will exercise the right to review, audit and disclose messages as well as graphics received, created or sent over e-mail, or by other electronic means. All communications should meet professional standards and should not contain offensive, obscene, or harassing messages or graphics. Offensive messages include content which is inconsistent with Christiana Care Core Value behaviors and includes, but is not limited to comments that may be offensive based on age, race, sex, sexual orientation, religion, national origin, disability, or veteran's status. Use of e-mail/electronic technology to copy and/or transmit any documents, software or other information protected by copyright laws is prohibited. Based on current technology, "deleted" files may also be restored and their contents disclosed.

Christiana Care may also monitor or intercept telephone conversations as necessary for customer service, quality assurance and performance improvement purposes.

Violations of Christiana Care communications standards may result in disciplinary action up to and including termination of employment.

**Corrective Action**
If you break hospital or other reasonable common sense rules of conduct, corrective action, which may range from coaching to termination will be administered promptly.

**Substance Abuse**
Christiana Care is dedicated to providing quality care for our patients, as well as a safe working environment for our employees.

To achieve this, we must ensure that all employees are able to function at their optimum level at all times. Therefore, we are committed to maintaining a drug and alcohol free work place.

Use of drugs and/or alcohol, or misuse or abuse of prescribed, controlled or other substances which alter or impair the behavior or ability of employees to function while working is prohibited. Employees appearing unfit for duty may be requested to submit to a medical evaluation, which may include drug and alcohol testing. Employees with the presence of drugs and/or alcohol in their system or who refuse testing will be subject to disciplinary action, up to and including termination of employment.

Christiana Care also prohibits the unlawful manufacture, sale, distribution, dispensing and/or unauthorized possession of drugs and/or alcohol or other controlled substances on Christiana Care premises. Violations of this nature will result in termination of employment and may have legal consequences. Possession and use of alcohol on Christiana Care premises for limited social events can only be authorized by the office of the President.

In accordance with the Drug Free Work Place Act, any employee charged with an alcohol-related or drug-related offense which involves the sale, use, distribution or possession with the intent to distribute or manufacture drugs must inform Christiana Care of the charge within five days of the charge. After notification to Christiana Care and depending on the circumstances involved, such a charge may subject the employee to disciplinary action up to and including termination of employment. Failure to report such a charge is grounds for disciplinary action up to and including termination of employment.

Christiana Care's Employee Assistance Program (1-800-298-9076) is available to employees experiencing substance abuse problems.

**Staff Rights**
Christiana Care recognizes that there may be situations where conflict may arise related to an employee's religious beliefs, cultural or moral values, or ethics and their participation in certain aspects of patient care. When such conflicts arise, employees may request to be excluded from certain aspects of patient care. Request for exclusion does not guarantee that the employee will be excluded. Christiana Care must ensure that patient care is continued and not compromised by a request for exclusion from an aspect of the patient care process. Specific procedures have been established to address such requests.

Whenever possible, employees should notify their supervisor or department head in advance and in writing about their concerns and request to be excused from participating in a particular aspect of treatment or care process.     A-182

### Leaving Christiana Care

You are required to give your supervisor at least two working weeks notice when you leave Christiana Care voluntarily. If you leave without proper notice or are terminated for cause, your final paycheck will not include any accrued paid leave hours.

You must return all uniforms, photo identification/access card, locker keys and any other Christiana Care property to your supervisor.

### Employee Identification/Access Card

Your photo identification/access card must be worn when reporting to work and at all times while you are on duty, on the upper half of your body, generally over the left side of the chest, with the photo and name clearly visible. Your photo identification/access card is required to access employee gate controlled parking lots and doors within the building. If your photo identification/access card is lost or stolen, you must report it to your supervisor. Your photo identification/access card can be replaced, at a cost to you, by contacting the Security department.

### Gifts and Gratuities

You may not accept gifts, tips or gratuities from patients or from firms doing business with Christiana Care. You may advise patients or families wishing to express their appreciation of certain appropriate methods, such as making a contribution to Christiana Care through the Development office.

### Telephone Messages, Personal Cell Phones and Pagers

Because Christiana Care receives thousands of telephone calls daily through our telephone system, employees may not use departmental telephones for personal business. While at work, you may only receive calls for hospital business or personal emergencies. Pay telephones or personal cell phones may be used when it is necessary to make personal calls on non-working time.

Use of personal cell phones and pagers while on duty is prohibited. Employees who are required to use cell phones or beepers for Christiana Care business reasons are to respond to calls in an appropriate area with consideration given to confidentiality, safety, and maintaining a quiet environment for those whom we serve.

Employees who are required to drive while carrying a business cell phone should pull safely off the road and stop before responding to the call.

### Solicitation and Distribution

In no way may solicitation or distribution by Christiana Care personnel interfere with Christiana Care's patient care or the work of an employee. To assure that does not occur, the following rules apply to solicitation and distribution of literature or other materials on Christiana Care property:

**Non-employees:** People not employed by Christiana Care may not, at any time, solicit or distribute literature or other materials for any purpose on Christiana Care property.

**Christiana Care employees:** No employee may solicit for any reason or distribute literature or other materials during work time or in working areas or patient care areas, such as patient rooms or treatment rooms. Work time excludes authorized break and meal time. This rule applies to employees soliciting or distributing and employees being solicited or receiving distributions.

Solicitation for and/or distribution of items such as cosmetics, jewelry, wearing apparel, housewares, religious information or similar items is not permitted by anyone at any time on Christiana Care property.

### Personal Mail

You are not permitted to use Christiana Care as your personal mailing address.

DP 000388

### Examination of Packages

You will need to obtain a package pass from your supervisor or department head when you plan to carry a bundle or package from Christiana Care property. Any packages, including handbags and personal luggage, must be made available for inspection at the request of a security officer.

### Visiting

We ask you to leave Christiana Care buildings and parking areas immediately after your duty ends, unless your presence is still required, and that you not return until the start of your next scheduled work time. This is important to our security and helps prevent unnecessary congestion.

## Your Wages and Your Paycheck

Christiana Care policy provides employees a competitive wage and benefits package. We periodically compare our wages and benefits with those of similar employers in the area to ensure competitive wages and benefits.

### Record Keeping
It is essential that the times at which you report on and off duty are accurate. Employees using Kronos, Christiana Care's electronic timekeeping system, may not swipe in earlier than seven (7) minutes prior to the start of, or seven (7) minutes past the end of their scheduled shift without supervisory permission. Employees who swipe after the start of their shift will be considered late, however, will not have their pay adjusted unless they are greater than seven (7) minutes late. Improper recording of time worked may result in disciplinary action, up to termination of employment. Employees should speak with their supervisor to review time reporting requirements.

### Swiping
Employees are expected to swipe in at the department's designated Kronos machine when they are ready to begin work. Individuals are not permitted to utilize time clocks located outside of their department unless permission has been given by management for a specific purpose (e.g., Inservice). Failure to swipe in or out appropriately will be reviewed for discipline up to and including termination.

### Payday
Christiana Care employees are paid bi-weekly or 26 times a year. Pay periods begin on Sunday and end Saturday night, two weeks later. Pay day is the following Friday. Paychecks contain wages earned during the two weeks prior to pay day and are mailed directly to employees' homes. (Note: Paychecks are distributed to departments within Home Health and Community Services.)

### Overtime Pay
We can not always predict the demand for patient services or the need for extra work time. When the need does arise, your supervisor will schedule you for overtime. Any overtime worked will be paid at the rate of time-and-one-half of your regular rate of pay, unless you are exempt, in accordance with current wage and hour laws.

Christiana Care has designated certain exempt positions, for competitive reasons, to be paid at straight time or time-and-one half of the regular rate of pay for overtime worked. Your supervisor will inform you about your eligibility for overtime pay and the basis of payment.

Christiana Care uses both a 7-day and 14-day work period to calculate overtime. If you are non-exempt, depending on the your wage type, you may be paid at the rate of time-and-one-half of your regular rate per hour for authorized time worked in excess of either:

1. All productive hours in excess 40 hours in a 7-day defined work week (Sunday through Saturday); or
2. All productive hours in excess of 8 hours in a twenty-four hour workday, or 80 hours in a bi-weekly 14-day pay period

Employees should direct questions regarding overtime rules to their supervisor.

Computation of overtime for special shifts must be approved by the Christiana Care's Wage and Compensation Manager from the Human Resources department. An Employee Relations Representative will be happy to answer your questions about computing overtime pay.

### Shift and Weekend Differentials
If you are required to work mornings, evenings and/or weekends, you may be paid an established shift differential.

### Holiday Premium
You are paid a holiday premium of fifty percent (50%) of your average rate of pay for all hours worked during the 24-hour holiday period if you are required to work a holiday. The 24-hour period begins with the shift that starts between 11:00 p.m. and 12:00 midnight, the night before the holiday. Your supervisor will advise you about your eligibility for this premium.

A-184

Employees who are scheduled to work on the following holidays are paid a holiday premium:

- New Year's Day (January 1)
- Memorial Day (last Monday in May)
- Independence Day (July 4)
- Labor Day (first Monday in September)
- Thanksgiving Day (fourth Thursday in November)
- Christmas Day (December 25)

If you are not required to work on a holiday because your department is closed, the hours will be deducted from your paid leave account. In this situation, employees who have not completed the three month eligibility period are to be advanced payment for planned time off from their paid leave account. (Note: School based policies and pay practices will be followed for employees working in the Wellness Centers. Please talk to your supervisor regarding these practices for observed holidays and winter and spring vacations).

**Paycheck Deductions**
Christiana Care makes the following deductions from your paycheck that are required by law: Social Security, Federal and State income taxes, and City of Wilmington wage taxes, where appropriate. All paychecks are mailed directly to employee's homes. You may also authorize deductions for the following:

**U.S. Savings Bonds:** You may purchase U.S. Savings Bonds through regular payroll deductions. You may start, change or stop bond deductions by notifying the payroll office prior to any pay period. An authorization form for bond deduction is available from your employee relations representative. (Note: Not available in all subsidiaries).

**United Way:** The United Way of Delaware is the only community- based fund raising campaign authorized by Christiana Care. Employees are encouraged to participate in the United Way's fall campaign by pledging an annual contribution through payroll deductions.

**Flexible Benefits:** Full time employees who select a level of benefits that requires a contribution, or part-time employees electing contributory coverage, are required to authorize Christiana Care to deduct a fixed, per pay amount when enrolling in the Flex-Plus benefits program.

**Tax Deferred Annuity Program:** Employees are permitted to allocate a portion of their present income for the purchase of an annuity. This program affords employees the opportunity to accumulate tax-free savings to supplement their retirement incomes. Representatives are available, by appointment, to discuss the program and enroll employees. The Benefits office of the Human Resources department can provide you with more detailed information.

**Automatic Paycheck Deposit**
Employees may have their paycheck deposited automatically in an area bank. Employees opting for automatic paycheck deposit receive a check stub mailed directly to their home indicating earnings and deductions. A form authorizing automatic deposit is available from your supervisor or employee relations representative.

**Wage Attachments**
Employees are expected to conduct their financial affairs responsibly. While Christiana Care does not want to be involved with creditors, we are required by law to honor wage attachments.

**Employee Records**
Up-to-date information on the number of your dependents, your home address and any name changes is required so we can properly prepare your paycheck and maintain other important records. Please notify your supervisor if there are any change in the following:

- legal name;
- marital status, dependents or beneficiaries;
- home address, telephone number, or person to be notified in case of emergency;
- additional educational qualifications you may acquire after beginning employment.

A-185

DP 000390

Your supervisor will forward all changes to the Human Resources department where your record will be updated. The Human Resources department maintains your records in a strictly confidential manner. No information from active employee records is provided to outside agencies without your written authorization, unless required by law.

## Your Time Off

### Paid Time Off

Christiana Care recognizes the need and importance of paid time away from work for vacation, sickness or other personal reasons. Christiana Care's paid time off program is offered to full and part-time employees who have completed three months of service. (Note: Paid time off available to full-time employees in Home Health & Community Services). The paid time off program is composed of two accounts, paid leave and disability leave. These accounts are described below:

**Paid Leave Account** - The hours accrued in the paid leave account can be used for vacation, personal reasons, holidays or absences due to illness (that are not covered by the disability account). Generally, paid leave should be requested in advance and approved by your supervisor.

The paid leave accrual rate is determined by the employee's position, authorized hours and years of credited service. For employees in Home Health & Community Services, the paid leave accrual is determined by years of service. Part time employees accrue paid leave through a pro-rated system based on their authorized hours.

The maximum benefit balance allowed to accumulate in the paid leave account is two times the maximum annual accrual and appears on your pay stub. Employees should contact their supervisor for more details concerning their specific accrual rates. (Note: Employees in Home Health & Community Services should speak to their supervisor to determine the maximum benefit balance for the paid leave account.)

Employees who reach their maximum paid leave account balance will automatically have excess hours transferred into their disability account.

Employees do not accumulate paid leave credits during a leave of absence without pay, unless the absence is a short-term military training leave.

Christiana Care also provides employees in Health Services, Health Plans and Health Initiatives the opportunity to cash out forty (40) paid leave hours twice a year (spring and fall) if they have a minimum balance of 200 hours. Eligible employees will receive notice at home if they qualify for this option.

**Disability Leave Account** - The hours in the disability leave account can be used for absences due to illness after the twenty-fourth consecutive scheduled work hour of absence (i.e., (2) 12 hour shifts or (3) 8 hour shifts). The first twenty-four consecutive hours of absence due to illness will be deducted from the paid leave account and, thereafter the absence can be deducted from the disability leave account. The twenty-four hour deductible is waived for scheduled work lost due to worker's compensation injuries, medical leaves of absence and inpatient treatment or outpatient surgery which does not require being placed on a leave of absence.

Full time employees will accrue at a rate of 1.54 hours of disability leave per pay. (Full-time employees in Home Health & Community Services accrue at a rate of 3.08 hours per pay). Part-time employees accrue disability leave hours through a pro-rated system based on authorized hours each pay period. Disability leave hours do not accrue during an unpaid leave of absence, except during an annual two week military training leave. The maximum benefit balance allowed to accumulate in the disability leave account is unlimited.

Employees with ten or more years of service are eligible to be paid for any unused disability leave, up to 400 hours, upon early or normal retirement under the provisions of Christiana Care's Retirement Plan. Upon retirement, employees in Home Health & Community Services, will receive payment of one half of accumulated disability leave hours up to a maximum of 480 hours. Terminated employees who are vested and eligible for future pensions are not eligible for payment of unused disability leave.

A-186

DP 000391

Employee Handbook

**Other Time Off**

### Bereavement Leave

In the event of a death in your immediate family (defined as mother, father, sister, brother, wife, husband or child) full-time employees will be eligible for twenty-four (24) hours of bereavement leave. (Note: In Home Health & Community Services, parent-in-law is defined as an immediate family member). In the event of the death of any other relative, full-time employees will be eligible for eight (8) hours of bereavement leave. Part-time employees will be eligible for bereavement leave on a pro-rated basis. If you require additional time, you need to obtain permission in advance from your supervisor to use paid leave time. It is your responsibility to keep your supervisor informed.

If you are on paid leave when a relative dies, you should notify your supervisor immediately. You may substitute funeral leave for the day or hours approved to attend the funeral.

### Jury Duty

Christiana Care will pay you your scheduled work hours if you are required to serve on jury duty. You are expected to report for work on scheduled workdays when court is not in session, or if excused from jury duty in time to work at least one-half day. Documentation from the court verifying jury duty attendance is required for payment.

### Military Leave

Christiana Care grants a leave of absence without pay to employees required to serve on active duty status in the armed forces of the United States. This applies to both full and part-time employees. You are entitled to employment privileges provided by the Uniformed Services Employment and Re-employment Rights Act of 1994.

### Leaves of Absence/Family Medical Leave Act (FMLA)

Christiana Care recognizes that employees may occasionally need to request a leave of absence for family and/or medical reasons. The following is provided to guide employees when requesting a leave by clarifying eligibility, time lines and responsibilities.

An approved leave of absence protects your continuity of service and benefits accrued before the effective date of the leave.

- Employees who have been granted a leave of absence will be guaranteed their position or an equivalent position provided their total leave time does not exceed twelve (12) weeks during the last 12 month rolling period, measured backward from the current leave.
- If your leave exceeds twelve (12) weeks as indicated above or you are physically unable to perform your former job, you will be eligible to apply for other open positions for which you are qualified. However, there is no guarantee of placement.
- Medical leaves can be granted up to a maximum of twenty four (24) weeks in a 12 month rolling period, measured backward from the current leave, but there is no job guarantee in the last twelve (12) weeks of such leave. Employees unable to return after twenty four (24) weeks leave in a rolling 12 month period will be terminated from payroll.

### A. Eligibility

Christiana Care employees must meet the following eligibility requirements to apply for a leave of absence:

- Continuous leaves of absence: Full-time and part-time employees must have a minimum of six (6) months of service. All other employment categories must meet the FMLA requirements of twelve (12) months of service with a minimum of 1,250 hours worked in the past 12 months.
- Intermittent leaves of absences: Full-time and part-time employees must have a minimum of six (6) months of service. All other employment categories must meet the FMLA requirements of twelve (12) months of service with a minimum of 1,250 hours worked in the past 12 months, immediately preceding the leave.

A-187

**B. Request/Notification of Need For Leave**

DP 000392

Employee Handbook

Employees may request a leave of absence for family/medical reasons by contacting their manager, the HR Customer Service Center at (302) 327-5555 or by completing a "Request for Leave" web form available on HR Online, available from all portals, under the Leave of Absence/FMLA quick link. This will generate a Leave of Absence packet being mailed to the employee's home address. Employees must submit a completed Certification of Healthcare Provider and paper copy of the request for leave within the time frames outlined. Any questions related to leaves of absences should be directed the HR Customer Service Center at (302) 327-5555 or toll-free at 1-800-849-8598.

**C. Time Frames**

1. Employees requesting FMLA time are required to provide 30-day advance notice when the need is foreseeable (e.g., pregnancy). Otherwise, they should provide as much notice as is practicable given the circumstances. Generally this notice should be provided within two (2) days after learning of the need for a leave. Whenever possible, requests for leave should be in writing and should specify an effective date as well as the length of leave requested. Application forms are available by contacting the HR Customer Service Center or via the Leave of Absence /FMLA quick link on HR Online.
2. Medical Certification forms are also available by contacting the HR Customer Service Center or via the Leave of Absence /FMLA quick link on HR Online. Failure to provide the required documentation within the required time frames may result in your leave being denied and subject you to action consistent with Christiana Care Policy.

**D. FMLA Entitlement**

If you meet the eligibility requirements, proper documentation is received, and your leave is determined to be FMLA qualifying, your absence/leave will be counted against your annual 12 week FMLA entitlement, measured backwards from the first day you were absent.

**E. Employee Responsibilities**

Employees are responsible for the following:

- Notifying their supervisor of their need for leave.
- Submitting the appropriate documentation to request the leave within the above specified time frames.
- Maintaining contact with their supervisor during their job guarantee period (12 weeks).
- Maintain contact with the Employee Relations section of the Human Resources department once the job guarantee period has expired.
- Providing appropriate documentation as requested to support their ongoing need to leave including evaluation in Employee Health Services as requested.
- Obtaining medical clearance from their healthcare provider and Employee Health before returning to work.

Personal leaves of absence of up to thirty (30) days may also be requested by eligible employees to care for other family members not covered under the FMLA.

Employees granted a personal leave will be provided a 30 day job guarantee as long as they have not exceeded 30 days of personal leave in a rolling 12 month period.

Failure to maintain contact or submit medical documentation during the leave period may result in termination of employment.

---

**Insurance Policies**

DP 000393

**Flex-Plus Benefit Program**

Christiana Care employees may enroll in a flexible benefits program which can be customized to meet their personal needs. Benefits become effective on the first of the month following the date of hire.

**Full-time:** Full-time employees can enroll in a basic benefits program at no cost, enroll in lower levels of coverage and receive extra cash each pay period, or enroll in enhanced benefits by contributing toward the cost of benefits each pay period through payroll deduction. (Benefits cost sharing vary by subsidiary. Please contact the Benefits Service Center with specific questions.)

**Part-time:** Part-time employees can elect to participate in benefit options by contributing to the cost of benefits through payroll deduction each payperiod. Christiana Care shares the cost of certain benefits for part-time employees on the basis of an employee's authorized scheduled hours.

Employees must complete Flex-Plus Benefit enrollment forms within established deadlines. Failure to meet the deadlines will limit coverage. The Flex-Plus workbook provides detailed information about this program.

### General and Professional Liability Insurance
You are covered by general and professional liability insurance while carrying out your responsibilities while on duty as a Christiana Care employee. Any claims arising from work performed outside your normal occupation, or on patients you are caring for outside the Christiana Care, are not covered under Christiana Care insurance policies.

### Other Employee Benefits

### Group Blood Bank
Christiana Care pays for the enrollment of full and part-time employees in the group program of the Blood Bank of Delaware. If you, a family member or friend donate a pint of blood, or if you pay a fee, you and your family are assured an unlimited supply of blood should you need it, without charge, anywhere in the United States.

### Employee Health Services
Employee Health Services provides care for all occupational injuries and illnesses. Limited care is also available for simple, common non-occupational problems. Employees will be referred to their physicians for on-going follow-up care for chronic or more serious problems.

Employees with occupational exposures to work place hazards are evaluated periodically in accordance with OSHA, JCAHO and other regulatory requirements. Employees with direct or indirect patient contact are required to have annual TB skin testing. Employee Health Services will contact you to schedule these evaluations.

Employee Health Services offers immunizations for tetanus, influenza, measles, mumps, rubella and hepatitis B. These are offered to employees at no cost.

Your supervisor may require you to be seen by Employee Health Services if there is any question regarding your fitness to safely perform your job or upon return to work following an absence. All employees are required to be cleared by Employee Health Services after an absence for an occupational injury or illness, hospitalization or absences exceeding five days.

A physician's excuse is required for absences exceeding five days if the employee was not initially seen by Employee Health Services.

Employees will not be allowed to return to work if they are taking medications or have problems which may affect their ability to safely perform their job.

### Employee Assistance Program
If you need help with a personal, alcohol or drug related problem you may contact Christiana Care's Employee Assistance Program (1-800-298-9076) for professional, confidential help. Supervisors of troubled employees may also seek the aid of the Employee Assistance Program in handling such problems. All records and conversations associated with your problem are handled in complete confidence.

### Infectious Disease
To prevent the spread of infectious disease, you will not be permitted to remain on duty if you have direct or indirect contact with patients and are believed to be carrying an infectious or contagious disease. Employee Health Services will determine your fitness to remain on duty and authorize your absence from work, if necessary.

A-189

## Occupational Injury or Illness

If you suffer an injury or illness while working on the job, you may be entitled to benefits covered by worker's compensation under the provisions of the Delaware Worker's Compensation Act. Any work related injury, illness or exposure must be reported to your supervisor immediately. Delays in reporting may jeopardize benefits. Necessary medical care is provided by Christiana Care. Your supervisor will authorize a visit to Employee Health Services or the Emergency department. All employees seen in the Emergency department for a work related injury or illness should contact Employee Health Services as soon as possible for follow-up treatment.

## Retirement Plan

Christiana Care's Retirement Plan pays benefits which, along with Social Security and your own personal savings and investments, provide financial security when you retire. Your retirement income is derived from three sources:

**Social Security:** You and Christiana Care contribute equal amounts of money to provide for retirement benefits.

**Christiana Care's Retirement Plan:** A retirement plan is provided by Christiana Care for you at no cost. For eligible employees working on or after October 1, 1989, normal retirement benefits are available to eligible employees at age 65 with five years of service. Early retirement is available any time after age 55 to employees who have completed 10 years of service.

Home Health & Community Services Retirement Plan: A retirement plan is provided by Home Health & Community Services at no cost. For eligible employees, normal retirement benefits are available to eligible employees at age 65. Partial vesting begins with 3 years of service and full vesting is achieved after 7 years of service. Early retirement is available at any time after age 55 at a reduced benefit.

**Matching Contribution Program (403b):** Christiana Care's Matching Contribution Program (403b) allows you to accumulate additional retirement funds by choosing to save a portion of your salary on a regular basis. Money placed in a matching contribution program reduces, for that tax year, the amount of federal and state tax withheld from your paycheck. You are not required to pay taxes on this money until it is withdrawn for retirement or other use. As an additional benefit, Christiana Care also provides a matching contribution program to eligible employees. Christiana Care will match $.50 for every $1.00 an employee contributes to their MCP (403b), up to 6% of their base salary. Please contact the Benefits office of the Human Resources department for further information regarding participation, eligibility and vesting requirements. (Note: Option not available in all subsidiaries).

## Service Awards

Christiana Care recognizes employees with long periods of service by awarding employees in Health Services & Health Initiatives with your choice of either a gift or a pin after 5 years of service and every five years thereafter.

## Recognition

All employees are encouraged to recognize and support each other. Christiana Care has a comprehensive recognition program. Details can be accessed on the Portals by clicking onto the Recognition icon. Options include Verbal Recognition, Written Recognition, CCHS Diamond, Departmental Recognition, Spot Bonus Awards and Christiana Care's Focus on Excellence Award Program.

## Tuition Assistance Plan

Employees are encouraged to further their education and become more proficient in their occupation or profession. Full-time employees may be reimbursed one-hundred percent (100%) for education expenses, up to a maximum dollar amount per year (July - June), for course work that is related to their present occupation or profession, or for related Christiana Care positions. Tuition reimbursement for part-time employees is calculated on a pro-rated formula, based on the number of hours you are regularly scheduled to work. The percentage is applied against the amount that would be payable under the plan to a full-time employee taking the same course at the same institution. If you have less than three months of service, you are limited to three credit hours per semester or unit.

You should consult with your supervisor before enrolling to determine whether the courses meet eligibility requirements.

## Employee Parking

Christiana Care maximizes use of all of its available parking space. Parking is offered on a first-come, first-serve basis. Your photo identification/access card will provide you access to designated parking areas as well as to

DP 000395

Employee Handbook

authorized entrance/access controlled doors. Each hospital has special parking arrangements to accommodate individuals who are on shift work.

To make parking available to all employees, visitors and patients, you are asked to observe the following general rules:

- Park only in areas designated for employees; park within the lines. Do not park in aisles, roadways, unmarked areas or block fire lanes.
- Properly display your parking hang tag (permit) on your rear view mirror.
- Exit the parking area as soon as possible after your shift ends and do not leave your vehicle parked in the lot when not on duty.
- Never loan your photo identification/access card to anyone else. It is for your use only.
- Be respectful of Public Safety as they work to provide campus safety and direct vehicles to appropriate parking locations.

**Cafeteria**
Christiana Care's non-profit cafeterias provide nutritious meals at a highly subsidized cost. To assure continued coverage in your area, your supervisor will assign you meal periods.

**Employee Work Life Balance**
Discount movie and other recreational tickets are available to all employees at all locations 24 hours a day/7 days a week via the web, phone, mail or fax. Employees who wish to purchase movie or other tickets can log onto the Working Advantage Web site or order by telephone at 1-800-565-3712, fax at 1-888-340-3388 or by mail. Employees will need to provide Christiana Care's Corporate ID number, 1032804, when using the on-line service for the first time under Register. Check out all the Employee Discounts available 24/7 on HR Online under Work/Life.

**Credit Union**
You may participate in programs of Christiana Care's affiliated federal credit union through payroll deduction. As a member of the credit union, you may also apply for various types of loans after you have satisfied eligibility guidelines. For additional information, contact your hospital employee relations representative or the Benefits office of the Human Resources department.

**Worklife Balance**
Other Christiana Care worklife balance programs include the following:

- Family & Workplace Connection ® Services (1-888-390-2900) including childcare resource and referral with confirmed openings, backup care, educational and parenting guidance, eldercare and adoption resource and referral, and self care with free publications (e.g., stress management, college planning)
- Pathways Employee Assistance Program (1-800-298-9076)
- On-site Daycare - Imaginations at Christiana Hospital (733-KIDS)
- Fitness Reimbursement (contact the Benefits Service Center for details)
- Flexible Work Options including part-time, casual, temporary, per diem, weekend incentive program and part-time limited benefits with higher pay (contact your supervisor for options in your department)
- Free employee health and wellness services (e.g., smoking cessation, free flu shots and mammograms) Contact Employee Health Services or watch FOCUS for details.)
- Lactation rooms/support at the Wilmington and Christiana campuses.
- Walking Trails (Christiana site and Brandywine trails at Wilmington)
- On site fitness center at Wilmington and PMRI
- Therapeutic massage at PMRI and PT Plus
- Gift Shops at Christiana and Wilmington locations and on-site ATMs
- On-site Pharmacy (Christiana and Wilmington campuses)

DP 000396

**Locker Rooms**
We provide locker rooms and lockers for the convenience of some Christiana Care employees, where they may change clothes before and after work. Lockers are inspected occasionally for maintenance, sanitation and

security.

**Lost and Found**
For your convenience, a lost and found service is located in the security office of each hospital.

**Communications**

**Corporate Communications**
Christiana Care is committed to maintaining the flow of information to all employees. Several publications are produced and distributed to provide you with timely and accurate information about Christiana Care events and activities.

**Employee Meetings**
Your ideas, suggestions and concerns are always appreciated. Frequent meetings are held with different levels of management to inform you of Christiana Care policies and plans. The meetings provide an opportunity for you to share your thoughts and ideas.

**Employee Information Centers**
Employee Information Centers are located at each hospital to post official information as determined by the senior vice president of Human Resources. You should visit these centers periodically to review current policies and benefits announcements, photos and articles of interest, Recreation information and current job openings.

**Employee Publications**
Christiana Care has several publications to provide information to you about Christiana Care related activities.

- FOCUS is a bi-weekly newsletter distributed every other Thursday to all employees and selected audiences associated with the Christiana Care.
- Executive Office News is published on an as needed basis to inform employees of late breaking events or important information from the President's office. Executive Office News is posted at employee information centers.
- Annual Reports of Christiana Care, which summarize the activities of the fiscal year ending June 30, are published each November.

**Transportation**
Christiana Care has standard mileage reimbursement that we pay to cover the use of your automobile while you are on company business. We also pay for tolls, parking, and public transportation while on company business. We do not reimburse for transportation to and from work or between the Christiana and Wilmington campuses.

**Traveler's Advisory**
All employees are considered essential personnel in the case of a severe weather emergency and are expected to report for duty. Christiana Care is open for business as usual in these circumstances. Any Christiana Care activity that is affected by severe weather will be announced on the following radio stations:

WDEL 1150 AM - Wilmington, New Castle, Newark
WSTW 93.7 FM - Wilmington, New Castle, Newark
WILM 1450 AM - Wilmington
WGMD 92 FM - Rehoboth, Lewes, Bethany Beach
WECY 98.3 FM - Seaford, Laurel
WDSD 92.1 FM - Dover, Milford
WAFL 97.7 FM - Georgetown, Dover, Milford
WQHQ 104.7 FM - Salisbury, MD
WLVW 105.5 FM - Salisbury, MD

**Safety, Security and Emergency Codes**

DP 000397

Employee Handbook

**Emergency Codes and Plans**
You should be familiar with the five emergency codes and plans at Christiana Care. They are:

| | |
|---|---|
| **Code Red** | fire disaster |
| **Code Green** | nuclear disaster |
| **Code Delta** | civil disaster (airplane crash, train wreck, tornado, etc.) |
| **Code Blue** | a patient is having cardiopulmonary failure |
| Code Yellow | Infant/Juvenile Abduction Alert. This code is declared if an actual abduction occurs or if all infants/juveniles can't be accounted for in the unit. |

Your supervisor informs you of your individual assignment and provides you with the necessary response to these codes where applicable.

**Fire Prevention**
Fire is a great danger because it threatens your safety and the safety of our patients and everyone associated with Christiana Care. You are responsible to help prevent fires. Carelessness and thoughtlessness are the primary causes of fire. Observing the following common-sense rules will help prevent fires.

- No smoking is allowed in any Christiana Care facility or campus or while employees are on work time.
- Eliminate fire hazards by keeping your work area free of unnecessary combustible materials.
- Report any fire hazard immediately to your supervisor or department head.
- Know the location and how to use fire fighting equipment and alarm boxes in your immediate area.
- If you discover a fire, follow this procedure:

| | |
|---|---|
| **R** | Rescue all persons in the immediate area of smoke |
| **A** | Alarm |
| **C** | Contain the fire by closing all doors, or take other measures to ensure that the fire is contained in a small area. |
| **E** | Extinguish when possible. |

DP 000398

All unusual odors or other emergencies should be reported immediately by dialing 911.

**Security**
Call 911 to report security problems such as disorderly persons, unauthorized people in restricted areas or other unusual or suspicious activity.

**Safety Rules**
Christiana Care is committed to providing a safe working environment for its' employees. Safety regulations are designed for everyone's protection.

Every employee is provided a Christiana Care Safety Handbook and every department has a safety policy. Employees are required to read and abide by these documents. Particular attention should be given to information on hazardous materials and the employee's right to know what materials are hazardous and how to handle them.

Adherence to established safety practices and appropriate use of personal protective equipment is required.

Report anything that could be dangerous to your supervisor. Be particularly alert to hazards that could cause fires, falls, scalds, burns, cuts or electric shock. Be aware of areas where warning signs are posted. Guard against contamination by soiled objects and wash your hands immediately after handling anything that may be contaminated. Report all exposures, injuries or illnesses immediately to your supervisor.

Your supervisor will discuss with you general safety rules and specific safety precautions related to your job. You

A-193

Employee Handbook

will be informed of all potential hazards that you may be exposed to and instructed to use appropriate protective precautions.

<u>Print Handbook</u>

A-194

**Habich, April R.**

| | |
|---|---|
| From: | Fitzgerald, Melinda |
| Sent: | Friday, February 25, 2005 8:25 AM |
| To: | Hisey, Jennifer ; Smith, Jessica R.; Dever, Donna; Lovett, Stacie; Biddle, Janet; Cuff, Trafinna; Moser, Melissa D.; Eastburn, Terri |
| Cc: | Habich, April R. |
| Subject: | Cell Phones |

Please take note on Christiana Care policy regarding personal phone calls and Cell phones!!

## Telephone Messages, Personal Cell Phones and Pagers

Because Christiana Care receives thousands of telephone calls daily through our telephone system, <u>employees may not use departmental telephones for personal business</u>. While at work, you may only receive calls for hospital business or personal emergencies. Pay telephones or personal cell phones may be used when it is necessary to make personal calls on <u>non-working time.</u>

<u>Use of personal cell phones and pagers while on duty is prohibited</u>. Employees who are required to use cell phones or beepers for Christiana Care business reasons are to respond to calls in an appropriate area with consideration given to confidentiality, safety, and maintaining a quiet environment for those whom we serve.

Employees who are required to drive while carrying a business cell phone should pull safely off the road and stop before responding to the call.

Melinda FitzGerald
Billing Supervisor
Health Care Center / Occupational Health
(302) 623-7344
mfitzgerald@christianacare.org

CONFIDENTIALITY NOTICE: This E-Mail is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt for disclosure under application law.  If you received this transmission in error, please contract the sender immediately by replying to this email and delete the material from any computer.  Thank you for your compliance.



A-195

1

DP 000183

**Fitzgerald, Melinda**

| | |
|---|---|
| **From:** | Cuff, Trafinna |
| **Sent:** | Wednesday, April 03, 2002 8:36 AM |
| **To:** | Fitzgerald, Melinda |
| **Subject:** | RE: Internet use |

Sorry. I will discontinue my use.

*Trafinna Cuff*
*Occupational Health*
*(302)576-7416*
*(302)576-7444 Fax*

-----Original Message-----
**From:** Fitzgerald, Melinda
**Sent:** Wednesday, April 03, 2002 7:09 AM
**To:** Cuff, Trafinna
**Subject:** Internet use

The Internet report is showing your usage is very high...is there any reason?



DP 000142

To    April Habich

From Trafinna Cuff

July 17, 2002

Re: Trafinna Cuff

On Tuesday July 16, I reported to work at Wilmington Hospital in the Occupational Health Department.
 Approximently 12:15 pm. I spoke to Dr. Tinklepaugh informing her of my departing from Wilmington Hospital. We spoke briefly concerning doctors plans for Thursday and I left the office. I walked down the hall to the examining room and Mr. Vespe took my blood pressure, per my request earlier in the day. I collected the cash from Nurse Barbara, spoke to everyone in the room and left the site the time was approximately 12:30pm.

I picked up my lunch and went to the bank.  Due to a personal situation at the bank, I was detained longer than my half-hour lunch break. I have adjusted my time (PTO) to make up the unexpected extra hour lunch break.

I returned to the office at 2:00pm. I put my things away and proceeded to attend a meeting with April Habich.  April stated; Loretta Foster told her that I left the hospital at 12:00pm (which I do not agree with).

Ms Habich has a big concern with my Internet usage. I stated; I have received a large volume of junk mail. I have been receiving this large email volume over a year now. I have called IS to attempt to get rid of the unwanted email only to be unsuccessful.  I have tried to unsubscribe to some of them but it seems to be a waste of my time so I stopped.  Ms Habich states a computer report that she has shows the month of June I have over 9000 hits to the Internet site. I denied /can not recall this many attempts.  I called IS Tuesday spoke to Debra Williams problem # 195290, she recommend I speak to dept. manager to monitor the time to unsubscrib to the emails. I asked questions concerning a new email account, I was informed to take it up with my manager.



EXHIBIT
WILSON 3
11/3/07 TB

A-197

TO:        Trafinna Cuff

FROM:    Melinda Fitsgerald, Supervisor
            April Habich, Manager

DATE:    June, 16 2003

RE:        FIRST STEP REMINDER FOR OVERALL ATTENDANCE

As a member of the Health Initiatives department, it is important that each member demonstrate their commitment to the success of our mission, which is to provide our customers with quality health care/service. We individually can contribute to this by our presence on the job and the completion of daily assignments. It is important that you are present when scheduled, as any absence causes difficulty in the proper planning and scheduling of assignments.

On April 7, 2003 we talked in reference to your overall attendance and how your inability to report when scheduled impacts your overall performance. We also talked about the changing you hours from 7:00 / 3:30 to 7:30 / 4:00.

The standard for an employee working 10 tours each pay period, within a rolling 12-month period is 6 Absences and 5 Lates. You currently have 6 occurrences of Lateness (1/6/03; 2/28/03; 03/11/03; 03/14/03; 03/25/03; 04/07/03 and 06/12/03 which places you out of standard. I am therefore giving you this 1st Step Reminder. This disciplinary action will remain in effect for 1 year, at which time it will be deactivated. Any future occurrences of absences or lateness, which place you out of CCHS standard, may result in further disciplinary action up to and including termination.

If you are experiencing any problems that may have an effect on your attendance or work performance, you may utilize the Employee Assistance Program (1-800-298-9076), or contact Employee Relations at 428-5729. You may also appeal this disciplinary action by contacting Employee Relations within 15 calendar days of receipt.

_____            _____
Employee                                    Supervisor/Manager

EXHIBIT
WILSON-5
11/13/07 TB

DP 000185

A-198

**Habich, April R.**

| | |
|---|---|
| **From:** | Habich, April R. |
| **Sent:** | Monday, November 18, 2002 4:20 PM |
| **To:** | Davenport, Lorean M.; Meeker, Regina; Noll, Lisa; Schmidt, Cindy; Addis-Marchiani, Shannon; Adkins, Cherlyne; Briggs, Rebecca; Eastburn, Terri; Hisey, Jennifer ; Lovett, Stacie, Cuff, Trafinna; Smith, Jessica R.; Dever, Donna |
| **Cc:** | Conrad, Dianne; Breen, Fran; Fitzgerald, Melinda; Harris, Sheila |
| **Subject:** | E-Z Time |

Just a reminder that the new system for scanning time in and out will be effective Monday November 25th. All employees will be required to swipe their badge as they arrive and depart from work. Please note that you are not to swipe your badge before 7 minutes of your start time unless you have been approved overtime.(Ex: start time is 8:00 you can swipe your badge anytime between 7:53 - 8:00). Also at lunch time if your going to leave the building for more than a half hour you will be required to swipe your badge. Just remember that Christiana Care's policy is if your one minute late your considered late. I will circulate a copy of this email, please read, and sign that you fully understand the new time system.

*April R. Habich*
*Billing Manager*
*Christiana Care Health Initiatives*
*AHabich@Christianacare.org*
*302-576-7424*
*302-576-7444 - Fax*



A-199

DP 000009

Please sign your name and todays date that you fully understand the new sign – in procedure. Thank you

| | Signature: | Date: |
|---|---|---|
| Renie Davenport | *Renie W. Davenport* | 11/19/02 |
| Regina Meeker | *Regina M Meeker* | 11/19/02 |
| Lisa Noll | *Lisa Noll* | 11/19/02 |
| Cindy Schmidt | *Cindy L Schmidt* | 11/19/02 |
| Jennifer Hisey | *Jennifer Hisey* | 11/19/02 |
| Stacie Lovett | *Stacie Lovett* | 11/19/02 |
| Trafinna Cuff | *Trafinna Cuff* | 11/19/02 |
| Donna Dever | *Donna T. Dever* | 11/19/02 |
| Jessica Smith | *Jessica Smith* | 11/19/02 |

**A-200**

DP 000010

 CHRISTIANA CARE
HEALTH SYSTEM

**DISCIPLINARY ACTION RECORD**

| NAME | POSITION | | | | | | DATE |
|---|---|---|---|---|---|---|---|
| Trafinna Cuff | Billing Representative | ☒FT ☐PT ☐CasualTemp ☐WIP ☐PerDiem ☐Trial | | | | | 10/28/03 |

| LOCATION | SHIFT | BI-WKLY TOURS | DEPARTMENT | DATE OF HIRE | TIME IN POSITION |
|---|---|---|---|---|---|
| Rockland Road | Day | 10 | Occup Health Billing | 03-16-98 | |

| PREVIOUS DISCIPLINARY ACTION RECORD | DATE | PROBLEM | ACTION TAKEN |
|---|---|---|---|
| | 06/16/03 | Overall Attendance - lateness | 1st Step Reminder |

**INFRACTION NATURE AND DATE**   STATE PERFORMANCE OR BEHAVIOR THAT IS UNACCEPTABLE AND WHY THIS IS A PROBLEM. PROVIDE DETAILS OF WHEN, WHAT, WHERE AND WHO WAS INVOLVED.

Overall Attendance-10/24/03
In the past pay period, you were late for work on six occassions. You stated the reason for your late occurrences were all due to traffic. These occurrences place you out of standard for Christiana Care's Attendance policy. Christiana Care's Attendance & Lateness standard for employees working 10 tours of duty per payperiod in a rolling 12 month period is 6 occurrences of absence and 5 occurrences of lateness. You currently have 1 occurrence of absence and 13 occurrences of lateness in the past 12 months as follows:

Lates:
1. 01/06/03
2. 02/28/03
3. 03/11/03
4. 03/14/03
5. 03/25/03
6. 04/07/03
7. 06/12/03
8. 10/16/03
9. 10/17/03
10. 10/20/03
11. 10/22/03
12. 10/23/03
13. 10/24/03

Absences:
1. 02/07/03

Absences and tardiness places an additional burden on your co-workers and supervisors in an effort to maintain quality patient care services.

**EMPLOYEE'S COMMENTS:**
I was under the influence that CCHS Policy is employee's have 7 mins grace period before management considered one as being Late.
In any rate I will be on time hereafter.

**DISCIPLINARY ACTION TO BE TAKEN:** INCLUDE CONSEQUENCES OF CONTINUED UNACCEPTABLE BEHAVIOR OR PERFORMANCE. This 2nd step reminder is being issued for being out of standard for attendance. If you do not accrue any additional disciplinary actions within the next two years, this reminder will be deactivated. Any additional attendance, performance issues, or violations of any Christiana Care policies or procedures will be reviewed for further discipline up to and including termination.

☒ 2nd STEP REMINDER   ☐ DECISION MAKING   DATE       RETURN       ☐ TERMINATION

CONTACT EMPLOYEE RELATIONS AT 733-1120 TO DISCUSS APPEAL RIGHTS WITHIN 15 CALENDAR DAYS OF RECEIPT.

| ACTION EMPLOYEE AGREED TO TAKE TO SOLVE THE PROBLEM: | SIGNATURES | DATES |
|---|---|---|
| | Trafinna Cuff | 11/06/03 |
| | EMPLOYEE (ACKNOWLEDGING RECEIPT OF COPY) | 10/28/03 |
| | INITIATED BY (POSITION OR TITLE) | 10/30/03 |
| If you are experiencing any difficulties that may be affecting your overall performance, contact the Employee Assistance Program at 800-298-9076. | DEPARTMENT MANAGER | 11/5/03 |
| | VICE PRESIDENT | |
| FOLLOW UP: BY SUPERVISOR TO ASSURE PROBLEM RESOLUTION | HUMAN RESOURCES DEPARTMENT | |

☑ EMPLOYEE COPY    ☐ HUMAN RESOURCES COPY    ☐ DEPARTMENTAL COPY

EXHIBIT
Wilson-C

A-201

DP 001403



CHRI. A CARE
HEALTH SYSTEM

# DISCIPLINARY ACTION RECORD

| NAME Trafinna Cuff | POSITION HI Billing Rep | ☒FT ☐PT ☐CasualTemp ☐WIP ☐PerDiem ☐Trial | DATE 03-18-05 |
|---|---|---|---|

| LOCATION HCC | SHIFT Day | BI-WKLY TOURS 10 | DEPARTMENT Occupational Health Billing | DATE OF HIRE 03-16-98 | TIME IN POSITION 12-10-01 |
|---|---|---|---|---|---|

| PREVIOUS DISCIPLINARY ACTION RECORD | DATE | PROBLEM | ACTION TAKEN |
|---|---|---|---|
| | 03/18/05 | IDLENESS | Decision Making Leave |
| | 10/25/03 | Overall Attendance | 2nd Step Reminder |
| | 06/16/03 | Overall Attendance | 1st Step Reminder |

**INFRACTION NATURE AND DATE**    STATE PERFORMANCE OR BEHAVIOR THAT IS UNACCEPTABLE AND WHY THIS IS A PROBLEM.  PROVIDE DETAILS OF WHEN, WHAT, WHERE AND WHO WAS INVOLVED.

IDLENESS

In reviewing the phone logs for January and February 2005 it was noticed you had 15 long distance calls (many over 10 minutes) during work time totaling 6 hours and 12 mins.  These calls were placed to a personal residence in Swathmore, PA; although you indicated that you do not recognize the phone number, these calls were made numerous times during your work hours from your work phone.  Additionally, on February 21 (21 mins.& 32 mins.) & February 28, 2005 (54 mins) you received a personal call during working hours which totaled (107 mins.) On March 17th we requested  you provide a writen statement explaining the above calls on 02/21 / 02/28 by the end of the day. After requesting the statement three times we  received it on 3/18/05  However, when you presented your statement it was in a very unprofessional manner. i.e slamming door.

As we have previously discussed on numerous occasions in staff meetings and via e-mail, CCHS property is to be used for business purposes (this includes use of the phones and the Internet); unless prior approval is obtained or for emergent situations.  At no time did you discuss with me the need to make/receive personal calls of an emergent nature.  Because your job requires you to be on the phone contacting employers/insurance companies, it is expected that while you are on work time at your desk , that you are conducting Christiana Care business and not using Christiana Care productive time for personal use.  These personal calls are excessive and occurred during productive time for which you were being paid to conduct Christiana Care business.  Based on the above you are being issued a Decision Making Leave.

**EMPLOYEE'S COMMENTS:**

**DISCIPLINARY ACTION TO BE TAKEN:  INCLUDE CONSEQUENCES OF CONTINUED UNACCEPTABLE BEHAVIOR OR PERFORMANCE.**  As a result of this infraction of idleness & the previous active 2nd step reminder for overall attendance, you are being issued this Decision Making Leave.  If you do not accrue any additional disciplinary actions within the next 3 years, this DML will be deactivated.  Please note that any future violation of ANY Christiana Care policy or procedure requiring formal disciplinary action during the active life of this decision making leave will be reviewed for termination.

☐ 2nd STEP REMINDER    ☒ DECISION MAKING    DATE _____    RETURN _____    ☐ TERMINATION

**Employees wishing to APPEAL must CONTACT 733-1120 and complete and return the necessary forms within 15 calendar days from the date this discipline was issued.**

ACTION EMPLOYEE AGREED TO TAKE TO SOLVE THE PROBLEM:

| SIGNATURES | DATES |
|---|---|
| EMPLOYEE (ACKNOWLEDGING RECEIPT OF COPY) | 3/23/05 |
| INITIATED BY (POSITION OR TITLE) Supervisor | |
| DEPARTMENT MANAGER | 3/28/05 |
| VICE PRESIDENT | 0/25/05 |
| HUMAN RESOURCES DEPARTMENT | |

If you are experiencing any difficulties that may be affecting your overall performance, contact the Employee Assistance Program at 800-298-9076.

FOLLOW UP: BY SUPERVISOR TO ASSURE PROBLEM RESOLUTION

A-202

☐ **EMPLOYEE COPY**    ☐ **HUMAN RESOURCES COPY**    ☐ **DEPARTMENTAL COPY**

08/15/2005 13:30 FAX 302 623 7262 ☒003

## Phone Log Summary
### Trafinne Cuff

**Outgoing**

| Date | Time of Call | Place of Call | Duration | Phone Number |
|------|--------------|---------------|----------|--------------|
| 07/08/05 | 15:37 | Singular Wireless | 13.22 | 888-562-8662 |
| 07/08/05 | 15:39 | Singular Wireless | 2.02 | 888-562-8662 |
| 07/11/05 | 8:20 | Cash Advance Network | 15.06 | 800-853-4735— Benckor Assoc |
| 07/12/05 | 7:52 | A Cuff | 9.10 | 302-765-2657 |
| 07/13/05 | 9:01 | At & T (access code needed | 24.30 | 800-853-4735— Benckor Assoc |
| 07/19/05 | 11:19 | Travelocity | 14.20 | 877-815-5446 |
| 07/19/05 | 11:42 | Travelocity | 5.22 | 877-815-5446 |
| 07/20/05 | 13:37 | Travelocity | 16.02 | 877-815-5446 |
| 07/20/05 | 15:07 | Travelocity | 9.22 | 877-815-5446 |
| 07/21/05 | 11:36 | John Gangi (Attorney) | 27.54 | 302-656-4090 |
| 08/01/05 | 15:40 | American Express | 5.02 | 866-314-0237 |
| 08/01/05 | 15:48 | American Express | 10.28 | 866-314-0237 |
| 08/08/05 | 12:24 | New Centruy Mortgage | 12.36 | 800-561-4567 |
| | | | 163.54 | |

**Incoming**

| Date | Time of Call | Call From | Duration | Phone Number |
|------|--------------|-----------|----------|--------------|
| 07/05/05 | 11:16 | A Cuff | 15.56 | 302-765-2657 |
| 07/12/05 | 9:07 | A Cuff | 25.12 | 302-765-2657 |
| 07/18/05 | 10:30 | Jamie Ross | 14.40 | 302-324-1086 |
| 07/19/05 | 9:08 | Susanne Muhammad | 20.52 | 302-652-1880 |
| 08/02/05 | 7:25:00 AM | ?? | 38.48 | 302-695-8722 |
| 08/02/05 | 14:53 | Jamie Ross | 40.54 | 302-324-1086 |
| 08/02/05 | 10:13 | Jamie Ross | 41.36 | 302-324-1086 |
| | | | 195.98 | |



EXHIBIT
Wilson 14
11/3/07 TB

A-203

08-13-2005 13:30 FAX 302 823 7262                                                    @005

TM              CHRISTIANA CARE  - HEALTH CARE CENTER       08-11-2005 11:26
                          STATION DETAIL REPORT

UNASSIGNED              -       0

Station:    7416                        Exceptions - Calls over 60 mins or   5 dollars
Name:                                   # Indicates operator assisted call
Location:

DATE    TIME    NUMBER          PLACE           MIN     COST    EXCEPTION   AUTH CODE

- LONG DISTANCE -
08/03   09:38   302-883-1492    DOVER       DE  0:52    0.08
08/03   09:44   302-883-1492    DOVER       DE  3:00    0.24
08/03   10:19   302-883-1492    DOVER       DE  1:00    0.08
08/03   11:01   302-653-2556    SMYRNA      DE  1:02    0.16
08/03   11:52   713-241-5057    HOUSTON     TX  2:26    0.30
08/03   11:56   713-241-5057    HOUSTON     TX  0:28    0.10
08/03   11:58   610-834-9060    CONSHOHCKN  PA  2:02    0.30
08/03   12:21   850-558-1818    TALLAHASSE  FL  16:40   1.70#
08/04   10:59   610-344-3545    W CHESTER   PA  3:06    0.40
08/04   14:49   856-482-7101    MERCHANTVL  NJ  8:58    0.90
08/10   11:18   610-834-9060    CONSHOHCKN  PA  2:04    0.30
08/10   16:23   856-988-5572    MARLTON     NJ  1:36    0.20
        Subtotal            Avg Mins  3.6     43:14   4.76        12 CALLS

INTERNATIONAL -
     .Subtotal              Avg Mins  0.0     0:00    0.00         0 CALLS

- SPECIAL -
08/01   15:40   866-314-0237    800SERVICE      5:02    0.00
08/01   15:48   866-314-0237    800SERVICE      10:26   0.00
08/02   11:03   800-662-5814    800SERVICE      2:00    0.00
08/02   11:13   800-853-4735    800SERVICE      0:12    0.00
08/02   11:14   800-551-0271    800SERVICE      0:32    0.00
08/02   11:14   800-662-5814    800SERVICE      6:40    0.00
08/02   11:21   800-853-4735    800SERVICE      3:50    0.00
08/02   12:27   877-228-2758    800SERVICE      0:38    0.00
08/02   12:29   877-228-2758    800SERVICE      0:40    0.00
08/03   08:27   888-476-2669    800SERVICE      2:32    0.00
08/03   11:20   800-300-4472    800SERVICE      2:40    0.00
08/03   12:02   800-500-7044    800SERVICE      2:18    0.00
08/03   12:17   866-335-8319    800SERVICE      3:20    0.00
08/04   10:31   877-228-2758    800SERVICE      3:24    0.00
08/04   14:39   800-300-4472    800SERVICE      3:16    0.00
08/08   12:24   800-561-4567    800SERVICE      12:36   0.00      New Century
08/08   14:47   888-476-2669    800SERVICE      0:08    0.00      mortgage -
08/08   14:47   888-476-2669    800SERVICE      0:28    0.00
08/08   14:48   888-476-2669    800SERVICE      0:08    0.00
08/08   14:48   888-476-2669    800SERVICE      1:40    0.00
08/10   07:53   800-500-7044    800SERVICE      0:38    0.00
08/10   08:01   800-332-4463    800SERVICE      0:50    0.00
08/10   09:46   800-500-7044    800SERVICE      7:56    0.00

     ------  CONTINUED ON NEXT PAGE ------

A-204

DP 001525

@011

TM                    CHRISTIANA CARE  - HEALTH CARE CENTER          08-11-2005 11:26

Station: 7416  Name:
UNASSIGNED                -        0

- SPECIAL -

| Date | Time | Number | Location | Mins | Cost | |
|---|---|---|---|---|---|---|
| 08/10 | 09:54 | 800-300-4472 | 800SERVICE | 1:24 | 0.00 | |
| 08/10 | 09:56 | 800-300-4472 | 800SERVICE | 5:28 | 0.00 | |
| 08/10 | 10:02 | 800-241-9911 | 800SERVICE | 3:18 | 0.00 | |
| 08/10 | 13:30 | 800-500-7044 | 800SERVICE | 4:44 | 0.00 | |
| 08/10 | 14:32 | 800-262-9633 | 800SERVICE | 2:06 | 0.00 | |
| | Subtotal | | Avg Mins 3.2 | 88:53 | 0.00 | 28 CALLS |

- LOCAL -

| Date | Time | Number | Location | Mins | Cost |
|---|---|---|---|---|---|
| 08/01 | 13:16 | 302-324-0558 | NEW CASTLE DE | 25:54 | 0.00 |
| 08/01 | 14:34 | 302-328-1597 | NEW CASTLE DE | 3:12 | 0.00 |
| 08/01 | 14:38 | 302-324-0558 | NEW CASTLE DE | 2:16 | 0.00 |
| 08/01 | 14:41 | 302-328-1597 | NEW CASTLE DE | 4:48 | 0.00 |
| 08/01 | 15:59 | 302-324-1086 | NEW CASTLE DE | 3:52 | 0.00 |
| 08/02 | 09:07 | 302-623-0550 | NEWARK    DE | 6:26 | 0.00 |
| 08/02 | 09:27 | 302-324-0558 | NEW CASTLE DE | 21:38 | 0.00 |
| 08/02 | 11:09 | 302-428-4244 | WILMINGTON DE | 4:08 | 0.00 |
| 08/02 | 11:19 | 302-886-3327 | WILMINGTON DE | 6:50 | 0.00 |
| 08/02 | 11:57 | 302-652-1666 | WILMINGTON DE | 2:28 | 0.00 |
| 08/02 | 12:07 | 302-764-0181 | WILMINGTON DE | 4:18 | 0.00 |
| 08/02 | 17:46 | 302-994-2738 | WILMINGTON DE | 2:54 | 0.00 |
| 08/03 | 07:07 | 302-324-0558 | NEW CASTLE DE | 1:52 | 0.00 |
| 08/03 | 07:45 | 302-656-3370 | WILMINGTON DE | 2:06 | 0.00 |
| 08/03 | 08:33 | 302-428-4251 | WILMINGTON DE | 2:08 | 0.00 |
| 08/03 | 09:39 | 302-328-1597 | NEW CASTLE DE | 2:04 | 0.00 |
| 08/03 | 09:42 | 302-325-1020 | NEW CASTLE DE | 0:26 | 0.00 |
| 08/03 | 09:42 | 302-437-4480 | MIDDLETOWN DE | 1:10 | 0.00 |
| 08/03 | 09:48 | 302-559-9789 | WILMINGTON DE | 1:30 | 0.00 |
| 08/03 | 10:20 | 302-437-4480 | MIDDLETOWN DE | 0:40 | 0.00 |
| 08/03 | 11:39 | 302-654-5243 | WILMINGTON DE | 3:26 | 0.00 |
| 08/03 | 11:46 | 302-266-6550 | NEWARK    DE | 3:26 | 0.00 |
| 08/03 | 12:59 | 302-328-0726 | NEW CASTLE DE | 4:34 | 0.00 |
| 08/03 | 15:14 | 302-521-1948 | WILMINGTON DE | 2:22 | 0.00 |
| 08/04 | 08:46 | 302-328-0726 | NEW CASTLE DE | 0:08 | 0.00 |
| 08/04 | 08:47 | 302-328-0726 | NEW CASTLE DE | 1:16 | 0.00 |
| 08/04 | 09:35 | 302-838-3992 | DELAWARECY DE | 0:40 | 0.00 |
| 08/04 | 09:40 | 302-761-8085 | WILMINGTON DE | 1:26 | 0.00 |
| 08/04 | 09:42 | 302-761-8091 | WILMINGTON DE | 1:06 | 0.00 |
| 08/04 | 10:23 | 302-994-5757 | WILMINGTON DE | 0:36 | 0.00 |
| 08/04 | 10:51 | 302-325-7911 | NEW CASTLE DE | 1:08 | 0.00 |
| 08/04 | 11:15 | 302-992-0212 | WILMINGTON DE | 1:44 | 0.00 |
| 08/04 | 15:14 | 302-655-4339 | WILMINGTON DE | 1:20 | 0.00 |
| 08/08 | 13:19 | 302-428-4251 | WILMINGTON DE | 9:36 | 0.00 |
| 08/08 | 14:04 | 302-478-9200 | WILMINGTON DE | 2:52 | 0.00 |
| 08/08 | 14:18 | 302-834-3875 | DELAWARECY DE | 1:20 | 0.00 |
| 08/09 | 08:13 | 302-428-4244 | WILMINGTON DE | 1:20 | 0.00 |
| 08/09 | 16:36 | 302-623-0550 | NEWARK    DE | 3:00 | 0.00 |
| 08/10 | 09:31 | 302-428-5796 | WILMINGTON DE | 3:10 | 0.00 |
| 08/10 | 10:54 | 302-836-6670 | DELAWARECY DE | 1:02 | 0.00 |

------ CONTINUED ON NEXT PAGE ------

A-205

@004

```
TM                  CHRISTIANA CARE  - HEALTH CARE CENTER      08-11-2005 11:26

Station: 7416  Name:
UNASSIGNED                    -    0

- LOCAL -
08/10  11:09  302-762-7125  WILMINGTON DE  2:00      0.00
       Subtotal             Avg Mins  3.6   148:11   0.00    41 CALLS

- TIE LINES -
       Subtotal             Avg Mins  0.0    0:00    0.00     0 CALLS

- INCOMING -
08/01  09:00  302-559-9789  WILMINGTON DE  6:02      0.00
08/01  14:53  302-324-1086  NEW CASTLE DE  40:54     0.00      Jaime Ross
08/02  07:25  302-695-8722  WILMINGTON DE  38:48     0.00 —
08/02  10:13  302-324-1086  NEW CASTLE DE  41:36     0.00      Jaime Ross
08/02  17:09  302-559-9789  WILMINGTON DE  2:50      0.00
08/03  10:10  302-437-4480  MIDDLETOWN DE  0:36      0.00
08/03  10:41  302-437-4480  MIDDLETOWN DE  5:14      0.00
08/03  11:03  302-898-6005  WILMINGTON DE  2:40      0.00
08/03  11:27  302-428-2999  WILMINGTON DE  7:12      0.00
08/03  12:05  302-559-9789  WILMINGTON DE  0:46      0.00
08/03  14:30  877-610-4173  800SERVICE     6:46      0.00
08/03  14:55  302-652-1630  WILMINGTON DE  14:02     0.00
08/03  15:19  302-559-9789  WILMINGTON DE  1:02      0.00
08/04  09:17  302-898-6005  WILMINGTON DE  3:24      0.00
08/04  12:15  302-598-1181  WILMINGTON DE  0:14      0.00
08/04  15:32  302-761-6550  WILMINGTON DE  1:52      0.00
08/08  11:59  302-559-9789  WILMINGTON DE  1:50      0.00
08/08  12:01  302-559-9789  WILMINGTON DE  1:34      0.00
08/08  14:30  909-890-2600  S BERNDINO CA  0:08      0.00
08/09  10:33  302-559-9789  WILMINGTON DE  1:50      0.00
08/09  10:36  909-890-2600  S BERNDINO CA  0:00      0.00
08/09  10:41  302-559-9789  WILMINGTON DE  2:36      0.00
08/09  10:43  610-344-3541  W CHESTER  PA  0:56      0.00
08/09  14:06  302-559-9789  WILMINGTON DE  4:12      0.00
08/09  17:20  302-559-9789  WILMINGTON DE  1:06      0.00
08/10  10:44  909-397-3080  POMONA     CA  4:38      0.00
08/10  13:57  302-373-3736  MIDDLETOWN DE  1:02      0.00
       Subtotal             Avg Mins  7.2   193:49   0.00    27 CALLS


**** TOTALS ****        Avg Mins  4.4   474:09   4.76   108 CALLS
- SUMMARY -
Station: 7416  Name:
EQUIPMENT   OTHER      LD&SP    LOCAL  TIE LINE    TOTAL   YTD OUT
   0.00     0.00       4.76     0.00    0.00        4.76    16.21
```

A-206

DP 001527

```
LM                CHRISTIANA CARE  - HEALTH CARE CENTER        08-10-2005 11:12
                          STATION DETAIL REPORT

UNASSIGNED              -     0

Station:  7416                      Exceptions - Calls over 60 mins or  5 dollars
Name:                              # Indicates operator assisted call
Location:

DATE    TIME   NUMBER       PLACE        MIN     COST  EXCEPTION  AUTH CODE
 - LONG DISTANCE -
07/05   14:15  917-601-1727  QUEENS NYC NY  0:28     0.10
07/05   14:16  212-620-5056  NEW YORK   NY  0:48     0.10
07/08   10:15  410-773-4231  COCKEYSVL  MD  1:34     0.20
07/11   14:04  410-316-8700  COCKEYSVL  MD  1:32     0.20
07/12   08:01  513-551-2866  CINCINNATI OH  6:02     0.70
07/12   10:01  610-471-9000  CHESTER    PA 18:36     1.90 ?
07/13   12:34  586-939-7000  WARREN     MI  1:24     0.20
07/14   08:24  443-353-1000  ANNAPOLIS  MD  0:54     0.10
07/19   08:13  713-241-5057  HOUSTON    TX  1:36     0.20
07/19   08:55  713-241-5057  HOUSTON    TX  1:04     0.20
07/19   09:01  989-671-1500  BAY CITY   MI  2:18     0.30
07/19   09:42  215-661-0500  NORTH WALE PA  5:10     0.60
07/19   11:34  559-978-0009  FRESNO     CA  1:00     0.10
07/19   13:45  850-558-1818  TALLAHASSE FL 12:14     1.30 α
07/19   14:01  850-558-1818  TALLAHASSE FL 31:32     3.20 α
 7/25   13:17  610-834-9060  CONSHOHCKN PA  1:02     0.20
 7/27   09:36  804-762-9192  RICHMOND   VA  8:42     0.90
07/27   10:43  804-762-9192  RICHMOND   VA  4:40     0.50
 7/27   14:48  301-983-7413  ROCKVILLE  MD  0:52     0.10
     Subtotal          Avg Mins  5.3     101:28     11.10      19 CALLS

 - INTERNATIONAL -
     Subtotal          Avg Mins  0.0       0:00      0.00       0 CALLS

 - SPECIAL -
07/08   10:58  800-606-6551  800SERVICE     0:52     0.00
07/08   11:00  800-262-9633  800SERVICE     5:36     0.00
07/08   15:24  800-331-0500  800SERVICE    11:26     0.00 ?
07/08   15:37  888-562-8662  800SERVICE     2:02     0.00       Singular Wireless
07/08   15:39  888-562-8662  800SERVICE    13:22     0.00
07/11   07:38  800-662-5814  800SERVICE     0:32     0.00
07/11   07:42  800-300-4472  800SERVICE     0:14     0.00
07/11   08:20  800-853-4735  800SERVICE    15:06     0.00       Cash Advance Network
07/11   08:54  800-906-5373  800SERVICE     2:36     0.00
07/11   11:10  800-550-1811  800SERVICE     3:48     0.00
07/11   11:14  800-550-1811  800SERVICE     3:38     0.00
07/11   13:47  888-853-4735  800SERVICE     5:56     0.00
07/11   13:57  888-886-8773  800SERVICE     2:16     0.00
07/11   16:40  888-847-4708  800SERVICE     9:12     0.00
07/12   08:43  800-300-4472  800SERVICE     3:08     0.00
 7/12   09:02  888-886-8773  800SERVICE     2:10     0.00

     ------  CONTINUED ON NEXT PAGE ------
```

A-207

@006

LM                    CHRISTIANA CARE  - HEALTH CARE CENTER        08-10-2005 11:12

Station: 7416   Name:
UNASSIGNED          -     0

- SPECIAL -
| 07/12 | 09:33 | 800-662-5814 | 800SERVICE |    | 0:22  | 0.00 |
| 07/12 | 09:34 | 800-662-5814 | 800SERVICE |    | 7:34  | 0.00 |
| 07/12 | 09:49 | 800-662-5814 | 800SERVICE |    | 0:24  | 0.00 |
| 07/12 | 09:50 | 800-662-5814 | 800SERVICE |    | 0:04  | 0.00 |
| 07/12 | 09:50 | 800-662-5814 | 800SERVICE |    | 0:06  | 0.00 |
| 07/12 | 09:50 | 800-662-5814 | 800SERVICE |    | 0:04  | 0.00 |
| 07/12 | 09:51 | 800-662-5814 | 800SERVICE |    | 0:06  | 0.00 |
| 07/12 | 09:54 | 800-662-5814 | 800SERVICE |    | 0:06  | 0.00 |
| 07/12 | 09:55 | 800-906-5373 | 800SERVICE |    | 5:52  | 0.00 |
| 07/12 | 10:20 | 800-551-0271 | 800SERVICE |    | 3:04  | 0.00 |
| 07/12 | 10:52 | 800-662-5814 | 800SERVICE |    | 0:08  | 0.00 |
| 07/12 | 11:03 | 800-933-4188 | 800SERVICE |    | 11:16 | 0.00 |
| 07/12 | 11:14 | 800-551-0271 | 800SERVICE |    | 8:26  | 0.00 |
| 07/12 | 11:57 | 800-262-9633 | 800SERVICE |    | 6:54  | 0.00 |
| 07/12 | 12:05 | 800-262-8714 | 800SERVICE |    | 3:12  | 0.00 |
| 07/12 | 13:44 | 800-221-2836 | 800SERVICE |    | 1:06  | 0.00 |
| 07/13 | 08:49 | 800-394-8335 | 800SERVICE |    | 2:18  | 0.00 |
| 07/13 | 08:55 | 800-394-8335 | 800SERVICE |    | 2:56  | 0.00 |
| 07/13 | 09:01 | 800-815-4735 | 800SERVICE |    | 0:06  | 0.00 |
| 07/13 | 09:01 | 800-853-4735 | 800SERVICE |    | 24:30 | 0.00 |
| 07/13 | 11:49 | 800-477-2103 | 800SERVICE |    | 1:56  | 0.00 |
| 7/13  | 13:17 | 800-285-3258 | 800SERVICE |    | 3:06  | 0.00 |
| 7/13  | 13:20 | 800-451-7336 | 800SERVICE |    | 2:56  | 0.00 |
| 07/13 | 14:55 | 800-500-7044 | 800SERVICE |    | 7:42  | 0.00 |
| 07/14 | 07:52 | 800-500-7044 | 800SERVICE |    | 0:38  | 0.00 |
| 7/14  | 08:15 | 800-500-7044 | 800SERVICE |    | 5:14  | 0.00 |
| 07/14 | 08:25 | 800-328-2189 | 800SERVICE |    | 0:52  | 0.00 |
| 07/14 | 08:27 | 800-842-3073 | 800SERVICE |    | 0:36  | 0.00 |
| 07/14 | 08:28 | 877-228-2758 | 800SERVICE |    | 5:38  | 0.00 |
| 07/14 | 11:17 | 800-500-7044 | 800SERVICE |    | 2:56  | 0.00 |
| 07/14 | 11:20 | 800-300-4472 | 800SERVICE |    | 3:32  | 0.00 |
| 07/14 | 11:54 | 302-555-1212 | DIR ASST    | DE | 0:34  | 0.35 |
| 07/14 | 13:07 | 800-550-1811 | 800SERVICE |    | 13:26 | 0.00 |
| 07/14 | 14:01 | 800-551-0271 | 800SERVICE |    | 0:06  | 0.00 |
| 07/14 | 14:02 | 800-551-0271 | 800SERVICE |    | 0:06  | 0.00 |
| 07/14 | 14:02 | 800-551-0271 | 800SERVICE |    | 3:02  | 0.00 |
| 07/14 | 14:09 | 800-300-4472 | 800SERVICE |    | 5:54  | 0.00 |
| 07/14 | 15:03 | 888-853-4735 | 800SERVICE |    | 8:46  | 0.00 |
| 07/18 | 14:06 | 800-285-3258 | 800SERVICE |    | 1:32  | 0.00 |
| 07/19 | 08:01 | 800-571-4501 | 800SERVICE |    | 0:08  | 0.00 |
| 07/19 | 11:19 | 877-815-5446 | 800SERVICE |    | 14:20 | 0.00 |
| 07/19 | 11:42 | 877-815-5446 | 800SERVICE |    | 5:22  | 0.00 |
| 07/19 | 13:29 | 800-571-4501 | 800SERVICE |    | 3:22  | 0.00 |
| 07/20 | 08:36 | 800-551-0271 | 800SERVICE |    | 0:06  | 0.00 |
| 07/20 | 08:37 | 800-551-0271 | 800SERVICE |    | 0:08  | 0.00 |
| 07/20 | 08:37 | 800-551-0271 | 800SERVICE |    | 2:26  | 0.00 |
| 07/20 | 11:22 | 888-476-2669 | 800SERVICE |    | 1:32  | 0.00 |
| 07/20 | 13:13 | 877-815-5446 | 800SERVICE |    | 20:08 | 0.00 |

------ CONTINUED ON NEXT PAGE ------

— AT+T  (Access Code Needed)

— Travelocity

A-208

DP 001529

@007

LM                    CHRISTIANA CARE  - HEALTH CARE CENTER      08-10-2005 11:12

Station: 7416   Name:
UNASSIGNED                  -         0

- SPECIAL -
| 07/20 | 13:37 | 877-815-5446 | 800SERVICE | 16:02 | 0.00 | Travelocity |
| 07/21 | 09:44 | 888-476-2669 | 800SERVICE | 2:22 | 0.00 | |
| 07/21 | 10:05 | 800-787-2851 | 800SERVICE | 1:56 | 0.00 | |
| 07/21 | 10:52 | 877-828-4132 | 800SERVICE | 3:54 | 0.00 | |
| 07/21 | 13:47 | 800-685-9656 | 800SERVICE | 8:56 | 0.00 | |
| 07/21 | 15:07 | 877-815-5446 | 800SERVICE | 9:22 | 0.00 | |
| 07/25 | 09:49 | 800-669-6087 | 800SERVICE | 2:24 | 0.00 | |
| 07/26 | 11:23 | 800-300-4472 | 800SERVICE | 0:44 | 0.00 | |
| 07/26 | 11:25 | 800-300-4472 | 800SERVICE | 2:42 | 0.00 | |
| 07/26 | 12:20 | 800-853-4735 | 800SERVICE | 3:02 | 0.00 | |
| 07/27 | 09:27 | 800-853-4735 | 800SERVICE | 4:00 | 0.00 | |
| 07/27 | 11:32 | 800-685-9656 | 800SERVICE | 3:10 | 0.00 | |
| 07/27 | 11:42 | 800-685-9656 | 800SERVICE | 0:30 | 0.00 | |
| 07/27 | 12:55 | 800-685-9656 | 800SERVICE | 1:12 | 0.00 | |
| | Subtotal | | Avg Mins 4.3 | 336:47 | 0.35 | 78 CALLS |

- LOCAL -
| 07/05 | 12:04 | 302-655-7151 | WILMINGTON DE | 0:38 | 0.00 |
| 07/05 | 12:05 | 302-324-0558 | NEW CASTLE DE | 0:36 | 0.00 |
| 07/06 | 10:07 | 302-428-4251 | WILMINGTON DE | 4:58 | 0.00 |
| 07/06 | 11:12 | 302-834-1560 | DELAWARECY DE | 1:16 | 0.00 |
| 7/06 | 12:18 | 302-655-7151 | WILMINGTON DE | 3:24 | 0.00 |
| 07/06 | 12:59 | 302-428-4251 | WILMINGTON DE | 0:42 | 0.00 |
| 07/06 | 13:15 | 302-655-1234 | WILMINGTON DE | 0:08 | 0.00 |
| 07/06 | 13:16 | 302-655-3123 | WILMINGTON DE | 0:06 | 0.00 |
| 07/06 | 13:18 | 302-733-2326 | NEWARK    DE | 0:10 | 0.00 |
| 07/06 | 13:34 | 302-428-5777 | WILMINGTON DE | 6:56 | 0.00 |
| 07/06 | 13:57 | 302-377-4565 | WILMINGTON DE | 0:54 | 0.00 |
| 07/06 | 14:14 | 302-655-7151 | WILMINGTON DE | 1:24 | 0.00 |
| 07/08 | 10:15 | 302-773-4231 | WILMINGTON DE | 0:06 | 0.00 |
| 07/08 | 10:57 | 302-655-7151 | WILMINGTON DE | 0:36 | 0.00 |
| 07/08 | 11:06 | 302-571-9773 | WILMINGTON DE | 2:14 | 0.00 |
| 07/08 | 14:11 | 302-373-5231 | MIDDLETOWN DE | 3:32 | 0.00 |
| 07/08 | 14:23 | 302-428-4251 | WILMINGTON DE | 3:14 | 0.00 |
| 07/08 | 14:27 | 302-571-9773 | WILMINGTON DE | 1:20 | 0.00 |
| 07/08 | 14:32 | 302-428-4251 | WILMINGTON DE | 1:02 | 0.00 |
| 07/08 | 14:35 | 302-377-4565 | WILMINGTON DE | 1:22 | 0.00 |
| 07/11 | 09:20 | 302-764-0181 | WILMINGTON DE | 2:38 | 0.00 |
| 07/11 | 09:26 | 302-764-0181 | WILMINGTON DE | 2:12 | 0.00 |
| 07/11 | 11:18 | 302-995-2211 | WILMINGTON DE | 2:10 | 0.00 |
| 07/11 | 13:19 | 302-324-1086 | NEW CASTLE DE | 4:24 | 0.00 |
| 07/11 | 13:53 | 302-479-7799 | WILMINGTON DE | 4:20 | 0.00 |
| 07/11 | 16:22 | 302-658-6881 | WILMINGTON DE | 5:12 | 0.00 |
| 07/12 | 07:52 | 302-765-2657 | WILMINGTON DE | 9:10 | 0.00 |
| 07/12 | 08:14 | 302-995-2211 | WILMINGTON DE | 0:52 | 0.00 |
| 07/12 | 09:06 | 302-764-0181 | WILMINGTON DE | 2:00 | 0.00 |
| 07/12 | 10:23 | 302-711-0053 | TRS     DE | 0:02 | 0.00 |
| 07/12 | 10:51 | 302-571-9773 | WILMINGTON DE | 0:48 | 0.00 |

------ CONTINUED ON NEXT PAGE ------

A-209

DP 001530

@010

LM                CHRISTIANA CARE  - HEALTH CARE CENTER        08-10-2005 11:12

Station: 7416  Name:
UNASSIGNED            -      0

- LOCAL -
07/21   11:03   302-373-5231   MIDDLETOWN DE 28:16      0.00    *
07/21   11:33   302-656-4090   WILMINGTON DE  0:02      0.00    John Cang. (Attorney)
07/21   11:36   302-656-4090   WILMINGTON DE 27:54      0.00
07/21   12:49   302-655-7151   WILMINGTON DE  1:00      0.00
07/21   13:08   302-656-4090   WILMINGTON DE  3:00      0.00
07/21   14:56   302-378-9500   MIDDLETOWN DE  5:48      0.00
07/25   08:46   302-655-2048   WILMINGTON DE  0:40      0.00
07/25   08:51   302-655-2048   WILMINGTON DE  1:06      0.00
07/25   11:23   302-324-1086   NEW CASTLE DE 21:42      0.00    Jaime Ross
07/25   12:42   302-652-1666   WILMINGTON DE  2:54      0.00
07/25   13:22   302-999-0183   WILMINGTON DE  1:12      0.00
07/26   12:23   302-886-3327   WILMINGTON DE  1:04      0.00
07/26   12:28   302-658-5214   WILMINGTON DE  2:48      0.00
07/26   13:37   302-886-3327   WILMINGTON DE  1:12      0.00
07/27   09:21   302-656-4090   WILMINGTON DE  0:40      0.00
07/27   13:56   302-994-5757   WILMINGTON DE  4:04      0.00
      Subtotal            Avg Mins  2.8     268:19      0.00      95 CALLS

- TIE LINES -
      Subtotal            Avg Mins  0.0       0:00      0.00       0 CALLS

    INCOMING -
07/05   11:16   302-765-2657   WILMINGTON DE 14:56      0.00    A Cuff
07/06   10:53   302-992-3637   WILMINGTON DE  0:40      0.00
07/06   14:27   302-428-2999   WILMINGTON DE  1:42      0.00
07/08   08:57   410-773-4200   COCKEYSVL  MD  7:22      0.00
07/08   11:13   302-479-0840   WILMINGTON DE  6:08      0.00
07/08   11:19   302-655-1629   WILMINGTON DE  3:34      0.00
07/08   14:34   302-428-2999   WILMINGTON DE  0:24      0.00
07/11   07:45   302-559-9789   WILMINGTON DE  1:40      0.00
07/11   10:33   302-559-9789   WILMINGTON DE  5:06      0.00
07/11   13:03                  INCOMING       1:06      0.00
07/11   16:01   302-559-9789   WILMINGTON DE  3:30      0.00
07/12   09:07   302-765-2657   WILMINGTON DE 25:12      0.00    A Cuff
07/12   09:30   610-664-6380   BALACYNWYD PA  2:50      0.00
07/12   11:42   302-324-1086   NEW CASTLE DE  0:28      0.00
07/12   11:48   302-324-1086   NEW CASTLE DE  0:28      0.00
07/12   12:12                  INCOMING       7:50      0.00
07/13   11:39   302-366-1969   NEWARK     DE  0:52      0.00
07/13   13:32   302-733-1000   NEWARK     DE  0:08      0.00
07/13   13:34   410-931-4431   PARKVILLE  MD  3:54      0.00
07/14   08:44   302-559-9789   WILMINGTON DE  4:44      0.00
07/14   09:15   302-656-3160   WILMINGTON DE  1:54      0.00
07/14   11:36   302-479-0840   WILMINGTON DE  2:40      0.00
07/14   12:15   215-938-7330   HUNTGDNVLY PA  0:22      0.00
07/14   12:16   302-377-4565   WILMINGTON DE  9:44      0.00
07/14   13:16   302-377-4565   WILMINGTON DE  0:22      0.00
07/14   14:11   302-377-4565   WILMINGTON DE  0:08      0.00

    ------ CONTINUED ON NEXT PAGE ------

A-210

DP 001531

☑009

```
LM                CHRISTIANA CARE  - HEALTH CARE CENTER      08-10-2005 11:12

Station: 7416  Name:
UNASSIGNED              -      0

- INCOMING -
07/18   10:30   302-324-1086   NEW CASTLE DE 14:40      0.00     Jaune Ross
07/18   11:08   302-722-3279   NEWARK      DE  0:12      0.00
07/18   13:04   215-938-7310   HUNTGDNVLY PA  0:08      0.00
07/18   13:04   215-938-7310   HUNTGDNVLY PA  1:50      0.00
07/18   14:13   302-633-1245   WILMINGTON DE  4:22      0.00
07/18   14:54   302-479-0840   WILMINGTON DE  5:32      0.00
07/18   15:05   302-428-2999   WILMINGTON DE  2:54      0.00
07/18   15:08   302-324-1086   NEW CASTLE DE  1:20      0.00
07/18   15:10   800-677-4576   800SERVICE     2:54      0.00
07/19   07:56   302-992-3637   WILMINGTON DE  0:34      0.00
07/19   09:08   302-652-1880   WILMINGTON DE 20:52      0.00   — Suzanne Muhammad
07/19   09:08   713-241-2991   HOUSTON    TX  2:28      0.00
07/19   13:08   302-559-9789   WILMINGTON DE  1:28      0.00
07/19   13:36   215-938-7310   HUNTGDNVLY PA  1:38      0.00
07/19   13:47   302-559-9789   WILMINGTON DE  0:28      0.00
07/20   08:24   302-559-9789   WILMINGTON DE  4:54      0.00
07/20   10:38   302-377-8886   WILMINGTON DE  4:38      0.00
07/20   11:23   302-428-2999   WILMINGTON DE  2:46      0.00
07/20   14:28   302-559-9789   WILMINGTON DE  6:30      0.00
07/21   09:36   410-982-2923   FORK       MD  7:34      0.00
07/21   11:33   302-655-1629   WILMINGTON DE  3:06      0.00
 7/21   12:58   215-938-7336   HUNTGDNVLY PA 13:00      0.00  ?
 7/21   14:00                  INCOMING       4:22      0.00
07/21   14:05   302-326-2572   NEW CASTLE DE  2:40      0.00
07/25   12:22   302-479-0840   WILMINGTON DE  7:02      0.00
 07/25  12:31   302-324-1086   NEW CASTLE DE  6:52      0.00
 07/25  13:21   302-324-1086   NEW CASTLE DE  0:28      0.00
07/25   14:01   302-428-2999   WILMINGTON DE  3:00      0.00
07/26   11:41   302-479-0840   WILMINGTON DE  8:08      0.00
07/27   09:23   302-886-3327   WILMINGTON DE  2:12      0.00
07/27   09:47   302-886-3327   WILMINGTON DE  3:16      0.00
07/27   15:15   302-656-4796   WILMINGTON DE  0:52      0.00
     Subtotal            Avg Mins  4.3    250:24      0.00     58 CALLS


**** TOTALS ****       Avg Mins  3.8    956:59    11.45    250 CALLS
SUMMARY -
Station: 7416  Name:
EQUIPMENT    OTHER      LD&SP     LOCAL TIE LINE       TOTAL     YTD OUT
   0.00      0.00      11.45      0.00     0.00       11.45      11.45
```

A-211

DP 001532

Christiana Care
200 Hygeia Dr
Newark, De 19713

To:      Melinda Fitzgerald
CC:      April Habich

From:    Trafinna Cuff

Date:    March 23, 2005

Re:      What is the issue and Do I want to remain apart to the team?

The issue is Excessive Misuse of Christiana Care Telephone during working hours.
My telephone log shows 15 excessive calls within 2 months period of time and are unrelated to CCOHS.

In response to your request regarding my situation. I can best explain it by informing you that prior to my
father death, there were numerous questions concerning Multiple Myloma that he went through, as a result
of the disease. I was preoccupied with trying to understand each stages of his condition, what my family and
I would be faced with and how we would work through it. Unaware of the amount of work time spent on
calls regarding his illness, it became excessive.
Other calls were in relation to moral support.

I understand the issues the serious violation and the disciplinary action given.
I take full responsibility for my actions and except the consequences set forth.

I am requesting to remain in my present position and apart of the Health Initiative Team. I will not make
any personal calls unless I notify supervisor first.  My supervisor will be notified when ever I am away from
my desk and for an extended period of time.



A-212

HASIUM, APRIL

CUFF, TRAFINNA W
38055 - OCCUP HEALTH BILLING
801020515

**Christiana Care Corporation**
Job Description/Performance Review

| NAME: Trafinna Cuff | DEPT: Health Initiative – Occupational Health Services | COST CENTER: 38055 |
| TITLE: HI Billing Rep – Occupational Health | CODE: 27131 | GRADE: F0300 |
| SOCIAL SECURITY # 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 | | |

**PART I Competency Review:**
INSTRUCTIONS:    Please circle the appropriate rating code, add comments at the end to individualize the document.  Comments must be added for all reviews of below standards or role model to specifically explain the rating.

Rating Code:

Value-Added Results
Overall Rating

R _____
K _____
B _____

R=Role Model: Consistently produce results that exceed performance expectations. Others describe as a leader and team player. *All not shared items rated Role Model.*
K= Key Contributor: Consistently produces results that meet or occasionally exceed performance expectations.
For new employees performance reflects growth or progress in meeting expectations. *All not shared items rated Key Contributor or Role Model.*
B= Below Standards: Results produced are below the performance expectations. *Any not shared item rated Below Standards.*

| Performance Standards | Value-Added Result | Measures and Performance Zones | Rating |
|---|---|---|---|
| A. **Prepare and submit claims to all third party payers.**<br>• Enters appropriate data in billing system, which will complete the claim.<br>• Reviews claims for completeness.<br>• Comply with insurance specific claim requirements.<br>• Keep abreast of insurance plank requirements by attending in-services and seminars.<br>• Access web sites for claim status.<br>• Creates refund request.<br><br>Weight ( 55 %) | Effective communication | **Measure:**<br>Analysis of cash compared to Gross Charges.<br><br>**Role Model:**<br>• Cash collection percentage increases 10% over the past year's monthly average.<br><br>**Key Contributor:**<br>• Assigned categories meet the average cash collection percentage over the past year's monthly average. | R  K  B<br><br>Shared: Yes |

1

EXHIBIT
Fitzgerald
CA-G  11/20/5?

A-213

Christiana Care Corporation
Job Description/Performance Review

| Performance Standards | Value-Added Result | Measures and Performance Zones | Rating |
|---|---|---|---|
| **B. Telephone interactions in resolving account balances and inquiries with all third party payers, patients, and patient's family members.**<br><br>• Answers phones in a professional courteous manner.<br>• Resolves problems in a timely manner.<br><br>**Weight ( 20 %)** | Increased patient satisfaction. | **Measure:**<br>Supervisor satisfaction with patient satisfaction.<br>**Role Model:**<br>• Proactive problem solver.<br>• Consistent positive comments received from customers.<br>**Key Contributor:**<br>• No more than one justified complaint per quarter from patients, care givers or clients. | R ⊘Ⓚ⊘ B<br><br>Shared: No<br><br>✗ |
| **C.  Obtain and attach appropriate documentation to claims.**<br><br>• Attach documentation as needed for claims.<br>• Keep abreast of insurance specific requirements for documentation.<br>• Identifies billing/insurance issues & resolves them in a timely manner.<br><br>**Weight ( 25 %)** | Completed documentation | **Measure:**<br>Random quarterly audit of documentation as reviewed by Supervisor.<br>**Role Model:**<br>• 100% compliance with problem identification and resolution.<br>**Key Contributor:**<br>• Not less than 99% of documentation attached or handled appropriately. | R ⊘Ⓚ⊘ B<br><br>Shared: No |

2

A-214

Christiana Care Corporation
Job Description/Performance Review

## PART II.  Core Value Behaviors:

INSTRUCTIONS: Please circle the appropriate rating code, add comments at the end to individualize the document.  Comments must be added for all reviews of below standards or role model to specifically explain the rating.

Rating Code:

Core Value Behaviors
Overall Rating

R _____

K _____

B _____

R = Role Model: Consistently demonstrates Role Model level behaviors *in addition to* all Key Contributor level behaviors.  *Four out of six Core Values rated Role Model including Caring and Teamwork, remaining must be at least Key Contributor.*

K = Key Contributor: Consistently demonstrates defined Key Contributor level Core Value Behaviors. For new employees performance reflects growth or progress in meeting expectations.  *All Core Values at least Key Contributor.*

B = Below Standards: Does not consistently demonstrate Key Contributor Behaviors.  *Any Core Value rated below standards.*

| Performance Standards | Measures and Performance Zones | Rating |
|---|---|---|
| | **Measure:** Manager observation, employee self-assessment and other internal & external patient/customer feedback | R (K) B |
| **I. Caring**<br><br>Creates positive relationships with those served by putting them first in all interactions.<br><br>Effectively meets the needs of those served in a compassionate, responsive and courteous manner. | **Key Contributor:**<br>• Anticipates and meets the needs of those served by assuming responsibility for providing care and services in a professional, courteous and timely manner.<br>• Introduces self, demonstrates courteous behavior by extending genuine words of concern, calling people by name, giving them their full attention & using appropriate body language.<br>• Asks questions for clarity, listens carefully, provides appropriate information in a manner others can understand, & summarizes to check understanding.<br>• Works to resolve and handle problems/concerns for those served.<br><br>**Role Model:**<br>• Anticipates the needs of those served and consistently exceeds their expectations.<br><br><br>• Excels in resolving difficult situations and restoring constructive relationships with those served. | |

3

Christiana Care Corporation
Job Description/Performance Review

| Performance Standards | Measures and Performance Zones | Rating |
|---|---|---|
| **Comments with Development Plans:** | | R (K) B |
| | | $\cancel{L}$ |
| **II. Teamwork** | **Measure:** Manager observation, employee self-assessment and other internal & external patient/customer feedback including formal recognition programs. | |
| Actively participates as a member of a team or department to get the work completed. Demonstrates flexibility and cooperation. Helps to remove obstacles for the team to reach goals. | **Key Contributor:** <br><br> • Listens and involves others in team decisions or actions. Builds and maintains positive working relationships. <br><br> • Works cooperatively with other team members, offers assistance, shares work credit, accepts and offers constructive feedback. <br><br> • Demonstrates personal commitment to team and other staff, does not speak negatively about others, respects differences. | **Role Model:** <br><br> • Pro-actively supports coworkers and other teams in developing a team approach to work or learning new skills. <br><br> • Proposes ideas and develops new Approaches to remove obstacles for Team to reach goals. Volunteers to assist in implementing improvements. <br><br> • Consistently maintains positive Working relationships in the face of Conflict. Assists others in resolving Conflict. <br><br> • Serves as source of positive Motivation and encouragement for others. |
| **Comments with Development Plans:** | | |

4

A-216

Christiana Care Corporation
Job Description/Performance Review

| Performance Standards | Measures and Performance Zones | Rating R (K) B |
|---|---|---|
| **III. Excellence** Strives for the highest quality in all aspects of work performance. Learns and uses new information, skills and knowledge. Assumes responsibility for improving care/services. | **Measure:** Manager observation, employee self-assessment and other internal & external patient/customer feedback. **Key Contributor:** • Seeks to achieve the highest quality standards by following established procedures, accurately completing work in a timely manner, taking action to correct errors and notify others that may be affected. • Utilizes resources efficiently at all times. • Seeks to improve individual performance by demonstrating commitment to ongoing learning and gaining new knowledge and skills. Completes mandatory education, acquires and adapts to new job skills/technology as required, • Open to new ideas, seeks to understand change and adapts positively. • Demonstrates systems thinking by understanding the impact of their actions & responsibilities on others inside and outside of their department. | **Role Model:** • Consistently demonstrates high levels of performance. Assumes additional duties during difficult times i.e. crisis, turnover etc. • Proposes ideas and develops new approaches to improve care/service quality and productivity of job and department. • Consistently behaves as a lifelong-learner by learning, applying and integrating new knowledge and skills to improve service. Supports and assists others in developing their skills and improving their contributions. • Behaves as a systems thinker by demonstrating responsibility for their actions inside and outside of the department. |

5

A-217

Christiana Care Corporation
Job Description/Performance Review

| Performance Standards | Measures and Performance Zones | | Rating |
|---|---|---|---|
| **Comments with Development Plans:** | | | R (K) B |
| **IV. Integrity** Consistently demonstrates actions which are professional, & responsible portraying trustworthiness and dependability | **Measure:** Manager observation, employee self-assessment and other internal & external patient/customer feedback. | | |
| | **Key Contributor:** <br> • Includes complete and accurate information in everyday work performance. <br> • Fulfills personal and professional commitments and promises. <br> • Respects and maintains confidentiality of patients, customers and colleagues in all situations. <br> • Uses sound judgment within scope of authority in decision making. <br> • Demonstrates ethical and appropriate workplace behaviors. | **Role Model:** <br> • Demonstrates conviction in articulating or doing the right thing in difficult or demanding situations even when it may be perceived negatively. | |

6

A-218

Christiana Care Corporation
Job Description/Performance Review

| Performance Standards | Measures and Performance Zones | | Rating |
|---|---|---|---|

**Comments with Development Plans:**

---

| | **Measure:** Manager observation, employee self-assessment and other internal & external patient/customer feedback. | |
|---|---|---|
| **V. Leadership** | **Key Contributor:** | **Role Model:** |
| Assumes responsibility for quality care and services and in all situations. Adapts positively to change. | • Readily accepts responsibility for job duties, team and department service requirements. | • Pro-actively supports and assists others in developing their skills and knowledge. Influences co-workers to demonstrate core values and to meet team, department and organizational goals. |
| | • Is self-directed and takes ownership to manage self and work including responsibility for actions and accountability for results. | • Consistently exhibits conduct that serves as an example to others. |
| | • Seeks to understand change, adapts and performs well in the changing environment. | • Acts as a positive change agent, supporting and influencing others to adapt to the changing environment. |

R (K) B

**Comments and Development Plans:**

7

A-219

Christiana Care Corporation
Job Description/Performance Review

| VI. Pride | **Measure:** Manager observation, employee self-assessment and other internal & external patient/customer feedback. | R (K) B |
|---|---|---|
| Creates a positive impression in dress and manner. Serves as an ambassador for our health system. | **Key Contributor:**<br>• Behaves in a dignified manner demonstrating respect for self and others in all aspects of performance.<br><br>• Maintains a personal appearance that conveys confidence and professionalism, and demonstrates respect for the patients and customers we serve.<br><br>• Serves as an ambassador for our health system by always speaking and behaving positively in and outside of the workplace. | **Role Model:**<br>• Always behaves in a dignified manner in adverse situations.<br><br><br><br>• Seeks out and takes advantage of opportunities to share Christiana Care's Mission, Vision and Values and improve our image in the eyes of patients and other internal and external customers. |

**Comments and Development Plans:**

8

Christiana Care Corporation
Job Description/Performance Review

**PART III Critical Skills: (low volume, high risk)**
INSTRUCTIONS: Check the box(es) that apply when completing the evaluation.
For age specific categories place N/A = not applicable to the specific age population if does not apply.

| Critical Skills | Neonatal | Pediatric | Adolescent | Adult | Geriatric | Currently in Training | Yes – Performs Skills | No – Does Not Perform Skills |
|---|---|---|---|---|---|---|---|---|
| Cross train with other divisions Payment Entry | | | | | | | | |
| Cross train with other divisions Charge Entry | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Rating Code;    Overall Rating for
                Value-Added Results and
                Core Value Behavior

R _____

K _____

B _____

**R = Role Model:** Consistently produce results that exceed performance expectations. Others describe as a leader and team player. *Value-Added Results and Core Values rated Role Model.*

**K = Key Contributor:** Consistently produces results that meet or occasionally exceed performance expectations and core value behaviors. For new employees performance reflects growth or progress in meeting expectations. *Value-Added Results and Core Values rated Role Model or Key Contributor.*

**B = Below Standards:** Results produced are below the performance expectations and/or core value behaviors. *Either Value-Added Results or Core Values rated Below Standards.*

9

A-221

**Christiana Care Corporation**
**Job Description/Performance Review**

REVIEWER COMMENT SECTION:
(If the overall rating is Role Model or Below Standan

_____

_____

_____

Trafinna —Key (-) Contributor.... Meets many performance expectations reasonably well, but improvement is needed in a number of areas.
  1) Limited personal phone calls
  2) Limited personal interactions with other employees.
  3) Independently working without close supervision. (has improved )

_____

_____

_____

EMPLOYEE COMMENT SECTION:

_____

_____

_____

Performance Reviewed by:

_____                              _____
Reviewer's Signature                                  Date

_____                              6-21-05.
Employee's Signature                                  Date

10

A-222

00000033

Christiana Care Corporation
Job Description/Performance Review

| NAME: Trafinna Cuff | DEPT: Health Initiative – Occupational Health Services | COST CENTER: 38055 |
| TITLE: HI Billing Rep – Occupational Health | CODE: 27131 | GRADE: F0300 |
| SOCIAL SECURITY # 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 | | |

**PART I Competency Review:**
INSTRUCTIONS:    Please circle the appropriate rating code, add comments at the end to individualize the document.  Comments must be added for all reviews of below standards or role model to specifically explain the rating.

Rating Code:

Value-Added Results
Overall Rating

R _____ ✓ _____

K _____ _____

B _____ _____

R=Role Model: Consistently produce results that exceed performance expectations. Others describe as a leader and team player. *All not shared items rated Role Model.*
K= Key Contributor: Consistently produces results that meet or occasionally exceed performance expectations.
For new employees performance reflects growth or progress in meeting expectations. *All not shared items rated Key Contributor or Role Model.*
B= Below Standards: Results produced are below the performance expectations. *Any not shared item rated Below Standards.*

| Performance Standards | Value-Added Result | Measures and Performance Zones | Rating |
|---|---|---|---|
| A.  Prepare and submit claims to all third party payers. | Effective communication | Measure: | R  Ⓚ  B |
| •  Enters appropriate data in billing system, which will complete the claim. | | Analysis of cash compared to Gross Charges. | |
| •  Reviews claims for completeness. | RECEIVED | Role Model: | Shared: Yes |
| •  Comply with insurance specific claim requirements. | AUG 2 3 2004 | •  Cash collection percentage increases 10% over the past year's monthly average. | |
| •  Keep abreast of insurance plank requirements by attending in-services and seminars. | HUMAN RESOURCES DEPT | Key Contributor: | |
| •  Access web sites for claim status. | | •  Assigned categories meet the average cash collection percentage over the past year's monthly average. | |
| •  Creates refund request. | | | |
| Weight ( 55 %) | | | |

EXHIBIT
Fitzgerald 2
Cao 4/26/07

1

A-223

DP 000034

Christiana Care Corporation
Job Description/Performance Review

| Performance Standards | Value-Added Result | Measures and Performance Zones | Rating |
|---|---|---|---|
| B. Telephone interactions in resolving account balances and inquiries with all third party payers, patients, and patient's family members.<br><br>• Answers phones in a professional courteous manner.<br>• Resolves problems in a timely manner.<br><br>Weight ( 20 %) | Increased patient satisfaction. | **Measure:**<br>Supervisor satisfaction with patient satisfaction.<br>**Role Model:**<br>• Proactive problem solver.<br>• Consistent positive comments received from customers.<br>**Key Contributor:**<br>• No more than one justified complaint per quarter from patients, care givers or clients. | R ( K ) B<br><br>Shared: No |
| C. Obtain and attach appropriate documentation to claims.<br><br>• Attach documentation as needed for claims.<br>• Keep abreast of insurance specific requirements for documentation.<br>• Identifies billing/insurance issues & resolves them in a timely manner.<br><br>Weight (25 %) | Completed documentation | **Measure:**<br>Random quarterly audit of documentation as reviewed by Supervisor.<br>**Role Model:**<br>• 100% compliance with problem identification and resolution.<br>**Key Contributor:**<br>• Not less than 99% of documentation attached or handled appropriately. | R ( K ) B<br><br>Shared: No |

2

DP 000035

Christiana Care Corporation
Job Description/Performance Review

**PART II.  Core Value Behaviors:**
INSTRUCTIONS: Please circle the appropriate rating code, add comments at the end to individualize the document.  Comments must be added for all reviews of below standards or role model to specifically explain the rating.

Rating Code:       **Core Value Behaviors**
                   **Overall Rating**

R _____

K ✓_____

B _____

R=Role Model: Consistently demonstrates Role Model level behaviors in addition to all Key Contributor level behaviors.  *Four out of six Core Values rated Role Model including Caring and Teamwork, remaining must be at least Key Contributor.*
K = Key Contributor: Consistently demonstrates defined Key Contributor level Core Value Behaviors. For new employees performance reflects growth or progress in meeting expectations. *All Core Values at least Key Contributor.*
B = Below Standards: Does not consistently demonstrate Key Contributor Behaviors.  *Any Core Value rated below standards.*

| Performance Standards | Measures and Performance Zones | Rating |
|---|---|---|
| | **Measure:** Manager observation, employee self-assessment and other internal & external patient/customer feedback | R ⓚ B |
| **I. Caring**<br><br>Creates positive relationships with those served by putting them first in all interactions.<br><br>Effectively meets the needs of those served in a compassionate, responsive and courteous manner. | **Key Contributor:**<br>• Anticipates and meets the needs of those served by assuming responsibility for providing care and services in a professional, courteous and timely manner.<br>• Introduces self, demonstrates courteous behavior by extending genuine words of concern, calling people by name, giving them their full attention & using appropriate body language.<br>• Asks questions for clarity, listens carefully, provides appropriate information in a manner others can understand, & summarizes to check understanding.<br>• Works to resolve and handle problems/concerns for those served.<br><br>**Role Model:**<br>• Anticipates the needs of those served and consistently exceeds their expectations.<br><br><br><br><br><br>• Excels in resolving difficult situations and restoring constructive relationships with those served. | |

3

A-225

Christiana Care Corporation
Job Description/Performance Review

| Performance Standards | Measures and Performance Zones | Rating |
|---|---|---|
| **Comments with Development Plans:** | | |
| | | R Q B |
| **II. Teamwork**<br><br>Actively participates as a member of a team or department to get the work completed. Demonstrates flexibility and cooperation. Helps to remove obstacles for the team to reach goals. | **Measure:** Manager observation, employee self-assessment and other internal & external patient/customer feedback including formal recognition programs.<br><br>Key Contributor:<br>• Listens and involves others in team decisions or actions. Builds and maintains positive working relationships.<br><br>• Works cooperatively with other team members, offers assistance, shares work credit, accepts and offers constructive feedback.<br><br>• Demonstrates personal commitment to team and other staff, does not speak negatively about others, respects differences.<br><br>Role Model:<br>• Pro-actively supports coworkers and other teams in developing a team approach to work or learning new skills.<br><br>• Proposes ideas and develops new Approaches to remove obstacles for Team to reach goals. Volunteers to assist in implementing improvements.<br><br>• Consistently maintains positive Working relationships in the face of Conflict. Assists others in resolving Conflict.<br><br>• Serves as source of positive Motivation and encouragement for others. | |
| **Comments with Development Plans:** | | |

4

A-226

Christiana Care Corporation
Job Description/Performance Review

| Performance Standards | Measures and Performance Zones | Rating |
| --- | --- | --- |
| | **Measure:** Manager observation, employee self-assessment and other internal & external patient/customer feedback. | R (K) B |
| **III. Excellence**<br><br>Strives for the highest quality in all aspects of work performance. Learns and uses new information, skills and knowledge. Assumes responsibility for improving care/services. | **Key Contributor:**<br>• Seeks to achieve the highest quality standards by following established procedures, accurately completing work in a timely manner, taking action to correct errors and notify others that may be affected.<br>• Utilizes resources efficiently at all times.<br>• Seeks to improve individual performance by demonstrating commitment to ongoing learning and gaining new knowledge and skills. Completes mandatory education, acquires and adapts to new job skills/technology as required,<br>• Open to new ideas, seeks to understand change and adapts positively.<br>• Demonstrates systems thinking by understanding the impact of their actions & responsibilities on others inside and outside of their department. | **Role Model:**<br>• Consistently demonstrates high levels of performance. Assumes additional duties during difficult times i.e. crisis, turnover etc.<br>• Proposes ideas and develops new approaches to improve care/service quality and productivity of job and department.<br><br>• Consistently behaves as a lifelong-learner by learning, applying and integrating new knowledge and skills to improve service. Supports and assists others in developing their skills and improving their contributions.<br><br>• Behaves as a systems thinker by demonstrating responsibility for their actions inside and outside of the department. |

5

A-227

Christiana Care Corporation
Job Description/Performance Review

| Performance Standards | Measures and Performance Zones | Rating |
|---|---|---|
| **Comments with Development Plans:** | | |
| **IV. Integrity**<br><br>Consistently demonstrates actions which are professional, & responsible portraying trustworthiness and dependability | **Measure:** Manager observation, employee self-assessment and other internal & external patient/customer feedback.<br><br>**Key Contributor:**<br>• Includes complete and accurate information in everyday work performance.<br>• Fulfills personal and professional commitments and promises.<br>• Respects and maintains confidentiality of patients, customers and colleagues in all situations.<br>• Uses sound judgment within scope of authority in decision making.<br>• Demonstrates ethical and appropriate workplace behaviors.<br><br>**Role Model:**<br>• Demonstrates conviction in articulating or doing the right thing in difficult or demanding situations even when it may be perceived negatively. | R (K) B |

6

00000038

A-228

Christiana Care Corporation
Job Description/Performance Review

| Performance Standards: | Measures and Performance Zones: | | Rating |
|---|---|---|---|

## Comments with Development Plans:

| V. Leadership | Measure: Manager observation, employee self-assessment and other internal & external patient/customer feedback. | | R (K) B |
|---|---|---|---|
| Assumes responsibility for quality care and services and in all situations. Adapts positively to change. | **Key Contributor:**<br>• Readily accepts responsibility for job duties, team and department service requirements.<br><br>• Is self-directed and takes ownership to manage self and work including responsibility for actions and accountability for results.<br><br>• Seeks to understand change, adapts and performs well in the changing environment. | **Role Model:**<br>• Pro-actively supports and assists others in developing their skills and knowledge. Influences co-workers to demonstrate core values and to meet team, department and organizational goals.<br>• Consistently exhibits conduct that serves as an example to others.<br><br>• Acts as a positive change agent, supporting and influencing others to adapt to the changing environment. | |

## Comments and Development Plans:

7

040000040

Christiana Care Corporation
Job Description/Performance Review

| VI. Pride | **Measure:** Manager observation, employee self-assessment and other internal & external patient/customer feedback. | R Ⓚ B |
|---|---|---|
| Creates a positive impression in dress and manner. Serves as an ambassador for our health system. | **Key Contributor:**<br><br>• Behaves in a dignified manner demonstrating respect for self and others in all aspects of performance.<br><br>• Maintains a personal appearance that conveys confidence and professionalism, and demonstrates respect for the patients and customers we serve.<br><br>• Serves as an ambassador for our health system by always speaking and behaving positively in and outside of the workplace. | **Role Model:**<br><br>• Always behaves in a dignified manner in adverse situations.<br><br><br>• Seeks out and takes advantage of opportunities to share Christiana Care's Mission, Vision and Values and improve our image in the eyes of patients and other internal and external customers. |

**Comments and Development Plans:**

8

A-230

DP 000041

Christiana Care Corporation
Job Description/Performance Review

**PART III  Critical Skills: (low volume, high risk)**
INSTRUCTIONS:  Check the box(es) that apply when completing the evaluation.
For age specific categories place N/A = not applicable to the specific age population if does not apply.

| Critical Skills | Neonatal | Pediatric | Adolescent | Adult | Geriatric | Currently In Training | Yes – Performs Skills | No – Does Not Perform Skills |
|---|---|---|---|---|---|---|---|---|
| Cross train with other divisions Payment Entry | | | | | | | | |
| Cross train with other divisions Charge Entry | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Rating Code:    Overall Rating for
Value-Added Results and
Core Value Behavior

R _____

K ✓

B _____

R = Role Model: Consistently produce results that exceed performance expectations.  Others describe as a leader and team player.  *Value-Added Results and Core Values rated Role Model.*
K = Key Contributor: Consistently produces results that meet or occasionally exceed performance expectations and core value behaviors.
For new employees performance reflects growth or progress in meeting expectations.  *Value-Added Results and Core Values rated Role Model or Key Contributor.*
B = Below Standards: Results produced are below the performance expectations and/or core value behaviors.  *Either Value-Added Results or Core Values rated Below Standards.*

9

DP 000042

**Christiana Care Corporation**
**Job Description/Performance Review**

REVIEWER COMMENT SEC
(If the overall rating is Role Mo

Trafinna Cuff

Key Contributor... Trafinna performance has fully met the established job expectations. Trafinna generally preforms very well and required little additional guidance. Over the last year Trafinna's performance has improved but, I would like to see a little more focus on her daily schedule.

EMPLOYEE COMMENT SECTION:

Performance Reviewed by:

_____    6/17/06
Reviewer's Signature             Date

_____    06/14/06
Employee's Signature            Date

10

A-232

DP 000043

**Christiana Care Corporation**
**Job Description/Performance Review**

| NAME: Trafnna Cuff | DEPT: Health Initiative – Occupational Health Services | COST CENTER: 38055 |
|---|---|---|
| TITLE: HI Billing Rep – Occupational Health | CODE: 27131 | GRADE: F0300 |
| SOCIAL SECURITY # 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 | | |

**PART I Competency Review:**
INSTRUCTIONS:    Please circle the appropriate rating code, add comments at the end to individualize the document.  Comments must be added for all reviews of below standards or role model to specifically explain the rating.

Rating Code:
Value-Added Results
Overall Rating

R= **Role Model:** Consistently produces results that exceed performance expectations. Others describe as a leader and team player. *All not shared items rated Role Model.*
K= **Key Contributor:** Consistently produces results that meet or occasionally exceed performance expectations.
For new employees performance reflects growth or progress in meeting expectations. *All not shared items rated Key Contributor or Role Model.*
B= **Below Standards:** Results produced are below the performance expectations. *Any not shared item rated Below Standards.*

R _____

K _____

B _____

| Performance Standards | Value-Added Result | Measures and Performance Zones | Rating |
|---|---|---|---|
| **A. Enters payments accurately into billing system.** <br><br> • Enters payments into the billing system. <br><br> • Balance payments to the deposit sheets. <br><br> **Weight ( 5 %)** | Posted cash | **Measure:** <br> Quarterly random audit of payments entered as judged by Supervisor. <br><br> **Role Model:** <br> • 100% accuracy rate <br><br> **Key Contributor:** <br> • 99% accuracy rate on all payments entered. | **R    K    B** <br><br> **Shared: No** |

( 3.570 )

RECEIVED
JUL 2 1 2003
HUMAN RESOURCES DEPT



EXHIBIT
Fitzgerald 3
Case 11/28/07

A-233

DP 000044

Christiana Care Corporation
Job Description/Performance Review

| Performance Standards | Value-Added Result | Measures and Performance Zones | Rating |
|---|---|---|---|
| **B. Prepare and submit claims to all third party payers.**<br><br>• Enters appropriate data in billing system, which will complete the claim.<br>• Reviews claims for completeness.<br>• Comply with insurance specific claim requirements.<br>• Keep abreast of insurance plank requirements by attending in-services and seminars.<br><br>Weight ( 45 %) | **Effective communication** | **Measure:**<br>Analysis of cash compared to Gross Charges.<br><br>**Role Model:**<br>• Cash collection percentage increases 10% over the past year's monthly average.<br><br>**Key Contributor:**<br>• Assigned categories meet the average cash collection percentage over the past year's monthly average. | R  (K)  B<br><br>Shared: Yes |
| **C. Telephone interactions in resolving account balances and inquiries with all third party payers, patients, and patient's family members.**<br><br>• Answers phones in a professional courteous manner.<br>• Resolves problems in a timely manner.<br><br>Weight ( 15 %) | Increased patient satisfaction. | **Measure:**<br>Supervisor satisfaction with patient satisfaction.<br><br>**Role Model:**<br>• Proactive problem solver.<br>• Consistent positive comments received from customers.<br><br>**Key Contributor:**<br>• No more than one justified complaint per quarter from patients, care givers or clients. | (R) (K) B<br><br>Shared: No |

SA000045

Christiana Care Corporation
Job Description/Performance Review

| Performance Standards | Value-Added Result | Measures and Performance Zones | Rating |
|---|---|---|---|
| **D. Enter services accurately and efficiently into billing system.**<br><br>• Enter charges into billing system.<br>• Balance charges as determined by Billing Manager.<br>• Review charge document for accuracy.<br><br>Weight ( 10 %) | Captured revenue | **Measure:**<br>Quarterly random audit of charge entry as reviewed by Supervisor.<br><br>**Role Model:**<br>• 100 % accuracy on charges entered.<br>**Key Contributor:**<br>• Error rate does not exceed 99% on all charges entered. | R    K    B<br><br>Shared: No |
| **E. Obtain and attach appropriate documentation to claims.**<br><br>• Attach documentation as needed for claims.<br>• Keep abreast of insurance specific requirements for documentation.<br><br>Weight ( 10 %) | Completed documentation | **Measure:**<br>Random quarterly audit of documentation as reviewed by Supervisor.<br><br>**Role Model:**<br>• 100% compliance with problem identification and resolution.<br>**Key Contributor:**<br>• Not less than 99% of documentation attached or handled appropriately. | R   ⓚ   B<br><br>Shared: No |

3

A-235

DP 000046

Christiana Care Corporation
Job Description/Performance Review

**PART II.  Core Value Behaviors:**
INSTRUCTIONS: Please circle the appropriate rating code, add comments at the end to individualize the document.  Comments must be added for all reviews of below standards or role model to specifically explain the rating.

Rating Code:   Core Value Behaviors   R _____
               Overall Rating

                                      K _____

                                      B _____

R=Role Model: Consistently demonstrates Role Model level behaviors *in addition to all* Key Contributor level behaviors. *Four out of six Core Values rated Role Model including Caring and Teamwork, remaining must be at least Key Contributor.*

K= Key Contributor: Consistently demonstrates defined Key Contributor level Core Value Behaviors. For new employees performance reflects growth or progress in meeting expectations. *All Core Values at least Key Contributor.*

B= Below Standards: Does not consistently demonstrate Key Contributor Behaviors. *Any Core Value rated below standards.*

| Performance Standards | Measures and Performance Zones: | Rating |
|---|---|---|
| | **Measure:** Manager observation, employee self-assessment and other internal & external patient/customer feedback | RKB |
| **I. Caring** | | |
| Creates positive relationships with those served by putting them first in all interactions. Effectively meets the needs of those served in a compassionate, responsive and courteous manner. | **Key Contributor:** <br>• Anticipates and meets the needs of those served by assuming responsibility for providing care and services in a professional, courteous and timely manner. <br>• Introduces self, demonstrates courteous behavior by extending genuine words of concern, calling people by name, giving them their full attention & using appropriate body language. <br>• Asks questions for clarity, listens carefully, provides appropriate information in a manner others can understand, & summarizes to check understanding. <br>• Works to resolve and handle problems/concerns for those served. <br><br>**Role Model:** <br>• Anticipates the needs of those served and consistently exceeds their expectations. <br><br>• Excels in resolving difficult situations and restoring constructive relationships with those served. | |
| **Comments with Development Plans:** | | |

4

SSP 000047

Christiana Care Corporation
Job Description/Performance Review

| Performance Standards | Measures and Performance Zones | Rating |
|---|---|---|
| **II. Teamwork**<br><br>Actively participates as a member of a team or department to get the work completed. Demonstrates flexibility and cooperation. Helps to remove obstacles for the team to reach goals. | **Measure:** Manager observation, employee self-assessment and other internal & external patient/customer feedback including formal recognition programs.<br><br>Key Contributor:<br>• Listens and involves others in team decisions or actions. Builds and maintains positive working relationships.<br><br>• Works cooperatively with other team members, offers assistance, shares work credit, accepts and offers constructive feedback.<br><br>• Demonstrates personal commitment to team and other staff, does not speak negatively about others, respects differences.<br><br>Role Model:<br>• Pro-actively supports coworkers and other teams in developing a team approach to work or learning new skills.<br><br>• Proposes ideas and develops new Approaches to remove obstacles for Team to reach goals. Volunteers to assist in implementing improvements.<br><br>• Consistently maintains positive Working relationships in the face of Conflict. Assists others in resolving Conflict.<br><br>• Serves as source of positive Motivation and encouragement for others. | R / K / B |

**Comments with Development Plans:**

A-237

Christiana Care Corporation
Job Description/Performance Review

| Performance Standards | Measures and Performance Zones | Rating R K B |
|---|---|---|
| **III. Excellence**<br><br>Strives for the highest quality in all aspects of work performance. Learns and uses new information, skills and knowledge. Assumes responsibility for improving care/services. | **Measure:** Manager observation, employee self-assessment and other internal & external patient/customer feedback.<br><br>**Key Contributor:**<br>• Seeks to achieve the highest quality standards by following established procedures, accurately completing work in a timely manner, taking action to correct errors and notify others that may be affected.<br>• Utilizes resources efficiently at all times.<br>• Seeks to improve individual performance by demonstrating commitment to ongoing learning and gaining new knowledge and skills.<br>• Completes mandatory education, acquires and adapts to new job skills/technology as required.<br>• Open to new ideas, seeks to understand change and adapts positively.<br>• Demonstrates systems thinking by understanding the impact of their actions & responsibilities on others inside and outside of their department.<br><br>**Role Model:**<br>• Consistently demonstrates high levels of performance. Assumes additional duties during difficult times i.e. crisis, turnover etc.<br>• Proposes ideas and develops new approaches to improve care/service quality and productivity of job and department.<br>• Consistently behaves as a lifelong-learner by learning, applying and integrating new knowledge and skills to improve service. Supports and assists others in developing their skills and improving their contributions.<br>• Behaves as a systems thinker by demonstrating responsibility for their actions inside and outside of the department. | |

A-238

Christiana Care Corporation
Job Description/Performance Review

| Performance Standards | Measures and Performance Zones | Rating |
|---|---|---|

**Comments with Development Plans:**

**Measure:** Manager observation, employee self-assessment and other internal & external patient/customer feedback.

| IV. Integrity | **Key Contributor:** | **Role Model:** | R (K) B |
|---|---|---|---|
| Consistently demonstrates actions which are professional, & responsible portraying trustworthiness and dependability | • Includes complete and accurate information in everyday work performance.<br><br>• Fulfills personal and professional commitments and promises.<br><br>• Respects and maintains confidentiality of patients, customers and colleagues in all situations.<br><br>• Uses sound judgment within scope of authority in decision making.<br><br>• Demonstrates ethical and appropriate workplace behaviors. | • Demonstrates conviction in articulating or doing the right thing in difficult or demanding situations even when it may be perceived negatively. | |

A-239

Christiana Care Corporation
Job Description/Performance Review

| Performance Standards | Measures and Performance Zones | | Rating |
|---|---|---|---|

**Comments with Development Plans:**

| V. Leadership | **Measure:** Manager observation, employee self-assessment and other internal & external patient/customer feedback. | | R (K) B |
|---|---|---|---|
| Assumes responsibility for quality care and services and in all situations. Adapts positively to change. | **Key Contributor:** | **Role Model:** | |
| | • Readily accepts responsibility for job duties, team and department service requirements. | • Pro-actively supports and assists others in developing their skills and knowledge. Influences co-workers to demonstrate core values and to meet team, department and organizational goals. | |
| | • Is self-directed and takes ownership to manage self and work including responsibility for actions and accountability for results. | • Consistently exhibits conduct that serves as an example to others. | |
| | • Seeks to understand change, adapts and performs well in the changing environment. | • Acts as a positive change agent, supporting and influencing others to adapt to the changing environment. | |

**Comments and Development Plans:**

8

A-240

Christiana Care Corporation
Job Description/Performance Review

| | | R K B |
|---|---|---|
| **VI. Pride** | **Measure:** Manager observation, employee self-assessment and other internal & external patient/customer feedback. | |
| Creates a positive impression in dress and manner. Serves as an ambassador for our health system. | **Key Contributor:**<br>• Behaves in a dignified manner demonstrating respect for self and others in all aspects of performance.<br>• Maintains a personal appearance that conveys confidence and professionalism, and demonstrates respect for the patients and customers we serve.<br>• Serves as an ambassador for our health system by always speaking and behaving positively in and outside of the workplace. | **Role Model:**<br>• Always behaves in a dignified manner in adverse situations.<br><br>• Seeks out and takes advantage of opportunities to share Christiana Care's Mission, Vision and Values and improve our image in the eyes of patients and other internal and external customers. |
| **Comments and Development Plans:** | | |

9

A-241

Christiana Care Corporation
Job Description/Performance Review

## PART III Critical Skills: (low volume, high risk)
INSTRUCTIONS:  Check the box(es) that apply when completing the evaluation.
For age specific categories place N/A = not applicable to the specific age population if does not apply.

| Critical Skills | Neonatal | Pediatric | Adolescent | Adult | Geriatric | Currently in Training | Yes – Performs Skills | No – Does Not Perform Skills |
|---|---|---|---|---|---|---|---|---|
| Cross train with other divisions Payment Entry | | | | | | | | |
| Cross train with other divisions Charge Entry | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**Rating Code:**

R=**Role Model:** Consistently produce results that exceed performance expectations. Others describe as a leader and team player. *Value-Added Results and Core Values rated Role Model.*

K= **Key Contributor:** Consistently produces results that meet or occasionally exceed performance expectations and core value behaviors. For new employees performance reflects growth or progress in meeting expectations. *Value-Added Results and Core Values rated Role Model or Key Contributor.*

B= **Below Standards:** Results produced are below the performance expectations and/or core value behaviors. *Either Value-Added Results or Core Values rated Below Standards.*

Overall Rating for
Value-Added Results and
Core Value Behavior

R  _____

K  ✓

B  _____

10

A-242

DP 000053

**Christiana Care Corporation**
**Job Description/Performance Review**

REVIEWER COMMENT SECTION:
(If the overall rating is Role Model or Below Standards, please explain the reason(s) for this rating below.)

EMPLOYEE COMMENT SECTION:

I understand CCHS standard policy and the importance of arriving to work on time. In going forward I will strive to correct my attendance pattern, and if for any reason I need to arrive late I will notify supervisor at that time.

Performance Reviewed by:

_____    7/7/03
Reviewer's Signature        Date

_____    6/14
                            Date

_____    6-16-03
Employee's Signature        Date

11

A-243

## Unknown

**From:**
**Sent:** Cuff, Trafinna
**To:** Monday, August 15, 2005 11:38 AM
**Subject:** Bryson, Larry
Statements

**Importance:**
**Sensitivity:** High
Confidential

August 15, 2005

9:16am Meeting with Melinda Fitzgerald and Joseph Richichi.
I am asked to write a statement for personal phones calls and Internet Usage.

**Outgoing Calls**
I am aware of Christiana Care policy for Personal Calls and Non Business Internet Use.
I have made non business calls. A few calls were very important to my personal living (ie.housing/finances).
I informed Melinda of a couple calls I made the very next day- 07/09/05 th call was made. In the future I will limit personal use of Christiana Care telephone.

**Incoming Calls**
In going forward, I will tell all family and friends unless it is an emergency do not call me at my place of business (Christiana Care).

**Internet Usage**
I have discuss this concern before and as I stated before, my Microsoft Outlook attracts many Potential Spasm messages and non Spasm messages. Most of these are connected to a Web Page and some of them I do go into and read what they have to offer. Since this action has caused a problem, I will refrain from going into these email message as of today.

Attach please find correction on Phone Log Summary.



A-244

EXHIBIT
Wilson-6
11/3/07B

 CHRISTIANA CARE HEALTH SYSTEM

## DISCIPLINARY ACTION RECORD

| NAME | POSITION | | | DATE |
|---|---|---|---|---|
| Trafinna Cuff | HI Billing Rep | ☒FT ☐PT ☐Casual/Temp ☐WIP ☐PerDiem ☐Trial | | 08/23/05 |

| LOCATION | SHIFT | BI-WKLY TOURS | DEPARTMENT | DATE OF HIRE | TIME IN POSITION |
|---|---|---|---|---|---|
| HCC | Day | 10 | Occupational Health Billing | 03-16-98 | 12-10-01 |

| PREVIOUS DISCIPLINARY ACTION RECORD | DATE | PROBLEM | ACTION TAKEN |
|---|---|---|---|
| | 03/18/05 | IDLENESS | Decision Making Leave |
| | 10/28/03 | Overall Attendance | 2nd Step Reminder |
| | 06/16/03 | Overall Attendance | 1st Step Reminder |

**INFRACTION NATURE AND DATE**   STATE PERFORMANCE OR BEHAVIOR THAT IS UNACCEPTABLE AND WHY THIS IS A PROBLEM. PROVIDE DETAILS OF WHEN, WHAT, WHERE AND WHO WAS INVOLVED.

IDLENESS

In reviewing the phone logs for July and August it was noticed you had (7) incoming calls (many over 10 minutes) during work time totaling 3 hours and 25 mins. Additionally there were 9 outgoing calls (different dates) totaling 2 hours and 41 mins. This amounts to almost six hours of work time. On August 15th we requested from you a written statement explaining the above calls. Your statement did admit to making and receiving personal calls on Christiana Care Company time.

Following your Decision Making Leave in March 2005 you indicated that you understood that this was a serious violation of CCHS policy and took ownership for your behavior. In addition, you committed to not making personal calls unless you notified your supervisor first. There have been other occasions when the expectaions of e-mail/internet and phone use have been discussed, e.g., in staff meetings. It has been discussed that CCHS property is to be used for business purposes (this includes use of the phones and the internet); unless prior approval is obtained or for emergent situations. At no time did you discuss with me the need to make/receive personal calls of an emergent nature. (for the exception of 07/08/05 Cingular Wireless) Because your job requires you to be on the phone contacting employers/insurance companies, it is expected that while you are on work time at your desk , that you are conducting Christiana Care business and not using Christiana Care productive time for personal use. These personal calls are excessive and occurred during productive time for which you were being paid to conduct Christiana Care business.

In addition, an internet useage report also reveals that you have spent excessive time on the internet on non-business related sites. The total amount of time is 2 hours 18 min

Since you have an active DML for these offenses, your employment is being terminated.

**EMPLOYEE'S COMMENTS:**   Refused to sign

**DISCIPLINARY ACTION TO BE TAKEN: INCLUDE CONSEQUENCES OF CONTINUED UNACCEPTABLE BEHAVIOR OR PERFORMANCE.** Because of this infraction of idleness & the previous active 2nd step reminder for overall attendance, you are being issued this Decision Making Leave. As a result of any additional disciplinary actions within the next 3 years, this DML will be deactivated. If you do not accrue any additional disciplinary action during the active life of this decision making leave will be reviewed for termination. procedure requiring formal disciplinary action during the active life of this decision making leave will be reviewed for termination. Please note that any future violation of ANY Christiana Care policy or

☐ 2ⁿᵈ STEP REMINDER   ☐ DECISION MAKING   DATE _____ RETURN _____   ☒ TERMINATION

**Employees wishing to APPEAL must CONTACT 733-1120 and complete and return the necessary forms within 15 calendar days from the date this discipline was issued.**

ACTION EMPLOYEE AGREED TO TAKE TO SOLVE THE PROBLEM:

If you are experiencing any difficulties that may be affecting your overall performance, contact the Employee Assistance Program at 800-298-9076.

FOLLOW UP: BY SUPERVISOR TO ASSURE PROBLEM RESOLUTION

| SIGNATURES | DATES |
|---|---|
| EMPLOYEE (ACKNOWLEDGING RECEIPT OF COPY) | |
| INITIATED BY (POSITION OR TITLE) | 8/23/05 |
| DEPARTMENT MANAGER | 8/23/05 |
| VICE PRESIDENT | 8/23/05 |
| HUMAN RESOURCES DEPARTMENT | |

A-245

☐ **EMPLOYEE COPY**      ☐ **HUMAN RESOURCES COPY**      ☐ **DEPARTMENTAL COPY**

To:
Renee
Pearman
11/1/2/05

THIS FORM MUST BE COMPLETED AND ~~RETURNED~~
OFFICE NO LATER THAN 4:00PM ON _____9/7/05_____.

Christiana Care Health Systems
**PROBLEM SOLVING PROCEDURE FORM**                    3

Employee: __Trafima Cuff__  Department: __Billing__    Location: __HCC__
__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__
Work #: _____  Home #: __521-1948__  Shift: __Day__  Supervisor: __A. Habich__

**Explanation of Complaint:** I was terminated because I was not
willing to cooperate with managements decision to
change my position, department, and cost center
with another employee.

    Melinda Fitzgerald informed me that managem
had made a decision for another employee and
myself to "flip flop" positions. The two positions ar
not comparable, it was not to my advantage to go
along with this decision. I informed Melinda
that I didn't like the decision and after making
this comment to her, she informed April Hibich.
April attempted to reassure me that the chang
would be a good one and if I did not go along wit
the decision, "Things Could Be Worst". As a result
of her threatning remark, I went to Human
Resources. Human Resources met with my supervis
and informed them that they could not flip flop positio
As a result of this information from HR, supervisio

**Description of Requested Remedy:**
I want my employment and all benefits reinstated, an
employment record clear from any derogatory action.

I have informally discussed this problem with my supervisor on _____ and I wish t
proceed to Step 1.                                    **(Date)**

Employee Signature: _____  Date: _____
(Submit to Human Resources/Employee Relations within 15 calendar days of informal discussion with
~~supervisor.~~

EXHIBIT
WILSON-16
11/12/07 TB

A-246

DP 000580

retaliated by accessing my employee internet logs to terminate my employment.

A-247

DP 000581



**CHRISTIANA CARE**
HEALTH SERVICES

4755 Ogletown-Stanton Road
PO Box 6001
Newark, Delaware 19718-6001

302-733-1000

September 22, 2005

Trafinna Cuff
802 B Village Circle
Newark, DE 19713

Dear Ms. Cuff:

Thank you for meeting with us on Thursday, September 22, 2005 to share your concerns and allow us to review the circumstances surrounding the recent termination of your employment with Christiana Care. As part of our review, we considered the current situation, in addition to conducting a review of your employment history with Christiana Care.

We felt that you were well prepared to meet with us and did a commendable job on presenting your appeal. Based on our review of policy, precedent and information you provided, we have decided to uphold the decision to terminate your employment with Christiana Care Health System.

Despite our denial of your appeal, we hope that you are able to identify some positive experiences you have had while employed with Christiana Care. We wish you the best in future pursuits.

Sincerely,

The Peer Review Panel



A-248



STATE OF DELAWARE DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS
4425 NORTH MARKET STREET
WILMINGTON, DE 19802
(302) 761-8200/ FAX: (302) 761-6601

## CERTIFIED MAIL - RETURN RECEIPT REQUESTED

September 26, 2005

Personnel Manager
**Christiana Care Health Services**
4755 Ogletown-Stanton Road
Newark, DE 19718-6001

RE:    **Wilson v. Christiana Care Health Services, Case No: 05090422W/17CA500564**

Dear Respondent:

Enclosed please find a NOTICE OF CHARGE OF DISCRIMINATION, along with the following documents:

1.    Verified Charge of Discrimination filed against the above-named Respondent;
2.    Mediation questionnaire;
3.    Copy of 19 Del. Code § 712 (c), describing the administrative process.

Pursuant to 19 Del. Code § 712 (c), the named Respondent has an opportunity at this time to "file an answer **within twenty (20) days of the receipt of the Charge of Discrimination**, certifying that a copy of the answer was mailed to the Charging Party at the address provided." **If you are interested in mediation, you do not need to file an answer at this time.  If you elect this option you must check the appropriate provision of the enclosed Invitation to Engage in Mediation form and return it to us in lieu of your answer.**

This Charge of Discrimination has been filed under the following law(s), and as indicated by the case numbers referenced above.

☒ Title VII                              ☒ DE Discrimination in Employment Act
☐ ADA                               ☐ DE Handicapped Persons Employment Protection Act
☐ ADEA

We anticipate your full cooperation.  If you intend to retain legal representation at any time throughout this process, please have your attorney enter his or her appearance so that future contact will be made through him or her.

*Julie Cutler*

Julie Cutler, Administrator,
Discrimination Program

cc:  Charging Party (w/o enclosures)

A-249

DOL Form C-9W : 8/04



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Philadelphia District Office**

21 South 5th Street, Suite 400
Philadelphia, PA 19106-2515
(215) 440-2600
TTY (215) 440-2610
FAX (215) 440-2847

EEOC Charge No.: __17CA500564__      Date: __9.26.05__

Your charge of employment discrimination as filed with the Labor Law Enforcement Section of the Delaware Dept. of Labor (DDOL) will also be forwarded to the Philadelphia District Office of the U.S. Equal Employment Opportunity Commission (EEOC) for dual filing. This dual-filing is done in order to preserve your federal rights as explained below. The EEOC charge number will be assigned by the DDOL in addition to DDOL's own charge number. This letter, which will be sent to you by the DDOL, constitutes your notification of the dual-filing with EEOC. The Respondent named in your charge will also be notified by DDOL of the dual-filing with EEOC.

The EEOC will refrain from any processing of your charge until such time as the DDOL completes its processing and issues final findings and orders. At that time, the DDOL will notify the EEOC of the closure so that EEOC can review the DDOL finding. Those final findings and orders may be adopted by EEOC and the EEOC case would then be closed based on the DDOL proceedings.

However, under Section 1601.76 of EEOC's regulations, you are entitled to request that EEOC perform a Substantial Weight Review of the DDOL's final finding. To obtain this review, you must request it by writing to EEOC within 15 days of your receipt of DDOL's final finding in your case. Otherwise, EEOC will generally adopt the DDOL's findings.

To request the Substantial Weight Review, you should address your request to the address shown in the letterhead above, to the attention of the State and Local Unit. In addition, you should provide as much specific detail as possible as to why you are dissatisfied with the DDOL investigation or finding.

While your charge is being investigated by the DDOL, you should address any concerns or additional information concerning your charge or the DDOL investigation directly to the DDOL. This will ensure that such concerns or information are provided to the appropriate person(s). **Please do not contact EEOC directly as EEOC will not be able to assist you while the charge is being processed by DDOL. Also, please do not submit documents or evidence to EEOC since DDOL will be actively investigating the charge and will maintain the active case file.**

The dual-filing of the charge with EEOC will preserve your rights to file a private lawsuit in federal district court as follows:

a. If your charge is filed under Title VII of the Civil Rights Act of 1964, as amended (Title VII) (that is, based on race, sex, color, religion or national origin) or under the Americans with Disabilities Act of 1990, as amended (ADA) (that is, based upon mental or physical disability), you can only file a lawsuit in Federal Court if EEOC first issues you a Notice of Right to Sue. To obtain such a Notice, you must wait for 240 days from the date you filed your charge with DDOL. You must thereafter make a written request for issuance of the Notice of Right to Sue. This request can be sent directly

A-250

to EEOC at the address shown in the letterhead above or you can send the request to the DDOL for forwarding to EEOC. Upon its receipt, EEOC will issue you the Notice of Right to Sue and you would have 90 days in which to file suit. The issuance of the Notice of Right to Sue will normally result in EEOC terminating all further processing.

b. If your charge is filed under the Age Discrimination in Employment Act of 1967 as amended (ADEA), (that is, based on age 40 or older), you do not have to request a Notice of Right to Sue from EEOC if you wish to file a lawsuit in Federal Court. Instead, you must wait at least 60 days from the date you filed your charge with the DDOL, regardless of the status of the DDOL or EEOC processing. Thereafter, you can file a private lawsuit directly in Federal Court without first contacting EEOC in any manner.

If based upon EEOC's review of DDOL's final finding, the EEOC determines that the finding should be accepted as the basis for EEOC's closure, you will be so notified in writing. If the DDOL closure is for any reason other than a successful settlement or a withdrawal, the EEOC closure will also include a Notice of Right to Sue. This applies to charges filed under Title VII, the ADA and/or the ADEA. In such an event, you would then have 90 days from the date of your receipt of the Notice of Right to Sue to file suit in federal district court.

EEOC's regulations require that you notify EEOC of any change in address and keep us informed of any prolonged absence from your current address. However, if the DDOL is still processing your charge, you should forward any such notification or change of address directly to the DDOL. You should also cooperate fully with the DDOL in its processing of your charge.

Should you contact EEOC to request a Substantial Weight Review or to request a Notice of Right to Sue, please include the EEOC Charge Number shown at the top of page 1 in your correspondence to EEOC.

Sincerely,

Marie M. Tomasso
District Director

A-251

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

**Delaware Department of Labor**

| ENTER CHARGE NUMBER | |
|---|---|
| ☐ FEPA | C5090A22LW |
| ☐ EEOC | 170A500564 |

and EEOC (if applicable)

**NAME** (Indicate Mr., Mrs., Ms)
Trafinna Wilson

**HOME TELEPHONE NO.** (Include Area Code)
(302) 999-1399

**STREET ADDRESS**
234 Locust Ave

**CITY, STATE AND ZIP CODE**
Wilmington DE 19805   NCC

**COUNTY**

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME** (If more than one, list below.)

**NAME**
Christiana Care Health Services

**NO. OF EMPLOYEES OR MEMBERS** 100+

**TELEPHONE NUMBER** (Incl. Area Code)
(302) 623-0113

**STREET ADDRESS**
4755 Ogletown-Stanton Rd   PO Box 6001

**CITY, STATE AND ZIP CODE**
Newark, DE   19718-6001

**NAME**

**TELEPHONE NUMBER** (Include Area Code)

**STREET ADDRESS**

**CITY, STATE AND ZIP CODE**

☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE

☐ RETALIATION ☐ DISABILITY ☐ OTHER (Specify)

**DATE DISCRIMINATION TOOK PLACE**
**EARLIEST**   8/8/2005
**LATEST**   8/23/2005
☐ CONTINUING ACTION

**THE PARTICULARS ARE** (If additional space is needed, attached extra sheet(s):

Jurisdiction:  Charging Party worked for Respondent in Delaware since 03/16/98, most recently as a Biller

Charging Party's protected class:  Race (Black)

Adverse employment action:  Terms & Conditions, Discharge

Brief statement of allegations:  Charging Party alleges that she was subjected to disparate treatment by Respondent based upon her race. Charging Party alleges that Respondent wanted to give her job to another employee who is white. Charging Party alleges that on 08/08/05 Respondent came to her and requested that she voluntarily move to another position within the facility. Charging Party alleges she informed Respondent that she did not wish to change positions. The following day Charging Party states that she was again approached by her supervisor and asked if she had changed her mind about moving to another position. Charging Party again denied the offer to move positions. Charging Party states that she was then called into her supervisor's supervisor office and indirectly threatened that if she continued to voluntarily disagree to being moved to another position that her employment could be in jeopardy. The statement made by this supervisor was "If you continue to resist things could be worse". Immediately following this meeting a staff meeting was held where all employees were informed that as of 8/15/05 changes would occur within the department that would effect some employee's positions. Charging Party alleges that after this conversation and staff meeting she went to HR with the issue of her being moved to another position and was informed that she could not just be moved to another position. After Charging Party spoke to HR, Respondent did not again request that Charging Party move positions. On 8/15/05 only one of the effected staff members had a change in positions, the other changes which would have directly effected Charging Party did not occur. Charging Party alleges that without any previous notice or warning Respondent then terminated her employment on 8/23/05. Charging Party believes this termination was because of her race and Respondent's desire to put a white co-worker into her position.

Respondent's explanation:  Terminated for excessive telephone and internet usage

Applicable law(s):  Title VII of the Civil Rights Act of 1964 as ammended and the Delaware Discrimination in Employment Act

Comparator(s) or other specific reason(s) for alleging discrimination:  Terry Eastburn (W/F) was infomed she would be taking Charging Party's position and that Charging Party would be demoted to Ms. Eastburns position; Charging Party was informed by HR that this change in positions would actually be a demotion for Charging Party because of the difference in paygrades

Additional information and verification of these facts are provided by the attached Verification.

A-252

| ☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SIGNATURE OF COMPLAINANT   _Trafinna Wilson_   9/20/05 |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |

## VERIFICATION
Pursuant to Title 19 Del. C. § 712(c)(1)

State of Delaware )

_____ County )    ss:

)

I, _Trafinna Wilson_, swear or affirm that I have read the Charge of Discrimination and that it is true to the best of my knowledge, information and belief.

I further agree to advise the agencies involved if I change my address or telephone number, and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

In addition to the facts set forth in the Charge of Discrimination, I hereby aver the following: (optional; do not include witness information)

_No additional information_

_____
Charging Party's Verification Signature

**SWORN TO AND SUBSCRIBED** before me this 20th day of _September_, 2005.

_____
Notary Public/Attorney at Law

THOMAS J. SMITH
NOTARY PUBLIC, STATE OF DELAWARE
Commission Expires _1/26/07_

A-253

*The Department of Labor Discrimination Program provides the following excerpt from 19 Del. C. § 710, et seq. as a detailed description of the administrative process. If you need legal advice, please seek your own independent legal counsel.*

## § 712 Enforcement provisions; powers of the Department; administrative process.

(c) The administrative process requires the following:

(1) Statute of limitation and filing procedure. Any person claiming to be aggrieved by a violation of this chapter shall first file a Charge of Discrimination within 120 days of the alleged unlawful employment practice or its discovery, setting forth a concise statement of facts, in writing, verified and signed by the Charging Party. The Department shall serve a copy of the verified Charge of Discrimination upon the named Respondent by certified mail. The Respondent may file an answer within twenty (20) days of its receipt, certifying that a copy of the answer was mailed to the Charging Party at the address provided.

(2) Preliminary findings and recommendations. The Department shall review the submissions within sixty (60) days from the date of service upon the Respondent and issue preliminary findings with recommendations. The preliminary findings may recommend: (i) dismissing the Charge unless additional information is received which warrants further investigation; (ii) referring the case for mediation requiring the parties' appearance; or (iii) referring the case for investigation.

(3) Final determinations upon completion of investigation. After investigation, the Department shall issue a Determination of either "Reasonable Cause" or "No Reasonable Cause" to believe that a violation has occurred or is occurring. All cases resulting in a "Reasonable Cause" Determination will require the parties to appear for compulsory conciliation. All cases resulting in a "No Cause" Determination will receive a corresponding Delaware Right to Sue Letter.

(4) Confidentiality of the Department's process. The Department shall not make public the charge of discrimination or information obtained during the investigation of a charge. This provision does not apply to disclosures made to the parties, their counsel, or witnesses where disclosure is deemed necessary or appropriate. Nothing said or done during and as a part of the mediation or conciliation efforts may be made public by the Department, its officers or employees or used by any party as evidence in a subsequent proceeding without the written consent of the persons concerned.

(5) End of administrative process. In all cases where the Department has dismissed the Charge, issued a No Cause Determination or upon the parties failed conciliation efforts, the Department shall issue a Delaware Right to Sue Notice, acknowledging the Department's termination of the administrative process. Once the Department has issued its preliminary findings pursuant to subsection (2), the Department, in its discretion, may grant a Delaware Right to Sue Notice to a Charging Party.

UC-303
Document 60-06/96/02/01



DELAWARE
DEPARTMENT OF
**LABOR**

DUoL
05-91⅔

DEC 20 2005



DIVISION OF UNEMPLOYMENT INSURANCE
APPEALS
4425 N. MARKET STREET
P. O. BOX 9950
WILMINGTON, DE 19809

## <u>REFEREE'S DECISION</u>

CLAIMANT

TRAFINA WILSON
234 LOCUST AVE.
WILMINGTON, DE 19805

<u>APPEAL DOCKET NUMBER:</u> 159869

<u>SOCIAL SECURITY NO.:</u> 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

<u>DATE OF CLAIM:</u>  9/4/05

<u>DATE OF APPEAL:</u> 10/05/05

<u>DATE OF HEARING:</u> 12/12/05

EMPLOYER

<u>PLACE OF HEARING:</u> WILMINGTON

CHRISTIANA CARE HEALTH SERV.
ATTN: A. WARNER
P.O. BOX 6001
    WARK, DE 19718

<u>DATE DECISION MAILED:</u> 12/15/05

<u>LAST DAY TO FILE APPEAL:</u> 12/25/05

---

### <u>RIGHT OF FURTHER APPEALS</u>

Section 3318, Title 19, Delaware Code, provides that any interested party involved, the claimant, the employer, or the Claims Deputy has a right of appeal from the decision of the Referee to the Unemployment Insurance Appeal Board, and further provides that the opinion of the Referee "shall be deemed to be the final decision of the Department of Labor unless within 10 days after the date of notification or mailing of such decision further appeal is initiated ..." You are, therefore, hereby notified that if an appeal is not made within the ten-day period specified by law, all further right to appeal is lost and the case cannot be reopened. The appeal may be made at the local office or directed to Department of Labor, Division of Unemployment Insurance, 4425 N. Market Street, P.O. Box 9950, Wilmington, DE 19809..

---

<u>APPEARANCES:</u>  STEPHANIE FITZGERALD, APPEALS REFEREE;  TRAFINNA WILSON, CLAIMANT; NOEL PRIMOS, CLAIMANT'S ATTORNEY; ADAM GERBER, OBSERVER; LARRY BRYSON, EMPLOYER'S WITNESS; MELINDA FITZGERALD, EMPLOYER'S WITNESS

<u>CLAIMS DEPUTY'S DETERMINATION:</u>   THE CLAIMANT WAS DISCHARGED FROM WORK FOR JUST CAUSE IN CONNECTION WITH THE WORK AND IS DISQUALIFIED FROM THE RECEIPT OF UNEMPLOYMENT BENEFITS.

<u>STATUTORY PROVISION INVOLVED:</u> Title 19, Delaware Code, Section 3314 (2)

EXHIBIT
WILSON-20
11/13/07-TB

A-255

2

APPEAL DOCKET NO.: 159869

## SUMMARY OF EVIDENCE

The claimant was employed as a billing representative for Christiana Care from March 16, 1998 until August 16, 2005 when she was separated from employment. The claimant worked full-time and earned $15.58 per hour.

Employer's witness, Larry Bryson testified that the employer has a progressive discipline policy that calls for relatively minor infractions to begin with coaching and progress onward, more serious infractions call for start at a higher level. The claimant did progress through different steps of discipline. The witness testified that for multiple infractions once a person starts with the first step any other infractions lead to the next step and so forth. The issues with the claimant involve the use of the telephone and the internet. The employer stated that the concern was the amount of time the claimant spent on the phone and internet. The use of the internet for none business related activity is usually a minor infraction, dependent on the amount of time the employee spends on the medium. If the time is excessive it may lead to a higher level of discipline. The claimant did progress through the employer's discipline policy and was discharged as a result.

Employer's witness, Melinda Fitzgerald testified that she spoke with the claimant about her attendance on April 7, 2003 in a verbal coaching session. The witness again talked to the claimant on June 16, 2003 and the claimant was placed on a first step reminder. Employees are allowed five lates in a twelve month rolling period. After the claimant's first step reminder, the claimant went to a second step reminder on October 28, 2003 for overall attendance. The claimant had thirteen occurrences of lateness at this time. The witness testified that the second step reminder stated that any further violation in two years would be reviewed for further disciplinary action up to and including termination. The employer received complaints from other employees about the claimant's use of the phone. The witness questioned the claimant about some phone calls and it was determined that the claimant was involved in personal calls. The claimant was placed on decision making leave for the personal phone calls. The decision making leave clearly stated that any further infraction within three years would be reviewed for termination. The claimant wrote a commitment letter expressing that she was committed to her job and understood her violations. After the decision making leave was rendered, in July of 2005, the employer received further complaints about the claimant on personal phone calls. The witness testified that she made an attempt to switch the claimant to a position where she would not be able to make personal calls. The claimant objected to the switch. The witness was told she could not force the switch. The witness testified that she then reviewed the phone records, which revealed numerous personal phone calls. The claimant was discharged for violating Christiana Care policy and exhaustion of the employer's progressive discipline policy. The employer did note that there is a typographical error on the employer's policy with respect to time frames under which employees receive discipline. The employer's witness acknowledged that most of the claimant's warnings for tardiness involved lateness of no more than a minute or two. The witness testified that the claimant did report to her that she had been on the phone for an excessive period of time on a personal call. During the one month period documented the

A-256

3

## APPEAL DOCKET NO.: 159869

claimant had twelve personal out going phone calls and seven incoming personal phone calls.

The claimant testified that there was one instance where she was more than two minutes late and it was because she was at Wilmington Hospital picking up documents for her job. The claimant testified that she thought employees had seven minutes grace period before management considered them as being late. The witness testified that she went to Ms. Fitzgerald's supervisor about her instances of lateness. The witness stated that the manager told her that there is a seven minute grace period. The witness testified that employees were not to arrive more than fifteen minutes prior to a scheduled shift. The claimant stated that her father passed away in January of 2005 and his illness was discovered in August of 2004. The claimant stated that the nature of her father's illness was not known but she did have a friend who was a geriatric nurse. The claimant stated that she called the friend and the friend would call her for support with regard to her father's illness. The claimant worked in the occupational health department for three years and some months. The claimant stated that in three years it was a common occurrence for employees to make personal phone calls. The claimant stated that when she was disciplined in 2005 for phone usage there was no indication at that time that she had been engaging in improper internet usage. The claimant stated that her discipline considered only her phone usage. The claimant stated that all the employees exchange emails that were funny of a personal nature. Employees emailed web addresses of items that they wanted other employees to see. The claimant stated that her supervisor Ms. Fitzgerald was part of the email exchange. The witness testified that the claimant's supervisor was also aware of the personal phone usage. The witness testified that the Ms. Fitzgerald approached her on August 8, 2005 about switching position. The claimant stated that she did not agree with the proposal and wanted to know why. The claimant stated that Ms. Fitzgerald told her that it was a management decision and that is what management had decided. The claimant stated that she contacted Human Resources to discuss what her position was in keeping her job. The claimant stated that she had an appointment with Human Resources a couple days later. The claimant stated that after she met with Mr. Bryson she discovered that it was not allowed that she be moved to another position. The claimant stated that she subsequently received information about the subsequent discipline for which the claimant was terminated. The claimant had a meeting with Ms. Fitzgerald's boss and she told the claimant the job would be a good opportunity for her. The claimant told the supervisor that she didn't want to do data entry. The supervisor told the claimant that she was lucky she had a job and that if the claimant did not comply with the request, things could be worse. The claimant stated that she found out a week later that she was being investigated for personal phone usage. The claimant stated that she did make some personal phone calls regarding her home purchase, some were to American Express regarding some credit, and some pertained to a trip the claimant paid for with a credit card. The claimant stated that at times she would be on a personal call and put the phone on hold and take business call. The witness testified that there were breaks provided by the employer where personal calls could be made. The claimant stated that she filled out her performance review and the employer approved her performance review. The claimant was consistently considered a key

4

APPEAL DOCKET NO.: 159869

contributor and that she met her performance expectations. It was indicated in the review that the claimant needed to limit her personal phone usage. The claimant stated that she had no idea that her job was in jeopardy. The claimant testified that other employees were involved in internet usage, which was excessive. The claimant further testified that other employees were making personal phone calls and did not receive the prescribed level of discipline.

## FINDINGS OF FACT

The claimant was employed as a billing representative for Christiana Care from March 16, 1998 until August 16, 2005 when she was separated from employment. The claimant worked full-time and earned $15.58 per hour.

The claimant received a first and second reminder in 2003 for her overall attendance. The claimant then received a decision making leave for idleness related to excessive time spent on personal telephone calls. The decision making leave notified the claimant that any further infractions of Christiana Care policy would be reviewed for termination, and the claimant signed the DML. The claimant was then asked to change to a position that required less telephone time. The claimant did not want to change her position and questioned human resources regarding the change. The claimant was advised by human resources that her supervisor could not change her position. The employer reviewed the claimant's phone records for July and August and discovered that the claimant had spent another six hours of work time on personal phone calls for those months. The employer discharged the claimant for excessive phone and internet usage and for exhausting all of the steps in the employer's progressive discipline policy.

## CONCLUSIONS OF LAW

TITLE 19, SECTION 3314(2), DELAWARE CODE, PROVIDES AS FOLLOWS:

AN INDIVIDUAL SHALL BE DISQUALIFIED FOR BENEFITS:

FOR THE WEEK IN WHICH THE INDIVIDUAL WAS DISCHARGED FROM THE INDIVIDUAL'S WORK FOR JUST CAUSE IN CONNECTION WITH THE INDIVIDUAL'S WORK AND FOR EACH WEEK THEREAFTER UNTIL THE INDIVIDUAL HAS BEEN EMPLOYED IN EACH OF 4 SUBSEQUENT WEEKS (WHETHER OR NOT CONSECUTIVE) AND HAS EARNED WAGES IN COVERED EMPLOYMENT EQUAL TO NOT LESS THAN 4 TIMES THE WEEKLY BENEFIT AMOUNT.

The issue in this case is whether the employer discharged the claimant without just cause. In a discharge case, the employer must show by a preponderance of the evidence that the claimant was discharged for just cause in connection with her work. Just cause exists

A-258

5

## APPEAL DOCKET NO.: 159869

where the claimant commits a willful or wanton act or engages in a willful or wanton pattern of conduct in violation of the employer's interest, her duty to the employer or her expected standard of conduct. Ordinarily for there to be a finding of willful or wanton misconduct, a prior unequivocal warning is required, putting the employee on clear notice that a repetition or continuation of certain behavior may lead to dismissal. The function of the warning is twofold. First, it provides the employee with the information she needs to conform her conduct to what is required and thereby keep her job. Second, it permits an inference of willful or wanton misconduct if the offending behavior is subsequently repeated.

The claimant received numerous warnings during her employment at Christiana Care for both tardiness and idleness. The claimant received a final warning for excessive personal telephone time. The claimant disregarded the employer's final warning and continued to use company time to conduct personal business. It is understood that other employees were discovered making personal phone calls as well, but these employees were not on final warning as was the claimant. The bottom line is that the claimant was warned that personal telephone usage was not permitted and the claimant ignored the warning and continued to use company time and resources to conduct her personal business. The claimant acknowledged that she had breaks throughout the day when she could have appropriately made her personal phone calls without violating company policy. The claimant acted in disregard of her employer's legitimate interests. The claimant's behavior was wanton misconduct and just cause for her discharge.

## DECISION

The decision of the claims deputy is **AFFIRMED**. The claimant was discharged from her work for just cause in connection with her work. She is **DISQUALIFIED** from the receipt of unemployment insurance benefits for the week in which she was discharged from her work for just cause in connection with her work and for each week thereafter until she has been employed in each of four subsequent weeks (whether or not consecutive) and has earned wages in covered employment equal to not less than four times the weekly benefit amount.

Stephanie Fitzgerald
Appeals Referee

A-259